# United States Bankruptcy Court

NORTHERN DISTRICT OF ILLINOIS
219 S. Dearborn Street
Chicago, IL 60604

**Kenneth S. Gardner**, Bankruptcy Clerk

Date    **August 14, 2008**

Michael Dobbins, Clerk
United States District Court
Northern District of Illinois
219 S Dearborn Street
Chicago, IL 60604

Case Number    **04A189**

## FILED

**AUG 1 4 2008**

**MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT**

Case Name    **Myler v Fields**

Notice of Appeal Filed    **July 9, 2008**

Appellant    **Charles J Myler**

Dear Sir:

Pursuant to **Bankruptcy Rule 8007** transmitted herewith is the Record on Appeal. The Record on Appeal consist of:

| | | |
|---|---|---|
| ✓ | Transmittal Letter and Civil Cover Sheet | |
| ✓ | Designation and Statement of Issues | |
| ✓ | Transcript of Proceeding | |
| ☐ | In Forma Pauperis | |

| | |
|---|---|
| ✓ | Notice of Appeal |
| ✓ | Copy of Documents Designated |
| ☐ | Exhibits |
| ☐ | Expedited Notice of Appeal |

Additional Items Included

☐ _____

**08CV4630
JUDGE GETTLEMAN
MAG. JUDGE MASON**

☐ **1** Total Volumes Transmitted

The following items will be transmitted as a supplemental to the Record on Appeal

☐ _____

Previous D C Judge _____

Case Number _____

By Deputy Clerk _____



IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

EOD FEB 0 5 2004

PAID

FEB 0 5 2004

| | |
|---|---|
| *In Re:* | ) Chapter 7 |
| | ) Bankruptcy No. 03 B 2... |
| ANTHONY FIELDS, | ) Judge Manuel Barbosa |
| | ) |
| Debtor. | ) |
| | ) |
| CHARLES J. MYLER, not individually but | ) Adversary No. |
| solely as trustee, | ) |
| Plaintiff, | ) **04A00189** |
| | ) |
| vs. | ) |
| | ) |
| ANTHONY FIELDS, RALPH BOOKER, | ) |
| VERNON WILLIAMS, and VERNON | ) |
| WILLIAMS ARCHITECTS, P.C., | ) |
| LAKEVIEW REAL ESTATE DEVELOP- | ) |
| MENT CO., and PARKWAY BANK, | ) |
| | ) |
| Defendants. | ) |

KENNETH S. GARDNER, CLERK
UNITED STATES BANKRUPTCY COURT
BY...

KENNETH S. GARDNER, CLERK
PS REP. - FR

### ADVERSARY COMPLAINT BY BANKRUPTCY TRUSTEE
### TO DETERMINE THE INTEREST OF DEBTOR AND
### OTHER CLAIMANTS IN REAL PROPERTY

**NOW COMES** plaintiff, Charles J. Myler, not individually but as trustee in bankruptcy for

Anthony Fields ("Trustee"), by and through his attorneys, Charles J. Myler, Richard G. Larsen and

Myler, Ruddy & McTavish, and for his adversary complaint against the captioned defendants,

alleges as follows:

### PARTIES

1.     Plaintiff, Charles J. Myler, is the duly appointed and acting trustee ("trustee") in

bankruptcy for the estate of the debtor, Anthony Fields.

2.     Defendant, Anthony Fields, is the debtor herein who asserts that he is the legal owner

of property located in Chicago, Illinois, described hereafter ("subject property").

3.     Defendant, Ralph Booker, asserts that he retains an interest or ownership of the

subject property.

4.     Vernon Williams and Vernon Williams Architects P.C. assert an interest in the

property by reason of a mechanic's lien for services performed for Anthony Fields related to

planning and development of the subject property.

5.   Lakeview Real Estate Development Co. asserts an interest in the subject property by reason of a mechanic's lien.

6.   Parkway Bank has provided the plaintiff trustee with documentation that confirms that the Parkway Bank is the holder of a valid and subsisting first mortgage on the property or a portion thereof. By reason of its mortgage, said bank is a necessary party to this proceeding.

## JURISDICTION

7.   This adversary proceeding is brought pursuant to Bankruptcy Rule 7001(2) to determine the validity, priority or extent of a lien or other interest of the plaintiff and the other defendants in the subject property.

8.   This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§157(b) and 1334(b) and (d) and Local Rule 2.33 of the United States District Court for the Northern District of Illinois because the claims stated herein arise under Title 11 of the United States Code and are related to the debtor's case under Title 11 of the United States Code.

9.   The adversary complaint constitutes a core proceeding within the meaning of 28 U.S.C. §§157(b)(2)(A)(H)(J) and (O).

## ALLEGATIONS REGARDING TRUSTEE'S COMPLAINT FOR DECLARATORY JUDGMENT PURSUANT TO BANKRUPTCY RULE 7001(2)

10.   The debtor, Anthony Fields, is the legal title holder of the subject property which is a parcel comprised of realty located in the 900 block of Kenwood Avenue, Chicago, Illinois. A legal description of the property is attached hereto as Exhibit A.

11.   The entire subject property is subject to a condemnation proceeding in the Circuit Court of Cook County, Illinois, Law Division, entitled City of Chicago vs. Anthony Fields, et al., 03 L 050630. The subject property is designated as parcel 7-14 of the North Kenwood/Oakland Project.

12.   Defendant Ralph Booker ("Booker") asserts that he is a former owner of the property

who deeded the subject property to the debtor in 2000. Booker alleges that he was defrauded by the debtor in conveying the property and that he is now entitled to recision of the transfer or other relief.

13.    Vernon Williams and Vernon Williams Architects P.C. are architects and planners who were involved with the debtor in the development and planning of a proposed hotel and convention center on the subject property and who have filed an Illinois mechanic's lien on the premises which asserts priority over claims of the bankruptcy estate and any other claim. The validity, priority and extent of the mechanic's lien claim of these defendants, including the issue as to whether the property was enhanced by their services, should be declared and resolved by this proceeding.

14.    Lakeview Real Estate Development Co. has also filed a mechanic's lien in this proceeding. The plaintiff trustee believes that this defendant is actually an entity owned and operated by the debtor and the validity, priority and extent of this lien, including the issue as to whether the property was enhanced by its services, should be declared and resolved by the court.

15.    Parkway Bank is the holder of a first mortgage on the subject property. The priority and extent of the Parkway Bank mortgage should be resolved and determined.

16.    Plaintiff/trustee, on behalf of the bankruptcy estate, asserts that the bankruptcy estate has a priority interest in the subject property, inferior only to the aforesaid Parkway Bank first mortgage and any valid and subsisting federal tax lien at the time of bankruptcy filing. The validity and priority of the interest of the bankruptcy estate in the subject property and any proceeds of condemnation acquisition should be resolved, declared and determined by the bankruptcy court in this proceeding.

17.    By reason of the foregoing an actual controversy exists between all of the foregoing parties as to the validity, priority and extent of their liens or other interest in the subject property by reason of which the trustee brings this declaratory judgment proceeding.

**WHEREFORE**, Charles J. Myler, trustee in bankruptcy, prays for a declaratory judgment in this proceeding determining and declaring the validity, priority and extent of the foregoing parties

in the subject property and/or the proceeds of any eminent domain acquisition of the property by the City of Chicago, and for such other relief as the court deems fit.

**DATED:** this 4th day of February, 2004.

Charles J. Myler, Trustee in Bankruptcy

By: _____
One of his attorneys

Charles J. Myler, ARDC#2008602
Richard G. Larsen, ARDC#6193054
MYLER, RUDDY & MCTAVISH
Attorneys for Trustee
111 West Downer Place, Suite 400
Aurora, Illinois 60506
(630)897-8475
(630)897-8076 Fax

PARCEL 1:

A PARCEL OF LAND BEING THE EAST 80 FEET OF THE SOUTH 100 FEET OF LOT 10 IN BLOCK 3 IN CLEAVERVILLE (SO CALLED) A SUBDIVISION OF THE NORTH 71 AND 20/100 ACRES OF FRACTIONAL SECTION 2, TOWNSHIP 38 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, AND 20 ACRES OF THE SOUTHEAST PART OF FRACTIONAL SECTION 35, TOWNSHIP 38 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTH EAST CORNER OF SAID LOT 10, THENCE WESTERLY ALONG THE NORTH LINE OF OAKWOOD BOULEVARD 80 FEET;  THENCE NORTHERLY ON A LINE PARALLEL WITH THE EAST LINE OF SAID LOT 10 A DISTANCE OF 100 FEET; THENCE EASTERLY ON A LINE PARALLEL WITH THE NORTH LINE OF OAKWOOD BOULEVARD 80 FEET TO THE ILLINOIS CENTRAL RAILROAD COMPANY'S RIGHT OF WAY LINE; THENCE SOUTHERLY ALONG SAID WESTERLY RIGHT OF WAY LINE TO THE PLACE OF BEGINNING, IN COOK COUNTY, ILLINOIS.

PARCEL 2:

LOT 6 IN MARY A. HOAGLAND'S SUBDIVISION OF THAT PART OF THE SOUTH 100 FEET OF LOTS 10 AND 11 IN BLOCK 3 IN CLEAVERVILLE IN SECTION 35, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS:

COMMENCING AT A POINT ON THE SOUTH LINE OF LOT 10, 80 FEET WESTERLY OF THE SOUTHEAST CORNER OF SAID LOT 10; THENCE NORTHERLY 100 FEET TO A POINT 80 FEET WEST OF A POINT IN THE EAST LINE OF SAID LOT 10, 100 FEET NORTHERLY OF THE SOUTHEAST CORNER OF LOT 10; THENCE WESTERLY TO A POINT IN THE WEST LINE OF LOT 11 100 FEET NORTHERLY OF THE SOUTHWEST CORNER OF SAID LOT 11; THENCE SOUTHERLY ALONG THE WEST LINE OF LOT 11 100 FEET TO THE SOUTHWEST CORNER OF SAID LOT 11; THENCE EASTERLY ALONG THE SOUTH LINE OF LOTS 10 AND 11 TO THE POINT OF BEGINNING IN COOK COUNTY, ILLINOIS.

PARCEL 3:

LOTS 1, 2, 3, 4, AND 5 IN MARY A. HOAGLAND'S SUBDIVISION OF THAT PART OF THE SOUTH 100 FEET OF LOTS 10 AND 11 IN BLOCK 3 IN CLEAVERVILLE IN SECTION 35, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN IN COOK COUNTY, ILLINOIS.



EXHIBIT

A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

IN RE: )  Chapter 7
  )  Bankruptcy No. 03 B 21620
ANTHONY FIELDS, )  Judge Manuel Barbosa
  )
           Debtor, )
  )
_____ )
CHARLES J. MYLER, not individually but )  Adversary No. 04 A 00189
solely as trustee, )
  )
           Plaintiff, )
  )
    vs. )
  )
ANTHONY FIELDS, RALPH BOOKER, )
VERNON WILLIAMS, and VERNON )
WILLIAMS ARCHITECTS, P.C., )
LAKEVIEW REAL ESTATE DEVELOP- )
MENT CO., and PARKWAY BANK, )
  )
           Defendants. )

### ANSWER TO ADVERSARY COMPLAINT

Defendants, VERNON WILLIAMS ("Williams") and VERNON WILLIAMS

ARCHITECTS, P.C., ("VWA") by their attorneys, BROTHERS & THOMPSON, P.C., answer

the Trustee's Adversary Complaint as follows:

### PARTIES

1.    Plaintiff, Charles J. Myler, is the duly appointed and acting trustee ("trustee") in
bankruptcy for the estate of the debtor, Anthony Fields.

**ANSWER:**    Williams and VWA are without knowledge or information sufficient to form a

belief as to the truth of the allegations contained in this paragraph.

2.    Defendant, Anthony Fields, is the debtor herein who asserts that he is the legal
owner of property located in Chicago, Illinois, described hereafter ("subject property").

**ANSWER:**    Williams and VWA admit the allegations contained in this paragraph.

3.    Defendant, Ralph Booker, asserts that he retains an interest or ownership of the subject property.

**ANSWER:**    Williams and VWA are without knowledge or information sufficient to form a

belief as to the truth of the allegations contained in this paragraph.

4.    Vernon Williams and Vernon Williams Architects P.C. assert an interest in the property by reason of a mechanic's lien for services performed for Anthony Fields related to planning and development of the subject property.

**ANSWER:**    Williams and VWA admit that VWA entered into an Architect Agreement with

Lakeview Real Estate Development Company to design a hotel on the subject

property.  Williams and VWA further admit that architectural services were

performed, but payment for said services were never made.  Thereafter, VWA

filed an architect's lien on the property to secure payment.  Williams and VWA

deny the remaining allegations contained in this paragraph.

5.    Lakeview Real Estate Development Co. asserts an interest in the subject property by reason of a mechanic's lien.

**ANSWER:**    Williams and VWA are without knowledge or information sufficient to form a

belief as to the truth of the allegations contained in this paragraph.

6.    Parkway Bank has provided the plaintiff trustee with documentation that confirms that the Parkway Bank is the holder of a valid and subsisting first mortgage on the property or a portion thereof.  By reason of its mortgage, said bank is a necessary party to this proceeding.

**ANSWER:**    Williams and VWA are without knowledge or information sufficient to form a

belief as to the truth of the allegations contained in this paragraph

2

## JURISDICTION

7.   This adversary proceeding is brought pursuant to Bankruptcy Rule 7001(2) to determine the validity, priority or extent of a lien or other interest of the plaintiff and the other defendants in the subject property.

**ANSWER:**   Williams and VWA admit the allegations contained in this paragraph.

8.   This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§157(b) and 1334(b) and (d) and Local Rule 2.33 of the United States District Court for the Northern District of Illinois because the claims stated herein arise under Title 11 of the United States Code and are related to the debtor's case under Title 11 of the United States Code.

**ANSWER:**   Williams and VWA admit the allegations contained in this paragraph.

9.   The adversary complaint constitutes a core proceeding within the meaning of 28 U.S.C. §§157(b)(2)(A)(H)(J) and (O).

**ANSWER:**   Williams and VWA admit the allegations contained in this paragraph.

### ALLEGATIONS REGARDING TRUSTEE'S COMPLAINT
### FOR DECLARATORY JUDGMENT
### PURSUANT TO BANKRUPTCY RULE 70019(2)

10.   The debtor, Anthony Fields, is the legal title holder of the subject property which is a parcel comprised of realty located in the 900 block of Kenwood Avenue, Chicago, Illinois. A legal description of the property is attached hereto as Exhibit A.

**ANSWER:**   Williams and VWA admit the allegations contained in this paragraph.

11.   The entire subject property is subject to a condemnation proceeding in the Circuit Court of Cook County, Illinois, Law Division, entitled City of Chicago vs. Anthony Fields, et al., 03 L 050630.   The subject property is designated as parcel 7-14 of the North Kenwood/Oakland Project.

**ANSWER:**   Williams and VWA admit the allegations contained in this paragraph.

12.   Defendant Ralph Booker ("Booker") asserts that he is the former owner of the property who deeded the subject property to the debtor in 2000.  Booker alleges that he was defrauded by the debtor in conveying the property and that he is now entitled to recision[sic] of the transfer or other relief.

3

**ANSWER:**   Williams and VWA are without knowledge or information sufficient to form a

belief as to the truth of the allegations contained in this paragraph.

13.    Vernon Williams and Vernon Williams Architects P.C. are architects and planners who were involved with the debtor in the development and planning of a proposed hotel and convention center on the subject property and who have filed an Illinois mechanic's lien on the premises which asserts priority over claims of the bankruptcy estate and any other claim. The validity, priority and extent of the mechanic's lien claim of these defendants, including the issue as to whether the property was enhanced by their services, should be declared and resolved by this proceeding.

**ANSWER:**   Williams and VWA admit that VWA designed a hotel and convention center to

be located on the subject property. Williams and VWA further admit that VWA

has filed a valid architect's lien on the subject property which asserts priority

over claims of the bankruptcy estate and any other claim. Williams and VWA

deny the remaining allegations of this paragraph.

14.    Lakeview Real Estate Development Co. has also filed a mechanic's lien in this proceeding. The plaintiff trustee believes that this defendant is actually an entity owned and operated by the debtor and the validity, priority and extent of this lien, including the issue as to whether the property was enhanced by its services, should be declared and resolved by the court.

**ANSWER:**   Williams and VWA are without knowledge or information sufficient to form a

belief as to the truth of the allegations contained in this paragraph.

15.    Parkway Bank is the holder of a first mortgage on the subject property. The priority and extent of the Parkway Bank mortgage should be resolved and determined.

**ANSWER:**   Williams and VWA are without knowledge or information sufficient to form a

belief as to the truth of the allegations contained in this paragraph.

16.    Plaintiff/trustee, on behalf of the bankruptcy estate, asserts that the bankruptcy estate has a priority interest in the subject property, inferior only to the aforesaid Parkway Bank first mortgage and any valid and subsisting federal tax lien at the time of bankruptcy filing. The validity and priority of the interest and subsisting federal tax lien at the time of bankruptcy

4

filing. The validity and priority of the interest of the bankruptcy estate in the subject property and any proceeds of condemnation acquisition should be resolved, declared and determined by the bankruptcy court in this proceeding.

**ANSWER:**    Williams and VWA deny the allegations contained in this paragraph.

17.    By reason of the foregoing an actual controversy exists between all of the foregoing parties as to the validity, priority and extent of their liens or other interest in the subject property by reason of which the trustee brings this declaratory judgment proceeding.

**ANSWER:**    Williams and VWA admit the allegations contained in this paragraph.

## AFFIRMATIVE DEFENSES

Vernon Williams ("Williams") and Vernon Williams Architects P.C. ("VWA") present the following affirmative defenses.

## FIRST AFFIRMATIVE DEFENSE

The doctrine of *res judicata* prevents the trustee from re-litigating the question of whether VWA's lien is valid. The debtor previously filed an adversary complaint against Williams and VWA which sought to invalidate VWA's architect's lien. See Case No. 03 A 01969. On August 27, 2003, the Court entered an order dismissing the adversary complaint for want of prosecution. Pursuant to Rule 7041 of the Federal Rules of Bankruptcy Procedure and Rule 41 of the Federal Rules of Civil Procedure, a dismissal for want of prosecution "operates as an adjudication upon the merits." FRCP 41(b). Therefore, the trustee cannot re-litigate the validity of VWA's lien.

## SECOND AFFIRMATIVE DEFENSE

The adversary complaint should not include Williams, individually. The lien in question was filed by VWA.

5

WHEREFORE, Williams and VWA pray for an order declaring VWA's architect lien to be valid and superior to the claims of the bankruptcy estate.

VERNON WILLIAMS and
VERNON WILLIAMS ARCHITECTS, P.C.

BY: _____
One of Their Attorneys

Ronald Austin, Jr. (Atty. No. 06242453)
**BROTHERS & THOMPSON, P.C.**
100 West Monroe Street
Suite 1700
Chicago, Illinois 60603
(312) 372-2909

6

## SERVICE LIST

Stacey Johnson
Law Offices of Joseph V. Roddy
77 West Washington
Chicago, Illinois 60602

Mr. Charles J. Myler, Trustee
Myler, Ruddy and McTavish
Old Second National Bank Building
111 West Downer Place
Aurora, Illinois 60506

Miles Cohen
Scott & Kraus, L.L.C.
150 South Wacker Drive
Suite 2900
Chicago, Illinois 60606

Rick Taylor
Assistant Corporation Counsel
City of Chicago
Real Estate and Land Use Division
30 North LaSalle Street,  Room 1610
Chicago, Illinois 60602

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 7 |
| | ) | Bankruptcy No. 03 B 21620 |
| ANTHONY FIELDS, | ) | Judge Manuel Barbosa |
| | ) | |
| Debtor, | ) | |
| | ) | |
| CHARLES J. MYLER, not individually but | ) | Adversary No. 04 A 00189 |
| solely as trustee, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | |
| ANTHONY FIELDS, RALPH BOOKER, | ) | |
| VERNON WILLIAMS, VERNON | ) | |
| WILLIAMS ARCHITECTS, P.C., | ) | |
| LAKEVIEW REAL ESTATE DEVELOP- | ) | |
| MENT CO., and PARKWAY BANK, | ) | |
| | ) | |
| Defendants. | ) | |

## VERNON WILLIAMS AND VERNON WILLIAMS ARCHITECTS, P.C.'S MOTION AND MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Vernon Williams ("Williams") and Vernon Williams Architects, P.C. ("VWA") by and through their attorneys move this Honorable Court for summary judgment in their favor and against the Trustee. In support this motion, Williams and VWA present the following memorandum.

### INTRODUCTION

On February 5, 2004, the Trustee filed an adversary complaint against Williams and VWA challenging the validity of VWA's Architect's Notice and Claim for Lien ("Claim for Lien"). On March 3, 2004, Williams and VWA filed an Answer to the Adversary Complaint. The Answer included an Affirmative Defense for *res judicata* based on the fact that the Debtor previously filed an adversary complaint challenging the validity of the Claim for Lien.

On July 27, 2007, the Trustee filed a Motion for Partial Summary Judgment against VWA and Williams. In response, VWA and Williams argued that the motion should be denied because the doctrine of *res judicata* precluded the Trustee from re-litigating the question of whether the Claim for Lien is valid. On November 8, 2007, this Court denied the Trustee's Motion for Partial Summary Judgment. The Opinion states that "Because the pleadings on their face raise a question as to whether the doctrine of *res judicata* govern the outcome of the present case, the motion for summary judgment is denied without prejudice at this time." Opinion p. 3. Now the Trustee seeks to set a trial date on his Adversary Complaint. However, the legal question of whether the Trustee's Adversary Complaint is barred by *res judicata* has yet to be resolved. Because the question of whether *res judicata* applies in this case is dispositive, Williams and VWA have filed the present motion to resolve this critical question of law.

## STATEMENT OF FACTS

Williams is a licensed architect and the owner of VWA. Fact, ¶ 1.[1] In 1999, Debtor contacted Williams regarding the Debtor's plan to build a Howard Johnson Hotel on property owned by Debtor on Oakwood Blvd. in Chicago (the "Property"). Fact, ¶ 2. On October 6, 1999, Williams drafted a proposal for the Debtor to give him an estimated cost for VWA's architectural services. Fact, ¶ 3. The Debtor accepted the proposal and on December 1, 1999, VWA entered into a STANDARD FORM OF AGREEMENT BETWEEN OWNER AND ARCHITECT WITH STANDARD FORM OF ARCHITECT'S SERVICES ("Contract") with Lakeview Real Estate Development Company ("Lakeview"). Williams signed the contract on behalf of VWA and the Debtor signed the contract on behalf of Lakeview. Fact, ¶ 3.

---

[1] References to "Fact, ¶ ___" are to Williams and VWA's Statement of Material Facts.

2

From December 10, 1999 through June 21, 2001, VWA performed the following services pursuant to the Contract: drafted a proposed project schedule; prepared a zoning analysis; created grade level and street level site plans; drafted a document entitled "Background Material For Proposed Lakeview Howard Johnson Hotel;" and created nearly a dozen schematic designs. Fact, ¶ 4. On January 25, 2000, Williams met with Debtor and Alderman Toni Preckwinkle to present VWA's designs and to seek the alderman's support in re-zoning the property. Fact, ¶ 5. Subsequent to the meeting with Alderman Preckwinkle, VWA continued to create schematic designs for the project, Williams participated in numerous telephone conferences and meetings with the Debtor and his attorney regarding the zoning issues, and Williams met several times with representatives from Draper and Kramer regarding financial issues related to the project. Fact, ¶ 5.   In all, VWA spent 159 hours on the project. Fact, ¶ 5.

From December 1999 through June 2003, VWA submitted invoices to the Debtor for the work performed, however none of VWA's invoices were ever paid. Fact, ¶ 6. On January 10, 2002, VWA filed an Architect's Notice and Claim for Lien ("Claim for Lien") against Lakeview in the amount of $43,012.69. Fact, ¶ 7. To date, only the $5,000.00 retainer has been paid to VWA. Fact, ¶ 6.

On May 15, 2003, the Debtor filed bankruptcy under Chapter 11, and on June 10, 2003, Debtor filed an adversary complaint against Williams and VWA seeking to invalidate VWA's mechanic's lien. Fact, ¶ 13. On or about June 20, 2003, the Debtor filed a motion for summary judgment on his adversary complaint. Fact, ¶ 14. After a hearing, the court denied the Debtor's motion for summary judgment and set a trial date for August 27, 2003. Fact, ¶ 14. On August 27, 2003, Debtor informed the court that he was not prepared to proceed with the trial. Accordingly, the

3

court dismissed the Debtor's adversary complaint for want of prosecution. Fact ¶ 14. Also on August 27, 2003, the court converted the Debtor's Chapter 11 case to a Chapter 7 case. Fact, ¶ 15. On February 5, 2004, Charles J. Myler, the Chapter 7 Trustee assigned to this case ("Trustee"), filed an adversary complaint against Williams and VWA again challenging the validity of VWA's Claim for Lien. Fact, ¶ 16. On March 3, 2004, Williams and VWA filed their Answer and Affirmative Defenses to the Trustee's Adversary Complaint. Fact, ¶ 17. The first Affirmative Defense alleges that the Trustee's Adversary Complaint is barred by *res judicata*. *Id.*

## STANDARD OF REVIEW

Summary judgment should be rendered if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Federal Rules of Civil Procedure Rule 56. In ruling on a motion for summary judgment, the court must "view the record and all possible inferences in the light most favorable to the non-moving party. *Elliott v. ITT Corp.*, 150 B.R. 36, 38 (N.D. Ill. 1992).

## ARGUMENT

Williams and VWA are entitled to judgment in their favor because the doctrine of *res judicata* precludes the Trustee from re-litigating the question of the validity of VWA's lien. The doctrine of *res judicata* ensures the finality of decisions. *In re National Industrial Chemical Co.*, 237 B.R. 437, 441 (N.D. Ill. 1999). It bars re-litigation of claims that were or could have been raised in an earlier proceeding. *Id; D&K Properties Crystal Lake v. Mutual Life Ins. Co.*, 112 F.3d 257, 259 (7th Cir. 1997); *Allen v. McCurry*, 449 US 90, 94, 101 S.Ct. 411, 414 (1980)("Under *res judicata*, a final judgment on the merits of an action precludes parties or their privies from relitigating issues

4

that were or could have been raised in that action.") *Res judicata* applies to proceedings in bankruptcy. *In re National Industrial Chemical Co,* 237 B.R. at 441. Usually, *res judicata* applies in bankruptcy where a contested matter or an adversary proceeding provided the opportunity to litigate a given claim. *Id.*

The three elements of *res judicata* are: (1) an identity of the causes of action; (2) an identity of the parties or their privies; and (3) a final judgment on the merits. *Id.* Here, all three elements of *res judicata* exist.

A.    Identity of the Causes of Action

"The Seventh Circuit determines identity of the causes of action using the 'same transaction' test." *Id; Car Carriers, Inc. v. Ford Motor Co.,* 789 F.2d 589, 593 (7th Cir. 1986). Under the same transaction test, a claim has identity with a previous claim where both claims arise from a single core of operative facts. *Id.; Brzostowski v. Laidlaw Waste Systems, Inc.,* 49 F.3d 337, 339 (7th Cir. 1995). "Two claims are one for purposes of *res judicata* if they are based on the same, or nearly the same, factual allegations." *In re National Industrial Chemical Co,* 237 B.R. at 441.

In the present matter, the Debtor's adversary complaint and the Trustee's adversary complaint both challenge the validity of VWA's Claim for Lien. Therefore, the two causes of action are identical for purposes of *res judicata*.

B.    Identity of the Parties

*Res judicata* requires that the prior cause of action and the present cause of action involve the same parties or their privies. "A nonparty is in privity with a party, when the party adequately represents the nonparty's legal interest in the first proceeding. It is the identity of interests that

5

controls in determining privity, not the nominal identity of the parties." *In re Estate of Royal*, 289 B.R. 913, 919 (N.D. Ill. 2003)(trustee and debtor were found to be in privity with one another).

Here, the Trustee and the Debtor are in privity because the Debtor's interest is identical to the interest of the Trustee. Both the Debtor and the Trustee want to invalidate VWA's Claim for Lien. If the Claim for Lien is stricken, the bankruptcy estate would benefit because there will be more money available for the creditors of the estate. Moreover, the Debtor was represented by counsel when he filed his adversary complaint seeking to invalidate VWA's Claim for Lien. Therefore, the interests of the Trustee were adequately represented in the Debtor's adversary case. Because the Trustee and the Debtor shared the same interest with respect to VWA's Claim for Lien, the Trustee is in privity with the Debtor for purposes of *res judicata*.

C.      Final Judgment on the Merits

On August 27, 2003, this Court, per Judge Susan Sonderby, dismissed the Debtor's adversary complaint for want of prosecution. Pursuant to Rule 7041 of the Federal Rules of Bankruptcy Procedure and Rule 41 of the Federal Rules of Civil Procedure, a dismissal for want of prosecution "operates as an adjudication upon the merits." FRCP 41; *Lester v. Brown*, 929 F. Supp. 291, 293 (N.D. Ill. 1996)(a dismissal for want of prosecution amounts to an adjudication on the merits); *Kimmel v. Texas Commerce Bank*, 817 F.2d 39 (7th Cir. 1987) (under Rule 41, a dismissal for failure to prosecute operates as an adjudication upon the merits for purposes of *res judicata*).

Because the three elements of *res judicata* are present in this matter, the Trustee is barred from re-litigating the issue of the validity of VWA's Claim for Lien. Accordingly, Williams and VWA are entitled to judgment as a matter of law.

6

## CONCLUSION

For the reasons stated herein, Williams and VWA pray for judgment in their favor and against the Trustee.

Respectfully submitted,

**VERNON WILLIAMS and VERNON WILLIAMS ARCHITECTS, P.C.**

s/ Ronald Austin, Jr.

Ronald Austin, Jr.
BROTHERS & THOMPSON, P.C.
100 W. Monroe Street, Suite 1700
Chicago, Illinois 60603
(312) 372-2909
ra2law@cs.com

7

## CERTIFICATE OF SERVICE

The undersigned certifies that on January 8, 2008, he caused VERNON WILLIAMS AND

VERNON WILLIAMS ARCHITECTS, P.C.'S MOTION AND MEMORANDUM IN SUPPORT

OF THEIR MOTION FOR SUMMARY JUDGMENT to be served on all counsel of record via the

Court's electronic filing system.


s/ Ronald Austin, Jr.

Ronald Austin, Jr.
BROTHERS & THOMPSON, P.C.
100 W. Monroe Street, Suite 1700
Chicago, Illinois 60603
(312) 372-2909
ra2law@cs.com

## INDEX OF ATTACHED CASES
## PURSUANT TO STANDING ORDER NO. 9

1.   *Elliott v. ITT Corp.*, 150 B.R. 36 (N.D. Ill. 1992)

2.   *In re National Industrial Chemical Co.*, 237 B.R. 437 (N.D. Ill. 1999)

3.   *D&K Properties Crystal Lake v. Mutual Life Ins. Co.*, 112 F.3d 257 (7th Cir. 1997)

4.   *Allen v. McCurry*, 449 US 90, 94, 101 S.Ct. 411 (1980)

5.   *Car Carriers, Inc. v. Ford Motor Co.*, 789 F.2d 589 (7th Cir. 1986)

6.   *Brzostowski v. Laidlaw Waste Systems, Inc.*, 49 F.3d 337 (7th Cir. 1995)

7.   *In re Estate of Royal*, 289 B.R. 913 (N.D. Ill. 2003)

8.   *Lester v. Brown*, 929 F. Supp. 291 (N.D. Ill. 1996)

9.   *Kimmel v. Texas Commerce Bank*, 817 F.2d 39 (7th Cir. 1987)

Westlaw.

150 B.R. 36
150 B.R. 36
**(Cite as: 150 B.R. 36)**

▷
Elliott v. ITT Corp.
N.D.Ill.,1992.

United States District Court, N.D. Illinois,
Eastern Division.
Zenovia ELLIOTT, on behalf of herself and all
others similarly situated, Plaintiff,
v.
ITT CORPORATION, formerly known as
International Telephone & Telegraph
Corporation; ITT Consumer Financial
Corporation; Aetna Finance Company, doing
business as ITT Financial Services, formerly
known as ITT Thorp Corporation; ITT Lyndon
Life Insurance Company; and American
Bankers Life Assurance Company of Florida,
Defendants.
**No. 90 C 1841.**

Dec. 4, 1992.

Debtor brought consumer class action against
creditors, challenging practice known as
"insurance packing." Defendant moved for
summary judgment, and debtor moved for class
certification. The District Court, Aspen, J., held
that: (1) Chapter 13 debtor's "confirmed" plan did
not bar debtor under res judicata from bringing
subsequent consumer class action; (2) failure of
debtor to disclose to creditors her consumer fraud
and related claims during prior Chapter 13 case
did not judicially estop her from subsequently
asserting claims; and (3) earlier state court class
action by debtor challenging legitimacy of debt on
ground that creditors violated Illinois Interest Act
by its use of the "Rule of 78's" involved different
issues than did subsequent consumer class action,
and thus, res judicata did not bar debtor wife's
claims.

Motions denied.

West Headnotes
[1] Bankruptcy 51 ⬀3715(10)

51 Bankruptcy
    51XVIII Individual Debt Adjustment
        51k3704 Plan
            51k3715 Acceptance and Confirmation
                51k3715(9) Effect
                    51k3715(10) k. Conclusiveness;
Res Judicata; Collateral Estoppel. Most Cited
Cases
Chapter 13 debtor's "confirmed" plan did not bar
debtor under res judicata from bringing
subsequent consumer class action challenging
debt covered by plan under the Illinois Consumer
Fraud Act, the Racketeer Influenced and Corrupt
Organizations Act (RICO) and the Federal Truth
in Lending Act. Ill.S.H.A. ch. 121 1/2 , ¶ 262; 18
U.S.C.A. § 1961 et seq.; Truth in Lending Act, §
125, 15 U.S.C.A. § 1635.

[2] Judgment 228 ⬀636

228 Judgment
    228XIV Conclusiveness of Adjudication
        228XIV(A) Judgments Conclusive in
General
            228k635 Courts or Other Tribunals
Rendering Judgment
                228k636 k. In General. Most Cited
Cases
Because requiring full investigation and
disclosure of possible claims would defeat
summary nature of Chapter 13, it would be
inappropriate to give confirmation of Chapter 13
plan res judicata effect with respect to underlying
claims.

[3] Judgment 228 ⬀636

228 Judgment
    228XIV Conclusiveness of Adjudication

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

150 B.R. 36
150 B.R. 36
(Cite as: 150 B.R. 36)

228XIV(A) Judgments Conclusive in General

228k635 Courts or Other Tribunals Rendering Judgment

228k636 k. In General. Most Cited Cases

Even if confirmed Chapter 13 plan did bar challenges to underlying claims, res judicata would not apply where confirmed plan has subsequently been dismissed, in light of debtor's absolute right to dismiss plan under Chapter 13; once plan is dismissed, plan is vacated and without res judicata effect. Bankr.Code, 11 U.S.C.A. § 1307(b).

**[4] Estoppel 156 ☞68(2)**

156 Estoppel
156III Equitable Estoppel
156III(B) Grounds of Estoppel
156k68 Claim or Position in Judicial Proceedings
156k68(2) k. Claim Inconsistent with Previous Claim or Position in General. Most Cited Cases

Failure of debtor to disclose to creditors her consumer fraud and related claims during prior Chapter 13 case did not judicially estop her from subsequently asserting claims; if anything, debtor's failure to disclose potential "insurance packing" claims against creditors hurt her financially, and there was evidence that debtor did not intentionally omit her claims against creditors, but was simply unaware that they existed.

**[5] Estoppel 156 ☞68(2)**

156 Estoppel
156III Equitable Estoppel
156III(B) Grounds of Estoppel
156k68 Claim or Position in Judicial Proceedings
156k68(2) k. Claim Inconsistent with Previous Claim or Position in General. Most Cited Cases

Doctrine of "judicial estoppel" precludes party from taking position in one proceeding that is inconsistent with position she or he took, and prevailed upon, in earlier proceedings.

**[6] Judgment 228 ☞828.12**

228 Judgment
228XVII Foreign Judgments
228k828 Effect of Judgments of State Courts in United States Courts
228k828.12 k. Identity of Parties and Issues in General. Most Cited Cases
(Formerly 228k828(3.24))

Earlier state court class action by debtor husband challenging legitimacy of debt on ground that creditors violated Illinois Interest Act by its use of the "Rule of 78's" involved different issues than did subsequent consumer class action brought by debtor wife against creditors alleging "insurance packing" in violation of Illinois Consumer Fraud Act, the Racketeer Influence and Corrupt Organizations Act (RICO), and the Federal Truth in Lending Act (TILA), and thus, res judicata did not bar debtor wife's claims. Ill.S.H.A. ch. 121 1/2 , ¶ 262; 18 U.S.C.A. § 1961 et seq.; Truth in Lending Act, § 125, 15 U.S.C.A. § 1635.

**[7] Judgment 228 ☞634**

228 Judgment
228XIV Conclusiveness of Adjudication
228XIV(A) Judgments Conclusive in General
228k634 k. Nature and Requisites of Former Adjudication as Ground of Estoppel in General. Most Cited Cases

Judicial decision is given "res judicata" effect where there is final judgment on merits in prior suit, identity of parties or their privies in two suits, and identity of claims in two suits.

**[8] Judgment 228 ☞677**

228 Judgment

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

150 B.R. 36
150 B.R. 36
(Cite as: 150 B.R. 36)

228XIV Conclusiveness of Adjudication
228XIV(B) Persons Concluded
228k677 k. Persons Represented by
Parties. Most Cited Cases
Generally, judgment in class action will only bind members of class with respect to common issues adjudicated.

**\*37** Andy Robert Norman, Daniel A. Edelman, Law Offices of Daniel A. Edelman, Lawrence Walner, Lawrence Walner & Associates, Ltd., Chicago, IL, and William H. Crowder, Crowder & Bedor, St. Paul, MN, for plaintiff.

Geraldine M. Alexis, Sidley & Austin, Robert Patrick Cummins, Kass A. Plain, Bickel & Brewer, Chicago, IL, for defendants.

Geraldine M. Alexis, Daniel Stephen Kelly, Sidley & Austin, Mark Andrew Yeager, Grippo & Elden, Robert Patrick Cummins, Kass A. Plain, Bickel & Brewer, Chicago, IL, for defendant, American Bankers Life Assurance Co. of Fla.

MEMORANDUM OPINION AND ORDER
ASPEN, District Judge:

Zenovia Elliott ("Elliott"), has brought a consumer class action against defendants ITT Corporation, ITT Consumer Financial Corporation, Aetna Finance Company, doing business as ITT Financial Services, ITT Lyndon Life Insurance Company, and against American Bankers Life Assurance Company of Florida [FN1], alleging that the defendants engaged in a practice known as "insurance packing." [FN2] Elliott brings her **\*38** claims pursuant to § 2 of the Illinois Consumer Fraud Act, the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq., and § 125 of the federal Truth in Lending Act. 15 U.S.C. § 1635. Plaintiff has moved for class certification, and, in the face of defendants' objection to her ability to represent the class, has also moved to amend the complaint to add another person as class representative. In addition to opposing class certification, defendants have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56(b) on the ground that Elliott's claims are barred by res judicata. For the following reasons, we deny plaintiffs' motions for class certification and leave to amend and deny defendants' motions for summary judgment.

> FN1. Because the disposition of the motions before this Court make it unnecessary to address issues which might be unique to American Bankers, we will refer to all defendants collectively as "defendants" or "ITT."

> FN2. Plaintiff defines "insurance packing" as the use of unfair and deceptive means to induce the purchase of insurance in connection with consumer credit transactions. Complaint at ¶ 1.

I. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Moreover, we must view the record and all possible inferences in the light most favorable to the non-moving party. See United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); Williams v. Williams Electronics, Inc., 856 F.2d 920, 922 (7th Cir.1988). Summary judgment should be denied "where there is reason to believe that the better course would be to proceed to a full trial." Anderson v. Liberty Lobby, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

II. Factual Background

On January 7, 1988, Elliott and her husband borrowed $2,000 from ITT. At the same time they were given a disclosure statement which

150 B.R. 36
150 B.R. 36
(Cite as: 150 B.R. 36)

reported that the purchase of insurance was not required to obtain the loan. In signing the statement, the Elliotts indicated that they did not want to purchase any insurance products. On January 13, 1988, Elliott and her husband executed a promissory note with ITT ("the Debt") and signed the same disclosure statement, this time indicating that they did want insurance.

Unable to work due to health problems, the Elliotts filed their first Chapter 13 bankruptcy petition on June 21, 1988. The Elliotts provided an income statement that listed their assets and liabilities and acknowledged the Debt as their single largest debt. The Elliotts did not assert or list any claims against ITT at this time. During the bankruptcy proceeding, the Elliotts took out a new loan without realizing that this was a violation of the Bankruptcy Code. In January, 1989, the first bankruptcy proceeding was dismissed.

On February 1, 1989, Mr. Elliott filed a second bankruptcy petition. In the Schedule for "Debts and Debtor's Proposed Plan of Dealing with Creditors," he did not dispute the Debt, listing it as "current and to be paid direct." On April 19, 1989, the Bankruptcy Court entered an order confirming the Chapter 13 Plan. The Order obligated Mr. Elliott to make 100% payment to all secured creditors. Moreover, on May 11, 1989, the Bankruptcy Court granted Mr. Elliott's motion for a Special Mortgage Order. The Order provided for 100% payment of the Debt, and required the trustee to make "current second mortgage payments" of $476.00 per month to ITT.

Some time after the second bankruptcy filing, the Elliotts became aware of their potential claims against ITT. Accordingly, on February 13, 1990, Mr. Elliott filed a lawsuit against ITT in the Circuit Court of Cook County, Illinois. He filed a class action challenging the legitimacy of debt on the ground that ITT violated the Illinois Interest Act by its use of the "Rule of 78's." On

February 22, 1990, Mrs. Elliott filed this class action in the Cook County Circuit Court.[FN3] On April 16, 1990, Mr. Elliott amended his schedule of debts to indicate that the Debt was disputed. However, to avoid the risk of losing his home, he continued to pay the Debt while pursuing his claims against ITT.

> FN3. The case was removed to this Court on March 29, 1990.

In its answer and affirmative defenses to the present case, ITT asserted that under the doctrine of *res judicata,* the previous bankruptcy orders estopped the Elliotts *39 from challenging the legality of the Debt. ITT also sought consolidation of the two law suits.

On August 17, 1990, the Elliotts moved to voluntarily dismiss the second bankruptcy proceeding. The court granted that motion, and on August 20, 1990, the Elliotts filed a third Chapter 13 petition, in which they disputed the amount owed to ITT. On November 19, 1990, the bankruptcy court entered an Order confirming the Chapter 13 Plan, again providing for payment of 100% of the Debt.

Mr. Elliott's class action against ITT did not fare well. Due to an adverse court ruling and passage of new legislation, Mr. Elliott's claim was effectively eliminated. Accordingly, he moved to voluntarily dismiss his complaint. On February 28, 1992, the court granted the motion and dismissed the claim with prejudice.

III. Discussion

A. Class Certification and Leave to Amend

Plaintiffs' motions for class certification and leave to amend the complaint to add another named

150 B.R. 36
150 B.R. 36
(Cite as: 150 B.R. 36)

plaintiff were referred to Magistrate Judge Joan B. Gottschall. On November 10, 1992, Magistrate Judge Gottschall filed and served upon the parties her Report and Recommendation concerning plaintiffs' motion for class certification and for leave to amend the complaint to add another named plaintiff. Magistrate Judge Gottschall recommended that both motions be denied.

After careful consideration of the motions for certification and amendment, the applicable memoranda of law, other relevant pleadings, the record, the Magistrate Judge's Report, and the plaintiffs' and defendants' objections thereto, this Court hereby adopts Magistrate Judge Gottschall's Report and Recommendation on the plaintiffs' motions for class certification and amendment of the complaint. Accordingly, plaintiffs' and defendants' objections to the Magistrate Judge's Report are overruled, and, for the reasons set forth in the Magistrate Judge's Report, plaintiffs' motions for class certification and for leave to amend the complaint are denied.

B. Summary Judgment

ITT claims that based on Elliott's Chapter 13 bankruptcy proceedings and her husband's dismissed state court case, her complaint is barred by *res judicata* and/or judicial estoppel. As discussed below, we do not agree. [FN4]

> FN4. American Bankers seeks to join ITT's motion for summary judgment, arguing that in is in privity with ITT for the purposes of *res judicata*. Because we deny ITT's motion, we need not address this issue.

(i) Effect of Prior Bankruptcy Proceedings

(a) *Res Judicata*

[1] The doctrine of *res judicata* "bars parties or their privies from litigating not only matters that in fact were raised and decided in an earlier suit involving the same cause of action and the same parties, but also all other matters that could have been raised in the earlier suit." *Hagee v. City of Evanston,* 729 F.2d 510, 512 (7th Cir.1984).

ITT argues that the Chapter 13 Confirmation and Special Mortgage Orders entered in the Elliotts' bankruptcy cases preclude subsequent lawsuits by Elliott regarding the underlying Debt. Moreover, defendants allege that because Elliott could have disputed the Debt at the confirmation hearing, she is now precluded from doing so. We disagree with these contentions.

[2] First, underlying debts are not "confirmed" in a Chapter 13 plan. Instead, a Chapter 13 plan confirms the manner in which the debtor will discharge his financial obligations. In fact, several bankruptcy courts have expressly ruled that *res judicata* does not bar a debtor who has confirmed a Chapter 13 plan from objecting to claims under the Truth-In-Lending Act ("TILA"). See *In re Woolaghan,* 140 B.R. 377, 380 (Bankr.W.D.Pa.1992) (In a section headed "Debtors are not precluded from objecting to a claim after confirmation of the Chapter 13 plan," the court stated that "[t]his court believes that 'when confirmation of a plan does not purport to treat a specific creditor in a way such that its *40 rights are determined and when determination of allowed claims is not necessary to a determination of whether the plan meets the standards of confirmation, confirmation is not an appropriate deadline for objection' to a claim.") citing 8 Colliers, § 3007.03 (15th Ed.); *In re Marshall,* 121 B.R. 814 (Bankr.C.D.Ill.1990) (holding that a TILA claim is not a compulsory counterclaim and is not barred by *res judicata* from being initiated after confirmation of a Chapter 13 plan). Accordingly, we do not find that Elliott is precluded from challenging the Debt by virtue of his prior bankruptcy proceedings.[FN5, FN6]

FN5. The special mortgage order did not pass upon the legitimacy of the Debt, but simply outlined the amount of the current mortgage payments to be made outside of the plan. Accordingly, it does not affect our finding.

FN6. Moreover, because Chapter 13 is a voluntary proceeding designed to expeditiously develop a plan for putting the debtor's fiscal house in order, there is little time for a debtor to thoroughly explore possible challenges to his underlying debts. *See In re Marshall,* 121 B.R. at 829. Because requiring full investigation and disclosure of possible claims would defeat the summary nature of Chapter 13, it would be inconsistent and inappropriate to give confirmation of a plan *res judicata* effect with respect to the underlying claims.

[3] Moreover, even if a confirmed Chapter 13 plan did bar challenges to the underlying claims, *res judicata* would not apply where the confirmed plan had been dismissed. Under Chapter 13, a debtor has an absolute right to dismiss the plan. 11 U.S.C. § 1307(b). Once a debtor dismisses the action, the confirmation of the plan is vacated and without *res judicata* effect. *See In re Nash,* 765 F.2d 1410, 1412-13 (9th Cir.1985) (debtors are not bound by the terms of a confirmed plan after dismissal); *In re Shaffer,* 48 B.R. 952 (Bankr.N.D.Ohio 1985) (unlike Chapter 11 proceedings, the rights of debtors and creditors are not fixed upon confirmation of the plan and *res judicata* should not apply where the debtor had the option of voluntarily dismissing their case). Here, the Elliotts voluntarily dismissed their second Chapter 13 plan. Accordingly, it no longer had any binding effect on either party and had no further *res judicata* effect.

## (b) Judicial Estoppel

[4][5] Alternatively, defendants assert that Elliott's prior bankruptcy proceedings bar this suit under a theory of judicial estoppel. The doctrine of judicial estoppel precludes a party from taking a position in one proceeding that is inconsistent with a position s/he took, and prevailed upon, in earlier proceedings. *Eagle Foundation, Inc. v. Dole,* 813 F.2d 798, 810 (7th Cir.1987). ITT contends that because Elliott did not disclose her claim against ITT in her schedule of debts and assets, she should be barred by judicial estoppel from manipulating the courts and asserting such a claim now. This argument fails for several reasons.

First, it is not clear how Elliott's failure to disclose her potential "insurance packing" claim against ITT allowed her to "prevail" in the bankruptcy proceedings. If anything, that "position" hurt her financially, as her confirmed plan obligated her to pay 100% of the Debt.

Second, and most importantly, the doctrine of judicial estoppel is an equitable doctrine designed to prevent parties from "play[ing] fast and loose with the court." *Pako Corp. v. Citytrust,* 109 B.R. 368, 373 (D.Minn.1989). Here, ITT contends that Elliott failed to disclose and assert her claims against ITT in three separate bankruptcy proceedings. However, there is certainly a genuine issue of material fact as to whether the failure to list possible claims against ITT constituted a "position" for the purposes of judicial estoppel.

Here, there is evidence that Elliott did not intentionally omit her claim against ITT in the schedules of debts and assets. Elliott's 12(n) Statement, Exh. A at ¶ 5. She was simply unaware that they existed. *Id.* As soon as her attorney discovered the potential claims, the Elliotts amended their schedule of debts. Given these circumstances, judicial estoppel is

150 B.R. 36
150 B.R. 36
**(Cite as: 150 B.R. 36)**

inapplicable.


### (ii) The Effect of the State Court Dismissal

[6][7][8] Finally, ITT argues that the dismissal of Mr. Elliott's state court action **\*41** with prejudice bars the present suit under *res judicata.*    A judicial decision is given *res judicata* effect when there is 1) a final judgment on the merits in the prior suit, 2) an identity of parties or their privies in the two suits, and 3) an identity of claims in the two suits. *Pirela v. Village of North Aurora,* 935 F.2d 909, 911 (7th Cir.1991), *cert. denied,* 502 U.S. 983, 112 S.Ct. 587, 116 L.Ed.2d 612 (1991). However, generally the judgment in a class action, such as Mr. Elliott's, will only bind the members of the class with respect to the common issues adjudicated.    *See Cooper v. Federal Reserve Bank of Richmond,* 467 U.S. 867, 880-81, 104 S.Ct. 2794, 2802, 81 L.Ed.2d 718 (1984) (Court permitted members of class to litigate individual claims based on same events involved in class action where issues presented were distinct from those adjudicated in the class action); *Benton v. Smith,* 157 Ill.App.3d 847, 510 N.E.2d 952, 109 Ill.Dec. 884 (1st Dist.1987). [FN7]


> FN7. The *Benton* court stated as follows: We also find that *res judicata* would not bar this action because the issues here could not have been raised in the earlier action.    Under defendants' theory, each member of the [ ] class should have been required to intervene to litigate the merits of any individual property claims that might have arisen during the relevant period.    Class actions are meant to determine common questions.    The introduction of individual property damage claims arising during the same period of time could defeat this purpose and make the class unmanageable. *Id.* 510 N.E.2d at 957, 109 Ill.Dec. at 889.

Here, Mr. Elliott certified a class alleging that ITT violated an Illinois statute by using the so-called "Rule of 78's."    That suit, which involved a class of plaintiffs affected by ITT's use of the "Rule of 78's," did not adjudicate the issues before the Court in the present action.    Accordingly, *res judicata* does not bar Elliott's claim.


### IV. Conclusion

For the foregoing reasons, we overrule plaintiffs' and defendants' objections to the Magistrate Judge's Report and Recommendation, deny plaintiffs' motions for class certification and for leave to file an amended complaint and deny defendants' motion for summary judgment.    It is so ordered.

N.D.Ill.,1992.
Elliott v. ITT Corp.
150 B.R. 36

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw.**

237 B.R. 437
237 B.R. 437
(Cite as: 237 B.R. 437)

**H**
In re National Indus. Chemical Co.
Bkrtcy.N.D.Ill.,1999.

United States Bankruptcy Court,N.D.
Illinois,Eastern Division.
In re NATIONAL INDUSTRIAL CHEMICAL
COMPANY, Debtor.
Louis C. Johns, Plaintiff,
v.
Catherine Steege, not individually but solely as
the Chapter 7 trustee of National Industrial
Chemical Company and the City of Chicago, a
municipal corporation, Defendants.
**Bankruptcy No. 94 B 24486.**
**Adversary No. 97 A 01630.**

July 13, 1999.

Creditor sued for declaratory judgment that
Chapter 7 debtor was, in fact, the owner drums
which contained hazardous waste, and was
obligated to remediate environmental problem. On
trustee's motion for summary judgment, the
Bankruptcy Court, Erwin I. Katz, J., held that
creditor who, in previous bankruptcy case, had
withdrawn with prejudice its administrative claim
for costs of remediating environmental problems
associated with these drums was barred, under
doctrine of res judicata, from thereafter suing for
declaratory judgment that debtor did, in fact, own
drums and was obligated to remediate problem.

Summary judgment for defendant.
West Headnotes
**[1] Judgment 228 ☞713(2)**

228 Judgment
    228XIV Conclusiveness of Adjudication
        228XIV(C) Matters Concluded
            228k713 Scope and Extent of Estoppel
in General
            228k713(2) k. Matters Which Might
Have Been Litigated. Most Cited Cases

**Judgment 228 ☞720**

228 Judgment
    228XIV Conclusiveness of Adjudication
        228XIV(C) Matters Concluded
            228k716 Matters in Issue
            228k720 k. Matters Actually
Litigated and Determined. Most Cited Cases
Doctrine of res judicata ensures the finality of
decisions by barring the relitigation of claims that
were or could have been raised in earlier
proceeding.

**[2] Judgment 228 ☞713(2)**

228 Judgment
    228XIV Conclusiveness of Adjudication
        228XIV(C) Matters Concluded
            228k713 Scope and Extent of Estoppel
in General
            228k713(2) k. Matters Which Might
Have Been Litigated. Most Cited Cases
Res judicata bars litigation of all grounds for, or
defenses to, recovery that were previously
available to the parties, regardless of whether they
were asserted or determined in the prior
proceeding.

**[3] Judgment 228 ☞636**

228 Judgment
    228XIV Conclusiveness of Adjudication
        228XIV(A) Judgments Conclusive in
General
            228k635 Courts or Other Tribunals
Rendering Judgment
            228k636 k. In General. Most Cited
Cases

237 B.R. 437
237 B.R. 437
(Cite as: 237 B.R. 437)

Res judicata applies to proceedings in bankruptcy.

## [4] Judgment 228 ⬅️542

228 Judgment
    228XIII Merger and Bar of Causes of Action and Defenses
        228XIII(A) Judgments Operative as Bar
            228k541 Courts or Other Tribunals Rendering Judgment
            228k542 k. In General. Most Cited Cases
Usually, res judicata applies in bankruptcy where contested matter or adversary proceeding provided the opportunity to litigate given claim.

## [5] Judgment 228 ⬅️540

228 Judgment
    228XIII Merger and Bar of Causes of Action and Defenses
        228XIII(A) Judgments Operative as Bar
            228k540 k. Nature and Requisites of Former Recovery as Bar in General. Most Cited Cases
Three elements of res judicata are (1) an identity of causes of action; (2) an identity of parties or their privies; and (3) a final judgment on the merits.

## [6] Judgment 228 ⬅️564(1)

228 Judgment
    228XIII Merger and Bar of Causes of Action and Defenses
        228XIII(A) Judgments Operative as Bar
            228k564 Finality of Determination
            228k564(1) k. In General. Most Cited Cases

## Judgment 228 ⬅️585(2)

228 Judgment
    228XIII Merger and Bar of Causes of Action

and Defenses
        228XIII(B) Causes of Action and Defenses Merged, Barred, or Concluded
            228k585 Identity of Cause of Action in General
            228k585(2) k. What Constitutes Identical Causes. Most Cited Cases
Creditor who, in previous bankruptcy case, had withdrawn with prejudice its administrative claim for costs of remediating environmental problems associated with drums of hazardous waste allegedly owned by Chapter 7 debtor was barred, under doctrine of res judicata, from thereafter suing for declaratory judgment that debtor did, in fact, own drums and was obligated to remediate problem; suit was based on identical cause of action as its previously withdrawn claim, requisite identity existed between parties, and creditor's voluntary withdrawal of claim operated as final judgment on merits.

## [7] Judgment 228 ⬅️585(2)

228 Judgment
    228XIII Merger and Bar of Causes of Action and Defenses
        228XIII(B) Causes of Action and Defenses Merged, Barred, or Concluded
            228k585 Identity of Cause of Action in General
            228k585(2) k. What Constitutes Identical Causes. Most Cited Cases
Under the "same transaction" test which is applied in the Seventh Circuit to determine whether requisite identity exists between prior and present causes of action, two claims possess the requisite "identity," for res judicata purposes, when both arise from single core of operative facts; claims are one if they are based on the same, or nearly the same, factual allegations.

## [8] Judgment 228 ⬅️585(2)

228 Judgment

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

237 B.R. 437
237 B.R. 437
(Cite as: 237 B.R. 437)

Page 3

228XIII Merger and Bar of Causes of Action and Defenses

228XIII(B) Causes of Action and Defenses Merged, Barred, or Concluded

228k585 Identity of Cause of Action in General

228k585(2) k. What Constitutes Identical Causes. Most Cited Cases

Res judicata bars subsequent suit if the claim on which it is based arises from same incident, events, transaction, circumstances, or other factual nebula as prior suit that has gone to final judgment.

## [9] Judgment 228 ☜585(2)

228 Judgment

228XIII Merger and Bar of Causes of Action and Defenses

228XIII(B) Causes of Action and Defenses Merged, Barred, or Concluded

228k585 Identity of Cause of Action in General

228k585(2) k. What Constitutes Identical Causes. Most Cited Cases

In deciding whether requisite identity exists between prior and present causes of action, for res judicata purposes, courts must not describe the facts of cases too broadly, but must examine them at sufficient level of specificity.

## [10] Judgment 228 ☜587

228 Judgment

228XIII Merger and Bar of Causes of Action and Defenses

228XIII(B) Causes of Action and Defenses Merged, Barred, or Concluded

228k587 k. Theory of Action or Recovery. Most Cited Cases

Mere change in legal theory does not create a new cause of action, for res judicata purposes.

## [11] Judgment 228 ☜674

228 Judgment

228XIV Conclusiveness of Adjudication

228XIV(B) Persons Concluded

228k667 Parties of Record

228k674 k. Effect of Joinder of Additional Parties. Most Cited Cases

Res judicata applies even where present action includes parties that were not joined in previous action, as long as the party against whom doctrine is asserted was party to earlier litigation.

## [12] Bankruptcy 51 ☜2903

51 Bankruptcy

51VII Claims

51VII(D) Proof; Filing

51k2903 k. Amendment or Withdrawal. Most Cited Cases

Withdrawal of proof of claim under Bankruptcy Rule is analogous to voluntary dismissal of cause of action. Fed.Rules Bankr.Proc.Rule 3006, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 41, 28 U.S.C.A.

## [13] Judgment 228 ☜570(3)

228 Judgment

228XIII Merger and Bar of Causes of Action and Defenses

228XIII(A) Judgments Operative as Bar

228k570 Judgment on Discontinuance, Dismissal, or Nonsuit

228k570(3) k. Voluntary Dismissal or Nonsuit in General. Most Cited Cases

Voluntary dismissal with prejudice is "final judgment" for res judicata purposes.

## [14] Judgment 228 ☜570(3)

228 Judgment

228XIII Merger and Bar of Causes of Action and Defenses

228XIII(A) Judgments Operative as Bar

228k570 Judgment on Discontinuance,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

237 B.R. 437
237 B.R. 437
(Cite as: 237 B.R. 437)

Dismissal, or Nonsuit
        228k570(3) k. Voluntary Dismissal or
Nonsuit in General. Most Cited Cases
Creditor's voluntary withdrawal of its priority
claim, with "no right of reinstatement," was in
nature of "final judgment" for res judicata
purposes.

**[15] Contracts 95 ⚖️143(2)**

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
            95k143 Application to Contracts in
General
        95k143(2) k. Existence of Ambiguity.
Most Cited Cases
Doctrine of extrinsic ambiguity is defense to a
contract, which applies when background facts
indicate that the true meaning of contract,
seemingly clear on its face, is something other
than its plain meaning.

**[16] Contracts 95 ⚖️175(1)**

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
            95k175 Evidence to Aid Construction
                95k175(1) k. Presumptions. Most
Cited Cases
Burden of production rests with party asserting
extrinsic ambiguity as defense to action on
contract.

**[17] Bankruptcy 51 ⚖️2903**

51 Bankruptcy
    51VII Claims
        51VII(D) Proof; Filing
            51k2903 k. Amendment or Withdrawal.
Most Cited Cases

**Bankruptcy 51 ⚖️3032.1**

51 Bankruptcy
    51IX Administration
        51IX(A) In General
            51k3032 Compromises
                51k3032.1 k. In General. Most Cited
Cases
Creditor who had entered into stipulation to
withdraw its proof of claim, with "no right of
reinstatement," as part of consideration for
settlement in prior bankruptcy case could not rely
on doctrine of extrinsic ambiguity to argue that
stipulation was not meant to bar it from bringing
cause of action in current Chapter 7 case based on
same facts underlying its previously withdrawn
claim, given complete lack of evidence that
parties to stipulation did not mean what they said
or that the plain words used must or may have had
extrinsic ambiguity.


**\*438** Chester H. Foster, Jr.,Foster & Kallen,
Chicago, IL, for Plaintiff.
Catherine Steege, Frances Gecker, Joseph D.
Frank, Jenner & Block, Chicago, IL, for
Defendant.
Esther E. Tryban-Telser, City of Chicago,
Department of Law, Chicago, IL.

**MEMORANDUM OPINION**
ERWIN I. KATZ, Bankruptcy Judge.
This matter comes before the Court on the motion
of Catherine Steege, not individually but solely as
the Chapter 7 Trustee of National Industrial
Chemical Company (the "Trustee"), for a
remanded ruling on her motion to dismiss Louis
C. Johns' ("Johns") complaint seeking both a
declaratory judgment that certain drums
containing hazardous waste materials are property
of National Industrial Chemical's ("NIC")
bankruptcy estate and an order directing the
Trustee to clean up the waste materials.    The
motion to dismiss was converted to a motion for
summary judgment by order of this Court dated
June 11, 1999.    **\*439** For the reasons set forth

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

herein, the Court now grants the Trustee's motion for summary judgment.

## I. JURISDICTION

Jurisdiction lies under 28 U.S.C. § 1334 and core jurisdiction exists under 28 U.S.C. § 157(b)(2)(A) and (O). This matter is before the Court pursuant to 28 U.S.C. § 157 and Local General Rule 2.33(A) of the United States District Court for the Northern District of Illinois. Venue lies under 28 U.S.C. § 1409.

## II. PROCEDURAL HISTORY

NIC filed a petition for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 *et. seq.*, on December 12, 1994. The case was converted to a Chapter 7 case on October 19, 1995.

Johns filed his three-count complaint against the Trustee on December 2, 1997. Count I of the complaint sought a declaration as to ownership of certain drums containing waste materials. Count II sought a declaration that the provisions of the automatic stay, 11 U.S.C. § 362, were inapplicable to the City of Chicago. Count III sought a modification of the automatic stay to allow the City of Chicago (the "City") to name the Trustee as a defendant in a lawsuit seeking cleanup of the drums of waste materials.

The Trustee moved for dismissal on the grounds that the drums were never property of the estate and that Johns lacked standing to seek to modify the stay on behalf of the City. The Trustee also raised the defense of *res judicata*. The Court did not reach the issue of *res judicata*, but granted the Trustee's motion after taking judicial notice of documents in the public record and Johns appealed.

The District Court for the Northern District of Illinois affirmed the dismissal of Counts II and III, but reversed the dismissal of Count I and remanded so that this Court could address the issue of whether dismissal of Count I was justified on the grounds of *res judicata*. *Johns v. Steege (In re National Industrial Chemical Co.)*, 1998 WL 887065 (N.D.Ill. Dec. 11, 1998). The Trustee filed the instant motion for a remanded ruling and the Court converted the motion to a motion for summary judgment pursuant to Federal Rule of Civil Procedure 12(b), made applicable to bankruptcy proceedings by Federal Rule of Bankruptcy Procedure 7012. The parties were each given the opportunity to present all materials made pertinent to such a motion by Federal Rule of Civil Procedure 56. The parties filed a statement of uncontested facts and responses thereto pursuant to Local Bankruptcy Rule 402(M) and (N).

## III. BACKGROUND

This statement of facts has been compiled from the record of the NIC case before the Court and from the parties' statement of uncontested facts and the responses thereto made pursuant to Local Rule 402(M) and (N).

NIC generated various waste materials during the operation of its business. Those materials were stored in drums in a building located at 600 W. 52nd Street, Chicago, Illinois (the "Property"). William Lerch ("Lerch"), NIC's president and sole shareholder, owned the Property.

The question of who must clean up the drums of waste arises from the intersection of several different legal actions. Sometime in 1996, the City of Chicago filed a lawsuit against both NIC and Lerch, seeking fines and disposal of "leaking drums of hazardous waste stored throughout the premises."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

237 B.R. 437
237 B.R. 437
(Cite as: 237 B.R. 437)

On April 22, 1996, Lerch filed a petition for relief under Chapter 13 of the Bankruptcy Code. On July 12, 1996, the Court converted Lerch's Chapter 13 case to a Chapter 7 case. James Carmel ("Carmel") became the interim trustee of Lerch's Chapter 7 estate. On December 9, 1996, Carmel gave notice to Lerch, his creditors, and other parties in interest that he *440 sought the Court's permission to sell the Property and equipment:

[T]he Trustee is advised that the real estate is subject to potential environmental clean-up liability, the exact amount of which is not known to the Trustee.... Sale by the Trustee, if approved by the Court, will be subject to any and all outstanding liens, claims, encumbrances, real estate taxes and any liability for environmental clean-up, as is and shown and without any warranties.

On January 8, 1997, the Court issued an order authorizing Carmel "to sell the Trustee's right, title and interest in and to the real estate located at 600 W. 52nd Street, Chicago, Illinois ... and certain machinery, equipment and personal property located in and on said real estate, subject to all liens, claims, encumbrances and any and all environmental liability...." Johns purchased the Property from Lerch's bankruptcy estate.

After Johns purchased the Property, he leased it to Nichem Corp. Lerch is Nichem's president.

On January 6, 1997, the Trustee filed an adversary complaint against Lerch, asking the Court to deny his discharge under 11 U.S.C. § 727.

On June 30, 1997, Johns filed a proof of administrative priority claim in the amount of $1,200,000 against the NIC bankruptcy estate (the "Priority Claim"). Johns stated that "[c]laim is based on failure of Estate to remove hazardous waste materials from 600 West 52nd Street,

Chicago, Illinois ... as described on attached reports."

On July 22, 1997, the Trustee and Lerch settled their adversary case. As partial consideration for the settlement, Johns agreed to withdraw the Priority Claim against the NIC estate with prejudice. Johns signed a stipulation (the "Stipulation") which stated in part that "[i]n the event that a final order is entered by this Court approving the settlement between Catherine Steege, as Trustee, and William Lerch, then in that event the withdrawal of the aforesaid Proof of Administrative Priority Claim shall be final and no right of reinstatement shall exist." The Court approved the settlement agreement (the "Lerch Settlement") and the Stipulation.

On September 18, 1997, the City impleaded Johns as an additional defendant to its suit against NIC and Lerch. Johns filed the instant adversary case on December 2, 1997.

On August 13, 1998, the Circuit Court of Cook County Illinois entered a consent decree and settlement agreement (the "City Settlement") in the City's suit against NIC, Lerch, and Johns. The City Settlement was made between Lerch and the City and provides that Lerch will clean up the drums in accordance with an attached plan of remediation (the "Remediation Plan").

The Remediation Plan provides in part that 400 drums will be disposed of at an average cost of $700 per drum. All drums must be removed by the last day of February 2002. The Remediation Plan also provides that clean-up will be accelerated if Johns succeeds in this suit against the Trustee.

## IV. DISCUSSION

The purpose of summary judgment under Federal

237 B.R. 437
237 B.R. 437
(Cite as: 237 B.R. 437)

Rule of Civil Procedure 56 is to avoid unnecessary trials when there is no genuine issue of material fact in dispute. _Farries v. Stanadyne/Chicago Division_, 832 F.2d 374, 378 (7th Cir.1987); _Wainwright Bank & Trust Co. v. Railroadmens Fed. Sav. & Loan Assoc. of Indianapolis_, 806 F.2d 146, 149 (7th Cir.1986). Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. _Celotex Corp. v. Catrett_, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); **441**_Matsushita Elect. Indust. Co. v. Zenith Radio Corp._, 475 U.S. 574, 585-86, 106 S.Ct. 1348, 1355-56, 89 L.Ed.2d 538 (1986); _Trautvetter v. Quick_, 916 F.2d 1140, 1147 (7th Cir.1990). The existence of factual disputes is sufficient to deny summary judgment only if the disputed facts are outcome determinative. _Jones Truck Lines, Inc. v. Republic Tobacco, Inc._, 178 B.R. 999, 1003 (Bankr.N.D.Ill.1995). The burden is on the moving party to show that there is no such factual dispute. _Celotex_, 477 U.S. at 322, 106 S.Ct. at 2552; _Matsushita_, 475 U.S. at 585-87, 106 S.Ct. at 1355-56; _In re Chicago, Missouri & Western Ry. Co._, 156 B.R. 567 (Bankr.N.D.Ill.1993). This burden is met when the record, as a whole, does not lead a rational trier of fact to find for the non-moving party. _Matsushita_, 475 U.S. at 587, 106 S.Ct. at 1356. "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." _Anderson v. Liberty Lobby_, 477 U.S. 242, 249-250, 106 S.Ct. 2505, 2510-11, 91 L.Ed.2d 202 (1986) (citations omitted). The respondent may not rest upon mere allegations or denials in its pleadings. _Id._

The Trustee raises the doctrine of _res judicata_ as an affirmative defense to Johns' complaint, based upon the Stipulation. Johns argues that the elements of _res judicata_ have not been met.

Johns raises the additional argument that the doctrine of extrinsic ambiguity mandates denial of the Trustee's motion. Because the essential facts are undisputed and only legal questions remain, summary judgment is appropriate on both issues.

### A. Res Judicata

[1][2] The doctrine of _res judicata_ ensures the finality of decisions. _Brown v. Felsen_, 442 U.S. 127, 131, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979). It bars relitigation of claims that were or could have been raised in an earlier proceeding. _D & K Properties Crystal Lake v. Mutual Life Ins. Co. of New York_, 112 F.3d 257, 259 (7th Cir.1997). It bars "litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding". _Brown_, 442 U.S. at 131, 99 S.Ct. 2205.

[3][4] _Res judicata_ applies to proceedings in bankruptcy. _S.N.A. Nut Co. v. Haagen-Dazs Co., Inc._, 215 B.R. 1004, 1008 (Bankr.N.D.Ill.1997). Usually, _res judicata_ applies in bankruptcy where a contested matter or an adversary proceeding provided the opportunity to litigate a given claim. _Id._

[5][6] The three elements of _res judicata_ are: (1) an identity of the causes of action; (2) an identity of the parties or their privies; and (3) a final judgment on the merits. _Golden v. Barenborg_, 53 F.3d 866, 869 (7th Cir.1995). Johns asserts that none of the elements are present in this case.

### 1. Identity of the Causes of Action

Johns asserts that his present cause of action is different than his prior claim because he now seeks a declaratory judgment that the NIC estate should clean up the Property rather than

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

compensatory damages for doing so himself.

[7][8][9][10] The Seventh Circuit determines identity of the causes of action using the "same transaction" test. _Car Carriers, Inc. v. Ford Motor Co., 789 F.2d 589, 593 (7th Cir.1986)._ Under the same transaction test, a claim has identity with a previous claim where both claims arise from a single core of operative facts. _Brzostowski v. Laidlaw Waste Systems, Inc., 49 F.3d 337, 339 (7th Cir.1995)._ "[T]wo claims are one for purposes of _res judicata_ if they are based on the same, or nearly the same, factual allegations." _Herrmann v. Cencom Cable Assocs., Inc., 999 F.2d 223, 226 (7th Cir.1993)._  _Res judicata_ bars a subsequent suit "if the claim on which it is based arises from the same incident, events, transaction, circumstances, or other factual nebula as a prior suit that had gone to final judgment." _Okoro v. Bohman, 164 F.3d 1059, 1062 (7th Cir.1999)._  Courts *442 must not describe the facts of the cases too broadly, but must examine them at a sufficient level of specificity. _Andersen v. Chrysler Corp., 99 F.3d 846, 852-53 (7th Cir.1996)._ However, a mere change in legal theory does not create a new cause of action. _Id.; Alexander v. Chicago Park District, 773 F.2d 850, 854 (7th Cir.1985)._

The events, circumstances and other factual nebulae in the instant case are the same as those alleged in the Priority Claim. Specifically, Johns' Priority Claim was based upon the presence of the drums of waste materials on the Property and the NIC bankruptcy estate's alleged failure to remove them.  Johns alleged that NIC generated the materials stored in the drums and that the NIC bankruptcy estate thus owned them.  He sought 1.2 million dollars from the NIC estate to compensate him for the costs of remediation. The claim in the adversary proceeding now before the Court is based upon the presence of the drums of hazardous waste materials on the Property and the NIC bankruptcy estate's alleged failure to

remove them.  Johns alleges that NIC generated the materials stored in the drums and that the NIC bankruptcy estate thus owns them.  Johns seeks a declaration that the NIC estate owns the drums of waste and must remediate and remove the drums of waste from the Property.

The only difference between the two claims is that by his Priority Claim, Johns sought money damages to clean up the drums from the NIC bankruptcy estate and in the present action, he seeks a declaratory judgment that the NIC estate owns the drums and must thus clean them up itself.  The present claim does not even reflect a change in legal theory, but merely seeks a different form of relief than that requested in the Priority Claim.

The facts alleged in both claims are identical.  So, ultimately, is the relief sought, which is that, in one way or another, the NIC estate pays for the cleanup of the drums of waste.  There is identity of the causes of action.

## 2. Identity of the Parties

The two counts of Johns' complaint which involved the City have been dismissed.  The City was never a party to the remaining count, which seeks a declaratory judgment only against the NIC estate.

The parties to the present action are identical to the parties to the prior claim.

Johns argues that there is no identity of the parties because the City was not a party to the proceedings related to Johns' Priority Claim.  His argument has no basis in either law or fact.

[11] _Res judicata_ applies even where the present action includes parties that were not joined in the previous action, so long as the party against whom

237 B.R. 437
237 B.R. 437
(Cite as: 237 B.R. 437)

the doctrine is asserted was a party to the earlier litigation. _Dreyfus v. First Nat'l Bank of Chicago,_ 424 F.2d 1171, 1175 (7th Cir.1970); _see also, U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.,_ 971 F.2d 244, (stating that "the naming of additional parties does not eliminate the _res judicata_ effect of a prior judgment ...") _Id._ Johns and the Trustee were both parties to Johns' Priority Claim. _Res judicata_ thus applies in the present action even though Johns has named the City as an additional defendant.

### 3. Final Judgment on the Merits

On July 24, 1997, Johns withdrew his Priority Claim with prejudice.

[12] Federal Rule of Bankruptcy Procedure 3006 governs the withdrawal of claims. Fed.R.Bankr.P. 3006. The withdrawal of a proof of claim under Rule 3006 is analogous to voluntary dismissal of a claim under Federal Rule of Civil Procedure 41. _Smith v. Dowden,_ 47 F.3d 940, 942 (8th Cir.1995); _see also,_ Committee Notes, Fed.R.Bankr.P. 3006 "Courts have traditionally analogized a creditor's claim to a civil complaint, a trustee's objection to an answer, and an adversarial proceeding to a counterclaim." _Id._ Thus, the Court *443 may apply case law discussing claim dismissal under Rule 41 to questions involving claim withdrawal.

[13][14] A voluntary dismissal with prejudice is a final judgment for purposes of _res judicata._ _U.S. v. Cunan,_ 156 F.3d 110, 114 (1st Cir.1998); _Chase Manhattan Bank v. Celotex Corp.,_ 56 F.3d 343, 345 (2d Cir.1995); _Clark v. Haas Group, Inc.,_ 953 F.2d 1235, 1238 (10th Cir.1992); _Astron Industrial Assocs., Inc. v. Chrysler Motors Corp.,_ 405 F.2d 958, 960 (5th Cir.1968). Johns withdrew his Priority Claim, which is equivalent to dismissing his cause of action, with "finality" and "no right of reinstatement."

There has been a final judgment on the merits.

### B. Extrinsic Ambiguity

[15][16] The doctrine of extrinsic ambiguity is a defense to a contract. It applies when background facts indicate that the true meaning of a contract, seemingly clear on its face, is something other than its plain meaning. _In re Stoecker,_ 5 F.3d 1022, 1029-30 (7th Cir.1993). The burden of production rests with the party asserting the extrinsic ambiguity. _Id._ at 1030.

[17] It is undisputed that Johns withdrew his Priority Claim as partial consideration for Lerch's settlement with the Trustee. It is undisputed that the Priority Claim was for failure of the NIC estate to remove hazardous waste materials from the Property.

The Stipulation is unambiguous. Nor do the other facts that Johns raises to create ambiguity succeed in doing so. Johns states: (1) that the City had not named him as party to its lawsuit when he withdrew his claim; (2) that the claim was aimed at NIC's prepetition failure to act; (3) that he and the Trustee have no contractual relationship; and (4) that the Trustee has presented no evidence that the term "withdrawal" was meant to bar a later lawsuit.

The first three alleged facts have no impact on the plain meaning of the withdrawal. As for the fourth fact, the Trustee is under no burden to present evidence about the meaning of the word "withdrawal." The undisputed facts give "no indication that the parties did not mean what they said or that the plain words used must or may have had 'extrinsic ambiguity.' " _Greenfield Direct Response, Inc. v. ADCO List Mgt. (In re Greenfield Direct Response),_ 171 B.R. 848, 856 (Bankr.N.D.Ill.1994).

237 B.R. 437
237 B.R. 437
(Cite as: 237 B.R. 437)

Page 10

## V. CONCLUSION

For the foregoing reasons, summary judgment is granted in favor of the Defendant, Catherine Steege, not individually, but as the Chapter 7 Trustee of National Industrial Chemical Company.

Bkrtcy.N.D.Ill.,1999.
In re National Indus. Chemical Co.
237 B.R. 437

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

112 F.3d 257
112 F.3d 257, 37 Collier Bankr.Cas.2d 1380, Bankr. L. Rep. P 77,400
**(Cite as: 112 F.3d 257)**

▷
D & K Properties Crystal Lake v. Mutual Life
Ins. Co. of New York
C.A.7 (Ill.),1997.

United States Court of Appeals,Seventh Circuit.
D & K PROPERTIES CRYSTAL LAKE, an
Illinois Partnership, Plaintiff-Appellant,
v.
MUTUAL LIFE INSURANCE COMPANY OF
NEW YORK, a New York corporation,
Defendant-Appellee.
**No. 96-2278.**

Argued Dec. 9, 1996.
Decided April 17, 1997.

Former Chapter 11 debtor brought action to
recover from secured mortgage lender for its
alleged bad faith breach of contract in improperly
adjusting interest rate on loan. Lender moved to
dismiss based on res judicata effect of plan
confirmation order. The United States District
Court for the Northern District of Illinois, John A.
Nordberg, J., 1996 WL 224517, granted motion,
and debtor appealed. The Court of Appeals,
Manion, Circuit Judge, held that: (1) paragraph in
debtor's confirmed Chapter 11 plan, providing
that, from and after effective date of plan,
disbursing agent would enforce all causes of
action existing in favor of debtor, was not express
reservation of debtor's claims against lender of
kind sufficient to enable debtor to pursue such
claims, and (2) order allowing creditor's secured
claim was res judicata on debtor's ability to pursue
claim for damages against creditor, which in
effect contested validity and amount of creditor's
claim.

Affirmed.
West Headnotes

**[1] Judgment 228 🔑713(2)**

228 Judgment
   228XIV Conclusiveness of Adjudication
      228XIV(C) Matters Concluded
         228k713 Scope and Extent of Estoppel
in General
            228k713(2) k. Matters Which Might
Have Been Litigated. Most Cited Cases
Doctrine of res judicata bars relitigation of claims
that were or could have been asserted in earlier
proceeding.

**[2] Judgment 228 🔑540**

228 Judgment
   228XIII Merger and Bar of Causes of Action
and Defenses
      228XIII(A) Judgments Operative as Bar
         228k540 k. Nature and Requisites of
Former Recovery as Bar in General. Most Cited
Cases
For claim to be barred on res judicata grounds,
claim must share three elements with earlier
action: (1) identity of parties or their privies; (2)
identity of causes of action; and (3) final
judgment on merits.

**[3] Judgment 228 🔑566**

228 Judgment
   228XIII Merger and Bar of Causes of Action
and Defenses
      228XIII(A) Judgments Operative as Bar
         228k566 k. Judgment Expressly
Reserving Rights. Most Cited Cases
Res judicata does not apply if court in earlier
action expressly reserved litigant's right to bring
claims in later action.

**[4] Bankruptcy 51 🔑3568(2)**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

112 F.3d 257
112 F.3d 257, 37 Collier Bankr.Cas.2d 1380, Bankr. L. Rep. P 77,400
(Cite as: 112 F.3d 257)

51 Bankruptcy
   51XIV Reorganization
      51XIV(B) The Plan
         51k3566 Confirmation; Objections
            51k3568 Effect
               51k3568(2) k. Conclusiveness.
Most Cited Cases
Paragraph in debtor's confirmed Chapter 11 plan, providing that, from and after effective date of plan, disbursing agent would enforce all causes of action existing in favor of debtor, was not express reservation of debtor's claims against lender for its allegedly improper adjustment in interest rate on loan, but mere blanket reservation insufficient to enable debtor to pursue such claims over lender's motion to dismiss based on res judicata effect of plan confirmation order.

[5] Bankruptcy 51 ☞3568(2)

51 Bankruptcy
   51XIV Reorganization
      51XIV(B) The Plan
         51k3566 Confirmation; Objections
            51k3568 Effect
               51k3568(2) k. Conclusiveness.
Most Cited Cases
To avoid res judicata effect of Chapter 11 plan confirmation order, reservation of cause of action must be both express, as in writing, and express, as in specifically identified.

[6] Bankruptcy 51 ☞3568(2)

51 Bankruptcy
   51XIV Reorganization
      51XIV(B) The Plan
         51k3566 Confirmation; Objections
            51k3568 Effect
               51k3568(2) k. Conclusiveness.
Most Cited Cases
Order abandoning to Chapter 11 debtor a claim for breach of contract against mortgage lender, "to the extent that" breach of contract claim could be deemed a cause of action specifically reserved to disbursing agent under reservation of rights provision in confirmed plan, could not abandon any rights in excess of those granted to disbursing agent under confirmed plan; accordingly, absent express reservation of claim in plan itself, claim was barred by res judicata effects of plan confirmation order.

[7] Bankruptcy 51 ☞3568(2)

51 Bankruptcy
   51XIV Reorganization
      51XIV(B) The Plan
         51k3566 Confirmation; Objections
            51k3568 Effect
               51k3568(2) k. Conclusiveness.
Most Cited Cases
Order allowing creditor's secured claim was res judicata on debtor's ability to pursue claim for damages against creditor, which in effect contested validity and amount of creditor's claim, where debtor had opportunity to contest claim before bankruptcy court.

*258 Robert F. Coleman, Jerry S. Menge (argued), Coleman & Associates, Eugene I. Pavalon, Pavalon & Gifford, Chicago, IL, for Plaintiff-Appellant.
Steven M. Hartmann (argued), Felice K. Bernstein, Freeborn & Peters, Chicago, IL, for Defendant-Appellee.

Before COFFEY, MANION, and EVANS, Circuit Judges.
MANION, Circuit Judge.
D & K Properties Crystal Lake ("D & K") seeks to sue Mutual Life Insurance Company of New York ("MONY") for bad faith breach of contract, even though it admits its suit is barred by res judicata. D & K argues that it expressly reserved this cause of action earlier and therefore that it may still assert the claim. Because we disagree

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

112 F.3d 257
112 F.3d 257, 37 Collier Bankr.Cas.2d 1380, Bankr. L. Rep. P 77,400
(Cite as: 112 F.3d 257)

that the claim was expressly reserved, we affirm the district court's dismissal of D & K's lawsuit.

## I.

In January of 1991 MONY, a mortgage lender, increased the interest rate on a secured note it held on the Commons of Crystal Lake, D & K Limited Partnership's $20.3 million shopping center. When D & K challenged the new rate as contrary to the terms of the lending agreement, MONY accelerated the loan. In response, in June 1991, D & K filed a complaint in the Circuit Court of Cook County challenging MONY's actions. D & K subsequently amended the complaint to allege that MONY's adjustment of the interest rate was improper and intended "to force a forfeiture and to destroy the business of [D & K]."

Six months later D & K filed for Chapter 11 bankruptcy protection.    D & K proposed a reorganization plan which included a cram-down provision lowering the interest rate of MONY's loan.  MONY proposed an alternative plan which liquidated D & K's assets and satisfied its creditors in a shorter period of time.   D & K objected to MONY's plan, arguing that MONY had both proposed its alternative reorganization plan and reset D & K's interest rate in bad faith. Following evidentiary hearings, the bankruptcy court rejected D & K's plan and confirmed MONY's plan.  In doing so the bankruptcy *259 court expressly found that MONY had not acted in bad faith.

Prior to the confirmation MONY had removed to the federal bankruptcy court, as a related case, the complaint D & K originally filed in the Circuit Court of Cook County in June of 1991 (Case No. 91 CH 5081).  Following a hearing on the issues of that case, the bankruptcy court denied the relief requested by D & K relating to the note held by MONY and whether MONY had improperly adjusted the interest rate on the note, and closed the case.  D & K did not appeal the ruling.

Pursuant to the approved liquidation plan, MONY filed an application for allowance of its secured claim and the validity of its secured lien.    The claims were allowed on May 31, 1994 and the bankruptcy disbursing agent sold the shopping center and distributed the proceeds to D & K's creditors, including MONY.  D & K did not file any objections to MONY's application nor did it appeal any of the bankruptcy court's rulings.

Among other provisions of the plan, paragraph 7.1 provided:
From and after the Effective Date [of the plan], the Disbursing Agent, on behalf of the Debtor and the Estate, shall enforce all causes of action existing in favor of the Debtor and the Debtor in Possession.

After D & K's assets had been liquidated and redistributed, D & K sought and obtained from the disbursing agent a motion to the bankruptcy court to abandon to D & K the cause of action which forms the basis for the lawsuit now before this court: "[T]o the extent the Breach of Contract Action may be deemed a cause of action within the purview of Section 7.1 of the Plan, ... [the disbursing agent] prays for the entry of an order authorizing it to abandon same...."    The bankruptcy court granted the motion.   D & K thereafter filed in Cook County Circuit Court a complaint alleging in Count I that MONY's decision to reset D & K's interest rate breached the terms of the note and had been done in bad faith because it resulted from MONY's decision to get out of the mortgage banking business.  Count II alleged tortious interference with contract.  The case was removed to federal court based on diversity of the parties and the amount at issue.

MONY filed a motion to dismiss on the ground

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

112 F.3d 257
112 F.3d 257, 37 Collier Bankr.Cas.2d 1380, Bankr. L. Rep. P 77,400
(Cite as: 112 F.3d 257)

that D & K's claims were barred by res judicata.[FN1] The district court found that D & K's claims were raised or could have been raised in the bankruptcy action. Because res judicata applies to bankruptcy court decisions in this context, *Crop-Maker Soil Serv. v. Fairmount State Bank,* 881 F.2d 436, 439 (7th Cir.1989), the district court granted the motion and dismissed the complaint. D & K appeals the court's dismissal of count I.

> FN1. Because res judicata is an affirmative defense that often requires the court to consider matters outside the complaint, the district court construed MONY's motion to dismiss as a motion for summary judgment. See Fed.R.Civ.P. 8(c) & 12(b); *Miller v. Shell Oil Co.,* 345 F.2d 891, 893 (10th Cir.1965) (applying rule); *Batiste v. Burke,* 746 F.2d 524 nn. 1, 2 (5th Cir.1984) (discussing relationship between and application of Fed.R.Civ.P. 8(c) & 12(b)).

## II.

[1][2][3][4] The doctrine of res judicata bars relitigation of claims that were or could have been asserted in an earlier proceeding. *Levinson v. United States,* 969 F.2d 260, 262 (7th Cir.), *cert. denied,* 506 U.S. 989, 113 S.Ct. 505, 121 L.Ed.2d 441 (1992). A claim is precluded where it shares three elements with an earlier action: (1) an identity of the parties or their privies; (2) an identity of the causes of action; and (3) a final judgment on the merits. *Barnett v. Stern,* 909 F.2d 973, 978 (7th Cir.1990). Here, D & K concedes both that it could have brought this action before the confirmation of the bankruptcy plan and that res judicata ordinarily would bar it from bringing the action after the confirmation of the plan. *See, e.g., In re Heritage Hotel*

*Partnership I,* 160 B.R. 374, 377 (9th Cir. BAP 1993) ("Like final judgments, confirmed plans of reorganization are binding on all parties, and issues that could have been raised pertaining to such plans are barred by res judicata." (quoting J.S. Gilbert, *Substantive Consolidation in Bankruptcy: A Primer,* 43 Vand.L.Rev. 207, 239 (1990))). However, D & K correctly observes, res judicata does not apply when a cause of action *260 has been expressly reserved for later adjudication. "Under a generally accepted exception to the res judicata doctrine, a litigant's claims are not precluded if the court in an earlier action expressly reserves the litigant's right to bring those claims in a later action." *Apparel Art Intern. v. Amertex Enters.,* 48 F.3d 576, 586 (1st Cir.1995); *see also Matter of Energy Co-op., Inc.,* 814 F.2d at 1233 ("If a court reserves for later resolution an issue that might otherwise have been adjudicated in the initial proceeding, res judicata will not operate to bar the subsequent suit."). D & K argues that paragraph 7.1 of the confirmed plan expressly reserved its claim of bad faith breach of contract when it included "all causes of action existing in favor of the Debtor" among those to be enforced by the disbursing agent. The district court concluded otherwise, characterizing paragraph 7.1 as a blanket reservation lacking the specificity necessary to reserve a cause of action.

Both the district court and MONY rely on *Micro-Time Management Systems, Incorporated v. Allard & Fish, P.C.,* 983 F.2d 1067 (Table), 1993 WL 7524 (6th Cir.), *cert. denied,* 510 U.S. 906, 114 S.Ct. 287, 126 L.Ed.2d 237 (1993), an unpublished opinion [FN2] from the Sixth Circuit which is closely on point. In *Micro-Time* the confirmed plan contained a statement that "all causes of action which the debtor may choose to institute shall be vested with the debtor." *Micro-Time* at *5. This is little different than the statement in paragraph 7.1, which provides that the disbursing agent "shall enforce all causes of action existing in favor of the Debtor." [FN3] Had

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

112 F.3d 257
112 F.3d 257, 37 Collier Bankr.Cas.2d 1380, Bankr. L. Rep. P 77,400
(Cite as: 112 F.3d 257)

Page 5

the disbursing agent abandoned to D & K "all causes of action existing," the provision could appropriately be reworded to provide that "all causes of action existing" now vested with D & K.

This statement would be structurally and substantively similar to that in *Micro-Time*. But the disbursing agent did not abandon "all causes of action." It abandoned only a breach of contract cause of action, to the extent it was one of the "all causes of action existing" in paragraph 7.1. So what causes of action are "existing"? As the Sixth Circuit explained in *Micro-Time*: "While this language allows [the debtor, in this case D & K] to institute suits, any suit that it institutes would be subject to defenses such as lack of jurisdiction, the statute of limitations, or in this case, the doctrine of res judicata." *Micro-Time* at *5. To avoid a defense of res judicata, the claim would have to have been "expressly" reserved; otherwise, "any cause of action that may have existed was extinguished upon the plan being confirmed and not appealed or modified to reserve a right to sue [the defendant in *Micro-Time*]." Id. at *6.

FN2. Unpublished yet increasingly cited. *See, e.g., In re Kelley*, 199 B.R. 698, 704 (9th Cir. BAP 1996); *In re MAI Systems Corp.*, 178 B.R. 50, 55 (Bankr.D.Del.1995); *In re Hooker Invs., Inc.*, 162 B.R. 426, 433 (Bankr.S.D.N.Y.1993). Seventh Circuit Rule 53(e) provides: "Except to the purposes set forth in Circuit Rule 53(b)(2)(iv), no unpublished opinion or order of any court may be cited in the Seventh Circuit if citation is prohibited in the rendering court." While the Sixth Circuit disfavors citation of unpublished opinions by counsel, it permits citation where the case has "precedential value in relation to a material issue in a case and [ ] there is no published opinion that would

serve as well ...." 6th Cir.R. 24(c). The Sixth Circuit rules place no limitation on citation to unpublished opinions by courts.

FN3. Indeed, rather than expressly reserving claims against res judicata preclusion, both statements appear merely to set out who is responsible for bringing claims that do exist in favor of the debtor that either survive the bankruptcy order, or arise after its confirmation. Nevertheless, we examine whether they also serve as express reservations of claims capable of surviving the res judicata bar.

D & K attempts to distinguish *Micro-Time* on the ground that it only attempted to reserve existing causes of action and not, as in the case here, causes of action "from and after confirmation of the plan." D & K admits, however, that it could have brought this action prior to confirmation of the plan. The bad faith breach of contract action D & K seeks to prosecute arose when MONY allegedly breached the contract by raising D & K's interest rate. Not only did such an action exist prior to the bankruptcy court's confirmation of the plan, the bankruptcy court considered and rejected a similar suit that was removed to it from state court as part of the bankruptcy case. Furthermore, the distinction D & K seeks to make is *261 pointless. Actions arising after the plan by definition could not have been brought before the plan and thus are not precluded by res judicata in any event. D & K's problem is that the breach of contract claim is not such an action.

D & K also argues that in requiring that claims be expressly reserved, the term "express" must be contrasted with "implied," and only requires that the reservation be in writing. Because the reservation in paragraph 7.1 preserves "all cause of action existing" in writing, D & K claims the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

112 F.3d 257
112 F.3d 257, 37 Collier Bankr.Cas.2d 1380, Bankr. L. Rep. P 77,400
(Cite as: 112 F.3d 257)

reservation is "express." D & K is shooting at the wrong target. The problem in *Micro-Time*, as in this case, was not that the reservation was not in writing, but that the claim sought to be reserved was not identified in the reservation. The identification must not only be express, but also the claim must be specific. A blanket reservation that seeks to reserve all causes of action reserves nothing. To hold otherwise would eviscerate the finality of a bankruptcy plan containing such a reservation, a result at odds with the very purpose of a confirmed bankruptcy plan.

[5] The Ninth Circuit Bankruptcy Appellate Panel recently explained the distinction in *In re Kelley*, 199 B.R. 698 (9th Cir. BAP 1996). In *Kelley* the bankruptcy confirmation plan contained a reservation that was "express" in that it was written (as would be any reservation in a confirmation plan), but "general" in that it reserved rights to bring claims without identifying the claims. The court explained: "If a confirmed plan expressly reserves the right to litigate a *specific* cause of action after confirmation, then res judicata does not apply. On the other hand, if the debtor fails to mention the cause of action ... then he will be precluded from asserting it postconfirmation." *Id.* at 704 (emphasis added; internal citations omitted). The court noted that "[e]ven a blanket reservation by the debtor reserving 'all causes of action which the debtor may choose to institute' has been held insufficient to prevent the application of res judicata to a specific action." *Id.* (citing *In re Hooker Invs., Inc.*, 162 B.R. 426, 433 (Bankr.S.D.N.Y.1993)). The court determined that the confirmation plan language in *Kelley*, which attempted to reserve the right to bring "adversary proceedings to contest the amount, allowability, priority and/or secured status of any claims which the Debtors believe are not proper," was little more that a general reservation of rights "insufficient to prevent the application of res judicata." *Id.* at 704. To avoid res judicata the reservation of a cause of action

must be both express, as in writing, and express, as in specifically identified. D & K failed to identify any claim it was reserving and its cause of action thus is barred.

D & K urges us instead to rely on language in *In re Envirodyne Industries, Inc.*, 174 B.R. 986 (Bankr.N.D.Ill.1994). There the bankruptcy court commented on the defendant's arguments about res judicata, stating that they "might be persuasive if future causes of action were not reserved for in the Disclosure Statement, Plan and Order...." *Id.* at 991. Yet even a casual reading of the reservation at issue reveals that the right to preclude claims is both express and specific, even if broadly so, including claims "without limitation" and "of any kind whatsoever not otherwise released pursuant to the terms of the Plan." *Id.* at 989. The reservation in D & K lacks the specificity, even if broadly stated, of that in *Envirodyne*. The *Envirodyne* reservation, broad as it was, was clear in what it purported to reserve. And because it was explicit, the parties not only had an opportunity to dicker over the language, but they were thereafter on notice about which claims were reserved and which were not. In any event, *Envirodyne* provides scant support because the court explicitly stated that it was not reaching the question of res judicata. Id. at 992.

[6] D & K emphasizes the order it sought and obtained abandoning to it the right to bring this action previously reserved to the disbursing agent. Because the order abandons to D & K any claims for breach of contract, D & K argues that the order clarifies the meaning of paragraph 7.1. The district court ruled that the order was parol evidence and thus not admissible to explain what was in effect a contract between the debtor and the creditor. Even if it were not inadmissible, the language abandoning the claim is not as broad or as explicit as D & K *262 suggests. The claim was abandoned "to the extent that the Breach of Contract Action may be deemed a cause of action

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

112 F.3d 257
112 F.3d 257, 37 Collier Bankr.Cas.2d 1380, Bankr. L. Rep. P 77,400
(Cite as: 112 F.3d 257)

Page 7

within the purview of Section 7.1...." If it is not deemed a cause of action explicitly reserved by 7.1, then by its own terms the disbursing agent abandoned to D & K nothing. The disbursing agent cannot abandon rights greater than those granted to it in the confirmed plan. Cf. *Sure-Snap Corp. v. State Street Bank and Trust Co.,* 948 F.2d 869, 873 (2d Cir.1991) (unliquidated claims vested back to the debtor do so subject to res judicata bar). Because the plan extinguishes suits among parties to the plan, unless expressly reserved, the disbursing agent had no claim for breach of contract that was not barred by res judicata. And because the disbursing agent had no such claim, D & K took no such claim under the abandonment order.

[7] Citing the rule that bankruptcy plans are analogous to contracts, *see UNR Industries, Inc. v. Bloomington Factory Workers,* 173 B.R. 149, 156-57 (N.D.Ill.1994), D & K argues that the district court's construction creates a nullity of paragraph 7.1, contrary to general rules of construction that disapprove of so rendering a contract provision. It does not. The paragraph transfers to the disbursing agent "causes of action existing in favor of the Debtor or the Debtor in Possession." This permits, if not requires, the disbursing agent to pursue legal claims D & K might have against others. The idea is to bring into the bankrupt estate all moneys owed to the estate and maximize funds available for distribution to creditors. In D & K's case it might, for instance, authorize the disbursing agent to sue a tenant of the shopping center who owed rent. It does not create blanket authorization to file lawsuits and reopen issues that were considered and settled, or could have been so, as part of the bankruptcy plan. It does not give the disbursing agent, and thus in this case D & K, powers beyond those accorded by the final order, or by the law. So it does not provide D & K with the power to avoid legal bars to actions such as res judicata.[FN4]

FN4. Even if we had determined that Section 7.1 reserved this cause of action, an alternative res judicata bar to D & K's claim arises from the May 31, 1994 order allowing MONY's secured claim. D & K did not object to the claim at the May 31 hearing despite having the opportunity to do so. *See* Fed.R.Bankr.P. 3007 (setting out procedure for objecting to allowance of a claim). By pursuing damages from MONY, D & K is in effect contesting the validity and amount of MONY's claim. Because it had the opportunity to contest the claim before the bankruptcy court, even if the reservation had preserved D & K's right to pursue this action it became barred by res judicata when D & K failed to do so. *See Matter of Baudoin,* 981 F.2d 736, 741-42 (5th Cir.1993) (discussing relationship between core proceedings, counterclaims, and res judicata).

## III.

The exception to res judicata that expressly reserved suits may survive a final bankruptcy order is not available to D & K in this case. Accordingly, we affirm the district court.

C.A.7 (Ill.),1997.
D & K Properties Crystal Lake v. Mutual Life Ins. Co. of New York
112 F.3d 257, 37 Collier Bankr.Cas.2d 1380, Bankr. L. Rep. P 77,400

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

101 S.Ct. 411                                                                                                    Page 1
449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308
(Cite as: 449 U.S. 90, 101 S.Ct. 411)

▷
Allen v. McCurry
U.S.Mo.,1980.

Supreme Court of the United States
Marvin ALLEN et al., Petitioners,
v.
Willie McCURRY.
No. 79-935.

Argued Oct. 8, 1980.
Decided Dec. 9, 1980.

Plaintiff, who had been convicted in Missouri of heroin and assault offenses, brought Civil Rights Act suit against arresting officers and others claiming, among other things, an allegedly unconstitutional search and seizure. The United States District Court for the Eastern District of Missouri, 466 F.Supp. 514, rendered summary judgment for defendants. The Court of Appeals for the Eighth Circuit, 606 F.2d 795, reversed and remanded. Certiorari was granted. The Supreme Court, Justice Stewart, held that: (1) rules of collateral estoppel applied to actions brought under Civil Rights Act of 1871 and encompass state-court judgments or decisions, be they civil or criminal, and (2) fact that under *Stone v. Powell*, plaintiff was unable to obtain federal habeas corpus relief on his Fourth Amendment claim did not render doctrine of collateral estoppel inapplicable.

Judgment of Court of Appeals reversed and remanded.

Justice Blackmun filed a dissenting opinion in which Justice Brennan and Justice Marshall joined.
West Headnotes

[1] Judgment 228 ⟶634

228 Judgment
    228XIV Conclusiveness of Adjudication
        228XIV(A) Judgments Conclusive in General
        228k634 k. Nature and Requisites of Former Adjudication as Ground of Estoppel in General. Most Cited Cases
Federal courts have traditionally adhered to the related doctrines of res judicata and collateral estoppel.

[2] Judgment 228 ⟶713(2)

228 Judgment
    228XIV Conclusiveness of Adjudication
        228XIV(C) Matters Concluded
            228k713 Scope and Extent of Estoppel in General
            228k713(2) k. Matters Which Might Have Been Litigated. Most Cited Cases

Judgment 228 ⟶720

228 Judgment
    228XIV Conclusiveness of Adjudication
        228XIV(C) Matters Concluded
            228k716 Matters in Issue
                228k720 k. Matters Actually Litigated and Determined. Most Cited Cases
Under "res judicata," a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.

[3] Judgment 228 ⟶715(1)

228 Judgment
    228XIV Conclusiveness of Adjudication
        228XIV(C) Matters Concluded

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

101 S.Ct. 411
449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308
**(Cite as: 449 U.S. 90, 101 S.Ct. 411)**

228k715 Identity of Issues, in General
228k715(1) k. In General. Most Cited Cases

Under "collateral estoppel," once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case.

**[4] Judgment 228 ⚖634**

228 Judgment
228XIV Conclusiveness of Adjudication
228XIV(A) Judgments Conclusive in General
228k634 k. Nature and Requisites of Former Adjudication as Ground of Estoppel in General. Most Cited Cases

Res judicata and collateral estoppel relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication.

**[5] Judgment 228 ⚖713(1)**

228 Judgment
228XIV Conclusiveness of Adjudication
228XIV(C) Matters Concluded
228k713 Scope and Extent of Estoppel in General
228k713(1) k. In General. Most Cited Cases

Concept of collateral estoppel cannot apply when the party against whom the earlier decision is asserted did not have a full and fair opportunity to litigate that issue in the earlier case.

**[6] Judgment 228 ⚖828.1**

228 Judgment
228XVII Foreign Judgments
228k828 Effect of Judgments of State

Courts in United States Courts
228k828.1 k. In General. Most Cited Cases
(Formerly 228k828(1))

Federal courts generally accord preclusive effect to issues decided by state courts; res judicata and collateral estoppel not only reduce unnecessary litigation and foster reliance on adjudication, but also promote the comity between state and federal courts that has been recognized as a bulwark of the federal system. 28 U.S.C.A. § 1738.

**[7] Judgment 228 ⚖828.1**

228 Judgment
228XVII Foreign Judgments
228k828 Effect of Judgments of State Courts in United States Courts
228k828.1 k. In General. Most Cited Cases
(Formerly 228k828(1))

Although federal courts may look to the common law or to policies supporting res judicata and collateral estoppel in assessing the preclusive effect of decisions of other federal courts, Congress has specifically required all federal courts to give preclusive effect to state court judgments whenever the court of the State from which the judgments emerged would do so. 28 U.S.C.A. § 1738.

**[8] Habeas Corpus 197 ⚖207**

197 Habeas Corpus
197I In General
197I(A) In General
197I(A)1 Nature of Remedy in General
197k206 Purpose and Use of Writ
197k207 k. Release from Restraint. Most Cited Cases
(Formerly 197k1)

Unique purpose of habeas corpus is to release the applicant from unlawful confinement. 28

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

101 S.Ct. 411
449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308
(Cite as: 449 U.S. 90, 101 S.Ct. 411)

U.S.C.A. § 2254.

## [9] Civil Rights 78 ☜1004

78 Civil Rights
    78I Rights Protected and Discrimination
Prohibited in General
        78k1002 Constitutional and Statutory
Provisions
        78k1004 k. Purpose and Construction in
General. Most Cited Cases
    (Formerly 78k102.1, 78k102, 78k2)
Main goal of Civil Rights Act of 1871 was to
override the corrupting influence of the Ku Klux
Klan and its sympathizers on the government and
law enforcement agencies of the southern states
and one strong motive behind its enactment was
great congressional concern that the state courts
had been deficient in protecting federal rights. 42
U.S.C.A. § 1983.

## [10] Statutes 361 ☜158

361 Statutes
    361V Repeal, Suspension, Expiration, and
Revival
        361k158 k. Implied Repeal in General.
Most Cited Cases
Repeals by implication are disfavored.

## [11] Federal Courts 170B ☜4

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(A) In General
        170Bk3 Jurisdiction in General; Nature
and Source
            170Bk4 k. Constitutional and
Statutory Provisions. Most Cited Cases
Although in enacting Civil Rights Act of 1871
Congress altered the balance of judicial power
between the state and federal courts, Congress did
so by adding to the jurisdiction of the federal

courts and not by subtracting from that of the state
courts. 42 U.S.C.A. § 1983.

## [12] Federal Courts 170B ☜392

170B Federal Courts
    170BVI State Laws as Rules of Decision
        170BVI(B) Decisions of State Courts as
Authority
            170Bk388 Federal Decision Prior to
State Decision
            170Bk392 k. Withholding Decision;
Certifying Questions. Most Cited Cases
Where plaintiff properly invokes federal court
jurisdiction in the first instance on a federal claim,
the federal court has a duty to accept that
jurisdiction and abstention and remission to a
state court for a related decision of state law may
serve only to postpone, rather than to abdicate,
federal jurisdiction as its purpose is to determine
whether resolution of the federal question is even
necessary, or to obviate the risk of a federal
court's erroneous construction of state law.

## [13] Courts 106 ☜90(1)

106 Courts
    106II Establishment, Organization, and
Procedure
        106II(G) Rules of Decision
            106k88 Previous Decisions as
Controlling or as Precedents
            106k90 Decisions of Same Court or
Co-Ordinate Court
                106k90(1) k. In General. Most
Cited Cases
The Stone v. Powell decision, i. e., preclusion of
search and seizure issue on federal habeas petition
where state court accorded petitioner a full and
fair opportunity to litigate the issue, did not
furnish a logical doctrinal source for ruling that
unavailability of federal habeas corpus prevented
defendant police officers from raising state

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

criminal courts' partial rejection of plaintiff's Fourth Amendment claim as a collateral estoppel defense to civil rights damage suit brought against the officers based on the same search and seizure. 28 U.S.C.A. §§ 1738, 2254, 2254(b, d); 42 U.S.C.A. § 1983; U.S.C.A.Const. Amend. 4.

## [14] Judgment 228 ☜828.4(1)

228 Judgment
    228XVII Foreign Judgments
        228k828 Effect of Judgments of State Courts in United States Courts
            228k828.4 Full Faith and Credit
                228k828.4(1) k. In General. Most Cited Cases
    (Formerly 228k828(3.1))
Collateral estoppel effect may be accorded state court judgments or decisions in federal court actions under Civil Rights Act of 1871; nothing in language or legislative history of the Act shows congressional intent to deny binding effect to a state court determination where the state court, acting within its proper jurisdiction, be it civil or criminal, has given the parties a full and fair opportunity to litigate federal claims and thereby shown itself willing and able to protect federal rights and collateral estoppel is not precluded on theory that one asserting a federal right is entitled to one unencumbered opportunity to litigate such right in federal district court regardless of the legal posture in which the federal claim arises. 28 U.S.C.A. § 1738; 42 U.S.C.A. § 1983.
**412 *Syllabus* [FN*]

        FN* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.    See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

*90 At a hearing before respondent's criminal trial, a Missouri court denied, in part, respondent's motion to suppress, on Fourth and Fourteenth Amendment grounds, certain evidence that had been seized by the police.    Respondent was subsequently convicted, and the conviction was affirmed on appeal.    Because he did not assert that the state courts had denied him a "full and fair opportunity" to litigate his search-and-seizure claim, respondent was barred by *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067, from seeking a writ of habeas corpus in a federal district court.    Nevertheless, he sought federal-court redress for the alleged constitutional violation by bringing a suit for damages under 42 U.S.C. § 1983 against the officers who had seized the evidence in question.    The Federal District Court granted summary judgment for the defendants, holding that collateral estoppel **413 prevented respondent from relitigating the search-and-seizure question already decided against him in the state courts.    The Court of Appeals reversed and remanded, noting that *Stone v. Powell, supra,* barred respondent from federal habeas corpus relief and that the § 1983 suit was, therefore, respondent's only route to a federal forum for his constitutional claim, and directed the trial court to allow him to proceed to trial unencumbered by collateral estoppel.

*Held:* The Court of Appeals erred in holding that respondent's inability to obtain federal habeas corpus relief upon his Fourth Amendment claim renders the doctrine of collateral estoppel inapplicable to his § 1983 suit.    Nothing in the language or legislative history of § 1983 discloses any congressional intent to deny binding effect to a state-court judgment or decision when the state court, acting within its proper jurisdiction, has given the parties a full and fair opportunity to litigate federal claims, and thereby has shown itself willing and able to protect federal rights. Nor does anything in § 1983's legislative history

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

101 S.Ct. 411
449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308
**(Cite as: 449 U.S. 90, 101 S.Ct. 411)**

reveal any purpose to afford less deference to judgments in state criminal proceedings than to those in state civil proceedings. Pp. 414-420.

8th Cir., 606 F.2d 795, reversed and remanded.

***91** John J. Fitzgibbon, St. Louis, Mo., for petitioners.

Jeffrey J. Shank, St. Louis, Mo., for respondent.

Justice STEWART, delivered the opinion of the Court.

At a hearing before his criminal trial in a Missouri court, the respondent, Willie McCurry, invoked the Fourth and Fourteenth Amendments to suppress evidence that had been seized by the police. The trial court denied the suppression motion in part, and McCurry was subsequently convicted after a jury trial. The conviction was later affirmed on appeal. State v. McCurry, 587 S.W.2d 337 (Mo.App.1979). Because he did not assert that the state courts had denied him a "full and fair opportunity" to litigate his search and seizure claim, McCurry was barred by this Court's decision in Stone v. Powell, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067, from seeking a writ of habeas corpus in a federal district court. Nevertheless, he sought federal-court redress for the alleged constitutional violation by bringing a damages suit under 42 U.S.C. § 1983 against the officers who had entered his home and seized the evidence in question. We granted certiorari to consider whether the unavailability of federal habeas corpus prevented the police officers from raising the state courts' partial rejection of McCurry's constitutional claim as a collateral estoppel defense to the § 1983 suit against them for damages. 444 U.S. 1070, 100 S.Ct. 1012, 62 L.Ed.2d 751.

***92** I

In April 1977, several undercover police officers, following an informant's tip that McCurry was dealing in heroin, went to his house in St. Louis, Mo., to attempt a purchase.[FN1] Two officers, petitioners Allen and Jacobsmeyer, knocked on the front door, while the other officers hid nearby. When McCurry opened the door, the two officers asked to buy some heroin "caps." McCurry went back into the house and returned soon thereafter, firing a pistol at and seriously wounding Allen and Jacobsmeyer. After a gun battle with the other officers and their reinforcements, McCurry retreated into the house; he emerged again when the police demanded that he surrender. Several officers then entered the house without a warrant, purportedly to search for other persons inside. One of the officers seized drugs and other contraband that lay in plain view, as well as additional contraband ****414** he found in dresser drawers and in auto tires on the porch.

> FN1. The facts are drawn from the Court of Appeals' opinion. 606 F.2d 795 (CA8 1979).

McCurry was charged with possession of heroin and assault with intent to kill. At the pretrial suppression hearing, the trial judge excluded the evidence seized from the dresser drawers and tires, but denied suppression of the evidence found in plain view. McCurry was convicted of both the heroin and assault offenses.

McCurry subsequently filed the present § 1983 action for $1 million in damages against petitioners Allen and Jacobsmeyer, other unnamed individual police officers, and the city of St. Louis and its police department. The complaint alleged a conspiracy to violate McCurry's Fourth Amendment rights, an unconstitutional search and seizure of his house, and an assault on him by unknown police officers after he had been arrested

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

101 S.Ct. 411
449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308
(Cite as: 449 U.S. 90, 101 S.Ct. 411)

and handcuffed. The petitioners moved for summary judgment. The District Court apparently under stood**93** the gist of the complaint to be the allegedly unconstitutional search and seizure and granted summary judgment, holding that collateral estoppel prevented McCurry from relitigating the search-and-seizure question already decided against him in the state courts. 466 F.Supp. 514 (ED Mo.1978).[FN2]

> FN2. The merits of the Fourth Amendment claim are discussed in the opinion of the Missouri Court of Appeals. *State v. McCurry*, 587 S.W.2d 337 (1979). The state courts upheld the entry of the house as a reasonable response to emergency circumstances, but held illegal the seizure of any evidence discovered as a result of that entry except what was in plain view. *Id.*, at 340. McCurry therefore argues here that even if the doctrine of collateral estoppel generally applies to this case, he should be able to proceed to trial to obtain damages for the part of the seizure declared illegal by the state courts. The petitioners contend, on the other hand, that the complaint alleged essentially an illegal entry, adding that only the entry could possibly justify the $1 million prayer. Since the state courts upheld the entry, the petitioners argue that if collateral estoppel applies here at all, it removes from trial all issues except the alleged assault. The United States Court of Appeals, however, addressed only the broad question of the applicability of collateral estoppel to § 1983 suits brought by plaintiffs in McCurry's circumstances, and questions as to the scope of collateral estoppel with respect to the particular issues in this case

are not now before us.

The Court of Appeals reversed the judgment and remanded the case for trial. 606 F.2d 795 (CA8 1979).[FN3] The appellate court said it was not holding that collateral estoppel was generally inapplicable in a § 1983 suit raising issues determined against the federal plaintiff in a state criminal trial. *Id.* at 798. But noting that *Stone v. Powell, supra*, barred McCurry from federal habeas corpus relief, and invoking "the special role of the federal courts in protecting civil rights," 606 F.2d, at 799, the court concluded that the § 1983 suit was McCurry's only route to a federal forum for his **94** constitutional claim and directed the trial court to allow him to proceed to trial unencumbered by collateral estoppel.[FN4]

> FN3. Beyond holding that collateral estoppel does not apply in this case, the Court of Appeals noted that the District Court had overlooked the conspiracy and assault charges. 606 F.2d, at 797, and n. 1.

> FN4. Nevertheless, relying on the doctrine of *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669, the Court of Appeals directed the District Court to abstain from conducting the trial until McCurry had exhausted his opportunities for review of his claim in the state appellate courts. 606 F.2d, at 799.

## II

[1][2][3][4] The federal courts have traditionally adhered to the related doctrines of res judicata and collateral estoppel. Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

were or could have been raised in that action. *Cromwell v. County of Sac*, 94 U.S. 351, 352, 24 L.Ed. 195. Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case. **415*Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210.[FN5] As this Court and other courts have often recognized, res judicata and collateral estoppel relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication. *Id.*, at 153-154, 99 S.Ct. at 973-974.

> FN5. The Restatement of Judgments now speaks of res judicata as "claim preclusion" and collateral estoppel as "issue preclusion." Restatement (Second) of Judgments § 74 (Tent. Draft No. 3, Apr. 15, 1976). Some courts and commentators use "res judicata" as generally meaning both forms of preclusion.
> Contrary to a suggestion in the dissenting opinion, *post*, at 424, n. 12, this case does not involve the question whether a § 1983 claimant can litigate in federal court an issue he might have raised but did not raise in previous litigation.

[5] In recent years, this Court has reaffirmed the benefits of collateral estoppel in particular, finding the policies underlying it to apply in contexts not formerly recognized at common law. Thus, the Court has eliminated the requirement of mutuality in applying collateral estoppel to bar relitigation*95 of issues decided earlier in federal-court suits, *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S.

313, 91 S.Ct. 1434, 28 L.Ed.2d 788, and has allowed a litigant who was not a party to a federal case to use collateral estoppel "offensively" in a new federal suit against the party who lost on the decided issue in the first case, *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552.[FN6] But one general limitation the Court has repeatedly recognized is that the concept of collateral estoppel cannot apply when the party against whom the earlier decision is asserted did not have a "full and fair opportunity" to litigate that issue in the earlier case. *Montana v. United States, supra*, at 153, 99 S.Ct. at 973; *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, supra*, 402 U.S., at 328-329, 91 S.Ct., at 1443.[FN7]

> FN6. In *Blonder-Tongue* the Court noted other trends in the state and federal courts expanding the preclusive effects of judgments, such as the broadened definition of "claim" in the context of res judicata and the greater preclusive effect given criminal judgments in subsequent civil cases. 402 U.S., at 326, 91 S.Ct., at 1441.

> FN7. Other factors, of course, may require an exception to the normal rules of collateral estoppel in particular cases. *E. g., Montana v. United States*, 440 U.S., at 162, 99 S.Ct., at 978 (unmixed questions of law in successive actions between the same parties on unrelated claims).
> Contrary to the suggestion of the dissent, *post*, at 424, our decision today does not "fashion" any new more stringent doctrine of collateral estoppel, nor does it hold that the collateral-estoppel effect of a state-court decision turns on the single factor of whether the State gave the

101 S.Ct. 411
449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308
(Cite as: 449 U.S. 90, 101 S.Ct. 411)

Page 8

federal claimant a full and fair opportunity to litigate a federal question. Our decision does not "fashion" any doctrine of collateral estoppel at all. Rather, it construes § 1983 to determine whether the conventional doctrine of collateral estoppel applies to the case at hand. It must be emphasized that the question whether any exceptions or qualifications within the bounds of that doctrine might ultimately defeat a collateral-estoppel defense in this case is not before us. See n. 2, *supra*.

[6] The federal courts generally have also consistently accorded preclusive effect to issues decided by state courts. *E. g., Montana v. United States, supra; Angel v. Bullington*, 330 U.S. 183, 67 S.Ct. 657, 91 L.Ed. 832. Thus, res judicata and collateral estoppel not only reduce unnecessary litigation and foster reliance on adjudication,*96 but also promote the comity between state and federal courts that has been recognized as a bulwark of the federal system. See *Younger v. Harris*, 401 U.S. 37, 43-45, 91 S.Ct. 746, 750-51, 27 L.Ed.2d 669.

[7] Indeed, though the federal courts may look to the common law or to the policies supporting res judicata and collateral estoppel in assessing the preclusive effect of decisions of other federal courts, Congress has specifically required all federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so:

"[J]udicial proceedings [of any court of any State] shall have the same full faith **416 and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State...." 28 U.S.C. § 1738 (1976).[FN8]

*Huron Holding Corp. v. Lincoln Mine Operating Co.*, 312 U.S. 183, 193, 61 S.Ct. 513, 517, 85 L.Ed. 725; *Davis v. Davis*, 305 U.S. 32, 40, 59 S.Ct. 3, 6, 85 L.Ed. 26. It is against this background that we examine the relationship of § 1983 and collateral estoppel, and the decision of the Court of Appeals in this case.

FN8. This statute has existed in essentially unchanged form since its enactment just after the ratification of the Constitution, Act of May 26, 1790, ch. 11, 1 Stat. 122, and its re-enactment soon thereafter, Act of Mar. 27, 1804, ch. 56, 2 Stat. 298-299. Congress has also provided means for authenticating the records of the state proceedings to which the federal courts are to give full faith and credit. 28 U.S.C. § 1738.

III

This Court has never directly decided whether the rules of res judicata and collateral estoppel are generally applicable to § 1983 actions. But in *Preiser v. Rodriguez*, 411 U.S. 475, 497, 93 S.Ct. 1827, 1840, 36 L.Ed.2d 439, the Court noted with implicit approval the view of other federal courts that res judicata principles fully apply to civil rights suits brought under that statute. See also *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 606, n. 18, 95 S.Ct. 1200, 1209, n. 18, 43 L.Ed.2d 482; *97Wolff v. McDonnell*, 418 U.S. 539, 554, n. 12, 94 S.Ct. 2963, 2974, n. 12, 41 L.Ed.2d 935.[FN9] And the virtually unanimous view of the Courts of Appeals since *Preiser* has been that § 1983 presents no categorical bar to the application of res judicata and collateral estoppel concepts.[FN10] These federal appellate court decisions have spoken with little explanation or citation in assuming the compatibility of § 1983 and rules of preclusion, but the statute and its legislative

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

101 S.Ct. 411
449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308
(Cite as: 449 U.S. 90, 101 S.Ct. 411)

Page 9

history clearly support the courts' decisions.

> FN9. The cases noted in *Preiser* applied res judicata to issues decided both in state civil proceedings, *e. g., Coogan v. Cincinnati Bar Assn.*, 431 F.2d 1209, 1211 (CA6 1970), and state criminal proceedings, *e. g., Goss v. Illinois*, 312 F.2d 257, 259 (CA7 1963).

> FN10. *E. g., Robbins v. District Court*, 592 F.2d 1015 (CA8 1979); *Jennings v. Caddo Parish School Bd.*, 531 F.2d 1331 (CA5 1976); *Lovely v. Laliberte*, 498 F.2d 1261 (CA1 1974); *Brown v. Georgia Power Co.*, 491 F.2d 117 (CA5 1974); *Tang v. Appellate Division*, 487 F.2d 138 (CA2 1973).
> A very few courts have suggested that the normal rules of claim preclusion should not apply in § 1983 suits in one peculiar circumstance: Where a § 1983 plaintiff seeks to litigate in federal court a federal issue which he could have raised but did not raise in an earlier state-court suit against the same adverse party. *Graves v. Olgiati*, 550 F.2d 1327 (CA2 1977); *Lombard v. Board of Ed. of New York City*, 502 F.2d 631 (CA2 1974); *Mack v. Florida Bd. of Dentistry*, 430 F.2d 862 (CA5 1970). These cases present a narrow question not now before us, and we intimate no view as to whether they were correctly decided.

[8] Because the requirement of mutuality of estoppel was still alive in the federal courts until well into this century, see *Blonder-Tongue Laboratories, Inc., v. University of Illinois Foundation, supra*, at 322-323, 91 S.Ct., at 1439-1440, the drafters of the 1871 Civil Rights Act, of which § 1983 is a part, may have had less

reason to concern themselves with rules of preclusion than a modern Congress would. Nevertheless, in 1871 res judicata and collateral estoppel could certainly have applied in federal suits following state-court litigation between the same parties or their privies, and nothing in the language of § 1983 remotely expresses any congressional intent to contravene the common-law rules of preclusion or to repeal the express statutory**98 requirements of the predecessor of 28 U.S.C. § 1738, see n. 8, *supra*. Section 1983 creates a new federal cause of action.[FN11] It says nothing about the **417 preclusive effect of state-court judgments. [FN12]

> FN11. "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983.
> It has been argued that, since there remains little federal common law after *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, to hold that the creation of a federal cause of action by itself does away with the rules of preclusion would take away almost all meaning from § 1738. Currie, Res Judicata: The Neglected Defense, 45 U.Chi.L.Rev. 317, 328 (1978).

> FN12. By contrast, the roughly contemporaneous statute extending the federal writ of habeas corpus to state prisoners expressly rendered "null and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

void" any state-court proceeding inconsistent with the decision of a federal habeas court, Act of Feb. 5, 1867, ch. 28, § 1, 14 Stat. 385, 386 (current version at 28 U.S.C. § 2254), and the modern habeas statute also expressly adverts to the effect of state-court criminal judgments by requiring the applicant for the writ to exhaust his state-court remedies, 28 U.S.C. § 2254(b), and by presuming a state-court resolution of a factual issue to be correct except in eight specific circumstances, § 2254(d). In any event, the traditional exception to res judicata for habeas corpus review, see *Preiser v. Rodriguez*, 411 U.S. 475, 497, 93 S.Ct. 1827, 1840, 36 L.Ed.2d 439, provides no analogy to § 1983 cases, since that exception finds its source in the unique purpose of habeas corpus-to release the applicant for the writ from unlawful confinement. *Sanders v. United States*, 373 U.S. 1, 8, 83 S.Ct. 1068, 1073, 10 L.Ed.2d 148.

[9][10] Moreover, the legislative history of § 1983 does not in any clear way suggest that Congress intended to repeal or restrict the traditional doctrines of preclusion. The main goal of the Act was to override the corrupting influence of the Ku Klux Klan and its sympathizers on the governments and law enforcement agencies of the Southern States, see *Monroe v. Pape*, 365 U.S. 167, 174, 81 S.Ct. 473, 477, 5 L.Ed.2d 492, and of course the debates show that one strong motive behind its enactment was grave congressional concern that the state courts had been deficient in *99 protecting federal rights, *Mitchum v. Foster*, 407 U.S. 225, 241-242, 92 S.Ct. 2151, 2161-2162, 32 L.Ed.2d 705; *Monroe v. Pape, supra*, at 180, 81 S.Ct., at 480.[FN13] But in the context of the legislative history as a whole, this congressional concern lends only the most equivocal support to

any argument that, in cases where the state courts have recognized the constitutional claims asserted and provided fair procedures for determining them, Congress intended to override § 1738 or the common-law rules of collateral estoppel and res judicata. Since repeals by implication are disfavored, *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 154, 96 S.Ct. 1989, 1993, 48 L.Ed.2d 540, much clearer support than this would be required to hold that § 1738 and the traditional rules of preclusion are not applicable to § 1983 suits.

> FN13. See, *e. g.*, Cong. Globe, 42d Cong., 1st Sess., 374-376 (1871) (Rep. Lowe); *id.*, at 394 (Rep. Rainey); *id.*, at 653 (Sen. Osborn).

[11] As the Court has understood the history of the legislation, Congress realized that in enacting § 1983 it was altering the balance of judicial power between the state and federal courts. See *Mitchum v. Foster, supra*, at 241, 92 S.Ct., at 2161. But in doing so, Congress was adding to the jurisdiction of the federal courts, not subtracting from that of the state courts. See *Monroe v. Pape, supra*, at 183, 81 S.Ct., at 481 ("The federal remedy is supplementary to the state remedy ...").[FN14] The debates contain several references to the concurrent jurisdiction of the state courts over federal questions,[FN15] and numerous suggestions*100 that the state courts would retain their established jurisdiction so that they could, when the then current political passions abated, **418 demonstrate a new sensitivity to federal rights.[FN16]

> FN14. To the extent that Congress in the post-Civil War period did intend to deny full faith and credit to state-court decisions on constitutional issues, it

expressly chose the very different means of postjudgment removal for state court defendants whose civil rights were threatened by biased state courts and who therefore "are denied or cannot enforce [their civil rights] in the courts or judicial tribunals of the State." Act of Apr. 9, 1866, ch. 31, § 3, 14 Stat. 27.

FN15. *E. g.,* Cong. Globe, 42d Cong., 1st Sess., 514 (1871) (Rep. Poland); *id.,* at 695 (Sen. Edmunds); see *Martinez v. California,* 444 U.S. 277, 283-284, n.7, 100 S.Ct. 553, 558, n.7, 62 L.Ed.2d 481 (noting that the state courts may entertain § 1983 claims, while reserving the question whether the state courts must do so).

FN16. Senator Edmunds, the floor manager of the bill in the Senate, observed at the end of the debates:
"The bill, like all bills of this character, in its first and second sections, is a declaration of rights and a provision for the punishment of conspiracies against constitutional rights, and a redress for wrongs.    It does not undertake to overthrow any court....    It does not undertake to interpose itself out of the regular order of the administration of law.    It does not attempt to deprive any State of the honor which is due the punishment of crime.    It is a law acting upon the citizen like every other law, and it is a law to be enforced by the courts through the regular and ordinary processes of judicial administration, and in no other way, until forcible resistance shall be offered to the quiet and ordinary course of justice." Cong. Globe, 42d Cong., 1st Sess., 697-698 (1871).
Representative Coburn expressed his

belief that after passage of the Act "the tumbling and tottering States will spring up and resume the long-neglected administration of law in their own courts, giving, as they ought, themselves, equal protection to all."    *Id.,* at 460. Representative Sheldon noted:
"Convenience and courtesy to the States suggest a sparing use [of national authority] and never so far as to supplant the State authority except in cases of extreme necessity, and when the State governments criminally refuse or neglect those duties which are imposed on them....    It seems to me to be sufficient, and at the same time to be proper, to make a permanent law affording to every citizen a remedy in the United States courts for injuries to him in those rights declared and guaranteed by the Constitution...." *Id.,* at 368.

[12] To the extent that it did intend to change the balance of power over federal questions between the state and federal courts, the 42d Congress was acting in a way thoroughly consistent with the doctrines of preclusion.    In reviewing the legislative history of § 1983 in *Monroe v. Pape, supra,* the Court inferred that Congress had intended a federal remedy in three circumstances: where state substantive law was facially unconstitutional, where state procedural law was *101 inadequate to allow full litigation of a constitutional claim, and where state procedural law, though adequate in theory, was inadequate in practice.    365 U.S., at 173-174, 81 S.Ct., at 476-477.    In short, the federal courts could step in where the state courts were unable or unwilling to protect federal rights. *Id.,* at 176, 81 S.Ct., at 478. This understanding of § 1983 might well support an exception to res judicata and collateral estoppel where state law did not provide fair procedures for the litigation of constitutional claims, or where

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

a state court failed to even acknowledge the existence of the constitutional principle on which a litigant based his claim. Such an exception, however, would be essentially the same as the important general limit on rules of preclusion that already exists: Collateral estoppel does not apply where the party against whom an earlier court decision is asserted did not have a full and fair opportunity to litigate the claim or issue decided by the first court. See *supra,* at 415. But the Court's view of § 1983 in *Monroe* lends no strength to any argument that Congress intended to allow relitigation of federal issues decided after a full and fair hearing in a state court simply because the state court's decision may have been erroneous.[FN17]

> FN17. The dissent suggests, *post,* at 424, that the Court's decision in *England v. Medical Examiners,* 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440, demonstrates the impropriety of affording preclusive effect to the state-court decision in this case. The *England* decision is inapposite to the question before us. In the *England* case, a party first submitted to a federal court his claim that a state statute violated his constitutional rights. The federal court abstained and remitted the plaintiff to the state courts, holding that a state-court decision that the statute did not apply to the plaintiff would moot the federal question. *Id.,* at 413, 84 S.Ct. at 463. The plaintiff submitted both the state-and federal-law questions to the state courts, which decided both questions adversely to him. *Id.,* at 414, 84 S.Ct., at 464. This Court held that in such a circumstance, a plaintiff who properly reserved the federal issue by informing the state courts of his intention to return to federal court, if necessary,

was not precluded from litigating the federal question in federal court. The holding in *England* depended entirely on this Court's view of the purpose of abstention in such a case: Where a plaintiff properly invokes federal-court jurisdiction in the first instance on a federal claim, the federal court has a duty to accept that jurisdiction. *Id.,* at 415, 84 S.Ct., at 464. Abstention may serve only to postpone rather than to abdicate, jurisdiction, since its purpose is to determine whether resolution of the federal question is even necessary, or to obviate the risk of a federal court's erroneous construction of state law. *Id.,* at 416, and n. 7, 84 S.Ct., at 465, and n. 7.

These concerns have no bearing whatsoever on the present case.

**\*102 \*\*419** The Court of Appeals in this case acknowledged that every Court of Appeals that has squarely decided the question has held that collateral estoppel applies when § 1983 plaintiffs attempt to relitigate in federal court issues decided against them in state criminal proceedings. [FN18] But the court noted that the only two federal appellate decisions invoking collateral estoppel to bar relitigation of Fourth Amendment claims decided adversely to the § 1983 plaintiffs in state courts came before this Court's decision in *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067.[FN19] It also noted that some of the decisions holding \*103 collateral estoppel applicable to § 1983 actions were based at least in part on the estopped party's access to another federal forum through habeas corpus. [FN20] The Court of Appeals thus concluded that since *Stone v. Powell* had removed McCurry's right to a hearing of his Fourth Amendment claim in federal habeas corpus, collateral estoppel should not deprive him of a federal judicial hearing of that claim in a § 1983 suit.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

101 S.Ct. 411
449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308
(Cite as: 449 U.S. 90, 101 S.Ct. 411)

FN18. *E. g., Fernandez v. Trias Monge,* 586 F.2d 848, 854 (CA1 1978); *Wiggins v. Murphy,* 576 F.2d 572, 573 (CA4 1978); *Martin v. Delcambre,* 578 F.2d 1164, 1165 (CA5 1978); *Winters v. Lavine,* 574 F.2d 46, 58 (CA2 1978); *Metros v. United States District Court,* 441 F.2d 313 (CA10 1971); *Kauffman v. Moss,* 420 F.2d 1270, 1274 (CA3 1970); *Mulligan v. Schlachter,* 389 F.2d 231, 233 (CA6 1968).

Dictum in *Nev v. California,* 439 F.2d 1285, 1288 (CA9 1971), suggested that applying collateral estoppel in § 1983 actions might make the Civil Rights Act "a dead letter," but in that case, because the state prosecutor had agreed to withdraw the evidence allegedly seized in violation of the Fourth Amendment, the state court had never decided the constitutional claim. In *Brubaker v. King,* 505 F.2d 534, 537-538 (1974), the Court of Appeals for the Seventh Circuit held that since the issues in the state and federal cases were different-the legality of police conduct in the former and the good faith of the police in the latter-the state-decision could not have preclusive effect in the federal court. This solution, however, fails to recognize that a state court decision that the police acted legally cannot but foreclose a claim that they acted in bad faith. At least one Federal District Court has relied on the *Brubaker* case. *Clark v. Lutcher,* 436 F.Supp. 1266 (MD Pa.1977).

FN19. *Metros v. United States District Court, supra; Mulligan v. Schlachter, supra.*

FN20. *E. g., Rimmer v. Fayetteville Police Department,* 567 F.2d 273, 276 (CA4 1977); *Thistlewaite v. City of New York,* 497 F.2d 339, 343 (CA2 1973); *Alexander v. Emerson,* 489 F.2d 285, 286 (CA5 1973).

[13] *Stone v. Powell* does not provide a logical doctrinal source for the court's ruling. This Court in *Stone* assessed the costs and benefits of the judge-made exclusionary rule within the boundaries of the federal courts' statutory power to issue writs of habeas corpus, and decided that the incremental deterrent effect that the issuance of the writ in Fourth Amendment cases might have on police conduct did not justify the cost the writ imposed upon the fair administration of criminal justice. 428 U.S., at 489-496, 96 S.Ct., at 3050-3053. The *Stone* decision concerns only the prudent exercise of federal-court jurisdiction under 28 U.S.C. § 2254. It has no bearing on § 1983 suits or on the question of the preclusive effect of state-court judgments.

[14] The actual basis of the Court of Appeals' holding appears to be a generally framed principle that every person asserting a federal right is entitled to one unencumbered opportunity to litigate that right in a federal district court, regardless of the legal posture in which the federal claim arises. But the authority for this principle is difficult to discern. It cannot lie in the Constitution, which makes no such guarantee, but leaves the scope of the jurisdiction of the federal district courts to the wisdom of Congress.[FN21] And no such authority is to be found in § 1983 itself. For reasons already discussed at length, nothing in the language or legislative history of **104 § 1983 **420 proves any congressional intent to deny binding effect to a state-court judgment or decision when the state court, acting within its proper jurisdiction, has given the parties a full and fair opportunity to litigate federal claims, and thereby has shown itself willing and able to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

protect federal rights.     And nothing in the legislative history of § 1983 reveals any purpose to afford less deference to judgments in state criminal proceedings than to those in state civil proceedings.[FN22] There is, in short, no reason to believe that Congress intended to provide a person claiming a federal right an unrestricted opportunity to relitigate an issue already decided in state court simply because the issue arose in a state proceeding in which he would rather not have been engaged at all.[FN23]


FN21. U.S.Const., Art. III.


FN22. The remarks of the proponents of § 1983 quoted in n. 16, *supra*, suggest the contrary. The Court of Appeals did not in any degree rest its holding on disagreement with the common view that judgments in criminal proceedings as well as in civil proceedings are entitled to preclusive effect.     See, *e. g., Emich Motors Corp. v. General Motors Corp.*, 340 U.S. 558, 71 S.Ct. 408, 95 L.Ed. 534.


FN23. The Court of Appeals did not suggest that the prospect of collateral estoppel in a § 1983 suit would deter a defendant in a state criminal case from raising Fourth Amendment claims, and it is difficult to imagine a defendant risking conviction and imprisonment because he hoped to win a later civil judgment based upon an allegedly illegal search and seizure.


Through § 1983, the 42d Congress intended to afford an opportunity for legal and equitable relief in a federal court for certain types of injuries. It is difficult to believe that the drafters of that Act considered it a substitute for a federal writ of habeas corpus, the purpose of which is not to

redress civil injury, but to release the applicant from unlawful physical confinement, *Preiser v. Rodriguez*, 411 U.S., at 484, 93 S.Ct., at 1833; *Fay v. Noia*, 372 U.S. 391, 399, n. 5, 83 S.Ct. 822, 827, n. 5, 9 L.Ed.2d 837,[FN24] particularly in light of the *105 extremely narrow scope of federal habeas relief for state prisoners in 1871.


FN24. Under the modern statute, federal habeas corpus is bounded by a requirement of exhaustion of state remedies and by special procedural rules, 28 U.S.C. § 2254, which have no counterparts in § 1983, and which therefore demonstrate the continuing illogic of treating federal habeas and § 1983 suits as fungible remedies for constitutional violations.


The only other conceivable basis for finding a universal right to litigate a federal claim in a federal district court is hardly a legal basis at all, but rather a general distrust of the capacity of the state courts to render correct decisions on constitutional issues. It is ironic that *Stone v. Powell* provided the occasion for the expression of such an attitude in the present litigation, in view of this Court's emphatic reaffirmation in that case of the constitutional obligation of the state courts to uphold federal law, and its expression of confidence in their ability to do so. 428 U.S., at 493-494, n. 35, 96 S.Ct., at 3051-52, n. 35; see *Robb v. Connolly*, 111 U.S. 624, 637, 4 S.Ct. 544, 551, 28 L.Ed. 542 (Harlan, J.).

The Court of Appeals erred in holding that McCurry's inability to obtain federal habeas corpus relief upon his Fourth Amendment claim renders the doctrine of collateral estoppel inapplicable to his § 1983 suit.[FN25] Accordingly, the judgment is reversed, and the case is remanded to the Court of Appeals for proceedings consistent

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

101 S.Ct. 411
449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308
(Cite as: 449 U.S. 90, 101 S.Ct. 411)

with this opinion.

> FN25. We do not decide *how* the body of collateral estoppel-doctrine or 28 U.S.C. § 1738 should apply in this case. See n. 2, *supra.*

*It is so ordered.*

Justice BLACKMUN, with whom Justice BRENNAN and Justice MARSHALL join, dissenting.
The legal principles with which the Court is concerned in this civil case obviously far transcend the ugly facts of respondent's criminal convictions in the courts of Missouri for heroin possession and assault.

The Court today holds that notions of collateral estoppel apply with full force to this suit brought under 42 U.S.C. § 1983. In my view, the Court, in so ruling, ignores **421 the clear import of the legislative history of that statute and disregards the important federal policies that underlie its *106 enforcement. It also shows itself insensitive both to the significant differences between the § 1983 remedy and the exclusionary rule, and to the pressures upon a criminal defendant that make a free choice of forum illusory. I do not doubt that principles of preclusion are to be given such effect as is appropriate in a § 1983 action. In many cases, the denial of res judicata or collateral estoppel effect would serve no purpose and would harm relations between federal and state tribunals. Nonetheless, the Court's analysis in this particular case is unacceptable to me. It works injustice on this § 1983 plaintiff, and it makes more difficult the consistent protection of constitutional rights, a consideration that was at the core of the enacters' intent. Accordingly, I dissent.

In deciding whether a common-law doctrine is to apply to § 1983 when the statute itself is silent, prior cases uniformly have accorded the intent of the legislators great weight.[FN1] For example, in reference to the judicially created immunity doctrine, the Court has observed that when the "immunity claimed ... was well established at common law at the time § 1983 was enacted, and where its rationale was compatible with the purposes of the Civil Rights Act, we have construed the statute to incorporate that immunity." *Owen v. City of Independence*, 445 U.S. 622, 638, 100 S.Ct. 1398, 1409, 63 L.Ed.2d 673 (1980).[FN2] This very proper inquiry must be made in order to ensure that § 1983 will continue to serve the important goals intended for it by the 42d Congress. In the present case, however, the Court minimizes the significance of the legislative history and discounts its own prior explicit interpretations of the statute. Its discussion is limited to articulating what it terms the single fundamental principle of res judicata and collateral estoppel.

> FN1. See, *e. g., Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980); *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976).

> FN2. See also *Robertson v. Wegmann*, 436 U.S. 584, 98 S.Ct. 1991, 56 L.Ed.2d 554 (1978) (survival of action); *Carey v. Piphus*, 435 U.S. 247, 97 S.Ct. 1642, 55 L.Ed.2d 252 (1978) (nature of damages award).

*107 Respondent's position merits a quite different analysis. Although the legislators of the 42d Congress did not expressly state whether the

then existing common-law doctrine of preclusion would survive enactment of § 1983, they plainly anticipated more than the creation of a federal statutory remedy to be administered indifferently by either a state or a federal court. [FN3] The legislative intent, as expressed by supporters [FN4] and understood by opponents,[FN5] was to **422 restructure relations *108 between the state and federal courts.[FN6] Congress deliberately opened the federal courts to individual citizens in response to the States' failure to provide justice in their own courts. Contrary to the view presently expressed by the Court, the 42d Congress was not concerned solely with procedural regularity. Even where there was procedural regularity, which the Court today so stresses, Congress believed that substantive justice was unobtainable.[FN7] The availability of the federal *109 forum was not meant to turn on whether, in an individual case, the state procedures were adequate. Assessing the state of affairs as a whole, Congress specifically made a determination that federal oversight of constitutional determinations through the federal courts was necessary to ensure the effective enforcement of constitutional rights.

> FN3. Senator Osborn's remarks of April 13, 1871, illustrate the contemporary understanding:
> "That the State courts in the several States have been unable to enforce the criminal laws of their respective States or to suppress the disorders existing, and in fact that the preservation of life and property in many sections of the country is beyond the power of the State government, is a sufficient reason why Congress should [enact protective legislation]....
> "The question now is, what and where is the remedy? I believe the true remedy

lies chiefly in the United States district and circuit courts. If the State courts had proven themselves competent to suppress the local disorders, or to maintain law and order, we should not have been called upon to legislate upon this subject at all.

But they have not done so. We are driven by existing facts to provide for the several States in the South what they have been unable fully to provide for themselves; i. e., the full and complete administration of justice in the courts. And the courts with reference to which we legislate must be the United States courts." Cong. Globe, 42d Cong., 1st Sess., 653.

> FN4. See, e. g., id., at 460 (remarks of Rep. Coburn, whom the Court by its reference to the Congressman's "spring up and resume" observation, ante, at 418, n. 16, would interpret the other way) ("The United States courts are further above mere local influence than the county courts; their judges can act with more independence, cannot be put under terror, as local judges can; their sympathies are not so nearly identified with those of the vicinage; the jurors are taken from the State, and not the neighborhood; they will be able to rise above prejudices or bad passions or terror more easily.... We believe that we can trust our United States courts, and we propose to do so"); Cong.Globe, 42d Cong., 1st Sess., App., at 79 (comments of Rep. Perry) ("The first section provides redress by civil action in the Federal courts for a deprivation of any rights, privileges, and immunities secured by the Constitution ...") (emphasis added).

> FN5. Id., at 396 (comments of Rep. Rice)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

("[The bill] is but a bold and dangerous assertion of both the power and the duty of the Federal Government to intervene in the internal affairs and police regulations of the States and to suspend the exercise of their rightful authority.... It is at war with the spirit of a republican Government"); *id.*, at 416 (comments of Rep. Biggs) ("[If this bill should pass] we have by law done what has never before been done in our history, whatever the provocation, namely: authorized the punishment of crimes and offenses of a personal character among us under the Federal tribunals, which shall be of equal authority in criminal cases with our own State courts, and in many cases shall be of superior authority, and of an altogether extraordinary character[.] First, for the violation of the rights, privileges, and immunities of the citizen a civil remedy is to be had by proceedings in the Federal courts, State authorization in the premises to the contrary notwithstanding"); *id.*, App., at 86 (comments of Rep. Storm) ("Now these questions could all be tried, I take it, in the State courts, and by a writ of error, as provided by the twenty-fifth section of the act of 1789, could be brought before the Supreme Court for review.... But the first section of this bill does not allow that right. It takes the whole question away at once and forever; and I say that on the ground of delay it is objectionable"). See also *id.*, at 686-687 (comments of Sen. Schurz); *id.*, App., at 216 (comments of Sen. Thurman).

FN6. See *id.*, App., at 149 (comments of Rep. Garfield) (stating that Congress, in considering this legislation, must seek equipoise between opposing poles of government, on the one hand, "that despotism which shallows and absorbs all power in a single-central, government," and, on the other, the "extreme doctrine of local sovereignty which makes nationality impossible").

FN7. See *id.*, App., at 78 (comments of Rep. Perry) ("Sheriffs, having eyes to see, see not; judges, having ears to hear, hear not; witnesses conceal the truth or falsify it; grand and petit juries act as if they might be accomplices. In the presence of these gangs all the apparatus and machinery of civil government, all the processes of justice, skulk away as if government and justice were crimes and feared detection. Among the most dangerous things an injured party can do is to appeal to justice. Of the uncounted scores and hundreds of atrocious mutilations and murders it is credibly stated that not one has been punished"); *id.*, at 653 (comments of Sen. Osborn) ("The State courts, mainly under the influence of this [Klan] oath, are utterly powerless"); *id.*, at 394 (remarks of Rep. Rainey) ("The question is sometimes asked, Why do not the courts of law afford redress? Why the necessity of appealing to Congress? We answer that the courts are in many instances under the control of those who are wholly inimical to the impartial administration of law and equity. What benefit would result from appeal to tribunals whose officers are secretly in sympathy with the very evil against which we are striving?"); *id.*, App., at 153 (comments of Rep. Garfield) ("But the chief complaint is not that the laws of the State are unequal, but that even where the laws are just and equal on their face, yet, by a systematic maladministration of them, or a neglect or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

refusal to enforce their provisions, a portion of the people are denied equal protection under them"); *id.*, App., at 166-167 (comments of Rep. Williams regarding Klan methods of securing perjured testimony).

That the new federal jurisdiction was conceived of as concurrent with state jurisdiction does not alter the significance of Congress' opening the federal courts to these claims. Congress consciously acted in **423 the broadest possible manner.[FN8] The legislators perceived that justice was not being done in *110 the States then dominated by the Klan, and it seems senseless to suppose that they would have intended the federal courts to give full preclusive effect to prior state adjudications. That supposition would contradict their obvious aim to right the wrongs perpetuated in those same courts.

> FN8. Representative Shellabarger, the bill's sponsor, stated:
> "This act is remedial, and in aid of the preservation of human liberty and human rights. All statutes and constitutional provisions authorizing such statutes are liberally and beneficently construed. It would be most strange and, in civilized law, monstrous were this not the rule of interpretation. As has been again and again decided by your own Supreme Court of the United States, and everywhere else where there is wise judicial interpretation, the largest latitude consistent with the words employed is uniformly given in construing such statutes and constitutional provisions as are meant to protect and defend and give remedies for their wrongs to all the people." *Id.*, App., at 68.

I appreciate that the legislative history is capable of alternative interpretations. See the Court's opinion, *ante*, at 417-418. I would have thought, however, that our prior decisions made very clear which reading is required. The Court repeatedly has recognized that § 1983 embodies a strong congressional policy in favor of federal courts' acting as the primary and final arbiters of constitutional rights.[FN9] In *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 51 L.Ed.2d 492 (1961), the Court held that Congress passed the legislation in order to substitute a federal forum for the ineffective, although plainly available, state remedies:

> FN9. *E. g.*, *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 51 L.Ed.2d 492 (1961); *McNeese v. Board of Education*, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963); *Zwickler v. Koota*, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967).

"It is abundantly clear that one reason the legislation was passed was to afford a federal right in federal courts because, by reason of prejudice, passion, neglect, intolerance or otherwise, state laws might not be enforced and the claims of citizens to the enjoyment of rights, privileges, and immunities guaranteed by the Fourteenth Amendment might be denied by the state agencies." *Id.*, at 180, 81 S.Ct., at 480.[FN10]

> FN10. To the extent that *Monroe v. Pape* held that a municipality was not a "person" within the meaning of § 1983, it was overruled by the Court in *Monell v. New York City Dept. of Social Services*, 436 U.S., at 664-689, 98 S.Ct., at 2022-2035. That ruling, of course, does not affect *Monroe's* authoritative pronouncement of the legislative

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

purposes of § 1983.

The Court appears to me to misconstrue the plain meaning of *Monroe*. It states that in that case, "the Court inferred that Congress had intended a federal remedy in three circumstances: where state substantive law was facially unconstitutional, where state procedural law was inadequate to allow *111 full litigation of a constitutional claim, and where state procedural law, though adequate in practice, was inadequate in practice." *Ante*, at 418. It is true that the Court in *Monroe* described those three circumstances as the "three main aims" of the legislation. 365 U.S., at 173, 81 S.Ct., at 476. Yet in that case, the Court's recounting of the legislative history and its articulation of these three purposes were intended only as illustrative of *why* the 42d Congress chose to establish a federal remedy in federal court, not as a delineation of *when* the remedy would be available. The Court's conclusion was that this remedy was to be available no matter what the circumstances of state law:

"It is no answer that the State has a law which if enforced would give relief. The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked. Hence the fact that Illinois by its constitution and laws outlaws unreasonable searches and seizures is no barrier to the present suit in the federal court." *Id.*, at 183, 81 S.Ct., at 481.

In *Mitchum v. Foster*, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972), the Court reiterated**424 its understanding of the effect of § 1983 upon state and federal relations:"Section 1983 was thus a product of a vast transformation from the concepts of federalism that had prevailed in the late 18th century.... The very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights-to protect the people from

unconstitutional action under color of state law, 'whether that action be executive, legislative, or judicial.' *Ex parte Virginia*, 100 U.S. [339], at 346 [25 L.Ed. 676]." *Id.*, at 242, 92 S.Ct., at 2162. <sup>FN11</sup>

> FN11. The Court also stated:
> "This legislative history makes evident that Congress clearly conceived that it was altering the relationship between the States and the Nation with respect to the protection of federally created rights; it was concerned that state instrumentalities could not protect those rights; it realized that state officers might, in fact, be antipathetic to the vindication of those rights; and it believed that these failings extended to the state courts." 407 U.S., at 242, 92 S.Ct., at 2162.

*112 At the very least, it is inconsistent now to narrow, if not repudiate, the meaning of *Monroe* and *Mitchum* and to alter our prior understanding of the distribution of power between the state and federal courts.

One should note also that in *England v. Medical Examiners*, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964), the Court had affirmed the federal courts' special role in protecting constitutional rights under § 1983. In that case it held that a plaintiff required by the abstention doctrine to submit his constitutional claim first to a state court could not be precluded entirely from having the federal court, in which he initially had sought relief, pass on his constitutional claim. The Court relied on "the unqualified terms in which Congress, pursuant to constitutional authorization, has conferred specific categories of jurisdiction upon the federal courts," and on its "fundamental objections to any conclusion that a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

101 S.Ct. 411
449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308
(Cite as: 449 U.S. 90, 101 S.Ct. 411)

litigant who has properly invoked the jurisdiction of a Federal District Court to consider federal constitutional claims can be compelled, without his consent and through no fault of his own, to accept instead a state court's determination of those claims." _Id., at 415, 84 S.Ct., at 464._ The Court set out its understanding as to when a litigant in a § 1983 case might be precluded by prior litigation, holding that "if a party freely and without reservation submits his federal claims for decision by the state courts, litigates them there, and has them decided there, then-whether or not he seeks direct review of the state decision in this Court-he has elected to forgo his right to return to the District Court." _Id., at 419, 84 S.Ct., at 466._ I do not understand why the Court today should abandon this approach.

The Court now fashions a new doctrine of preclusion, applicable only to actions brought under § 1983, that is more *113 strict and more confining than the federal rules of preclusion applied in other cases. In _Montana v. United States,_ 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979), the Court pronounced three major factors to be considered in determining whether collateral estoppel serves as a barrier in the federal court:

"[W]hether the issues presented ... are in substance the same ...; whether controlling facts or legal principles have changed significantly since the state-court judgment; and finally, whether other special circumstances warrant an exception to the normal rules of preclusion." _Id., at 155, 99 S.Ct., at 975._

But now the Court states that the collateral-estoppel effect of prior state adjudication should turn on only one factor, namely, what it considers the "one general limitation" inherent in the doctrine of preclusion: "that the concept of collateral estoppel cannot

apply when the party against whom the earlier decision is asserted did not have a 'full and fair opportunity' to litigate that issue in the earlier case." _Ante,_ at 415, 418. If that one factor is present, the Court asserts, the litigant properly should be barred from relitigating the issue in federal **425 court.[FN12] One cannot deny that this factor is an important one. I do not believe, however, that the doctrine of preclusion requires the inquiry to be so narrow,[FN13] and my understanding of the policies underlying § 1983 would lead me to consider all relevant factors in each case before concluding that preclusion was warranted.

> FN12. This articulation of the preclusion doctrine of course would bar a § 1983 litigant from relitigating any issue he _might_ have raised, as well as any issue he actually litigated in his criminal trial.

> FN13. See Restatement (Second) of Judgments § 68.1 (Tent. Draft No. 4, Apr. 15, 1977); F. James & G. Hazard, Civil Procedure §§ 11.16-11.22 (2d ed. 1977).

In this case, the police officers seek to prevent a criminal defendant from relitigating the constitutionality of their conduct in searching his house, after the state trial court had *114 found that conduct in part violative of the defendant's Fourth Amendment rights and in part justified by the circumstances. I doubt that the police officers, now defendants in this § 1983 action, can be considered to have been in privity with the State in its role as prosecutor. Therefore, only "issue preclusion"[FN14] is at stake.

> FN14. See _Cromwell v. County of Sac,_ 94 U.S. 351, 24 L.Ed. 195 (1877); F. James & G. Hazard, Civil Procedure §§ 11.3,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

11.16 (2d ed. 1977).

The following factors persuade me to conclude that this respondent should not be precluded from asserting his claim in federal court. First, at the time § 1983 was passed, a nonparty's ability, as a practical matter, to invoke collateral estoppel was nonexistent. One could not preclude an opponent from relitigating an issue in a new cause of action, though that issue had been determined conclusively in a prior proceeding, unless there was "mutuality." [FN15] Additionally, the definitions of "cause of action" and "issue" were narrow.[FN16] As a result, and obviously, no preclusive effect could arise out of a criminal proceeding that would affect subsequent *civil* litigation. Thus, the 42d Congress could not have anticipated or approved that a criminal defendant, tried and convicted *115 in state court, would be precluded from raising against police officers a constitutional claim arising out of his arrest.

> FN15. *Triplett v. Lowell,* 297 U.S. 638, 56 S.Ct. 645, 80 L.Ed. 949 (1936), overruled by the Court in *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971); *Bigelow v. Old Dominion Copper Mining & Smelting Co.,* 225 U.S. 111, 32 S.Ct. 641, 56 L.Ed. 1009 (1912); F. James & G. Hazard, Civil Procedure § 11.2 (2d ed. 1977); Restatement of Judgments § 93 (1942); 1B J. Moore, Federal Practice ¶¶ 0.412[1], 0.441 [3] (2d ed. 1974).

> FN16. Compare McCaskill, Actions and Causes of Action, 34 Yale L.J. 614, 638 (1925) (defining "cause of action" as "that group of operative facts which, standing alone, would show a single right in the plaintiff and a single delict to that

right giving cause for the state, through its courts, to afford relief to the party or parties whose right was invaded"), with C. Clark, Handbook on the Law of Code Pleading 84 (1928) (adopting "modern" rule expanding "cause of action" to include more than one "right"). See also 1 H. Herman, Law of Estoppel and Res Judicata §§ 92, 96 ("cause of action"), 98, 103, 111 ("issue") (1886); *Developments in the Law-Res Judicata,* 65 Harv.L.Rev. 818, 826, 841-843 (1952).

Also, the process of deciding in a state criminal trial whether to exclude or admit evidence is not at all the equivalent of a § 1983 proceeding. The remedy sought in the latter is utterly different. In bringing the civil suit the criminal defendant does not seek to challenge his conviction collaterally. At most, he wins damages. In contrast, the exclusion of evidence may prevent a criminal conviction. A trial court, faced with the decision whether to exclude relevant evidence, confronts institutional pressures that may cause it to give a different shape to the Fourth Amendment right from what would result in civil litigation of a damages claim. Also, the issue whether to exclude evidence is subsidiary to the purpose of a criminal trial, which is to determine the guilt or innocence of the defendant, and a trial court, at least subconsciously, must weigh the potential damage to the truth-seeking process caused by excluding relevant evidence. See **426*Stone v. Powell,* 428 U.S. 465, 489-495, 96 S.Ct. 3037, 3050-3052, 49 L.Ed.2d 1067 (1976). Cf. *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388, 411-424, 91 S.Ct. 1999, 2012-2018, 29 L.Ed.2d 619 (1971) (dissenting opinion).

A state criminal defendant cannot be held to have chosen "voluntarily" to litigate his Fourth Amendment claim in the state court. The risk of conviction puts pressure upon him to raise all

101 S.Ct. 411
449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308
(Cite as: 449 U.S. 90, 101 S.Ct. 411)

Page 22

possible defenses.[FN17] He also faces uncertainty about the wisdom of forgoing litigation on *any* issue, for there is the possibility that he will be held to have waived his right to appeal on that issue. The "deliberate bypass" of state procedures, which the imposition of collateral estoppel under these circumstances encourages, surely is not a preferred goal. To hold that a criminal defendant who raises a Fourth Amendment claim at his criminal trial "freely and without reservation submits his federal claims for decision by the state *116 courts," see *England v. Medical Examiners*, 375 U.S., at 419, 84 S.Ct., at 466, is to deny reality. The criminal defendant is an involuntary litigant in the state tribunal, and against him all the forces of the State are arrayed. To force him to a choice between forgoing either a potential defense or a federal forum for hearing his constitutional civil claim is fundamentally unfair.

> FN17. See *Moran v. Mitchell*, 354 F.Supp. 86, 88-89 (ED Va.1973) (noting the defendant's dilemma).

I would affirm the judgment of the Court of Appeals.

U.S.Mo.,1980.
Allen v. McCurry
449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 7 |
| | ) | Bankruptcy No. 03 B 21620 |
| ANTHONY FIELDS, | ) | Judge Manuel Barbosa |
| | ) | |
| Debtor, | ) | |
| | ) | |
| CHARLES J. MYLER, not individually but | ) | Adversary No. 04 A 00189 |
| solely as trustee, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | |
| ANTHONY FIELDS, RALPH BOOKER, | ) | |
| VERNON WILLIAMS, VERNON | ) | |
| WILLIAMS ARCHITECTS, P.C., | ) | |
| LAKEVIEW REAL ESTATE DEVELOP- | ) | |
| MENT CO., and PARKWAY BANK, | ) | |
| | ) | |
| Defendants. | ) | |

## VERNON WILLIAMS AND VERNON WILLIAMS ARCHITECTS, P.C.'S STATEMENT OF MATERIAL FACTS

Vernon Williams ("Williams") and Vernon Williams Architects, P.C. ("VWA") by and

through their attorneys present the following Statement of Material Facts in support of their Motion

for Summary Judgment.

1.    Williams is a licensed architect and the owner of VWA. Affidavit of Vernon Williams, ¶ 2.

2.    In 1999, the Debtor, Anthony Fields, contacted Williams regarding the Debtor's plan to build

      a Howard Johnson Hotel on property owned by Debtor located on the northeast corner of

      South Lake Park Avenue and East Oakwood Boulevard in Chicago, Illinois. (the "Property")

      Affidavit of Vernon Williams, ¶ 3.

3.  On October 6, 1999, Williams drafted a proposal for the Debtor to give him an estimated cost for VWA's architectural services. The Debtor accepted the proposal and on December 1, 1999, VWA entered into a STANDARD FORM OF AGREEMENT BETWEEN OWNER AND ARCHITECT WITH STANDARD FORM OF ARCHITECT'S SERVICES ("Contract") with Lakeview Real Estate Development Company ("Lakeview"). Williams signed the contract on behalf of VWA and the Debtor signed the contract on behalf of Lakeview. Affidavit of Vernon Williams, ¶¶ 3-4.

4.  From December 10, 1999 through June 21, 2001, VWA performed the following services pursuant to the Contract: drafted a proposed project schedule; prepared a zoning analysis; created grade level and street level site plans; drafted a document entitled "Background Material For Proposed Lakeview Howard Johnson Hotel;" and created nearly a dozen schematic designs. Affidavit of Vernon Williams, ¶ 5.

5.  On January 25, 2000, Williams met with Debtor and Alderman Toni Preckwinkle to present VWA's designs and to seek the alderman's support in re-zoning the property. Subsequent to the meeting with Alderman Preckwinkle, VWA continued to create schematic designs for the project, Williams participated in numerous telephone conferences and meetings with the Debtor and his attorney regarding the zoning issues, and Williams met several times with representatives from Draper and Kramer regarding financial issues related to the project. Facts. In all, VWA spent 159 hours on the project. Affidavit of Vernon Williams, ¶ 6.

6.  From December 1999 through June 2003, VWA submitted invoices to the Debtor for the work performed, however none of VWA's invoices were ever paid. The invoices were mailed to the Debtor's home address: 42 W 036 Beith Rd. Elburn, Illinois, 60119. To date,

2

the only amount paid to VWA was the $5,000.00 retainer. Affidavit of Vernon Williams, ¶ 7.

7.    On January 10, 2002, Williams filed an Architect's Notice and Claim for Lien ("Claim for Lien") on behalf of VWA and against Lakeview in the amount of $43,012.69. Affidavit of Vernon Williams, ¶ 8.

8.    The Claim for Lien was verified by Williams and recorded with the Cook County Recorder's Office as Document Number 0020043287. Affidavit of Vernon Williams, ¶ 8.

9.    The Claim for Lien contained the following description of the contract:

That on December 1, 1999, said owner made a contract with the claimant to develop and prepare the design and construction documentation for the new construction of the proposed +/- 125 room hotel with restaurant, health spa and swimming pool, meeting/banquet rooms, administrative offices, parking for 133 cars and +/- 6400 s.f commercial retail space, for and in said improvement.

Affidavit of Vernon Williams, ¶ 8.

10.   The Claim for Lien also contained the following statement regarding the amount due under the contract:

There is due, unpaid and owing to the claimant, after allowing all credits, the sum of FORTY THREE THOUSAND AND TWELVE and 69/100 ($43,012.69) DOLLARS, for which, with interest, the claimant claims a lien on said land and improvements and on the moneys or other consideration due or to become due from the owner under said contract.

Affidavit of Vernon Williams, ¶ 8.

11.   The Claim for Lien contained the following description of the property that is subject to the lien:

Parcel 1:

3

Lots 1, 2, 3, 4 and 5 in Mary A. Hoagland's Subdivision of the Southerly 100 feet of Lots 10 and 11 except the Easterly 80 feet of said Lot 10 in Block 3 of Cleaverville in Section 35, Township 39 North, Range 14, East of the Third Principal Meridian, in Cook County, Illinois.

Permanent Tax Index Number 17-35-104-024.

Parcel 2:

Lot 5 in Mary A. Hoagland's Subdivision of the South 100 feet of Lots 10 and 11 (except the East 80 feet of Lot 10) in Block 3 of Cleaverville in Section 35, Township 39 North, Range 14, East of the Third Principal Meridian, in Cook County, Illinois.

Permanent Tax Index Number 17-35-104-022.

Parcel 3:

A parcel of land being the East 80 feet of the South 100 feet of Lot 10 in Block 3 in Cleaverville (so called) a Subdivision of the North 71 and 20/100 acres of fractional Section 2, Township 38 North, Range 14, East of the Third Principal Meridian, and 20 acres of the South East part of fractional of Section 35, Township 39 North, Range 14, East of the Third Principal described as follows: Beginning at the South East corner of said Lot 10, thence Westerly along the North line of Oakwood Boulevard 80 feet; thence Northerly on a line parallel with the East line of said Lot 10 a distance of 100 feet; thence Easterly on a line parallel with the North line of Oakwood Boulevard 80 feet to the Illinois Central Railroad Company's right of way line; thence Southerly along said Westerly right of way line to the place of beginning in Cook County, Illinois.

Permanent Tax Index Number 17-35-104-023.

Address(es) of premises: The northeast corner of South Lake Park Avenue and East Oakwood Boulevard, Chicago, Illinois.

Affidavit of Vernon Williams, ¶ 8.

12.     On January 21, 2003, the Debtor filed a "Petition to Declare Invalidity of Mechanic's Lien and Other Relief" as well as a "Petition for Temporary Mandatory Injunction and/or Alternative Relief" against Williams and VWA.    In the Petitions and in the Debtor's

4

affidavit in support of the Petitions, the Debtor identified the Property on which the Claim for Lien attached. Affidavit of Vernon Williams, ¶ 9.

13.     On May 15, 2003, Debtor filed bankruptcy under Chapter 11. On June 10, 2003, Debtor filed an adversary complaint (Case No. 03 A 01969) against Williams and VWA seeking to invalidate VWA's Claim for Lien ("Debtor's Adversary Complaint"). Affidavit of Vernon Williams, ¶ 10.

14.     On June 20, 2003, Debtor filed a motion for summary judgment on the Debtor's Adversary Complaint. After a hearing, the Debtor's motion for summary judgment was denied and a trial was set for August 27, 2003. On August 27, 2003, the Debtor advised the court that he was not prepared to proceed with the trial. Accordingly, the Adversary Complaint was dismissed for want of prosecution. Affidavit of Vernon Williams, ¶ 11.

15.     Also on August 27, 2003, the Debtor's case was converted from a Chapter 7 to a Chapter 11. Affidavit of Vernon Williams, ¶ 12.

16.     On February 5, 2004, the Trustee filed an adversary complaint against Williams and VWA again challenging the validity of VWA's Claim for Lien ("Trustee's Adversary Complaint"). Affidavit of Vernon Williams, ¶ 13.

17.     On March 3, 2004, Williams and VWA filed their Answer to the Adversary Complaint. The Answer contained the following Affirmative Defense:

> The doctrine of *res judicata* prevents the trustee from re-litigating the question of whether VWA's lien is valid. The debtor previously filed an adversary complaint against Williams and VWA which sought to invalidate VWA's architect's lien. See Case No. 03 A 01969. On August 27, 2003, the Court entered an order dismissing the adversary complaint for want of prosecution. Pursuant to Rule 7041 of the Federal Rules of Bankruptcy Procedure and Rule 41 of the Federal Rules of Civil Procedure, a dismissal

5

for want of prosecution "operates as an adjudication upon the merits." FRCP 41(b). Therefore, the trustee cannot re-litigate the validity of VWA's lien.

Affidavit of Vernon Williams, ¶ 14.

Respectfully submitted,

**VERNON WILLIAMS and VERNON WILLIAMS ARCHITECTS, P.C.**

s/Ronald Austin, Jr.

Ronald Austin, Jr.
**BROTHERS & THOMPSON, P.C.**
100 West Monroe Street, Suite 1700
Chicago, Illinois 60603
(312) 372-2909

6

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on January 8, 2008, he caused VERNON WILLIAMS AND

VERNON WILLIAMS ARCHITECTS, P.C.'S STATEMENT OF MATERIAL FACTS to be served

on all counsel of record via the Court's electronic filing system.


s/ Ronald Austin, Jr.

Ronald Austin, Jr.
BROTHERS & THOMPSON, P.C.
100 W. Monroe Street, Suite 1700
Chicago, Illinois 60603
(312) 372-2909
ra2law@cs.com

STATE OF ILLINOIS    )
                             ) ss

COUNTY OF COOK    )

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 7 |
| | ) | Bankruptcy No. 03 B 21620 |
| ANTHONY FIELDS, | ) | Judge Manuel Barbosa |
| | ) | |
| Debtor, | ) | |
| | ) | |
| CHARLES J. MYLER, not individually but solely as trustee, | ) ) ) | Adversary No. 04 A 00189 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ANTHONY FIELDS, RALPH BOOKER, VERNON WILLIAMS, VERNON WILLIAMS ARCHITECTS, P.C., LAKEVIEW REAL ESTATE DEVELOP-MENT CO., and PARKWAY BANK, | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

### AFFIDAVIT

I, VERNON A. WILLIAMS, being first duly sworn, deposes and states as follows:

1.    I have personal knowledge of the matters stated herein and if sworn as a witness I can testify competently thereto.

2.    I am a licensed architect and the owner of Vernon Williams Architects, P.C. ("VWA").

3.    Anthony Fields ("Debtor") contacted me regarding his plan to build a Howard Johnson Hotel on property he owned located on the northeast corner of South Lake Park Avenue and East Oakwood Boulevard in Chicago, Illinois (the "Property"). On October 6, 1999, I drafted a proposal for the Debtor to give him an estimate of the cost for my architectural services.

4.      The Debtor accepted my proposal and on December 1, 1999, VWA entered into a STANDARD
        FORM OF AGREEMENT BETWEEN OWNER AND ARCHITECT WITH STANDARD FORM OF
        ARCHITECT'S SERVICES ("Contract") with Lakeview Real Estate Development Company
        ("Lakeview"). I signed the Contract on behalf of VWA, and the Debtor signed the Contract
        on behalf of Lakeview. A copy of the Contract is attached as Exhibit 1.

5.      From December 10, 1999 through June 21, 2001, my staff and I performed the following
        services pursuant to the Contract: drafted a proposed project schedule; prepared a zoning
        analysis; created grade level and street level site plans; drafted a document entitled
        "Background Material For Proposed Lakeview Howard Johnson Hotel;" and created nearly
        a dozen schematic designs.

6.      On January 25, 2000, I met with the Debtor and Alderman Toni Preckwinkle to present
        VWA's designs and to seek the alderman's support in re-zoning the property. Subsequent
        to the meeting with Alderman Preckwinkle, VWA continued to create schematic designs for
        the project, I participated in numerous telephone conferences and meetings with the Debtor
        and his attorney regarding the zoning issues, and I met several times with representatives
        from Draper and Kramer regarding financial issues related to the project. In all, VWA spent
        159 hours on the project.

7.      From December 1999 through June 2003, I submitted invoices to the Debtor for the work
        VWA performed, however the Debtor never paid any of the invoices. The invoices were
        mailed to the Debtor's home address: 42 W 036 Beith Road, Elburn, Illinois 60119. To date,
        the only amount paid to VWA by the Debtor was the $5,000.00 retainer.

8.      On January 10, 2002, I filed an Architect's Notice and Claim for Lien ("Claim for Lien") on

                                              2

behalf of VWA against Lakeview in the amount of $43,012.69. The Claim for Lien was verified by me and recorded with the Cook County Recorder's Office as Document Number 0020043287. A copy of the Claim for Lien is attached as Exhibit 2.

9.      On January 21, 2003, the Debtor filed a "Petition to Declare Invalidity of Mechanic's Lien and Other Relief" as well as a "Petition for Temporary Mandatory Injunction and/or Alternative Relief" against me and VWA. In the Petitions and in the Debtor's affidavit in support of the Petitions, the Debtor identified the Property on which VWA's Claim for Lien attached. A copy of the Petitions are attached as Exhibits 3 and 4 respectively.

10.      On May 15, 2003, the Debtor filed bankruptcy under Chapter 11. On June 10, 2003, the Debtor filed an Adversary Complaint, Case No. 03 A 01969, against me personally and against VWA seeking to invalidate VWA's Claim for Lien. A copy of the Debtor's Adversary Complaint is attached as Exhibit 5.

11.      On June 20, 2003, the Debtor filed a motion for summary judgment on his Adversary Complaint. On August 4, 2003, the Debtor's motion for summary judgment was denied and the matter was set for trial on August 27, 2003. On August 27, 2003, the Debtor advised the Court that he was not prepared to proceed with the trial and the Court dismissed the Debtor's Adversary Complaint for want of prosecution. A copy of the Dismissal Order is attached as Exhibit 6.

12.      On August 27, 2003, the Debtor's case was converted from a Chapter 7 to a Chapter 11. A copy of the order is attached as Exhibit 7.

13.      On February 5, 2004, the Debtor's Chapter 7 Trustee filed an Adversary Complaint against me personally and against VWA again challenging the validity of VWA's Claim for Lien

3



("Trustee's Adversary Complaint").    A copy of the Trustee's Adversary Complaint is

attached as Exhibit 8.

14.    On March 3, 2004, VWA and I filed an Answer to the Trustee's Adversary Complaint.  Our

Answer contains the following Affirmative Defense:

> The doctrine of *res judicata* prevents the trustee from re-litigating the
> question of whether VWA's lien is valid.  The debtor previously filed an
> adversary complaint against Williams and VWA which sought to invalidate
> VWA's architect's lien. See Case No. 03 A 01969. On August 27, 2003, the
> Court entered an order dismissing the adversary complaint for want of
> prosecution.  Pursuant to Rule 7041 of the Federal Rules of Bankruptcy
> Procedure and Rule 41 of the Federal Rules of Civil Procedure, a dismissal
> for want of prosecution "operates as an adjudication upon the merits." FRCP
> 41(b).  Therefore, the trustee cannot re-litigate the validity of VWA's lien.

A copy of the Answer to the Trustee's Adversary Complaint is attached as Exhibit 9.


**FURTHER AFFIANT SAITH NOT.**

VERNON A. WILLIAMS


SWORN and SUBSCRIBED to before me this  17th  day of August, 2007.

Notary Public

OFFICIAL SEAL
RONALD AUSTIN JR
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:08/08/08

4

# EXHIBIT 1

1997 EDITION

## AIA DOCUMENT B141-1997



*Standard Form of Agreement Between Owner and Architect*
*with Standard Form of Architect's Services*

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

**AGREEMENT** made as of the ___1ᵴᵗ___ day of ___December___ in the year ___1999___
*(In words, indicate day, month and year)*

**BETWEEN** the Architect's client identified as the Owner:

*(Name, address and other information)*

```
Lakeview Real Estate Development Company
c/o Anthony Fields, CPA
5723 West Superior
Chicago, Illinois 60644
```

and the Architect:
*(Name, address and other information)*

```
Vernon Williams - Architects, P.C.
65 East Wacker Place
Chicago, Illinois 60601
```

For the following Project:
*(Include detailed description of Project)*



The design and construction documentation for the new construction of the proposed +/- 125 room hotel with restaurant, health spa and swimming pool, meeting/banquet rooms, administrative offices, parking for 133 cars and +/-6400 s.f. commercial retail space. The project is to be located on a 100 ft. x 269 ft. site at the northeast corner of South Lake Park Avenue and East Oakwood Boulevard, Chicago, Illinois.

The Owner and Architect agree as follows.

**TABLE OF ARTICLES**

1.1 INITIAL INFORMATION

1.2 RESPONSIBILITIES OF THE
    PARTIES

1.3 TERMS AND CONDITIONS

1.4 SCOPE OF SERVICES AND
    OTHER SPECIAL TERMS
    AND CONDITIONS

1.5 COMPENSATION

© 1997   A I A ®
**AIA DOCUMENT B141-1997**
STANDARD FORM
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

Copyright 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987, ©1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution.

1-1

## ARTICLE 1.1 INITIAL INFORMATION

1.1.1    This Agreement is based on the following information and assumptions.
*(Note the disposition for the following items by inserting the requested information or a statement such as "not applicable," "unknown at time of execution" or "to be determined later by mutual agreement.")*

### 1.1.2    PROJECT PARAMETERS

1.1.2.1  The objective or use is:
*(Identify or describe, if appropriate, proposed use or goals.)*

The design and documentation of the proposed hotel complex project as described on Page 1-1.

1.1.2.2  The physical parameters are:
*(Identify or describe, if appropriate, size, location, dimensions, or other pertinent information, such as geotechnical reports about the site.)*

To be determined later by mutual agreement.

1.1.2.3  The Owner's Program is:
*(Identify documentation or state the manner in which the program will be developed.)*

As described in Owner's Program, as per Article 2.2.1.1 and as per Exhibit "A".

1.1.2.4  The legal parameters are:
*(Identify pertinent legal information, including, if appropriate, land surveys and legal descriptions and restrictions of the site.)*
Unknown at time of execution.

1.1.2.5  The financial parameters are as follows.
   .1  Amount of the Owner's overall budget for the Project, including the Architect's compensation, is:

   .2  Amount of the Owner's budget for the Cost of the Work, excluding the Architect's compensation, is:  $10,800,000.00

1.1.2.6  The time parameters are:
*(Identify, if appropriate, milestone dates, durations or fast track scheduling.)*

Early start of demolition and foundation construction within 5 months.

1.1.2.7  The proposed procurement or delivery method for the Project is:
*(Identify method such as competitive bid, negotiated contract, or construction management.)*
Negotiated contract.

1.1.2.8  Other parameters are:
*(Identify special characteristics or needs of the Project such as energy, environmental or historic preservation requirements.)*

Zoning and Lakefront Protection Ordinances.



© 1997  AIA®
AIA DOCUMENT B141-1997
STANDARD FORM
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

1-2

WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

**1.1.3  PROJECT TEAM**

**1.1.3.1**  The Owner's Designated Representative is:
*(List name, address and other information.)*

Anthony Fields, CPA
President, Lakeview Real Estate Development Co.
5723 West Superior
Chicago, Illinois  60644

**1.1.3.2**  The persons or entities, in addition to the Owner's Designated Representative, who are required to review the Architect's submittals to the Owner are:
*(List name, address and other information.)*

Denny Pelarinos
Vice President, Lakeview Real Estate Development Co.
5723 West Superior
Chicago, Illinois 60644

**1.1.3.3**  The Owner's other consultants and contractors are:
*(List discipline and, if known, identify them by name and address.)*

Cendant Corporation
1 Sylvan Way
Parsippany, New Jersey  07054

**1.1.3.4**  The Architect's Designated Representative is:
*(List name, address and other information.)*

Vernon Williams, AIA
65 East Wacker Place
Chicago, Illinois  60601

**1.1.3.5**  The consultants retained at the Architect's expense are:
*(List discipline and, if known, identify them by name and address.)*

Unknown at time of execution.

**1.1.4**  Other important initial information is:

Not Applicable.

**1.1.5**  When the services under this Agreement include contract administration services, the General Conditions of the Contract for Construction shall be the edition of AIA Document A201 current as of the date of this Agreement, or as follows:

**1.1.6**  The information contained in this Article 1.1 may be reasonably relied upon by the Owner and Architect in determining the Architect's compensation. Both parties, however, recognize that such information may change and, in that event, the Owner and the Architect shall negotiate appropriate adjustments in schedule, compensation and Change in Services in accordance with Paragraph 1.3.3.



© 1997  A I A ®
**AIA DOCUMENT B141-1997**
STANDARD FORM
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

**1-3**

## ARTICLE 1.2 RESPONSIBILITIES OF THE PARTIES

**1.2.1**    The Owner and the Architect shall cooperate with one another to fulfill their respective obligations under this Agreement. Both parties shall endeavor to maintain good working relationships among all members of the Project team.

### 1.2.2    OWNER

**1.2.2.1**  Unless otherwise provided under this Agreement, the Owner shall provide full information in a timely manner regarding requirements for and limitations on the Project. The Owner shall furnish to the Architect, within 15 days after receipt of a written request, information necessary and relevant for the Architect to evaluate, give notice of or enforce lien rights.

**1.2.2.2**  The Owner shall periodically update the budget for the Project, including that portion allocated for the Cost of the Work. The Owner shall not significantly increase or decrease the overall budget, the portion of the budget allocated for the Cost of the Work, or contingencies included in the overall budget or a portion of the budget, without the agreement of the Architect to a corresponding change in the Project scope and quality.

**1.2.2.3**  The Owner's Designated Representative identified in Paragraph 1.1.3 shall be authorized to act on the Owner's behalf with respect to the Project. The Owner or the Owner's Designated Representative shall render decisions in a timely manner pertaining to documents submitted by the Architect in order to avoid unreasonable delay in the orderly and sequential progress of the Architect's services.

**1.2.2.4**  The Owner shall furnish the services of consultants other than those designated in Paragraph 1.1.3 or authorize the Architect to furnish them as a Change in Services when such services are requested by the Architect and are reasonably required by the scope of the Project.

**1.2.2.5**  Unless otherwise provided in this Agreement, the Owner shall furnish tests, inspections and reports required by law or the Contract Documents, such as structural, mechanical, and chemical tests, tests for air and water pollution, and tests for hazardous materials.

**1.2.2.6**  The Owner shall furnish all legal, insurance and accounting services, including auditing services, that may be reasonably necessary at any time for the Project to meet the Owner's needs and interests.

**1.2.2.7**  The Owner shall provide prompt written notice to the Architect if the Owner becomes aware of any fault or defect in the Project, including any errors, omissions or inconsistencies in the Architect's Instruments of Service.

### 1.2.3    ARCHITECT

**1.2.3.1**  The services performed by the Architect, Architect's employees and Architect's consultants shall be as enumerated in Article 1.4.

**1.2.3.2**  The Architect's services shall be performed as expeditiously as is consistent with professional skill and care and the orderly progress of the Project. The Architect shall submit for the Owner's approval a schedule for the performance of the Architect's services which initially shall be consistent with the time periods established in Subparagraph 1.1.2.6 and which shall be adjusted, if necessary, as the Project proceeds. This schedule shall include allowances for periods of time required for the Owner's review, for the performance of the Owner's consultants, and for approval of submissions by authorities having jurisdiction over the Project. Time limits established by this schedule approved by the Owner shall not, except for reasonable cause, be exceeded by the Architect or Owner.



© 1997   A I A ®
**AIA DOCUMENT B141-1997**
STANDARD FORM
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

1-6

**1.2.3.3** The Architect's Designated Representative identified in Paragraph 1.1.3 shall be authorized to act on the Architect's behalf with respect to the Project.

**1.2.3.4** The Architect shall maintain the confidentiality of information specifically designated as confidential by the Owner, unless withholding such information would violate the law, create the risk of significant harm to the public or prevent the Architect from establishing a claim or defense in an adjudicatory proceeding. The Architect shall require of the Architect's consultants similar agreements to maintain the confidentiality of information specifically designated as confidential by the Owner.

**1.2.3.5** Except with the Owner's knowledge and consent, the Architect shall not engage in any activity, or accept any employment, interest or contribution that would reasonably appear to compromise the Architect's professional judgment with respect to this Project.

**1.2.3.6** The Architect shall review laws, codes, and regulations applicable to the Architect's services. The Architect shall respond in the design of the Project to requirements imposed by governmental authorities having jurisdiction over the Project.

**1.2.3.7** The Architect shall be entitled to rely on the accuracy and completeness of services and information furnished by the Owner. The Architect shall provide prompt written notice to the Owner if the Architect becomes aware of any errors, omissions or inconsistencies in such services or information.

## ARTICLE 1.3 TERMS AND CONDITIONS

**1.3.1    COST OF THE WORK**

**1.3.1.1** The Cost of the Work shall be the total cost or, to the extent the Project is not completed, the estimated cost to the Owner of all elements of the Project designed or specified by the Architect.

**1.3.1.2** The Cost of the Work shall include the cost at current market rates of labor and materials furnished by the Owner and equipment designed, specified, selected or specially provided for by the Architect, including the costs of management or supervision of construction or installation provided by a separate construction manager or contractor, plus a reasonable allowance for their overhead and profit. In addition, a reasonable allowance for contingencies shall be included for market conditions at the time of bidding and for changes in the Work.

**1.3.1.3** The Cost of the Work does not include the compensation of the Architect and the Architect's consultants, the costs of the land, rights-of-way and financing or other costs that are the responsibility of the Owner.

**1.3.2    INSTRUMENTS OF SERVICE**

**1.3.2.1** Drawings, specifications and other documents, including those in electronic form, prepared by the Architect and the Architect's consultants are Instruments of Service for use solely with respect to this Project. The Architect and the Architect's consultants shall be deemed the authors and owners of their respective Instruments of Service and shall retain all common law, statutory and other reserved rights, including copyrights.

**1.3.2.2** Upon execution of this Agreement, the Architect grants to the Owner a nonexclusive license to reproduce the Architect's Instruments of Service solely for purposes of constructing, using and maintaining the Project, provided that the Owner shall comply with all obligations, including prompt payment of all sums when due, under this Agreement. The Architect shall



© 1997    A I A ®
**AIA DOCUMENT B141-1997**
STANDARD FORM
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

obtain similar nonexclusive licenses from the Architect's consultants consistent with this Agreement. Any termination of this Agreement prior to completion of the Project shall terminate this license. Upon such termination, the Owner shall refrain from making further reproductions of Instruments of Service and shall return to the Architect within seven days of termination all originals and reproductions in the Owner's possession or control. If and upon the date the Architect is adjudged in default of this Agreement, the foregoing license shall be deemed terminated and replaced by a second, nonexclusive license permitting the Owner to authorize other similarly credentialed design professionals to reproduce and, where permitted by law, to make changes, corrections or additions to the Instruments of Service solely for purposes of completing, using and maintaining the Project.

**1.3.2.3** Except for the licenses granted in Subparagraph 1.3.2.2, no other license or right shall be deemed granted or implied under this Agreement. The Owner shall not assign, delegate, sublicense, pledge or otherwise transfer any license granted herein to another party without the prior written agreement of the Architect. However, the Owner shall be permitted to authorize the Contractor, Subcontractors, Sub-subcontractors and material or equipment suppliers to reproduce applicable portions of the Instruments of Service appropriate to and for use in their execution of the Work by license granted in Subparagraph 1.3.2.2. Submission or distribution of Instruments of Service to meet official regulatory requirements or for similar purposes in connection with the Project is not to be construed as publication in derogation of the reserved rights of the Architect and the Architect's consultants. The Owner shall not use the Instruments of Service for future additions or alterations to this Project or for other projects, unless the Owner obtains the prior written agreement of the Architect and the Architect's consultants. Any unauthorized use of the Instruments of Service shall be at the Owner's sole risk and without liability to the Architect and the Architect's consultants.

**1.3.2.4** Prior to the Architect providing to the Owner any Instruments of Service in electronic form or the Owner providing to the Architect any electronic data for incorporation into the Instruments of Service, the Owner and the Architect shall by separate written agreement set forth the specific conditions governing the format of such Instruments of Service or electronic data, including any special limitations or licenses not otherwise provided in this Agreement.

**1.3.3  CHANGE IN SERVICES**
**1.3.3.1** Change in Services of the Architect, including services required of the Architect's consultants, may be accomplished after execution of this Agreement, without invalidating the Agreement, if mutually agreed in writing, if required by circumstances beyond the Architect's control, or if the Architect's services are affected as described in Subparagraph 1.3.3.2. In the absence of mutual agreement in writing, the Architect shall notify the Owner prior to providing such services. If the Owner deems that all or a part of such Change in Services is not required, the Owner shall give prompt written notice to the Architect, and the Architect shall have no obligation to provide those services. Except for a change due to the fault of the Architect, Change in Services of the Architect shall entitle the Architect to an adjustment in compensation pursuant to Paragraph 1.5.2, and to any Reimbursable Expenses described in Subparagraph 1.3.9.2 and Paragraph 1.5.5.

**1.3.3.2** If any of the following circumstances affect the Architect's services for the Project, the Architect shall be entitled to an appropriate adjustment in the Architect's schedule and compensation:
.1  change in the instructions or approvals given by the Owner that necessitate revisions in Instruments of Service;
.2  enactment or revision of codes, laws or regulations or official interpretations which necessitate changes to previously prepared Instruments of Service;



© 1997  A I A ®
**AIA DOCUMENT B141-199**
STANDARD FORM
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.
Washington, D.C. 20006-5

.3  decisions of the Owner not rendered in a timely manner;

.4  significant change in the Project including, but not limited to, size, quality, complexity, the Owner's schedule or budget, or procurement method;

.5  failure of performance on the part of the Owner or the Owner's consultants or contractors;

.6  preparation for and attendance at a public hearing, a dispute resolution proceeding or a legal proceeding except where the Architect is party thereto;

.7  change in the information contained in Article 1.1.

### 1.3.4  MEDIATION

**1.3.4.1**  Any claim, dispute or other matter in question arising out of or related to this Agreement shall be subject to mediation as a condition precedent to arbitration or the institution of legal or equitable proceedings by either party. If such matter relates to or is the subject of a lien arising out of the Architect's services, the Architect may proceed in accordance with applicable law to comply with the lien notice or filing deadlines prior to resolution of the matter by mediation or by arbitration.

**1.3.4.2**  The Owner and Architect shall endeavor to resolve claims, disputes and other matters in question between them by mediation which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Mediation Rules of the American Arbitration Association currently in effect. Request for mediation shall be filed in writing with the other party to this Agreement and with the American Arbitration Association. The request may be made concurrently with the filing of a demand for arbitration but, in such event, mediation shall proceed in advance of arbitration or legal or equitable proceedings, which shall be stayed pending mediation for a period of 60 days from the date of filing, unless stayed for a longer period by agreement of the parties or court order.

**1.3.4.3**  The parties shall share the mediator's fee and any filing fees equally. The mediation shall be held in the place where the Project is located, unless another location is mutually agreed upon. Agreements reached in mediation shall be enforceable as settlement agreements in any court having jurisdiction thereof.

### 1.3.5  ARBITRATION

**1.3.5.1**  Any claim, dispute or other matter in question arising out of or related to this Agreement shall be subject to arbitration. Prior to arbitration, the parties shall endeavor to resolve disputes by mediation in accordance with Paragraph 1.3.4.

**1.3.5.2**  Claims, disputes and other matters in question between the parties that are not resolved by mediation shall be decided by arbitration which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect. The demand for arbitration shall be filed in writing with the other party to this Agreement and with the American Arbitration Association.

**1.3.5.3**  A demand for arbitration shall be made within a reasonable time after the claim, dispute or other matter in question has arisen. In no event shall the demand for arbitration be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statute of limitations.

**1.3.5.4**  No arbitration arising out of or relating to this Agreement shall include, by consolidation or joinder or in any other manner, an additional person or entity not a party to this Agreement, except by written consent containing a specific reference to this Agreement and signed by the Owner, Architect, and any other person or entity sought to be joined. Consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of any claim,



**© 1997  AIA®
AIA DOCUMENT B141-1997
STANDARD FORM
AGREEMENT**

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

**1-7**

WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

dispute or other matter in question not described in the written consent or with a person or entity not named or described therein. The foregoing agreement to arbitrate and other agreements to arbitrate with an additional person or entity duly consented to by parties to this Agreement shall be specifically enforceable in accordance with applicable law in any court having jurisdiction thereof.

**1.3.5.5** The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

**1.3.6   CLAIMS FOR CONSEQUENTIAL DAMAGES**
The Architect and the Owner waive consequential damages for claims, disputes or other matters in question arising out of or relating to this Agreement. This mutual waiver is applicable, without limitation, to all consequential damages due to either party's termination in accordance with Paragraph 1.3.8.

**1.3.7   MISCELLANEOUS PROVISIONS**
**1.3.7.1** This Agreement shall be governed by the law of the principal place of business of the Architect, unless otherwise provided in Paragraph 1.4.2.

**1.3.7.2** Terms in this Agreement shall have the same meaning as those in the edition of AIA Document A201, General Conditions of the Contract for Construction, current as of the date of this Agreement.

**1.3.7.3** Causes of action between the parties to this Agreement pertaining to acts or failures to act shall be deemed to have accrued and the applicable statutes of limitations shall commence to run not later than either the date of Substantial Completion for acts or failures to act occurring prior to Substantial Completion or the date of issuance of the final Certificate for Payment for acts or failures to act occurring after Substantial Completion. In no event shall such statutes of limitations commence to run any later than the date when the Architect's services are substantially completed.

**1.3.7.4** To the extent damages are covered by property insurance during construction, the Owner and the Architect waive all rights against each other and against the contractors, consultants, agents and employees of the other for damages, except such rights as they may have to the proceeds of such insurance as set forth in the edition of AIA Document A201, General Conditions of the Contract for Construction, current as of the date of this Agreement. The Owner or the Architect, as appropriate, shall require of the contractors, consultants, agents and employees of any of them similar waivers in favor of the other parties enumerated herein.

**1.3.7.5** Nothing contained in this Agreement shall create a contractual relationship with or a cause of action in favor of a third party against either the Owner or Architect.

**1.3.7.6** Unless otherwise provided in this Agreement, the Architect and Architect's consultants shall have no responsibility for the discovery, presence, handling, removal or disposal of or exposure of persons to hazardous materials or toxic substances in any form at the Project site.

**1.3.7.7** The Architect shall have the right to include photographic or artistic representations of the design of the Project among the Architect's promotional and professional materials. The Architect shall be given reasonable access to the completed Project to make such representations. However, the Architect's materials shall not include the Owner's confidential or proprietary information if the Owner has previously advised the Architect in writing of the specific information considered by the Owner to be confidential or proprietary. The Owner shall provide professional credit for the Architect in the Owner's promotional materials for the Project.



© 1997   A I A ®
AIA DOCUMENT B141-19:
STANDARD FORM
AGREEMENT

The American Institute
of Architects
1735 New York Avenue,
Washington, D.C. 20006

**1-8**

**1.3.7.8** If the Owner requests the Architect to execute certificates, the proposed language of such certificates shall be submitted to the Architect for review at least 14 days prior to the requested dates of execution. The Architect shall not be required to execute certificates that would require knowledge, services or responsibilities beyond the scope of this Agreement.

**1.3.7.9** The Owner and Architect, respectively, bind themselves, their partners, successors, assigns and legal representatives to the other party to this Agreement and to the partners, successors, assigns and legal representatives of such other party with respect to all covenants of this Agreement. Neither the Owner nor the Architect shall assign this Agreement without the written consent of the other, except that the Owner may assign this Agreement to an institutional lender providing financing for the Project. In such event, the lender shall assume the Owner's rights and obligations under this Agreement. The Architect shall execute all consents reasonably required to facilitate such assignment.

### 1.3.8 · TERMINATION OR SUSPENSION

**1.3.8.1** If the Owner fails to make payments to the Architect in accordance with this Agreement, such failure shall be considered substantial nonperformance and cause for termination or, at the Architect's option, cause for suspension of performance of services under this Agreement. If the Architect elects to suspend services, prior to suspension of services, the Architect shall give seven days' written notice to the Owner. In the event of a suspension of services, the Architect shall have no liability to the Owner for delay or damage caused the Owner because of such suspension of services. Before resuming services, the Architect shall be paid all sums due prior to suspension and any expenses incurred in the interruption and resumption of the Architect's services. The Architect's fees for the remaining services and the time schedules shall be equitably adjusted.

**1.3.8.2** If the Project is suspended by the Owner for more than 30 consecutive days, the Architect shall be compensated for services performed prior to notice of such suspension. When the Project is resumed, the Architect shall be compensated for expenses incurred in the interruption and resumption of the Architect's services. The Architect's fees for the remaining services and the time schedules shall be equitably adjusted.

**1.3.8.3** If the Project is suspended or the Architect's services are suspended for more than 90 consecutive days, the Architect may terminate this Agreement by giving not less than seven days' written notice.

**1.3.8.4** This Agreement may be terminated by either party upon not less than seven days' written notice should the other party fail substantially to perform in accordance with the terms of this Agreement through no fault of the party initiating the termination.

**1.3.8.5** This Agreement may be terminated by the Owner upon not less than seven days' written notice to the Architect for the Owner's convenience and without cause.

**1.3.8.6** In the event of termination not the fault of the Architect, the Architect shall be compensated for services performed prior to termination, together with Reimbursable Expenses then due and all Termination Expenses as defined in Subparagraph 1.3.8.7.

**1.3.8.7** Termination Expenses are in addition to compensation for the services of the Agreement and include expenses directly attributable to termination for which the Architect is not otherwise compensated, plus an amount for the Architect's anticipated profit on the value of the services not performed by the Architect.



© 1997   A I A ®
**AIA DOCUMENT B141-1997**
STANDARD FORM
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

**1.3.9   PAYMENTS TO THE ARCHITECT**

**1.3.9.1**   Payments on account of services rendered and for Reimbursable Expenses incurred shall be made monthly upon presentation of the Architect's statement of services. No deductions shall be made from the Architect's compensation on account of penalty, liquidated damages or other sums withheld from payments to contractors, or on account of the cost of changes in the Work other than those for which the Architect has been adjudged to be liable.

**1.3.9.2**   Reimbursable Expenses are in addition to compensation for the Architect's services and include expenses incurred by the Architect and Architect's employees and consultants directly related to the Project, as identified in the following Clauses:

    .1   transportation in connection with the Project, authorized out-of-town travel and subsistence, and electronic communications;

    .2   fees paid for securing approval of authorities having jurisdiction over the Project;

    .3   reproductions, plots, standard form documents, postage, handling and delivery of Instruments of Service;

    .4   expense of overtime work requiring higher than regular rates if authorized in advance by the Owner;

    .5   renderings, models and mock-ups requested by the Owner;

    .6   expense of professional liability insurance dedicated exclusively to this Project or the expense of additional insurance coverage or limits requested by the Owner in excess of that normally carried by the Architect and the Architect's consultants;

    .7   reimbursable expenses as designated in Paragraph 1.5.5;

    .8   other similar direct Project-related expenditures.

**1.3.9.3**   Records of Reimbursable Expenses, of expenses pertaining to a Change in Services, and of services performed on the basis of hourly rates or a multiple of Direct Personnel Expense shall be available to the Owner or the Owner's authorized representative at mutually convenient times.

**1.3.9.4**   Direct Personnel Expense is defined as the direct salaries of the Architect's personnel engaged on the Project and the portion of the cost of their mandatory and customary contributions and benefits related thereto, such as employment taxes and other statutory employee benefits, insurance, sick leave, holidays, vacations, employee retirement plans and similar contributions.

**ARTICLE 1.4 SCOPE OF SERVICES AND OTHER SPECIAL TERMS AND CONDITIONS**

**1.4.1**   Enumeration of Parts of the Agreement. This Agreement represents the entire and integrated agreement between the Owner and the Architect and supersedes all prior negotiations, representations or agreements, either written or oral. This Agreement may be amended only by written instrument signed by both Owner and Architect. This Agreement comprises the documents listed below.

**1.4.1.1**   Standard Form of Agreement Between Owner and Architect, AIA Document B141-1997.

**1.4.1.2**   Standard Form of Architect's Services: Design and Contract Administration, AIA Document B141-1997, or as follows:
*(List other documents, if any, delineating Architect's scope of services.)*

**1.4.1.3**   Other documents as follows:
*(List other documents, if any, forming part of the Agreement.)*

Exhibit "A"



© 1997   AIA®
**AIA DOCUMENT B141-199**
STANDARD FORM
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.
Washington, D.C. 20006-

1.4.2    Special Terms and Conditions. Special terms and conditions that modify this Agreement are as follows:

Not Applicable.

## ARTICLE 1.5 COMPENSATION

1.5.1    For the Architect's services as described under Article 1.4, compensation shall be computed as follows:

Compensation shall be on a stipulated sum basis for the amount of $467,650.00, excluding expenses.

1.5.2    If the services of the Architect are changed as described in Subparagraph 1.3.3.1, the Architect's compensation shall be adjusted. Such adjustment shall be calculated as described below or, if no method of adjustment is indicated in this Paragraph 1.5.2, in an equitable manner.

*(Insert basis of compensation, including rates and multiples of Direct Personnel Expense for Principals and employees, and identify Principals and classify employees, if required. Identify specific services to which partic-ular methods of compensation apply.)*

As a multiple of 2.75 times the Direct Personnel Expenses for Principals and employees.

1.5.3    For a Change in Services of the Architect's consultants, compensation shall be computed as a multiple of one and one tenth    (  1.1  ) times the amounts billed to the Architect for such services.

1.5.4    For Reimbursable Expenses as described in Subparagraph 1.3.9.2, and any other items included in Paragraph 1.5.5 as Reimbursable Expenses, the compensation shall be computed as a multiple of    one and one tenth    (  1.1  ) times the expenses incurred by the Architect, and the Architect's employees and consultants.

1.5.5    Other Reimbursable Expenses, if any, are as follows:

- Interior design services
- Swimming pool consultant
- Lighting consultant (feature lighting)
- Food service consultant
- Parking consultant
- Security consultant
- Telephone/Data consultant
- Expert Zoning testimony



© 1997  AIA®
AIA DOCUMENT B141-1997
STANDARD FORM
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-52:

1-17

WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

**1.5.6**  The rates and multiples for services of the Architect and the Architect's consultants as set forth in this Agreement shall be adjusted in accordance with their normal salary review practices.

**1.5.7**  An initial payment of  Five Thousand and no/100        Dollars (s  5,000.00    ) shall be made upon execution of this Agreement and is the minimum payment under this Agreement. It shall be credited to the Owner's account at final payment. Subsequent payments for services shall be made monthly, and where applicable, shall be in proportion to services performed on the basis set forth in this Agreement.

**1.5.8**  Payments are due and payable  Fifteen        ( 15  ) days from the date of the Architect's invoice. Amounts unpaid   Thirty         ( 30  ) days after the invoice date shall bear interest at the rate entered below, or in the absence thereof at the legal rate prevailing from time to time at the principal place of business of the Architect.
*(Insert rate of interest agreed upon.)*

*(Usury laws and requirements under the Federal Truth in Lending Act, similar state and local consumer credit laws and other regulations at the Owner's and Architect's principal places of business, the location of the Project and elsewhere may affect the validity of this provision. Specific legal advice should be obtained with respect to deletions or modifications, and also regarding requirements such as written disclosures or waivers.)*

**1.5.9**  If the services covered by this Agreement have not been completed within eighteen        ( 18  ) months of the date hereof, through no fault of the Architect, extension of the Architect's services beyond that time shall be compensated as provided in Paragraph 1.5.2.

This Agreement entered into as of the day and year first written above.

OWNER *(Signature)*          ARCHITECT *(Signature)*

Anthony Fields, President    Vernon A. Williams, Principal

*(Printed name and title)*        *(Printed name and title)*
Lakeview Real Estate
Development Co.

CAUTION: *You should sign an original AIA document or a licensed reproduction. Originals contain the AIA logo printed in red; licensed reproductions are those produced in accordance with the Instructions to this document.*



© 1997  A I A®
AIA DOCUMENT B141-1997
STANDARD FORM
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.
Washington, D.C. 20006-

**1-12**

WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

1997 EDITION

## AIA DOCUMENT B141-1997



*Standard Form of Architect's Services:*
*Design and Contract Administration*

This document has important legal consequences.
Consultation with an attorney is encouraged with respect to its completion or modification.

### TABLE OF ARTICLES

2.1 PROJECT ADMINISTRATION SERVICES

2.2 SUPPORTING SERVICES

2.3 EVALUATION AND PLANNING SERVICES

2.4 DESIGN SERVICES

2.5 CONSTRUCTION PROCUREMENT SERVICES

2.6 CONTRACT ADMINISTRATION SERVICES

2.7 FACILITY OPERATION SERVICES

2.8 SCHEDULE OF SERVICES

2.9 MODIFICATIONS

© 1997   AIA ®
AIA DOCUMENT B141-1997
STANDARD FORM
SERVICES

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006 5292

Copyright 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987, ©1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution.
WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

2-1

## ARTICLE 2.1 PROJECT ADMINISTRATION SERVICES

2.1.1    The Architect shall manage the Architect's services and administer the Project. The Architect shall consult with the Owner, research applicable design criteria, attend Project meetings, communicate with members of the Project team and issue progress reports. The Architect shall coordinate the services provided by the Architect and the Architect's consultants with those services provided by the Owner and the Owner's consultants.

2.1.2    When Project requirements have been sufficiently identified, the Architect shall prepare, and periodically update, a Project schedule that shall identify milestone dates for decisions required of the Owner, design services furnished by the Architect, completion of documentation provided by the Architect, commencement of construction and Substantial Completion of the Work.

2.1.3    The Architect shall consider the value of alternative materials, building systems and equipment, together with other considerations based on program, budget and aesthetics in developing the design for the Project.

2.1.4    Upon request of the Owner, the Architect shall make a presentation to explain the design of the Project to representatives of the Owner.

2.1.5    The Architect shall submit design documents to the Owner at intervals appropriate to the design process for purposes of evaluation and approval by the Owner. The Architect shall be entitled to rely on approvals received from the Owner in the further development of the design.

2.1.6    The Architect shall assist the Owner in connection with the Owner's responsibility for filing documents required for the approval of governmental authorities having jurisdiction over the Project.

### 2.1.7    EVALUATION OF BUDGET AND COST OF THE WORK

2.1.7.1    When the Project requirements have been sufficiently identified, the Architect shall prepare a preliminary estimate of the Cost of the Work. This estimate may be based on current area, volume or similar conceptual estimating techniques. As the design process progresses through the end of the preparation of the Construction Documents, the Architect shall update and refine the preliminary estimate of the Cost of the Work. The Architect shall advise the Owner of any adjustments to previous estimates of the Cost of the Work indicated by changes in Project requirements or general market conditions. If at any time the Architect's estimate of the Cost of the Work exceeds the Owner's budget, the Architect shall make appropriate recommendations to the Owner to adjust the Project's size, quality or budget, and the Owner shall cooperate with the Architect in making such adjustments.

2.1.7.2    Evaluations of the Owner's budget for the Project, the preliminary estimate of the Cost of the Work and updated estimates of the Cost of the Work prepared by the Architect represent the Architect's judgment as a design professional familiar with the construction industry. It is recognized, however, that neither the Architect nor the Owner has control over the cost of labor, materials or equipment, over the Contractor's methods of determining bid prices, or over competitive bidding, market or negotiating conditions. Accordingly, the Architect cannot and does not warrant or represent that bids or negotiated prices will not vary from the Owner's budget for the Project or from any estimate of the Cost of the Work or evaluation prepared or agreed to by the Architect.



©1997  A I A ®
AIA DOCUMENT B141-1997
STANDARD FORM
SERVICES

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

2.1.7.3  In preparing estimates of the Cost of the Work, the Architect shall be permitted to include contingencies for design, bidding and price escalation; to determine what materials, equipment, component systems and types of construction are to be included in the Contract Documents; to make reasonable adjustments in the scope of the Project and to include in the Contract Documents alternate bids as may be necessary to adjust the estimated Cost of the Work to meet the Owner's budget for the Cost of the Work. If an increase in the Contract Sum occurring after execution of the Contract between the Owner and the Contractor causes the budget for the Cost of the Work to be exceeded, that budget shall be increased accordingly.

2.1.7.4  If bidding or negotiation has not commenced within 90 days after the Architect submits the Construction Documents to the Owner, the budget for the Cost of the Work shall be adjusted to reflect changes in the general level of prices in the construction industry.

2.1.7.5  If the budget for the Cost of the Work is exceeded by the lowest bona fide bid or negotiated proposal, the Owner shall:
    .1  give written approval of an increase in the budget for the Cost of the Work;
    .2  authorize rebidding or renegotiating of the Project within a reasonable time;
    .3  terminate in accordance with Subparagraph 1.1.3.5; or
    .4  cooperate in revising the Project scope and quality as required to reduce the Cost of the Work.

2.1.7.6  If the Owner chooses to proceed under Clause 2.1.7.5.4, the Architect, without additional compensation, shall modify the documents for which the Architect is responsible under this Agreement as necessary to comply with the budget for the Cost of the Work. The modification of such documents shall be the limit of the Architect's responsibility under this Paragraph 2.1.7. The Architect shall be entitled to compensation in accordance with this Agreement for all services performed whether or not construction is commenced.

**ARTICLE 2.2 SUPPORTING SERVICES**

2.2.1  Unless specifically designated in Paragraph 2.6.3, the services in this Article 2.2 shall be provided by the Owner or the Owner's consultants and contractors.

2.2.1.1  The Owner shall furnish a program setting forth the Owner's objectives, schedule, constraints and criteria, including space requirements and relationships, special equipment, systems and site requirements.

2.2.1.2  The Owner shall furnish surveys to describe physical characteristics, legal limitations and utility locations for the site of the Project, and a written legal description of the site. The surveys and legal information shall include, as applicable, grades and lines of streets, alleys, pavements and adjoining property and structures; adjacent drainage; rights-of-way, restrictions, easements, encroachments, zoning, deed restrictions, boundaries and contours of the site; locations, dimensions and necessary data with respect to existing buildings, other improvements and trees; and information concerning available utility services and lines, both public and private, above and below grade, including inverts and depths. All the information on the survey shall be referenced to a Project benchmark.

2.2.1.3  The Owner shall furnish services of geotechnical engineers which may include but are not limited to test borings, test pits, determinations of soil bearing values, percolation tests, evaluations of hazardous materials, ground corrosion tests and resistivity tests, including necessary operations for anticipating subsoil conditions, with reports and appropriate recommendations.



© 1997  AIA®
AIA DOCUMENT B141-1997
STANDARD FORM
SERVICES

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

**ARTICLE 2.3 EVALUATION AND PLANNING SERVICES**

2.3.1   The Architect shall provide a preliminary evaluation of the information furnished by the Owner under this Agreement, including the Owner's program and schedule requirements and budget for the Cost of the Work, each in terms of the other. The Architect shall review such information to ascertain that it is consistent with the requirements of the Project and shall notify the Owner of any other information or consultant services that may be reasonably needed for the Project.

2.3.2   The Architect shall provide a preliminary evaluation of the Owner's site for the Project based on the information provided by the Owner of site conditions, and the Owner's program, schedule and budget for the Cost of the Work.

2.3.3   The Architect shall review the Owner's proposed method of contracting for construction services and shall notify the Owner of anticipated impacts that such method may have on the Owner's program, financial and time requirements, and the scope of the Project.

**ARTICLE 2.4 DESIGN SERVICES**

2.4.1   The Architect's design services shall include normal structural, mechanical and electrical engineering services.

**2.4.2   SCHEMATIC DESIGN DOCUMENTS**

2.4.2.1 The Architect shall provide Schematic Design Documents based on the mutually agreed-upon program, schedule, and budget for the Cost of the Work. The documents shall establish the conceptual design of the Project illustrating the scale and relationship of the Project components. The Schematic Design Documents shall include a conceptual site plan, if appropriate, and preliminary building plans, sections and elevations. At the Architect's option, the Schematic Design Documents may include study models, perspective sketches, electronic modeling or combinations of these media. Preliminary selections of major building systems and construction materials shall be noted on the drawings or described in writing.

**2.4.3   DESIGN DEVELOPMENT DOCUMENTS**

2.4.3.1 The Architect shall provide Design Development Documents based on the approved Schematic Design Documents and updated budget for the Cost of the Work. The Design Development Documents shall illustrate and describe the refinement of the design of the Project, establishing the scope, relationships, forms, size and appearance of the Project by means of plans, sections and elevations, typical construction details, and equipment layouts. The Design Development Documents shall include specifications that identify major materials and systems and establish in general their quality levels.

**2.4.4   CONSTRUCTION DOCUMENTS**

2.4.4.1 The Architect shall provide Construction Documents based on the approved Design Development Documents and updated budget for the Cost of the Work. The Construction Documents shall set forth in detail the requirements for construction of the Project. The Construction Documents shall include Drawings and Specifications that establish in detail the quality levels of materials and systems required for the Project.

2.4.4.2 During the development of the Construction Documents, the Architect shall assist the Owner in the development and preparation of: (1) bidding and procurement information which describes the time, place and conditions of bidding; bidding or proposal forms; and the form of agreement between the Owner and the Contractor; and (2) the Conditions of the Contract for Construction (General, Supplementary and other Conditions). The Architect also shall compile the Project Manual that includes the Conditions of the Contract for Construction and Specifications and may include bidding requirements and sample forms.



©1997  AIA®
AIA DOCUMENT B141-1997
STANDARD FORM
SERVICES

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

## ARTICLE 2.5 CONSTRUCTION PROCUREMENT SERVICES

2.5.1   The Architect shall assist the Owner in obtaining either competitive bids or negotiated proposals and shall assist the Owner in awarding and preparing contracts for construction.

2.5.2   The Architect shall assist the Owner in establishing a list of prospective bidders or contractors.

2.5.3   The Architect shall assist the Owner in bid validation or proposal evaluation and determination of the successful bid or proposal, if any. If requested by the Owner, the Architect shall notify all prospective bidders or contractors of the bid or proposal results.

### 2.5.4   COMPETITIVE BIDDING

2.5.4.1 Bidding Documents shall consist of bidding requirements, proposed contract forms, General Conditions and Supplementary Conditions, Specifications and Drawings.

2.5.4.2 If requested by the Owner, the Architect shall arrange for procuring the reproduction of Bidding Documents for distribution to prospective bidders. The Owner shall pay directly for the cost of reproduction or shall reimburse the Architect for such expenses.

2.5.4.3 If requested by the Owner, the Architect shall distribute the Bidding Documents to prospective bidders and request their return upon completion of the bidding process. The Architect shall maintain a log of distribution and retrieval, and the amounts of deposits, if any, received from and returned to prospective bidders.

2.5.4.4 The Architect shall consider requests for substitutions, if permitted by the Bidding Documents, and shall prepare and distribute addenda identifying approved substitutions to all prospective bidders.

2.5.4.5 The Architect shall participate in or, at the Owner's direction, shall organize and conduct a pre-bid conference for prospective bidders.

2.5.4.6 The Architect shall prepare responses to questions from prospective bidders and provide clarifications and interpretations of the Bidding Documents to all prospective bidders in the form of addenda.

2.5.4.7 The Architect shall participate in or, at the Owner's direction, shall organize and conduct the opening of the bids. The Architect shall subsequently document and distribute the bidding results, as directed by the Owner.

### 2.5.5   NEGOTIATED PROPOSALS

2.5.5.1 Proposal Documents shall consist of proposal requirements, proposed contract forms, General Conditions and Supplementary Conditions, Specifications and Drawings.

2.5.5.2 If requested by the Owner, the Architect shall arrange for procuring the reproduction of Proposal Documents for distribution to prospective contractors. The Owner shall pay directly for the cost of reproduction or shall reimburse the Architect for such expenses.

2.5.5.3 If requested by the Owner, the Architect shall organize and participate in selection interviews with prospective contractors.

2.5.5.4 The Architect shall consider requests for substitutions, if permitted by the Proposal Documents, and shall prepare and distribute addenda identifying approved substitutions to all prospective contractors.



© 1997   A I A ®
AIA DOCUMENT B141-1997
STANDARD FORM
SERVICES

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

2.5

WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

Jan 19 03 03:09p

2.5.5.5  If requested by the Owner, the Architect shall assist the Owner during negotiations with prospective contractors. The Architect shall subsequently prepare a summary report of the negotiation results, as directed by the Owner.

## ARTICLE 2.6 CONTRACT ADMINISTRATION SERVICES

### 2.6.1  GENERAL ADMINISTRATION

2.6.1.1  The Architect shall provide administration of the Contract between the Owner and the Contractor as set forth below and in the edition of AIA Document A201, General Conditions of the Contract for Construction, current as of the date of this Agreement. Modifications made to the General Conditions, when adopted as part of the Contract Documents, shall be enforceable under this Agreement only to the extent that they are consistent with this Agreement or approved in writing by the Architect.

2.6.1.2  The Architect's responsibility to provide the Contract Administration Services under this Agreement commences with the award of the initial Contract for Construction and terminates at the issuance to the Owner of the final Certificate for Payment. However, the Architect shall be entitled to a Change in Services in accordance with Paragraph 1.3.3 when Contract Administration Services extend 60 days after the date of Substantial Completion of the Work.

2.6.1.3  The Architect shall be a representative of and shall advise and consult with the Owner during the provision of the Contract Administration Services. The Architect shall have authority to act on behalf of the Owner only to the extent provided in this Agreement unless otherwise modified by written amendment.

2.6.1.4  Duties, responsibilities and limitations of authority of the Architect under this Article 2.6 shall not be restricted, modified or extended without written agreement of the Owner and Architect with consent of the Contractor, which consent will not be unreasonably withheld.

2.6.1.5  The Architect shall review properly prepared, timely requests by the Contractor for additional information about the Contract Documents. A properly prepared request for additional information about the Contract Documents shall be in a form prepared or approved by the Architect and shall include a detailed written statement that indicates the specific Drawings or Specifications in need of clarification and the nature of the clarification requested.

2.6.1.6  If deemed appropriate by the Architect, the Architect shall on the Owner's behalf prepare, reproduce and distribute supplemental Drawings and Specifications in response to requests for information by the Contractor.

2.6.1.7  The Architect shall interpret and decide matters concerning performance of the Owner and Contractor under, and requirements of, the Contract Documents on written request of either the Owner or Contractor. The Architect's response to such requests shall be made in writing within any time limits agreed upon or otherwise with reasonable promptness.

2.6.1.8  Interpretations and decisions of the Architect shall be consistent with the intent of and reasonably inferable from the Contract Documents and shall be in writing or in the form of drawings. When making such interpretations and initial decisions, the Architect shall endeavor to secure faithful performance by both Owner and Contractor, shall not show partiality to either, and shall not be liable for the results of interpretations or decisions so rendered in good faith.

2.6.1.9  The Architect shall render initial decisions on claims, disputes or other matters in question between the Owner and Contractor as provided in the Contract Documents. However, the Architect's decisions on matters relating to aesthetic effect shall be final if consistent with the intent expressed in the Contract Documents.



© 1997  A I A ®
AIA DOCUMENT B141-1997
STANDARD FORM
SERVICES

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

**2.6.2  EVALUATIONS OF THE WORK**

2.6.2.1  The Architect, as a representative of the Owner, shall visit the site at intervals appropriate to the stage of the Contractor's operations, or as otherwise agreed by the Owner and the Architect in Article 2.8, (1) to become generally familiar with and to keep the Owner informed about the progress and quality of the portion of the Work completed, (2) to endeavor to guard the Owner against defects and deficiencies in the Work, and (3) to determine in general if the Work is being performed in a manner indicating that the Work, when fully completed, will be in accordance with the Contract Documents. However, the Architect shall not be required to make exhaustive or continuous on-site inspections to check the quality or quantity of the Work. The Architect shall neither have control over or charge of, nor be responsible for, the construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work, since these are solely the Contractor's rights and responsibilities under the Contract Documents.

2.6.2.2  The Architect shall report to the Owner known deviations from the Contract Documents and from the most recent construction schedule submitted by the Contractor. However, the Architect shall not be responsible for the Contractor's failure to perform the Work in accordance with the requirements of the Contract Documents. The Architect shall be responsible for the Architect's negligent acts or omissions, but shall not have control over or charge of and shall not be responsible for acts or omissions of the Contractor, Subcontractors, or their agents or employees, or of any other persons or entities performing portions of the Work.

2.6.2.3  The Architect shall at all times have access to the Work wherever it is in preparation or progress.

2.6.2.4  Except as otherwise provided in this Agreement or when direct communications have been specially authorized, the Owner shall endeavor to communicate with the Contractor through the Architect about matters arising out of or relating to the Contract Documents. Communications by and with the Architect's consultants shall be through the Architect.

2.6.2.5  The Architect shall have authority to reject Work that does not conform to the Contract Documents. Whenever the Architect considers it necessary or advisable, the Architect will have authority to require inspection or testing of the Work in accordance with the provisions of the Contract Documents, whether or not such Work is fabricated, installed or completed. However, neither this authority of the Architect nor a decision made in good faith either to exercise or not to exercise such authority shall give rise to a duty or responsibility of the Architect to the Contractor, Subcontractors, material and equipment suppliers, their agents or employees or other persons or entities performing portions of the Work.

**2.6.3  CERTIFICATION OF PAYMENTS TO CONTRACTOR**

2.6.3.1  The Architect shall review and certify the amounts due the Contractor and shall issue Certificates for Payment in such amounts. The Architect's certification for payment shall constitute a representation to the Owner, based on the Architect's evaluation of the Work as provided in Paragraph 2.6.2 and on the data comprising the Contractor's Application for Payment, that the Work has progressed to the point indicated and that, to the best of the Architect's knowledge, information and belief, the quality of the Work is in accordance with the Contract Documents. The foregoing representations are subject (1) to an evaluation of the Work for conformance with the Contract Documents upon Substantial Completion, (2) to results of subsequent tests and inspections, (3) to correction of minor deviations from the Contract Documents prior to completion, and (4) to specific qualifications expressed by the Architect.



© 1997  AIA®
AIA DOCUMENT B141-1997
STANDARD FORM
SERVICES

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

2-7

WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

P. 14

2.6.3.2 The issuance of a Certificate for Payment shall not be a representation that the Architect has (1) made exhaustive or continuous on-site inspections to check the quality or quantity of the Work, (2) reviewed construction means, methods, techniques, sequences or procedures, (3) reviewed copies of requisitions received from Subcontractors and material suppliers and other data requested by the Owner to substantiate the Contractor's right to payment, or (4) ascertained how or for what purpose the Contractor has used money previously paid on account of the Contract Sum.

2.6.3.3 The Architect shall maintain a record of the Contractor's Applications for Payment.

### 2.6.4  SUBMITTALS

2.6.4.1 The Architect shall review and approve or take other appropriate action upon the Contractor's submittals such as Shop Drawings, Product Data and Samples, but only for the limited purpose of checking for conformance with information given and the design concept expressed in the Contract Documents. The Architect's action shall be taken with such reasonable promptness as to cause no delay in the Work or in the activities of the Owner, Contractor or separate contractors, while allowing sufficient time in the Architect's professional judgment to permit adequate review. Review of such submittals is not conducted for the purpose of determining the accuracy and completeness of other details such as dimensions and quantities, or for substantiating instructions for installation or performance of equipment or systems, all of which remain the responsibility of the Contractor as required by the Contract Documents. The Architect's review shall not constitute approval of safety precautions or, unless otherwise specifically stated by the Architect, of any construction means, methods, techniques, sequences or procedures. The Architect's approval of a specific item shall not indicate approval of an assembly of which the item is a component.

2.6.4.2 The Architect shall maintain a record of submittals and copies of submittals supplied by the Contractor in accordance with the requirements of the Contract Documents.

2.6.4.3 If professional design services or certifications by a design professional related to systems, materials or equipment are specifically required of the Contractor by the Contract Documents, the Architect shall specify appropriate performance and design criteria that such services must satisfy. Shop Drawings and other submittals related to the Work designed or certified by the design professional retained by the Contractor shall bear such professional's written approval when submitted to the Architect. The Architect shall be entitled to rely upon the adequacy, accuracy and completeness of the services, certifications or approvals performed by such design professionals.

### 2.6.5  CHANGES IN THE WORK

2.6.5.1 The Architect shall prepare Change Orders and Construction Change Directives for the Owner's approval and execution in accordance with the Contract Documents. The Architect may authorize minor changes in the Work not involving an adjustment in Contract Sum or an extension of the Contract Time which are consistent with the intent of the Contract Documents. If necessary, the Architect shall prepare, reproduce and distribute Drawings and Specifications to describe Work to be added, deleted or modified, as provided in Paragraph 2.8.2.

2.6.5.2 The Architect shall review properly prepared, timely requests by the Owner or Contractor for changes in the Work, including adjustments to the Contract Sum or Contract Time. A properly prepared request for a change in the Work shall be accompanied by sufficient supporting data and information to permit the Architect to make a reasonable determination without extensive investigation or preparation of additional drawings or specifications. If the Architect



© 1997  A I A ®
AIA DOCUMENT B141-1997
STANDARD FORM
SERVICES

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

21

WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

... ... ... Johnson, Jr., Esq.    312 926-0004

determines that requested changes in the Work are not materially different from the requirements of the Contract Documents, the Architect may issue an order for a minor change in the Work or recommend to the Owner that the requested change be denied.

**2.6.5.3** If the Architect determines that implementation of the requested changes would result in a material change to the Contract that may cause an adjustment in the Contract Time or Contract Sum, the Architect shall make a recommendation to the Owner, who may authorize further investigation of such change. Upon such authorization, and based upon information furnished by the Contractor, if any, the Architect shall estimate the additional cost and time that might result from such change, including any additional costs attributable to a Change in Services of the Architect. With the Owner's approval, the Architect shall incorporate those estimates into a Change Order or other appropriate documentation for the Owner's execution or negotiation with the Contractor.

**2.6.5.4** The Architect shall maintain records relative to changes in the Work.

**2.6.6    PROJECT COMPLETION**

**2.6.6.1** The Architect shall conduct inspections to determine the date or dates of Substantial Completion and the date of final completion, shall receive from the Contractor and forward to the Owner, for the Owner's review and records, written warranties and related documents required by the Contract Documents and assembled by the Contractor, and shall issue a final Certificate for Payment based upon a final inspection indicating the Work complies with the requirements of the Contract Documents.

**2.6.6.2** The Architect's inspection shall be conducted with the Owner's Designated Representative to check conformance of the Work with the requirements of the Contract Documents and to verify the accuracy and completeness of the list submitted by the Contractor of Work to be completed or corrected.

**2.6.6.3** When the Work is found to be substantially complete, the Architect shall inform the Owner about the balance of the Contract Sum remaining to be paid the Contractor, including any amounts needed to pay for final completion or correction of the Work.

**2.6.6.4** The Architect shall receive from the Contractor and forward to the Owner: (1) consent of surety or sureties, if any, to reduction in or partial release of retainage or the making of final payment and (2) affidavits, receipts, releases and waivers of liens or bonds indemnifying the Owner against liens.

**ARTICLE 2.7 FACILITY OPERATION SERVICES**

**2.7.1**    The Architect shall meet with the Owner or the Owner's Designated Representative promptly after Substantial Completion to review the need for facility operation services.

**2.7.2**    Upon request of the Owner, and prior to the expiration of one year from the date of Substantial Completion, the Architect shall conduct a meeting with the Owner and the Owner's Designated Representative to review the facility operations and performance and to make appropriate recommendations to the Owner.



© 1997    AIA®
AIA DOCUMENT B141-1997
STANDARD FORM
SERVICES

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292



WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

Jan 19 03 03:10p

## ARTICLE 2.8 SCHEDULE OF SERVICES

2.8.1   Design and Contract Administration Services beyond the following limits shall be provided by the Architect as a Change in Services in accordance with Paragraph 1.3.3:

.1   up to t h r e e                 (  3  ) reviews of each Shop Drawing, Product Data item, sample and similar submittal of the Contractor.

.2   up to o n e  h u n d r e d      ( 100 ) visits to the site by the Architect over the duration of the Project during construction.

.3   up to t h r e e                 (  3  ) inspections for any portion of the Work to determine whether such portion of the Work is substantially complete in accordance with the requirements of the Contract Documents.

.4   up to t h r e e                 (  3  ) inspections for any portion of the Work to determine final completion.

2.8.2   The following Design and Contract Administration Services shall be provided by the Architect as a Change in Services in accordance with Paragraph 1.3.3:

.1   review of a Contractor's submittal out of sequence from the submittal schedule agreed to by the Architect;

.2   responses to the Contractor's requests for information where such information is available to the Contractor from a careful study and comparison of the Contract Documents, field conditions, other Owner-provided information, Contractor-prepared coordination drawings, or prior Project correspondence or documentation;

.3   Change Orders and Construction Change Directives requiring evaluation of proposals, including the preparation or revision of Instruments of Service;

.4   providing consultation concerning replacement of Work resulting from fire or other cause during construction;

.5   evaluation of an extensive number of claims submitted by the Owner's consultants, the Contractor or others in connection with the Work;

.6   evaluation of substitutions proposed by the Owner's consultants or contractors and making subsequent revisions to Instruments of Service resulting therefrom;

.7   preparation of design and documentation for alternate bid or proposal requests proposed by the Owner; or

.8   Contract Administration Services provided 60 days after the date of Substantial Completion of the Work.



©1997  AIA®
AIA DOCUMENT B141-1997
STANDARD FORM
SERVICES

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292



WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

# EXHIBIT 2

01/09/2003 12:55 FAX 847 587 8503          TICOR TITLE                    @002/004

0020043287
1108/0124 40 001 Page 1 of    3
2002-01-10  12:51:04
Cook County Recorder          27.50

**ARCHITECT'S**
**NOTICE AND CLAIM**
**FOR LIEN**

Above Space for Recorder's Use Only

STATE OF ILLINOIS )
                  )
COUNTY OF COOK    )

The claimant, VERNON WILLIAMS ARCHITECTS, P.C. of 65 East Wacker Place, 19th
Floor, Chicago, County of Cook, State of Illinois, (hereinafter referred to as "claimant") hereby
files notice and claim for lien against LAKEVIEW REAL ESTATE DEVELOPMENT CO., 42
West 036 Beith Road, Elburn, Illinois 60119, County of Kane, (hereinafter referred to as
"owner") and states:

That on December 1, 1999, the owner owned the following described land in the County
of Cook, State of Illinois, to wit:

Parcel 1:

Lots 1, 2, 3, 4 and 5 in Mary A. Hoagland's Subdivision of the Southerly 100 feet of Lots 10 and
11 except the Easterly 80 feet of said Lot 10 in Block 3 of Cleaverville in Section 35, Township
39 North, Range 14, East of the Third Principal Meridian, in Cook County, Illinois.

Permanent Tax Index Number 17-35-104-024.

Parcel 2:

Lot 5 in Mary A. Hoagland's Subdivision of the South 100 feet of Lots 10 and 11 (except the
East 80 feet of Lot 10) in Block 3 in Cleaverville in Section 35, Township 39 North, Range 14,
East of the Third Principal Meridian, in Cook County, Illinois.

Permanent Tax Index Number 17-35-104-022.

Parcel 3:

A parcel of land being the East 80 feet of the South 100 feet of Lot 10 in Block 3 in Cleaverville

0020043287 Page 2 of 3

(so called) a Subdivision of the North 71 and 20/100 acres of fractional Section 2, Township 38 North, Range 14, East of the Third Principal Meridian, and 20 acres of the South East part of fractional Section 35, Township 39 North, Range 14, East of the Third Principal described as follows: Beginning at the South East corner of said Lot 10, thence Westerly along the North line of Oakwood Boulevard 80 feet; thence Northerly on a line parallel with the East line of said Lot 10 a distance of 100 feet; thence Easterly on a line parallel with the North line of Oakwood Boulevard 80 feet to the Illinois Central Railroad Company's right of way line; thence Southerly along said Westerly right of way line to the place of beginning in Cook County, Illinois.

Permanent Tax Index Number 17-35-104-023.

Address(es) of premises: The northeast corner of South Lake Park Avenue and East Oakwood Boulevard, Chicago, Illinois.

That on December 1, 1999, said owner made a contract with the claimant to develop and prepare the design and construction documentation for the new construction of the proposed +/- 125 room hotel with restaurant, health spa and swimming pool, meeting/banquet rooms, administrative offices, parking for 133 cars and +/- 6400 s.f. commercial retail space, for and in said improvement.

That on November 28, 2007, the claimant completed thereunder all required by said contract to be done.

That said owner is entitled to credits on account thereof as follows: None

There is due, unpaid and owing to the claimant, after allowing all credits, the sum of FORTY THREE THOUSAND TWELVE and 69/100 ($43,012.69) DOLLARS, for which, with interest, the claimant claims a lien on said land and improvements and on the moneys or other considerations due or to become due from the owner under said contract.

VERNON WILLIAMS ARCHITECTS, P.C.

By: _____

Its:      President

This document was prepared by Vernon Williams Architects, P.C., 65 East Wacker Place, 19th Floor, Chicago, Illinois 60601

Mail to:        Vernon Williams Architects, P.C.
                65 East Wacker Place, 19th Floor
                Chicago, Illinois 60601

0020043287 Page 1 of 3

State of Illinois )
) SS,
County of Cook )

The affiant, VERNON WILLIAMS, being first duly sworn, on oath deposes and says that he is President of Vernon Williams Architects, P.C., 65 East Wacker Place, 19th Floor, Chicago, Illinois 60601, the claimant; that he has read the foregoing Architect's Notice and Claim for Lien and knows the contents thereof; and that the statements therein contained are true.

Subscribed and Sworn to before me this 7 day

of January , 2002

Yolanda G. Huitron
NOTARY PUBLIC

"OFFICIAL SEAL"
YOLANDA G. HUITRON
Notary Public, State of Illinois
My Commission Expires 8/13/05

Brothers + Thompson, PC
20 E Jackson, STE 650
Chicago IL 60604

# EXHIBIT 3

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT - CHANCERY DIVISION

ANTHONY FIELDS,                    )
                                   )
          Petitioner,              )
                                   )        03CH01055
     vs.                           )    NO.
                                   )
VERNON WILLIAMS, individually,     )
and VERNON WILLIAMS, ARCHI-        )
TECTS, P.C.,                       )
                                   )
          Respondents.             )

**PETITION TO DECLARE INVALIDITY OF
MECHANIC'S LIEN AND OTHER RELIEF**

NOW COMES the Petitioner, ANTHONY FIELDS, by his attorney,
Arnim Johnson, Jr., and petitions this honorable court to enter a
declaratory judgment determining the validity of a mechanic's
lien recorded by respondents, VERNON WILLIAMS, individually, and
VERNON WILLIAMS, ARCHITECTS, P.C. (Hereinafter WILLIAMS), and
other relief.  In support of this motion the Petitioner states as
follows:

1.  On December 1, 1999 WILLIAMS entered into the Standard
Form of Agreement Between Owner and Architect with Standard Form
of Architect's Services, issued by the American Institute of
Architects with Lakeview Real Estate Development Company
(hereinafter Lakeview), an Illinois corporation; a copy of which

1

is attached hereto.  Exhibit A.[1]

2.    Petitioner, FIELDS, executed said contract on behalf of the corporation in his capacity of President thereof.  At the time the contract was executed, FIELDS was a forty percent shareholder of Lakeview, and also owner in fee simple of certain real property, which is the subject of this action.

3.    The subject property consists of a tract of land containing three parcels, nine lots in total, commonly known as 914 - 924 East Oakwood Boulevard, Chicago, Illinois.

4.    Lakeview planned to develop the subject tract of land into a $18,000,000.00 (eighteen million) dollar, sixteen story Howard Johnson Hotel and Convention Center, and contracted with respondent, WILLIAMS to provide comprehensive architectural services through the completion of the construction project.

5.    Article 1.5 of the contract recites terms of compensation, and provides for an initial retainer of $5,000.00 (five thousand) dollars, and:

> "(1.5.7) Subsequent payments for services shall be made monthly, and where applicable, shall be in proportion to services performed on the basis set forth in this Agreement."

6.    Paragraph 1.5.1 provides that "Compensation shall be on a stipulated sum basis for the amount of $467,650.00 (four hundred sixty-seven thousand, six hundred fifty) dollars,

---

[1]    All Exhibits referred to are attached to Petitioner's Petition for Temporary Injunctive Relief filed simultaneously herewith.

2

excluding expenses".

7.   Pursuant to the terms of compensation Lakeview paid
WILLIAMS approximately $15,000.00 (fifteen thousand) dollars
during the viability of the contract.   In return, on or about
December 27, 1999 WILLIAMS completed a conceptual design of the
building relating to the exterior facade; site plan relating to
the interior floor plans of the building; and, elevations, i.e.,
how the building would appear from the north and south
approaches.   Copies of WILLIAMS' sketches are attached at the
end of Exhibit A, the Agreement.

8.   The purpose of the services completed by WILLIAMS was
to provide visuals for a presentation to Alderman Toni
Preckwinkle to obtain the Alderman's support for the project.

9.   Alderman Preckwinkle decided to withhold support for
the construction of the proposed hotel in February, 2000, and
subsequently, as a consequence, the zoning applications for a
change in zoning to comply with the proposed hotel were tabled.

10.   Compliance with Zoning and Lakefront Protection
Ordinances are recited as prerequisites for the performance of
the Architects Agreement.   See, Article 1.1.2.8, entitled,
"Parameters".

11.   No further work was performed by WILLIAMS under the
contract, and no further payments were made by Lakeview after
Alderman Preckwinkle failed to support the project in February,

3

2000.

12.   To the date of the filing of this Petition, no work or improvements of any nature have been done on the subject tract of real estate.

13.   On January 10, 2002 WILLIAMS recorded a mechanic's lien on the subject tract of real estate, Document #00200432387 in the amount of $43,012.69 (forty-three thousand, twelve and 69/100) dollars pursuant to 770 ILCS (60/1, *et seq.*), entitled, "Mechanic's Lien, Person entitled to lien – Extent of Lien".

14.   Said statute provides for a lien to be placed on real estate by any person who shall by contract, express or implied, with the owner of a lot or tract of land to improve the lot or tact of land, which includes furnishing or providing labor or services, or incur any expense, as an architect, structural engineer, professional engineer, land surveyor or the like, amongst others.

15.   The mechanic's lien filed against the subject tract of land by WILLIAMS is defective in two major respects.  First, WILLIAMS contracted with Lakeview Real Estate Development Corporation and not the owner of the property, Petitioner, FIELDS, and such is stated on the face of the property.  FIELDS, who executed the contract in his capacity as president of the corporation, as is plainly stated on the contract, did not execute the contract as owner of the property, nor as agent of

4

the owner of the property.

16.    Secondly, no services provided by respondent, WILLIAMS, resulted in any improvement on the land, its buildings, or fixtures at all, and certainly not within the meaning of the statute, and thus, cannot support a mechanic's lien on said property.    A mechanic's lien can not attach to property unless the property has been improved by the material, labor or services provided by the purported lienor, by virtue of a contract entered into with the owner.

17.    In **Ohrenstein vs. Howell**, 227 Ill.App 215, 219 (1st Dist. 1927) (Exhibit B attached hereto), the court held:

> "We have carefully reviewed the evidence in the case and find that the services rendered by appellees were not for the improvement of the lot, but were merely for the purpose of furnishing defendant with information tending to show the possibilities of such an improvement.    The sketches prepared by appellees were not used by appellant in the improvement of the lot and no use was made of them by appellant except in so far as they enabled him to determine the character of the improvement that the lot was capable of sustaining. The claim of appellees does not come within the terms of the statute.
> "The fact that appellees may be entitled to recover in an action at law for their services in preparing sketches does not entitle them to a mechanic's lien upon the premises in question"

18.    Petitioner, FIELDS, has repeatedly requested that WILLIAMS execute a release of the Mechanic' Lien, and WILLIAMS has steadfastly refused to do so, knowing that the lien is invalid, null, and void.

19.    WILLIAMS' failure to release the lien has resulted in

5

damage to FIELDS' credit reputation; impeded FIELDS' ability to conduct his business as a mortgage broker and real estate developer; and, is preventing FIELDS from fully appreciating and liquidating the equity he holds in the property without unjustly enriching WILLIAMS, all of which WILLIAMS is well aware.

WHEREFORE, Petitioner, ANTHONY FIELDS, prays that the court enter an order declaring the mechanic's lien of WILLIAMS, null and void, and enter an order awarding damages to FIELDS in an amount supported by the evidence.

ANTHONY FIELDS

By:
Arnim Johnson, Jr.
Attorney for Petitioner
7407 South Paxton Avenue
Chicago, Illinois 60649
312/326-5207
Atty No. 05031

## VERIFICATION BY CERTIFICATION

Under penalty of perjury as provided in Section 1-109 of the Code of Civil Procedure the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

ANTHONY FIELDS

6

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| *IN RE:* | ) | |
| | ) | |
| ANTHONY FIELDS, | ) | |
| | ) | |
| Debtor, | ) | Chapter 7 |
| | ) | |
| | ) | Bankruptcy No. 03 B 21620 |
| CHARLES J. MYLER, not individually, | ) | |
| but solely as Chapter 7 Trustee, | ) | Judge Manuel Barbosa |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary No. 04 A 00189 |
| | ) | |
| ANTHONY FIELDS, RALPH BOOKER, | ) | Hearing Date: March 6, 2008 |
| VERNON WILLIAMS and VERNON | ) | |
| WILLIAMS ARCHITECTS, P.C., | ) | Hearing Time: 10:00 a.m. |
| LAKEVIEW REAL ESTATE | ) | |
| DEVELOPMENT CO., and | ) | |
| PARKWAY BANK AND TRUST | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

## RESPONSE OF TRUSTEE TO MOTION OF VERNON WILLIAMS AND VERNON WILLIAMS ARCHITECTS, P.C. FOR SUMMARY JUDGMENT

Plaintiff, Charles J. Myler, not individually, but solely as Chapter 7 Trustee ("Trustee")

in the Bankruptcy of Debtor, Anthony Fields ("Debtor"), by his attorneys, Charles J. Myler,

Richard G. Larsen and Myler, Ruddy & McTavish, respectfully submits this Response to the

Motion of Vernon Williams and Vernon Williams Architects, P.C., for Summary Judgment.

### BACKGROUND

I.    Procedural Background.

Debtor filed his Chapter 11 Bankruptcy Petition on May 15, 2003, which was

subsequently converted to a Chapter 7 proceeding on August 27, 2003. Debtor's Estate is

comprised of, among other things, 900, 914-916 and 920-924 East Oakdale, Chicago, Cook County, Illinois. The PINs for these parcels are as follows: 900 is 17-35-104-024; 914-916 is 17-35-104-022; and 920-924 is 17-35-104-023 (hereinafter "Parcels 022, 023 and 024"). On June 10, 2002, Vernon Williams Architects, P.C. (together with Vernon Williams, the "Defendants"), recorded with the Cook County Recorder of Deeds an Architect's Mechanic's Lien Claim as Document No. 0020043287, purportedly against Parcels 022, 023 and 024 (the "Mechanic's Lien").

During the pendency of the Chapter 11 proceeding, Debtor filed a Petition to Declare Invalidity of Mechanic's Lien and Other Relief (the "Petition") against the Defendants. Through his Petition, Debtor challenged whether the Defendants could maintain their Mechanic's Lien on two distinct bases: (1) whether the Defendants' Mechanic's Lien is defective because the work performed by the Defendants was not authorized by Debtor or by the Debtor's recognized agent (Petition, ¶ 15); and (2) the Defendants did not provide services which resulted in an improvement to Parcels 022, 023 and 24. Petition, ¶ 16. Debtor's Petition was set for trial on August 27, 2003 – a date coterminous with the conversion of Debtor's Chapter 11 proceeding to a Chapter 7. However, on August 27, counsel for Debtor was not prepared to proceed to trial, and, on her own motion, Judge Susan Pierson Sonderby summarily dismissed Debtor's adversary action for want of prosecution.

Subsequent to the conversion of this matter to a Chapter 7 proceeding, a Letter of Appointment appointing Trustee to this case was filed on September 8, 2003. On February 5, 2004, Trustee filed an Adversary Complaint. Through the Adversary Complaint, Trustee seeks to determine whether Claimant has any interest in Parcels 022, 023 or 024. Adversary Complaint, ¶ 13.

On July 27, 2007, Trustee filed his Motion for Partial Summary Judgment (the "Motion"). That motion was denied by this Court, in part, on November 8, 2007. The Court, in its opinion, stated that "Because the pleadings on their face raise a question as to whether the doctrine of *res judicata* governs the outcome of the present case, the motion for summary judgment is denied without prejudice at this time." Thereafter, the Defendants moved for Summary Judgment claiming that the Trustee's complaint was barred due to *res judicata*.

As is explained below, *res judicata* is not an applicable bar to the Trustee's Complaint.

### ARGUMENT & ANALYSIS

I.    *Res Judicata* Does Not Operate to Bar Trustee's Complaint.

In their Motion for Summary Judgment, the Defendants contend that Trustee's Motion must be denied as the doctrine of *res judicata* operates in this case to bar Trustee from challenging the validity of the Defendants' Mechanic's Lien. The Defendants argue that when Judge Sonderby summarily dismissed Debtor's Petition for Want of Prosecution, the validity of the Mechanic's Lien could no longer be challenged. Motion, p. 4. However, this Court is not precluded from determining whether the Mechanic's Lien is void as a matter of law for two reasons. First, *res judicata* is inapplicable in this context, as there is no identity of claims between Debtor's Chapter 11 Adversary Petition, which challenged the circumstances surrounding the work upon which the Lien is based, and Trustee's contention that the Mechanic's Lien is void as a matter of law for Claimant's failure to comply with the rigid requirements prescribed by Illinois' Mechanic's Lien Act. Second, *res judicata* is inapplicable because there is no identity of parties between the Debtor's attempt to invalidate the Defendants' lien and the Trustees's request for a determination of the extent, priority and validity of the Defendants' lien.

A.    *Res Judicata* Does Not Apply – There Is No Identity of Parties between Debtor's Complaint and Trustee's Adversary Action.

In order for the doctrine of *res judicata* to be applied successfully, a party must satisfy three elements for a claim to be precluded:  (1) an identity of parties or their privies; (2) an identity of causes of action; and (3) a final judgment on the merits.  *D & K Properties Crystal Lake v. Mut. Life Ins. Co. of N.Y.*, 112 F.3d 257, 259 (7th.Cir.1997).

The first element – identity of parties – is lacking in this case.  The Debtor, as debtor-in-possession, brought suit against the Defendants to determine the validity, priority and extent of their liens when the case was in a chapter 11.  The Court dismissed the case when the Debtor failed to proceed.  Concurrently with the dismissal of the Debtor's suit against the Defendants, the Court entered an order on the United States Trustee's motion to convert the case to a chapter 7 proceeding.

In support of their argument that *res judicata* applies, the only case the Defendants cite is *In re Royal*, 289 B.R. 913 (Bankr.N.D.Ill.2003)(Schmetterer, J.).  In this case, a chapter 7 Trustee entered into an agreed order for relief from the automatic stay so that the Debtor and his estranged wife could resolve issues surrounding their divorce in state court.  At issue was real property whose value had to be appraised for the purposes of division between the Debtor and his estranged wife.  More than a year after the agreed order for relief from the automatic stay was entered, the Trustee filed a no asset report, and the case was closed less than two weeks later.  A little over two months later, the Trustee vacated the no asset report and sought to bring the real property that was divided between the Debtor and estranged wife back into the Debtor's bankruptcy.  Judge Schmetterer, citing *Raleigh v. Haskell*, 1998 WL 809520 (Bankr.N.D.Ill.1998), noted:

"While the Trustee and the Debtor are not precisely the same party, for the purpose of Rooker-Feldman, it must still be asked whether they were in privity with respect to the Dissolution Proceeding. In [*Haskell*], the bankruptcy judge's opinion noted:

> 'The *Rooker-Feldman* doctrine may apply to non parties when they occupy positions "functionally identical" to the parties. This identity of positions or interests involves the concept of privity which is applicable to the *Rooker-Feldman* doctrine as well as the doctrine of collateral estoppel. A nonparty is in privity with a party, when the party adequately represents the nonparty's legal interest in the first proceeding. It is the identity of interests that controls in determining privity, not the nominal identity of the parties. *Therefore, the question is whether the Debtor's legal interests in the divorce proceeding were congruent with the Trustee's legal interest.*'" (emphasis added)

*Royal*, at 919.

Judge Schmetterer went on to determine that the Trustee's legal interests were congruent with the Debtor's legal interests and granted the Defendant's motion to dismiss the Trustee's complaint on the grounds of *res judicata*.

Judge Schmetterer himself authored two other opinions in which the distinction with the *Royal* fact pattern existed and where he held that the doctrine of *res judicata* did not apply to the Trustee's actions. In *Paloian v. Grupo Serla S.A. de C.V. (In re GGSI Liquidation, Inc.)*, 351 B.R. 529 (Bankr.N.D.Ill.2006) and *Williams v. Stefan*, 122 B.R. 987 (Bankr.N.D.Ill. 1991), each of the debtors filed chapter 11 cases as debtors-in-possession that were subsequently converted to chapter 7. In both cases, Judge Schmetterer found that the identity of parties and the resulting privity was lacking and therefore *res judicata* could not be used to bar the Trustee's actions. In *Paloian*, Judge Schmetterer held that "To justify preclusion under a theory of privity, a non-party must have actual control. To have control of litigation requires that the person have effective choice as to the legal theories and proofs to be advanced on behalf of the party to the action."

*Paloian*, at 577, citing *Benson and Ford, Inc., v. Wanda Petroleum Co.*, 833 F.2d 1172, 1174 (5th Cir.1982). "In this case, the Trustee did not have control of the 1999 Debtor or its schedules. He did not control or participate in the prior bankruptcy proceedings. Moreover, as a representative of the estate in this case, the Trustee does not represent the same interests as the 1999 Chapter 11 Delaware Debtor." *Id.* Likewise, in the *Williams* case, Judge Schmetterer wrote:

> "privity in the res judicata sense involves a 'person so identified in interest with another that he represents the same legal right' regardless of whether the person is a formal party of record [*citing In re Wilcher*, 56 Bankr. 428, 439 (Bankr.N.D.Ill.1985)(Martin, J.)]. Such identification of interest can be shown by two sets of circumstances which are relevant here: the interests of a person are placed before the court by one authorized to sue or defend on his behalf; or, a person with an interest in the outcome controls or shares control of a suit by another."

*Williams*, at 993.

In the present case, the Debtor as debtor-in-possession attempted to litigate the issue of the extent, priority and validity of the Defendants' liens. Unlike the Trustee in *Royal*, where the case was filed under chapter 7 and remained under chapter 7, here the Trustee was not appointed until the day the Debtor's case was converted, and his retention of counsel was not approved until a month and a half after the Debtor's complaint against the Defendants' was dismissed. Using the standard set forth in the *Paloian* and *Williams* cases, the Trustee here had neither the privity nor the control required for *res judicata* to operate as a bar to the Trustee's action. The application of the doctrine of *res judicata* to this case is inapposite and must be denied.

        B.    *Res Judicata* Does Not Apply –There Is No Identity of Causes between Debtor's Complaint and Trustee's Adversary Action.

The Defendants baldly state that "Debtor's adversary complaint and Trustee's adversary complaint both challenge the validity of VWA's Claim for Lien. Therefore, the two causes of action are identical for purposes of *res judicata*." In order to invoke the doctrine of *res judicata*, however, the Defendants must demonstrate that both Debtor's Adversary action and Trustee's

Adversary Complaint are based on the same or nearly the same factual allegations. *In re National Industrial Chemical Company*, 237 B.R. 437, 441 (N.D. East. Div. 1999).

The Seventh Circuit determines identity of the causes of action using the "same transaction" test. *Id.* Two claims are one for purposes of *res judicata* if they are based on the same, or nearly the same, factual allegations. *Id.* *Res judicata* bars the subsequent suit if the claim upon which it is based arises from the same incident, events, transaction, circumstances or other factual nebula as a prior suit that had gone to final judgment. *Id.* However, Courts must not describe the facts of the cases too broadly, but must examine them at a sufficient level of specificity in order to determine whether to apply the doctrine of *res judicata*. *Id.* at 441-442.

In this case, Trustee seeks to invalidate the Mechanic's Lien based upon facts completely separate and distinct from Debtor's Petition. Debtor challenged the Mechanic's Lien on two specific grounds: (1) that the Defendants' Mechanic's Lien is defective because the work performed by the Defendants was not authorized by either the owner of Parcels 022, 023 and 024 or by the owner's recognized agent (Petition, ¶ 15); and (2) that the Defendants did not provide services which resulted in an improvement to Parcels 022, 023 and 24. Petition, ¶ 16. Trustee, however, seeks to have the Mechanic's Lien deemed void as a matter of law because: (1) the Lien is not perfected against Parcel 022; and (2) misidentifies the Owner of Parcels 022, 023 or 024 and was never served upon the Owner. Thus, while the Petition and Trustee's Motion both attack the validity of the Mechanic's Lien, the facts and legal theories are not similar, let alone identical. As such, an element essential to establishing the doctrine of *res judicata* is not met, and *res judicata* does not operate to bar Trustee's Motion. *In re National Industrial Chemical Company* at 441-442.

CONCLUSION

The Defendants are misapplying the doctrine of *res judicata* to the facts of the present case. Because the Trustee was not involved in the case while it was a chapter 11, debtor-in-possession proceeding, there was no identity of parties. The Trustee had absolutely no control over the litigation involving the Defendants' alleged mechanics' liens. Furthermore, the Defendants' attempt to apply the doctrine of *res judicata* must fail because the there is no identity of causes. The Trustee's complaint addresses different causes than those raised by the debtor-in-possession.

For those reasons, the Defendants' motion for summary judgment must be denied.

Respectfully submitted,

By: /s/ Charles J. Myler, not individually, but
     solely as Chapter 7 Trustee for
     the Estate of Anthony Fields
     Attorneys for Charles J. Myler, Trustee

Charles J. Myler, ARDC No. 2008602
Richard G. Larsen, ARDC No. 6193054
Myler, Ruddy & McTavish
111 West Downer Place, Suite 400
Aurora, Illinois 60506
(630) 897-8475
(630) 897-8076 (fax)

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| *IN RE:* | ) | |
| | ) | |
| ANTHONY FIELDS, | ) | |
| | ) | |
| Debtor, | ) | Chapter 7 |
| | ) | |
| | ) | Bankruptcy No. 03 B 21620 |
| CHARLES J. MYLER, not individually, | ) | |
| but solely as Chapter 7 Trustee, | ) | Judge Manuel Barbosa |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary No. 04 A 00189 |
| | ) | |
| ANTHONY FIELDS, RALPH BOOKER, | ) | Hearing Date: March 6, 2008 |
| VERNON WILLIAMS and VERNON | ) | |
| WILLIAMS ARCHITECTS, P.C., | ) | Hearing Time: 10:00 a.m. |
| LAKEVIEW REAL ESTATE | ) | |
| DEVELOPMENT CO., and | ) | |
| PARKWAY BANK AND TRUST | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

## RESPONSE OF TRUSTEE TO MOTION OF VERNON WILLIAMS AND VERNON WILLIAMS ARCHITECTS, P.C. FOR SUMMARY JUDGMENT

Plaintiff, Charles J. Myler, not individually, but solely as Chapter 7 Trustee ("Trustee") in the Bankruptcy of Debtor, Anthony Fields ("Debtor"), by his attorneys, Charles J. Myler, Richard G. Larsen and Myler, Ruddy & McTavish, respectfully submits this Response to the Motion of Vernon Williams and Vernon Williams Architects, P.C., for Summary Judgment.

### BACKGROUND

I.      Procedural Background.

Debtor filed his Chapter 11 Bankruptcy Petition on May 15, 2003, which was subsequently converted to a Chapter 7 proceeding on August 27, 2003. Debtor's Estate is

comprised of, among other things, 900, 914-916 and 920-924 East Oakdale, Chicago, Cook County, Illinois. The PINs for these parcels are as follows: 900 is 17-35-104-024; 914-916 is 17-35-104-022; and 920-924 is 17-35-104-023 (hereinafter "Parcels 022, 023 and 024"). On June 10, 2002, Vernon Williams Architects, P.C. (together with Vernon Williams, the "Defendants"), recorded with the Cook County Recorder of Deeds an Architect's Mechanic's Lien Claim as Document No. 0020043287, purportedly against Parcels 022, 023 and 024 (the "Mechanic's Lien").

During the pendency of the Chapter 11 proceeding, Debtor filed a Petition to Declare Invalidity of Mechanic's Lien and Other Relief (the "Petition") against the Defendants. Through his Petition, Debtor challenged whether the Defendants could maintain their Mechanic's Lien on two distinct bases: (1) whether the Defendants' Mechanic's Lien is defective because the work performed by the Defendants was not authorized by Debtor or by the Debtor's recognized agent (Petition, ¶ 15); and (2) the Defendants did not provide services which resulted in an improvement to Parcels 022, 023 and 24. Petition, ¶ 16. Debtor's Petition was set for trial on August 27, 2003 – a date coterminous with the conversion of Debtor's Chapter 11 proceeding to a Chapter 7. However, on August 27, counsel for Debtor was not prepared to proceed to trial, and, on her own motion, Judge Susan Pierson Sonderby summarily dismissed Debtor's adversary action for want of prosecution.

Subsequent to the conversion of this matter to a Chapter 7 proceeding, a Letter of Appointment appointing Trustee to this case was filed on September 8, 2003. On February 5, 2004, Trustee filed an Adversary Complaint. Through the Adversary Complaint, Trustee seeks to determine whether Claimant has any interest in Parcels 022, 023 or 024. Adversary Complaint, ¶ 13.

On July 27, 2007, Trustee filed his Motion for Partial Summary Judgment (the "Motion"). That motion was denied by this Court, in part, on November 8, 2007. The Court, in its opinion, stated that "Because the pleadings on their face raise a question as to whether the doctrine of *res judicata* governs the outcome of the present case, the motion for summary judgment is denied without prejudice at this time." Thereafter, the Defendants moved for Summary Judgment claiming that the Trustee's complaint was barred due to *res judicata*.

As is explained below, *res judicata* is not an applicable bar to the Trustee's Complaint.

## ARGUMENT & ANALYSIS

I.    *Res Judicata* Does Not Operate to Bar Trustee's Complaint.

In their Motion for Summary Judgment, the Defendants contend that Trustee's Motion must be denied as the doctrine of *res judicata* operates in this case to bar Trustee from challenging the validity of the Defendants' Mechanic's Lien. The Defendants argue that when Judge Sonderby summarily dismissed Debtor's Petition for Want of Prosecution, the validity of the Mechanic's Lien could no longer be challenged. Motion, p. 4. However, this Court is not precluded from determining whether the Mechanic's Lien is void as a matter of law for two reasons. First, *res judicata* is inapplicable in this context, as there is no identity of claims between Debtor's Chapter 11 Adversary Petition, which challenged the circumstances surrounding the work upon which the Lien is based, and Trustee's contention that the Mechanic's Lien is void as a matter of law for Claimant's failure to comply with the rigid requirements prescribed by Illinois' Mechanic's Lien Act. Second, *res judicata* is inapplicable because there is no identity of parties between the Debtor's attempt to invalidate the Defendants' lien and the Trustees's request for a determination of the extent, priority and validity of the Defendants' lien.

A.    *Res Judicata* Does Not Apply --There Is No Identity of Parties between Debtor's Complaint and Trustee's Adversary Action.

In order for the doctrine of *res judicata* to be applied successfully, a party must satisfy three elements for a claim to be precluded: (1) an identity of parties or their privies; (2) an identity of causes of action; and (3) a final judgment on the merits. *D & K Properties Crystal Lake v. Mut. Life Ins. Co. of N.Y.*, 112 F.3d 257, 259 (7th.Cir.1997).

The first element -- identity of parties -- is lacking in this case. The Debtor, as debtor-in-possession, brought suit against the Defendants to determine the validity, priority and extent of their liens when the case was in a chapter 11. The Court dismissed the case when the Debtor failed to proceed. Concurrently with the dismissal of the Debtor's suit against the Defendants, the Court entered an order on the United States Trustee's motion to convert the case to a chapter 7 proceeding.

In support of their argument that *res judicata* applies, the only case the Defendants cite is *In re Royal*, 289 B.R. 913 (Bankr.N.D.Ill.2003)(Schmetterer, J.). In this case, a chapter 7 Trustee entered into an agreed order for relief from the automatic stay so that the Debtor and his estranged wife could resolve issues surrounding their divorce in state court. At issue was real property whose value had to be appraised for the purposes of division between the Debtor and his estranged wife. More than a year after the agreed order for relief from the automatic stay was entered, the Trustee filed a no asset report, and the case was closed less than two weeks later. A little over two months later, the Trustee vacated the no asset report and sought to bring the real property that was divided between the Debtor and estranged wife back into the Debtor's bankruptcy. Judge Schmetterer, citing *Raleigh v. Haskell*, 1998 WL 809520 (Bankr.N.D.Ill.1998), noted:

"While the Trustee and the Debtor are not precisely the same party, for the

purpose of Rooker-Feldman, it must still be asked whether they were in privity with

respect to the Dissolution Proceeding. In [*Haskell*], the bankruptcy judge's opinion

noted:

> 'The *Rooker-Feldman* doctrine may apply to non parties when they occupy
> positions "functionally identical" to the parties. This identity of positions or
> interests involves the concept of privity which is applicable to the *Rooker-
> Feldman* doctrine as well as the doctrine of collateral estoppel. A nonparty is in
> privity with a party, when the party adequately represents the nonparty's legal
> interest in the first proceeding. It is the identity of interests that controls in
> determining privity, not the nominal identity of the parties. *Therefore, the
> question is whether the Debtor's legal interests in the divorce proceeding were
> congruent with the Trustee's legal interest.*'" (emphasis added)

*Royal*, at 919.

Judge Schmetterer went on to determine that the Trustee's legal interests were congruent with

the Debtor's legal interests and granted the Defendant's motion to dismiss the Trustee's

complaint on the grounds of *res judicata*.

Judge Schmetterer himself authored two other opinions in which the distinction with the

*Royal* fact pattern existed and where he held that the doctrine of *res judicata* did not apply to the

Trustee's actions. In *Paloian v. Grupo Serla S.A. de C.V. (In re GGSI Liquidation, Inc.)*, 351

B.R. 529 (Bankr.N.D.Ill.2006) and *Williams v. Stefan*, 122 B.R. 987 (Bankr.N.D.Ill. 1991), each

of the debtors filed chapter 11 cases as debtors-in-possession that were subsequently converted

to chapter 7. In both cases, Judge Schmetterer found that the identity of parties and the resulting

privity was lacking and therefore *res judicata* could not be used to bar the Trustee's actions. In

*Paloian*, Judge Schmetterer held that "To justify preclusion under a theory of privity, a non-party

must have actual control. To have control of litigation requires that the person have effective

choice as to the legal theories and proofs to be advanced on behalf of the party to the action."

*Paloian,* at 577, citing *Benson and Ford, Inc., v. Wanda Petroleum Co.,* 833 F.2d 1172, 1174 (5th

Cir.1982). "In this case, the Trustee did not have control of the 1999 Debtor or its schedules. He

did not control or participate in the prior bankruptcy proceedings. Moreover, as a representative

of the estate in this case, the Trustee does not represent the same interests as the 1999 Chapter 11

Delaware Debtor." *Id.* Likewise, in the *Williams* case, Judge Schmetterer wrote:

> "privity in the res judicata sense involves a 'person so identified in interest with another
> that he represents the same legal right' regardless of whether the person is a formal party
> of record [*citing In re Wilcher,* 56 Bankr. 428, 439 (Bankr.N.D.Ill.1985)(Martin, J.)].
> Such identification of interest can be shown by two sets of circumstances which are
> relevant here: the interests of a person are placed before the court by one authorized to
> sue or defend on his behalf; or, a person with an interest in the outcome controls or shares
> control of a suit by another."

*Williams,* at 993.

In the present case, the Debtor as debtor-in-possession attempted to litigate the issue of

the extent, priority and validity of the Defendants' liens. Unlike the Trustee in *Royal,* where the

case was filed under chapter 7 and remained under chapter 7, here the Trustee was not appointed

until the day the Debtor's case was converted, and his retention of counsel was not approved

until a month and a half after the Debtor's complaint against the Defendants' was dismissed.

Using the standard set forth in the *Paloian* and *Williams* cases, the Trustee here had neither the

privity nor the control required for *res judicata* to operate as a bar to the Trustee's action. The

application of the doctrine of *res judicata* to this case is inapposite and must be denied.

> B.  *Res Judicata* Does Not Apply – There Is No Identity of Causes between
> Debtor's Complaint and Trustee's Adversary Action.

The Defendants baldly state that "Debtor's adversary complaint and Trustee's adversary

complaint both challenge the validity of VWA's Claim for Lien. Therefore, the two causes of

action are identical for purposes of *res judicata.*" In order to invoke the doctrine of *res judicata,*

however, the Defendants must demonstrate that both Debtor's Adversary action and Trustee's

Adversary Complaint are based on the same or nearly the same factual allegations. *In re National Industrial Chemical Company*, 237 B.R. 437, 441 (N.D. East. Div. 1999).

The Seventh Circuit determines identity of the causes of action using the "same transaction" test. *Id.* Two claims are one for purposes of *res judicata* if they are based on the same, or nearly the same, factual allegations. *Id. Res judicata* bars the subsequent suit if the claim upon which it is based arises from the same incident, events, transaction, circumstances or other factual nebula as a prior suit that had gone to final judgment. *Id.* However, Courts must not describe the facts of the cases too broadly, but must examine them at a sufficient level of specificity in order to determine whether to apply the doctrine of *res judicata*. *Id.* at 441-442.

In this case, Trustee seeks to invalidate the Mechanic's Lien based upon facts completely separate and distinct from Debtor's Petition. Debtor challenged the Mechanic's Lien on two specific grounds: (1) that the Defendants' Mechanic's Lien is defective because the work performed by the Defendants was not authorized by either the owner of Parcels 022, 023 and 024 or by the owner's recognized agent (Petition, ¶ 15); and (2) that the Defendants did not provide services which resulted in an improvement to Parcels 022, 023 and 24. Petition, ¶ 16. Trustee, however, seeks to have the Mechanic's Lien deemed void as a matter of law because: (1) the Lien is not perfected against Parcel 022; and (2) misidentifies the Owner of Parcels 022, 023 or 024 and was never served upon the Owner. Thus, while the Petition and Trustee's Motion both attack the validity of the Mechanic's Lien, the facts and legal theories are not similar, let alone identical. As such, an element essential to establishing the doctrine of *res judicata* is not met, and *res judicata* does not operate to bar Trustee's Motion. *In re National Industrial Chemical Company* at 441-442.

## CONCLUSION

The Defendants are misapplying the doctrine of *res judicata* to the facts of the present case. Because the Trustee was not involved in the case while it was a chapter 11, debtor-in-possession proceeding, there was no identity of parties. The Trustee had absolutely no control over the litigation involving the Defendants' alleged mechanics' liens. Furthermore, the Defendants' attempt to apply the doctrine of *res judicata* must fail because the there is no identity of causes. The Trustee's complaint addresses different causes than those raised by the debtor-in-possession.

For those reasons, the Defendants' motion for summary judgment must be denied.

Respectfully submitted,

By: /s/ Charles J. Myler, not individually, but
solely as Chapter 7 Trustee for
the Estate of Anthony Fields
Attorneys for Charles J. Myler, Trustee

Charles J. Myler, ARDC No. 2008602
Richard G. Larsen, ARDC No. 6193054
Myler, Ruddy & McTavish
111 West Downer Place, Suite 400
Aurora, Illinois 60506
(630) 897-8475
(630) 897-8076 (fax)

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| *In Re:* ) | |
| ) | |
| ANTHONY FIELDS, ) | |
| Debtor, ) | Chapter 7 |
| ) | |
| ———————————— ) | |
| ) | Bankruptcy No. 03 B 21620 |
| CHARLES J. MYLER, not individually but ) | |
| solely as trustee, ) | |
| Plaintiff, ) | Judge Manuel Barbosa |
| ) | |
| vs. ) | |
| ) | Adversary No. 04 A 00189 |
| ANTHONY FIELDS, RALPH BOOKER, ) | |
| VERNON WILLIAMS, and VERNON ) | |
| WILLIAMS ARCHITECTS, P.C., ) | Hearing Date: February 21, 2008 |
| LAKEVIEW REAL ESTATE ) | |
| DEVELOPMENT CO., and ) | Time: 10:00 a.m. |
| PARKWAY BANK, ) | |
| Defendants. ) | Geneva, IL |

## TRUSTEE'S RESPONSE TO VERNON WILLIAMS AND VERNON WILLIAMS ARCHITECTS, P.C.'S STATEMENT OF MATERIAL FACTS

Trustee Charles J. Myler, by and through his attorneys, Charles J. Myler, Richard G. Larsen and Myler, Ruddy & McTavish, present the following Response to Vernon Williams ("Williams") and Vernon Williams Architects, P.C.'s ("VWA") Statement of Material Facts:

1.    Williams is a licensed architect and owner of VWA. Affidavit of Vernon Williams ¶2.

RESPONSE:  Admits

2.    In 1999, the debtor, Anthony Fields, contacted Williams regarding the debtor's plan to build a Howard Johnson Hotel on property owned by debtor located on the northeast corner of South Lake Park Avenue and East Oakwood Boulevard in Chicago, Illinois (the "property"). Affidavit of Vernon Williams, ¶3.

1

RESPONSE:  Admits

3.      On October 6, 1999, Williams drafted a proposal for the debtor to give him an estimated cost for VWA's architectural services.  The debtor accepted the proposal and on December 1, 1999, VWA entered into a Standard Form of Agreement Between Owner and Architect with Standard Form of Architect's Services ("Contract") with lakeview Real Estate Development Company ("Lakeview").  Williams signed the contract on behalf of VWA and the debtor signed the contract on behalf of Lakeview.  Affidavit of Vernon Williams, ¶3-4.

RESPONSE:  Admits

4.      From December 10, 1999 through June 21, 2001, VWA performed the following services pursuant to the Contract: drafted a proposed project schedule; prepared a zoning analysis; created grade level and street level site plans; drafted a document entitled "Background Material for Proposed Lakeview Howard Johnson Hotel"; and created nearly a dozen schematic designs.  Affidavit of Vernon Williams, ¶5.

RESPONSE:  Admits

5.      On January 25, 2000 Williams met with debtor and Alderman Toni Preckwinkle to present VWA's designs and to seek the alderman's support in rezoning the property.  Subsequent to the meeting with Alderman Preckwinkle, VWA continued to create schematic designs for the project, Williams participated in numerous telephone conferences and meetings with the debtor and his attorney regarding the zoning issues, and Williams met several times with representatives from Draper and Kramer regarding financial issues related to the project.  Facts.  In all, VWA spent 159 hours on the project.  Affidavit of Vernon Williams, ¶6.

RESPONSE:  Admits

6.      From December 1999 through June 2003, VWA submitted invoices to the debtor

2

for the work performed; however none of VWA's invoices were ever paid. The invoices were mailed to the debtor's home address: 42 W 036 Beith Rd., Elburn, IL 60119. To date, the only amount paid to VWA was the $5,000.00 retainer. Affidavit of Vernon Williams, ¶7.

RESPONSE: Admits

7.    On January 10, 2002, Williams filed an Architect's Notice and Claim for Lien ("Claim for Lien") on behalf of VWA and against Lakeview in the amount of $43,012.69. Affidavit of Vernon Williams, ¶8.

RESPONSE: Admits

8.    The Claim for Lien was verified by Williams and recorded with the Cook County Recorder's Office as Document Number 0020043287. Affidavit of Vernon Williams, ¶8.

RESPONSE: Admits

9.    The Claim for Lien contained the following description of the contract:

> That on December 1, 1999, said owner made a contract with the claimant to develop the prepare the design and construction documentation for the new construction of the proposed +/- 125 room hotel with restaurant, health spa and swimming pool, meeting/banquet rooms, administrative offices, parking for 133 cars and +/- 6400 s.f. commercial retail space, for and in said improvement

Affidavit of Vernon Williams, ¶8.

RESPONSE: Admits

10.    The Claim for Lien also contained the following statement regarding the amount due under the contract:

> There is due, unpaid and owing to the claimant, after allowing all credits, the sum of FORTY THREE THOUSAND AND TWELVE and 69/100 ($43,012.69) DOLLARS, for which, with interest, the claimant claims a lien on said land and improvements and on the moneys or other consideration due or to become due from the owner under said contract.

Affidavit of Vernon Williams, ¶8.

3

RESPONSE:  Admits

11.    The Claim for Lien contained the following description of the property that is

subject to the lien:

> Parcel 1:
>
> Lots 1, 2, 3, 4 and 5 in Mary A. Hoagland's Subdivision of the Southerly 100 feet
> of Lots 10 and 11 except the Easterly 80 feet of said Lot 10 in Block 3 of
> Cleaverville in Section 35,Township 39 North, Range 14, East of the Third
> Principal Meridian, in Cook County, Illinois.
>
> Permanent Tax Index Number 17-35-104-024.

Parcel 2:

> Lot 5 in Mary Hoagland's Subdivision of the South 100 feet of Lots 10 and 11
> (except the East 80 feet of Lot 10) in Block 3 of Cleaverville in Section 35,
> Township 39 North, Range 14, East of the Third Principal Meridian, in Cook
> County, Illinois.
>
> Permanent tax Index Number 17-35-104-022.

Parcel 3:

> A parcel of land being the East 80 feet of the South 100 feet of Lot 10 in Block 3
> in Cleaverville (so called) a Subdivision of the North 71 and 20/100 acres of
> fractional Section 2, Township 38 North, Range 14, East of the Third Principal
> Meridian, and 20 acres of the South East part of fractional of Section 35,
> Township 39 North, Range 14, East of the Third Principal described as follows:
> Beginning at the South East corner of said Lot 10, thence Westerly along the
> North line of Oakwood Boulevard 80 feet; thence Northerly on a line parallel with
> the East line of said Lot 10 a distance of 100 feet; thence Easterly on a line
> parallel with the North line of Oakwood Boulevard 80 feet to the Illinois Central
> Railroad Company's right of way line; thence Southerly along said Westerly right
> of way line to the place of beginning in Cook County, Illinois.
>
> Permanent Tax Index Number 17-35-104-023.
>
> Address(es) of premises: The northeast corner of South Lake Park Avenue and
> East Oakwood Boulevard, Chicago, Illinois.

Affidavit of Vernon Williams, ¶8.

RESPONSE:  Neither admits nor denies and states that the document speaks for itself.

4

12.     On January 21, 2003, the debtor filed a "Petition to Declare Invalidity of Mechanic's Lien and Other Relief" as well as a "petition for Temporary Mandatory Injunction and/or Alternative Relief" against Williams and VWA. In the petitions and in the debtor's affidavit in support of the petitions, the debtor identified the Property on which the Claim for Lien attached. Affidavit of Vernon Williams, ¶9.

RESPONSE: Admits

13.     On May 15, 2003, debtor filed a bankruptcy under Chapter 11. On June 10, 2003, debtor filed an adversary complaint (Case No. 03 A 01969) against Williams and VWA seeking to invalidate VWA's Claim for Lien ("Debtor's Adversary Complaint"). Affidavit of Vernon Williams, ¶10.

RESPONSE: Admits

14.     On June 20, 2003, debtor filed a motion for summary judgment on the debtor's Adversary Complaint. After a hearing, the debtor's motion for summary judgment was denied and a trial was set for August 27, 2003. On August 27, 2003, the debtor advised the court that he was not prepared to proceed with the trial. Accordingly, the Adversary Complaint was dismissed for want of prosecution. Affidavit of Vernon Williams, ¶11.

RESPONSE: Admits

15.     Also on August 27, 2003, the debtor's case was converted from a Chapter 7 a Chapter 11. Affidavit of Vernon Williams, ¶12.

RESPONSE: Admits

16.     On February 5, 2004, the Trustee filed an adversary complaint against Williams and VWA again challenging the validity of VWA's Claim for Lien ("Trustee's Adversary Complaint"). Affidavit of Vernon Williams, ¶13.

5

RESPONSE:  Admits

17.    On March 3, 2004, Williams and VWA filed their Answer to the Adversary

Complaint.  The Answer contained the following Affirmative Defense:

> The doctrine of res judicata prevents the trustee from re-litigating the question of whether VWA's lien is valid.  The debtor previously filed an adversary complaint against Williams and VWA which sought to invalidate VWA's architect's lien. See Case No. 03 A 01969.  On August 23m 2003, the court entered an order dismissing the adversary complaint for want of prosecution.  Pursuant to Rule 7041 of the Federal Rules of Bankruptcy Procedure and Rule 41 of the Federal Rules of Civil Procedure, a dismissal for want of prosecution "operates as an adjudication upon the merits".  FRCP 41(b).  Therefore, the trustee cannot re-litigate the validity of VWA's lien.

Affidavit of Vernon Williams, ¶14.

RESPONSE:  Admits that the defense was filed, but denies its validity.

In addition to this response, trustee attaches hereto his Statement of Uncontested Material

Facts as Exhibit "A".

Respectfully submitted.
/s/ Charles J. Myler
Charles J. Myler, Attorney for Trustee

Charles J. Myler # 2008602
Richard G. Larsen # 6193054
Attorneys for adversary plaintiff
**Myler, Ruddy & McTavish**
105 East Galena Blvd., 8th Floor
Aurora, Illinois 60505
(630)897-8475
(630)897-8076 (fax)

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| *IN RE:* | ) | |
| | ) | |
| ANTHONY FIELDS, | ) | |
| | ) | |
| Debtor, | ) | Chapter 7 |
| | ) | |
| | ) | Bankruptcy No. 03 B 21620 |
| CHARLES J. MYLER, not individually, | ) | |
| but solely as Chapter 7 Trustee, | ) | Judge Manuel Barbosa |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary No. 04 A 00189 |
| | ) | |
| ANTHONY FIELDS, RALPH BOOKER, | ) | |
| VERNON WILLIAMS and VERNON | ) | |
| WILLIAMS ARCHITECTS, P.C., | ) | |
| LAKEVIEW REAL ESTATE | ) | |
| DEVELOPMENT CO., and | ) | |
| PARKWAY BANK AND TRUST | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

TRUSTEE'S STATEMENT OF UNCONTESTED MATERIAL FACTS

Plaintiff, Charles J. Myler, not individually, but solely as Chapter 7 Trustee ("Trustee")

in the Bankruptcy of Debtor, Anthony Fields ("Fields"), by his attorneys, Charles J. Myler,

Richard G. Larsen and Myler, Ruddy & McTavish, in support of his Motion for Partial Summary

Judgment and in accordance with Bankruptcy Rule 7056/FRCP 56(c), identifies the following

uncontested material facts:

1.    On or before January 1, 2000, and at all times thereafter, Debtor, Anthony Fields

was and remains the sole owner of certain real property commonly known as 900, 914-916 and

920-924 East Oakdale, Chicago, Cook County, Illinois.

EXHIBIT
*A*

2. Debtor, Anthony Fields, filed his Chapter 11 Bankruptcy Petition on June 15, 2003, which was converted to a Chapter 7 proceeding on August 27, 2003.

3. A Letter of Appointment appointing Trustee to this case was filed on September 8, 2003.

4. Debtor's Estate is comprised of, among other things, 900, 914-916 and 920-924 East Oakdale, Chicago, Cook County, Illinois.

5. On June 10, 2002, Claimant recorded with the Cook County Recorder of Deeds an Architect's Mechanic's Lien Claim as Document No. 0020043287 (the "Mechanic's Lien") against 900, 914-916 and 920-924 East Oakdale, Chicago, Cook County, Illinois.

6. Vernon Williams Architects, P.C. filed a proof of claim against Debtor for the sums sought through the Mechanic's Lien on January 13, 2004.

7. Vernon Williams Architects, P.C.'s Mechanic's Lien does not identify the owner of the Property, Fields.

8. Vernon Williams Architects, P.C.'s Mechanic's Lien does not identify the owner of 900, 914-916 and 920-924 East Oakdale, Chicago, Cook County, Illinois.

9. Vernon Williams Architects, P.C. has never served the owner of 900, 914-916 and 920-924 East Oakdale, Chicago, Cook County, Illinois with a copy of its Mechanic's Lien.

10. Vernon Williams Architects, P.C.'s Mechanic's Lien does not identify describe 914-916 East Oakdale, Chicago, Cook County, Illinois.

Respectfully submitted,

By: /s/ Charles J. Myler, not individually, but

solely as Chapter 7 Trustee for
the Estate of Anthony Fields
Attorneys for Charles J. Myler, Trustee

Charles J. Myler, ARDC No. 2008602
Ricahrd G. Larsen, ARDC No. 6193054
Myler, Ruddy & McTavish
111 West Downer Place
Suite 400
Aurora, Illinois 60506
(630) 897-8475
(630) 897-8076 (fax)

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | Chapter 7 |
| | ) | Bankruptcy No. 03 B 21620 |
| ANTHONY FIELDS, | ) | Judge Manuel Barbosa |
| | ) | |
| Debtor, | ) | |
| | ) | |
| CHARLES J. MYLER, not individually but | ) | Adversary No. 04 A 00189 |
| solely as trustee, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | |
| ANTHONY FIELDS, RALPH BOOKER, | ) | |
| VERNON WILLIAMS, VERNON | ) | |
| WILLIAMS ARCHITECTS, P.C., | ) | |
| LAKEVIEW REAL ESTATE DEVELOP- | ) | |
| MENT CO., and PARKWAY BANK, | ) | |
| | ) | |
| Defendants. | ) | |

**VERNON WILLIAMS AND VERNON WILLIAMS ARCHITECTS, P.C.'S**
**REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Vernon Williams ("Williams") and Vernon Williams Architects, P.C. ("VWA") by and

through their attorneys present the following reply memorandum in support of their motion for

summary judgment.

**ARGUMENT**

Williams and VWA filed a motion for summary judgment based on the doctrine of *res*

*judicata.* The motion establishes that there are three elements of *res judicata*: (1) an identity of the

causes of action; (2) an identity of the parties or their privies; and (3) a final judgment on the merits.

*In re National Industrial Chemical Co.*, 237 B.R. 437, 441 (N.D. Ill. 1999). The motion also

establishes that all three elements are present in this case. Accordingly, the Trustee's attempt to re-litigate the validity of VWA's Architect's Notice and Claim for Lien ("Claim for Lien") is barred.

In his response to the motion for summary judgment ("Trustee's Response"), the Trustee argues that two of the elements of *res judicata* are missing, namely: (a) an identity of the causes of action and (b) an identity of the parties or their privies.[1] The Trustee is wrong on both arguments.

A.    There is an identity of the causes of action filed by the Debtor and the Trustee.

The doctrine of *res judicata* ensures the finality of decisions. *Id.* It bars re-litigation of claims that were or could have been raised in an earlier proceeding. *Id; D&K Properties Crystal Lake v. Mutual Life Ins. Co.,* 112 F.3d 257, 259 (7th Cir. 1997); *Allen v. McCurry,* 449 US 90, 94, 101 S.Ct. 411, 414 (1980) ("Under *res judicata,* a final judgment on the merits of an action precludes parties or their privies from relitigating issues that were or could have been raised in that action.")

"The Seventh Circuit determines identity of the causes of action using the 'same transaction' test." *Id; Car Carriers, Inc. v. Ford Motor Co.,* 789 F.2d 589, 593 (7th Cir. 1986). Under the same transaction test, a claim has identity with a previous claim where both claims arise from a single core of operative facts. *Id.; Brzostowski v. Laidlaw Waste Systems, Inc.,* 49 F.3d 337, 339 (7th Cir. 1995). "Two claims are one for purposes of *res judicata* if they are based on the same, or nearly the same, factual allegations." *In re National Industrial Chemical Co,* 237 B.R. at 441.

In the present matter, the Debtor's adversary complaint and the Trustee's adversary complaint arise from a single core of operative facts. Both complaints seek to invalidate the Claim for Lien that was filed after the Debtor failed to pay for the architectural services that VWA performed. Because

---

[1] The Trustee does not dispute that the third element of *res judicata* - a final judgment on the merits - has been met.

2

the Debtor's and the Trustee's adversary complaints make the same claim – that the Claim for Lien is invalid – there is an identity of the causes of action for purposes of *res judicata*.

Incredibly, the Trustee argues that he seeks to invalidate the Claim for Lien "based upon facts completely separate and distinct from the Debtor's Petition." Trustee's Response, p. 7. The Trustee argues that the Debtor challenged the Claim for Lien based on the arguments that the work was not authorized and that the work did not improve the subject property, while the Trustee's argument is that the Claim for Lien was not perfected. *Id.* However, the arguments put forth by the Debtor and the Trustee are not based on different facts. The Debtor and the Trustee have simply made different **legal arguments**. The "same transaction" test is not based on whether the legal arguments in both cases are the same. Rather, the "same transaction" test looks at whether the two claims arise from the same incident, events, transaction, circumstances or other factual nebula as a prior suit that had gone to final judgment. *In re National Industrial Chemical Co.*, 237 B.R. at 441. "A mere change in legal theory does not create a new cause of action." *Id.* at 442. In addition, *res judicata* bars re-litigation of claims that were **or could have been raised** in an earlier proceeding. *D&K Properties*, 112 F.3d at 259. While the Trustee chose to make a different legal argument than the Debtor, the Trustee's argument could have been raised in the Debtor's adversary complaint.

Here, the Trustee's adversary complaint arises out of the same incident, event and transaction as the Debtor's adversary complaint. Both complaints challenge the validity of the Claim for Lien which arose out of the following facts: from 1999 through 2001, VWA performed architectural services for the Debtor and the Debtor's corporation (Facts, ¶ 4); the Debtor never paid VWA for these services (Facts, ¶ 6); on January 10, 2002, VWA filed the Claim for Lien (Facts, ¶ 7); in 2003, the Debtor filed a Chapter 11 bankruptcy petition along with an adversary complaint against

Williams and VWA seeking to invalidate the Claim for Lien (Facts, ¶ 13); the Debtor filed a motion for summary judgment on his adversary complaint (Facts, ¶ 14); the motion for summary judgment was denied and a trial date was set for August 23, 2003 (Facts, ¶ 14); on August 23, 2003, the bankruptcy court dismissed the Debtor's adversary complaint and converted the Debtor's Chapter 11 case to a Chapter 7 case (Facts, ¶¶ 14-15); thereafter, the Trustee filed an adversary complaint against Williams and VWA seeking to invalidate the same Claim for Lien that the Debtor sought to invalidate (Facts, ¶ 16). Because both adversary complaints arise out of a single core of operative facts, there is an identity of the causes of action for purposes of *res judicata*.

      B.    There is an identity of the parties because the Trustee is in Privity with the Debtor.

*Res judicata* requires that the prior cause of action and the present cause of action involve the same parties or their privies. "A nonparty is in privity with a party, when the party adequately represents the nonparty's legal interest in the first proceeding. It is the identity of interests that controls in determining privity, not the nominal identity of the parties." *In re Estate of Royal*, 289 B.R. 913, 919 (N.D. Ill. 2003). The court in *In re Estate of Royal*, stated that the question is whether the Debtor's legal interests in the previous case were congruent with the trustee's legal interest. *Id.* There, the court determined that the debtor's interest and the trustee's interest were, in fact, congruent. Therefore, the trustee was in privity with the debtor and was barred from re-litigating the same issues that the debtor litigated in the previous case. *Id.*

Similarly, the Trustee and the Debtor in this case are in privity for purposes of *res judicata*. The Debtor and the Trustee shared the same interests. Both sought to maximize the value of the bankruptcy estate by invalidating VWA's Claim for Lien. The Debtor, like the Trustee, filed an adversary complaint to challenge the validity of the lien. The Debtor was represented by counsel at

4

the time that he filed his adversary complaint and the Debtor adequately represented the interests that
he shared with the Trustee. The Debtor moved for summary judgment on his adversary complaint
and after a hearing, the motion was denied. Later, the court dismissed the Debtor's adversary
complaint. That dismissal barred the Debtor from re-litigating the validity of VWA's Claim for
Lien.

On the same day that the court dismissed the Debtor's adversary complaint, the court
converted the Debtor's Chapter 11 case into a Chapter 7 case and subsequently, the Trustee was
appointed. The Trustee, just like the Debtor, seeks to maximize the value of the estate by
challenging the validity of VWA's Claim for Lien. The Trustee and the Debtor share the same
interest – both want to maximize the value of the estate by eliminating VWA's Claim for Lien.
Therefore, the Trustee is in privity with the Debtor. Because the Debtor is barred from re-litigating
the validity of the Claim for Lien, the Trustee is also barred from re-litigating the validity of the
Claim for Lien.

Interestingly, the Trustee did not dispute that he was in privity with the Debtor when
Williams and VWA previously raised the issue of *res judicata.* On July 27, 2007, the Trustee filed
a motion for partial summary judgment against Williams and VWA on the Trustee's adversary
complaint. In response to the motion, Williams and VWA argued, *inter alia,* that *res judicata* barred
the Trustee from re-litigating the validity of the Clam for Lien. *See* Vernon Williams and Vernon
Williams Architects, P.C.'s Memorandum in Opposition to the Trustee's Motion for Partial
Summary Judgment, attached as Exhibit 1, pp. 5-7. In his reply brief, the Trustee argued that *res
judicata* did not apply because there was no identity of the causes of action. *See* Reply in Support
of Trustee's Motion for Partial Summary Judgment, attached as Exhibit 2, p. 4. The Trustee failed

5

to address the remaining to two elements - an identity of the parties or their privies and a final judgment on the merits. Accordingly, the Trustee conceded that these two elements are present in this case. *See Van Hoey v. Baxter International Inc.*, 1997 WL 665855 (N.D. Ill. Oct. 21, 1997) (a party who fails to address a summary judgment argument "concedes its validity"). The Trustee should not be allowed to argue now, for the first time, that the identity of the parties element is missing when he previously conceded this fact.

Despite the fact that the Trustee has already conceded that he is in privity with the Debtor, the Trustee now argues that a non-party must have control over the previous litigation in order for there to be privity between the two. Trustee's Response, pp. 5-6. The Trustee's argument is wrong. In support of this argument, the Trustee relies on two cases: *Paloian v. Grupo Serla S.A. de C.V. (In re GGSI Liquidation, Inc.)*, 351 B.R. 529 (Bankr. N.D. Ill. 2006) and *Williams v. Stefan*, 122 B.R. 987 (Bankr. N.D. Ill. 1991). The "control" language found in *Paloian*, was taken from the case of *Benson and Ford, Inc. v. Wanda Petroleum*, 833 F.2d 1172 (5th Cir. 1982).

In *Benson*, the Fifth Circuit wrote that a nonparty will be considered in privity, or sufficiently close to a party in the prior suit so as to justify preclusion, **in three situations**: "First, a nonparty who has succeeded to a party's interest in property is bound by any prior judgments against that party.... Second, a nonparty who controlled the original suit will be bound by the resulting judgment.... Third, federal courts will bind a nonparty whose interests were represented adequately by a party in the original suit...."*Id.* at 1174. The *Paloian* decision that the Trustee cites only discusses **one** of the three ways identified in *Benson* for a non-party to be considered in privity with a party. Thus, the Trustee's argument that a non-party must have control over the previous litigation before privity

6

attaches is false because control over the prior litigation is only one circumstance in which privity will be found.

Moreover, under *Benson*, the Trustee is in privity with the Debtor for two reasons. The first situation identified in *Benson* is, "a nonparty who has succeeded to a party's interest in property is bound by any prior judgments against that party." *Id.* Here, the Trustee has succeeded to the Debtor's interest in the property that is subject to the Claim for Lien and is therefore bound by the dismissal of the Debtor's adversary complaint. The third situation identified in *Benson* is "federal courts will bind a nonparty whose interests were represented adequately by a party in the original suit." *Id.* As demonstrated above, the Trustee and the Debtor have the same interest and that interest was adequately represented in the Debtor's adversary case.

The Trustee's reliance upon *Williams* is also misplaced. The Trustee's Response cites the following language from *Williams*, "Such identification of interest can be shown by **two sets of circumstances which are relevant here**: the interests of a person are placed before the court by one authorized to sue on his behalf; or a person with an interest in the outcome controls or shares control of a suit by another." Trustee's Response, p. 6. Again, the *Williams* court did not discuss all of the circumstances in which privity will be found. It only addressed the two circumstances that were relevant to that particular case. Therefore, it is misleading for the Trustee to argue that control over the prior case is required to be in privity with the Debtor.

It is clear that the Trustee has chosen to ignore the caselaw that holds that a nonparty is in privity with a party if they share the same legal interests and those interests are adequately represented in a previous lawsuit. *See In Re Estate of Royal*, 289 B.R. at 919 (trustee in privity with debtor because they shared same legal interest); *Pullen-Walker v. Roosevelt University*, 2006 WL

7

1843364 (N.D. Ill. June 28, 2006) ("privity exits between parties who adequately represent the same interests"); *Graebel/Los Angeles Movers, Inc. v. Johnson*, 2006 WL533360 (N.D. Ill. March 1, 2006) (strict identity of the parties is not necessary to achieve privity; "parties who 'adequately represent the same legal interests' are in privity for *res judicata* purposes"). The Trustee does not dispute that he and the Debtor share the same legal interests with respect to the Claim for Lien. The Trustee also does not dispute that the shared interests were adequately represented in the Debtor's adversary case. Accordingly, the Debtor and the Trustee are in privity for *res judicata* purposes. Therefore, the Trustee is barred from re-litigating the validity of the Claim for Lien.

## CONCLUSION

All three elements of *res judicata* are present in this matter. Therefore, the Trustee is barred from re-litigation the validity of VWA's Claim for Lien. Accordingly, Williams and VWA are entitled to judgment as a matter of law as to the Trustee's Adversary Complaint.

Respectfully submitted,

**VERNON WILLIAMS and VERNON WILLIAMS ARCHITECTS, P.C.**

s/ Ronald Austin, Jr.
Ronald Austin, Jr.
BROTHERS & THOMPSON, P.C.
100 W. Monroe Street, Suite 1700
Chicago, Illinois 60603
(312) 372-2909
ra2law@cs.com

8

## CERTIFICATE OF SERVICE

The undersigned certifies that on February 21, 2008, he caused VERNON WILLIAMS AND VERNON WILLIAMS ARCHITECTS, P.C.'S REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT to be served on all counsel of record via the Court's electronic filing system.

s/ Ronald Austin, Jr.

Ronald Austin, Jr.
BROTHERS & THOMPSON, P.C.
100 W. Monroe Street, Suite 1700
Chicago, Illinois 60603
(312) 372-2909
ra2law@cs.com

## INDEX OF ATTACHED CASES
## PURSUANT TO STANDING ORDER NO. 9

1.  *In re National Industrial Chemical Co.*, 237 B.R. 437 (N.D. Ill. 1999)*

2.   *D&K Properties Crystal Lake v. Mutual Life Ins. Co.*, 112 F.3d 257 (7th Cir. 1997)*

3.  *Allen v. McCurry*, 449 US 90, 101 S.Ct. 411 (1980)*

4.  *Car Carriers, Inc. v. Ford Motor Co.*, 789 F.2d 589 (7th Cir. 1986)*

5.  *Brzostowski v. Laidlaw Waste Systems, Inc.*, 49 F.3d 337 (7th Cir. 1995)*

6.  *In re Estate of Royal*, 289 B.R. 913 (N.D. Ill. 2003)*

7.  *Van Hoey v. Baxter International, Inc.*, 1997 WL 665855 (N.D. Ill. Oct. 21, 1997)

8.  *Paloian v. Grupo Serla S.A. de C.V. (In re GGSI Liquidation, Inc.)*, 351 B.R. 529 (Bankr. N.D. Ill. 2006)

9.  *Williams v. Stefan*, 122 B.R. 987 (Bankr. N.D. Ill. 1991)

10.  *Benson and Ford, Inc. v. Wanda Petroleum*, 833 F.2d 1172 (5th Cir. 1982)

11.  *Pullen-Walker v. Roosevelt University*, 2006 WL 1843364 (N.D. Ill. June 28, 2006)

12.  *Graebel/Los Angeles Movers, Inc. v. Johnson*, 2006 WL533360 (N.D. Ill. March 1, 2006)

\* Previously attached.  See Motion for Summary Judgment, docket no. 92.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE: ) Chapter 7
) Bankruptcy No. 03 B 21620
ANTHONY FIELDS, ) Judge Manuel Barbosa
)
                         Debtor, )
                                 )
_____ )
CHARLES J. MYLER, not individually but ) Adversary No. 04 A 00189
solely as trustee, )
                                 )
                         Plaintiff, )
    vs. )
                                 )
ANTHONY FIELDS, RALPH BOOKER, )
VERNON WILLIAMS, VERNON )
WILLIAMS ARCHITECTS, P.C., )
LAKEVIEW REAL ESTATE DEVELOP- )
MENT CO., and PARKWAY BANK, )
                                 )
                         Defendants. )

## VERNON WILLIAMS AND VERNON WILLIAMS ARCHITECTS, P.C.'S MEMORANDUM IN OPPOSITION TO THE TRUSTEE'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Vernon Williams ("Williams") and Vernon Williams Architects, P.C. ("VWA") by and

through their attorneys present the following memorandum in opposition to the Trustee's Motion

for Partial Summary Judgment.

### INTRODUCTION

The Trustee has filed a motion for summary judgment in which he challenges the validity of

the Architect'S Notice and Claim for Lien ("Claim for Lien") filed by VWA on certain property that

is part of the bankruptcy estate. However, the doctrine of *res judicata* prevents the Trustee from re-

litigating the validity of VWA's lien. In a previous bankruptcy filing, the Debtor filed an adversary

complaint against Williams and VWA in which the Debtor challenged the validity of VWA's lien.

See Case No. 03 A 1969. On August 27, 2003, this Court, per Judge Susan Sonderby, dismissed the Debtor's adversary complaint for want of prosecution. Pursuant to Rule 7041 of the Federal Rules of Bankruptcy Procedure and Rule 41 of the Federal Rules of Civil Procedure, a dismissal for want of prosecution "operates as an adjudication upon the merits." FRCP 41. Accordingly, the Trustee is precluded from re-litigating the question of the validity of VWA's lien.

In addition to the fact that *res judicata* prevents the Trustee from challenging the validity of the lien, the Trustee's motion should be denied because the Trustee failed to comply with local rules regarding summary judgment motions. Specifically, the Trustee filed a Statement of Facts without citing to the record to support the alleged facts. This is a violation of Local Rule 7056. Accordingly, Williams and VWA have filed a separate Motion to Strike the Trustee's Statement of Facts.

Finally, the Trustee's motion should be denied because the evidence establishes that VWA's lien meets all the elements of a valid mechanic's lien under the Illinois Mechanic's Lien Act ("Act"). Accordingly, the Trustee's Motion for Partial Summary Judgment should be denied.

## STATEMENT OF FACTS

Williams is a licensed architect and the owner of VWA. Add. Fact, ¶ 1.[1] In 1999, Debtor contacted Williams regarding the Debtor's plan to build a Howard Johnson Hotel on property owned by Debtor on Oakwood Blvd. in Chicago (the "Property"). Add. Fact, ¶ 2. On October 6, 1999, Williams drafted a proposal for the Debtor to give him an estimated cost for VWA's architectural services. Add. Fact, ¶ 3. The Debtor accepted the proposal and on December 1, 1999, VWA entered into a STANDARD FORM OF AGREEMENT BETWEEN OWNER AND ARCHITECT WITH STANDARD FORM

---

[1] References to "Add. Fact, ¶ ___" are to Williams and VWA's Statement of Additional Material Facts.

2

OF ARCHITECT'S SERVICES ("Contract") with Lakeview Real Estate Development Company ("Lakeview"). Williams signed the contract on behalf of VWA and the Debtor signed the contract on behalf of Lakeview. Add. Fact, ¶ 3.

From December 10, 1999 through June 21, 2001,VWA performed the following services pursuant to the Contract: drafted a proposed project schedule; prepared a zoning analysis; created grade level and street level site plans; drafted a document entitled "Background Material For Proposed Lakeview Howard Johnson Hotel;" and created nearly a dozen schematic designs. Add. Fact, ¶ 4. On January 25, 2000, Williams met with Debtor and Alderman Toni Preckwinkle to present VWA's designs and to seek the alderman's support in re-zoning the property. Add. Fact, ¶ 5. Subsequent to the meeting with Alderman Preckwinkle, VWA continued to create schematic designs for the project, Williams participated in numerous telephone conferences and meetings with the Debtor and his attorney regarding the zoning issues, and Williams met several times with representatives from Draper and Kramer regarding financial issues related to the project. Add. Fact, ¶ 5. In all, VWA spent 159 hours on the project. Add. Fact, ¶ 5.

From December 1999 through June 2003, VWA submitted invoices to the Debtor for the work performed, however none of VWA's invoices were ever paid. Add. Fact, ¶ 6. On January 10, 2002, VWA filed an Architect's Notice and Claim for Lien ("Claim for Lien") against Lakeview in the amount of $43,012.69. Add. Fact, ¶ 7. To date, only the $5,000.00 retainer has been paid to VWA. Add. Fact, ¶ 6.

On May 15, 2003, the Debtor filed bankruptcy under Chapter 11, and on June 10, 2003, Debtor filed an adversary complaint against Williams and VWA seeking to invalidate VWA's mechanic's lien. Add. Fact, ¶ 13. On or about June 20, 2003, the Debtor filed a motion for summary

3

judgment on his adversary complaint. Add. Fact, ¶ 14. The Debtor's motion was denied and a trial date was set for August 27, 2003. Add. Fact, ¶ 14. On August 27, 2003, Debtor informed the court that he was not prepared to proceed with the trial. Accordingly, the court dismissed the Debtor's adversary complaint for want of prosecution. Add. Fact ¶ 14. Also on August 27, 2003, the court converted the Debtor's Chapter 11 case to a Chapter 7 case. Add. Fact, ¶ 15. On February 5, 2004, Charles J. Myler, the Chapter 7 Trustee assigned to this case ("Trustee"), filed an adversary complaint against Williams and VWA again challenging the validity of VWA's Claim for Lien. Add. Fact, ¶ 16. On March 3, 2004, Williams and VWA filed their Answer and Affirmative Defenses to the Trustee's Adversary Complaint. Add. Fact, ¶ 17. The first Affirmative Defense alleges that the Trustee's Adversary Complaint is barred by *res judicata*. *Id.*

## STANDARD

Summary judgment should be rendered only if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Federal Rules of Civil Procedure Rule 56. In ruling on a motion for summary judgment, the court must "view the record and all possible inferences in the light most favorable to the non-moving party. *Elliott v. ITT Corp.*, 150 B.R. 36, 38 (N.D. Ill. 1992). "The movant bears the burden to prove each fact material to its claim and to establish that each fact is not in genuine dispute. If the movant fails to make that showing, summary judgment is not proper and must be denied. *In re Campbell*, 2007 WL 2283526 (Bankruptcy C.D. Ill. August 8, 2007).

4

## ARGUMENT

The Trustee has filed an adversary complaint in which he challenges the validity of VWA's Claim for Lien. The Trustee's motion should be denied because: (1) the doctrine of *res judicata* precludes the Trustee from re-litigating the question of the validity of VWA's lien; (2) the Trustee failed to comply with the local rules; and (3) VWA's lien satisfies all the elements of a valid architect's lien.

I. THE DOCTRINE OF *RES JUDICATA* PRECLUDES THE TRUSTEE FROM RE-LITIGATING THE ISSUE OF THE VALIDITY OF VWA'S LIEN.

The doctrine of *res judicata* ensures the finality of decisions. *In re National Industrial Chemical Co.*, 237 B.R. 437, 441 (N.D. Ill. 1999). It bars re-litigation of claims that were or could have been raised in an earlier proceeding. *Id; D&K Properties Crystal Lake v. Mutual Life Ins. Co.*, 112 F.3d 257, 259 (7th Cir. 1997); *Allen v. McCurry*, 449 US 90, 94, 101 S.Ct. 411, 414 (1980)("Under *res judicata*, a final judgment on the merits of an action precludes parties or their privies from relitigating issues that were or could have been raised in that action.") *Res judicata* applies to proceedings in bankruptcy. *In re National Industrial Chemical Co*, 237 B.R. at 441. Usually, *res judicata* applies in bankruptcy where a contested matter or an adversary proceeding provided the opportunity to litigate a given claim. *Id.*

The three elements of *res judicata* are: (1) an identity of the causes of action; (2) an identity of the parties or their privies; and (3) a final judgment on the merits. *Id.* Here, all three elements of *res judicata* exist.

5

A.    Identity of the Causes of Action

"The Seventh Circuit determines identity of the causes of action using the 'same transaction' test." *Id; Car Carriers, Inc. v. Ford Motor Co.*, 789 F.2d 589, 593 (7th Cir. 1986). Under the same transaction test, a claim has identity with a previous claim where both claims arise from a single core of operative facts. *Id.; Brzostowski v. Laidlaw Waste Systems, Inc.*, 49 F.3d 337, 339 (7th Cir. 1995). "Two claims are one for purposes of *res judicata* if they are based on the same, or nearly the same, factual allegations." *In re National Industrial Chemical Co*, 237 B.R. at 441.

In the present matter, the Debtor's adversary complaint and the Trustee's adversary complaint both challenge the validity of VWA's Claim for Lien. Therefore, the two causes of action are identical for purposes of *res judicata*.

B.    Identity of the Parties

*Res judicata* requires that the prior cause of action and the present cause of action involve the same parties or their privies. "A nonparty is in privity with a party, when the party adequately represents the nonparty's legal interest in the first proceeding. It is the identity of interests that controls in determining privity, not the nominal identity of the parties." *In re Estate of Royal*, 289 B.R. 913, 919 (N.D. Ill. 2003)(trustee and debtor were found to be in privity with one another).

Here, the Trustee and the Debtor are in privity because the Debtor's interest is identical to the interest of the Trustee. Both the Debtor and the Trustee want to invalidate VWA's Claim for Lien. If the Claim for Lien is stricken, the bankruptcy estate would benefit because there will be more money available for the creditors of the estate. Moreover, the Debtor was represented by counsel when he filed his adversary complaint seeking to invalidate VWA's Claim for Lien.

6

Therefore, the interests of the Trustee were adequately represented in the Debtor's adversary case. Because the Trustee and the Debtor shared the same interest with respect to VWA's Claim for Lien, the Trustee is in privity with the Debtor for purposes of *res judicata*.

      C.     <u>Final Judgment on the Merits</u>

On August 27, 2003, this Court, per Judge Susan Sonderby, dismissed the Debtor's adversary complaint for want of prosecution. Pursuant to Rule 7041 of the Federal Rules of Bankruptcy Procedure and Rule 41 of the Federal Rules of Civil Procedure, a dismissal for want of prosecution "operates as an adjudication upon the merits." FRCP 41; *Lester v. Brown*, 929 F. Supp. 291, 293 (N.D. Ill. 1996)(a dismissal for want of prosecution amounts to an adjudication on the merits).

Because the three elements of *res judicata* are present in this matter, the Trustee is barred from re-litigating the issue of the validity of VWA's Claim for Lien. Accordingly, the Trustee's motion for summary judgment must be denied.

II.    <u>THE TRUSTEE FAILED TO COMPLY WITH LOCAL RULE 7056.</u>

See VERNON WILLIAMS AND VERNON WILLIAMS ARCHITECTS, P.C.'S MOTION TO STRIKE THE TRUSTEE'S STATEMENT OF MATERIAL FACTS filed herewith.

III.    <u>VWA'S LIEN IS VALID UNDER ILLINOIS MECHANIC'S LIEN ACT.</u>

In addition to the fact that *res judicata* prevents the Trustee from re-litigating the validity of VWA's lien and the fact that the Trustee failed to comply with Local Rule 7056, the Trustee's motion should be denied because the evidence establishes that VWA's lien is valid and enforceable. The prerequisites of a lien under the Act are:"(1) a valid contract; (2) with the owner of the property or his agent or someone who is knowingly permitted by the owner to contract for improvements; (3)

7

for the furnishing of services or materials; and (4) performance of the contract or a valid excuse for nonperformance." *Delaney Electric Co. v. Schiessle*, 601 N.E.2d 978, 982 (Ill. App. Ct. 1992).

Here, VWA and Lakeview entered into a STANDARD FORM OF AGREEMENT BETWEEN OWNER AND ARCHITECT WITH STANDARD FORM OF ARCHITECT'S SERVICES. Add. Fact, ¶ 3. The Contract was signed by the Debtor (the owner of the Property) on behalf of Lakeview. Add. Fact, ¶ 3. Therefore, VWA entered into the Contract with "**someone who [was] knowingly permitted by the owner to contract for improvements**." *Delaney Electric*, 601 N.E.2d at 982. Pursuant to the Contract, VWA performed various architectural services but was never paid. Add. Fact, ¶¶ 4-6. Accordingly, VWA has established that it is entitled to a lien on the Property.

VWA is a contractor as defined by the Act. The Act defines a contractor as "Any person who shall by any contract . . . with the owner of a lot or tract of land, or with one whom the owner has authorized or knowingly permitted to contract to improve the lot or tract or land . . . **or perform any services or incur any expense as an architect** . . . is known under this Act as a contractor." 770 ILCS 60/1.

Section 60/7 of the Act governs claims for liens. Section 60/7 states in relevant part that a contractor seeking to enforce a lien under the Act shall:

> file in the Recorder's Office "a claim for lien, verified by the affidavit of himself or herself, or his or her agent or employee, which shall consist of a brief statement of the claimant's contract, the balance due after allowing all credits, and a sufficiently correct description of the lot, lots or tracts of land to identify the same.

770 ILCS 60/7. Pursuant to Section 60/7 of the Act, a valid claim for lien must include: (1) a brief statement of the contract; (2) the amount due after allowing all credits; (3) a sufficiently correct

8

description of the property to identify it; (4) the claim must be verified by the contractor or his agent; and (5) the claim must be filed with Recorder of Deeds. 770 ILCS 60/7. Here, the Claim for Lien filed by VWA satisfies all five elements and therefore is valid and enforceable.

With respect to the first element, VWA's Claim for Lien contains a brief statement of the contract. The Claim for Lien contains the following statement:

> That on December 1, 1999, said owner made a contract with the claimant to develop and prepare the design and construction documentation for the new construction of the proposed +/- 125 room hotel with restaurant, health spa and swimming pool, meeting/banquet rooms, administrative offices, parking for 133 cars and +/- 6400 s.f commercial retail space, for and in said improvement.

Add. Fact, ¶ 9.

With respect to the second element, VWA's Claim for Lien states the amount due under the contract after allowing for all credits. The Claim for Lien states as follows:

> There is due, unpaid and owing to the claimant, after allowing all credits, the sum of FORTY THREE THOUSAND AND TWELVE and 69/100 ($43,012.69) DOLLARS, for which, with interest, the claimant claims a lien on said land and improvements and on the moneys or other consideration due or to become due from the owner under said contract.

Add. Fact, ¶ 10.

With respect to the third element, the Claim for Lien contains a sufficiently correct description of the property to allow the Property to be identified. The Claim for Lien contains the legal description for the Property, the Property Identification Numbers ("PIN") and the street address of the three parcels that are subject to the lien. Add. Fact, ¶ 11.

9

The Claim for Lien also satisfies the fourth and fifth elements of a valid and enforceable lien because it was verified by Williams, the agent of VWA, and the Claim for Lien was filed with the Cook County Recorder of Deeds. Add. Fact, ¶ 8. Accordingly, VWA's Claim for Lien is valid and enforceable.

Nevertheless, the Trustee argues in his Memorandum of Law in Support of his Motion for Partial Summary Judgment ("Trustee's Memo") that VWA's Claim for Lien is not enforceable. The Trustee contends that the Claim for Lien (1) does not identify the Debtor as the owner of the property; (2) notice of the lien was not provided to the Debtor; and (3) the Claim for Lien does not properly identify the Property. See Trustee's Memo pp. 5-7. The Trustee's arguments are without merit.

The Trustee's argument that VWA's Claim for Lien is unenforceable because it failed to identify the Debtor is not supported by the Act. In support of his argument, the Trustee cites to Section 60/5(a) of the Act. Section 60/5 of the Act is entitled "Statement of persons furnishing labor, services, material, fixtures, apparatus or machinery, forms or form work notice to owner of waiver; size of type."[2] See 770 ILCS 60/5. Section 60/5 does not govern claims for liens. Rather, Section 60/5 governs the sworn statement that a contractor or sub-contractors must give to the owner before the owner makes a payment to the contractor. "The purpose of the sworn statement is to protect owners from the potential claims of subcontractors." *Northwest Millwork Co. v. Komperda*, 788 N.E.2d 399, 402 (Ill. App. 2003). Section 60/5 is simply not applicable.

---

[2] Prior to the January 1, 2006, amendments, the title to 770 ILCS 60/5 was "Claims of sub-contractor; notice to owner; owner's duty; contractor's liability; exceptions."

10

As stated above, Section 60/7 of the Act governs claims for liens by contractors. Section 60/7 **does not** require a contractor's claim for lien to identify the owner of the property. Section 60/7 merely requires a "brief statement of the claimant's contract." 770 ILCS 60/7. VWA's Claim for Lien contains the required statement. Thus, the Trustee's first argument fails.

Next, the Trustee argues that the "Debtor has never been served with notice of the Mechanic's Lien as prescribed under Section 60/5(a)." See Trustee's Memo p. 5. Again, Section 60/5(a) of the Act governs sub-contractors's sworn statements. Section 60/5 of the Act does not govern claims for liens and it **does not** require contractors to serve the owner of the property with a copy of the Claim for Lien. See 770 ILCS 60/5. Accordingly, the Trustee's second argument also fails.

The Trustee's final argument is that VWA's Claim for Lien fails to properly identify the Property that is subject to the lien. Trustee's Memo p. 7. VWA'a Claim for Lien identifies the following parcels of land:

**Parcel 1:**

**Lots 1, 2, 3, 4 and 5 in Mary A. Hoagland's Subdivision of the Southerly 100 feet of Lots 10 and 11 except the Easterly 80 feet of said Lot 10 in Block 3 of Cleaverville in Section 35, Township 39 North, Range 14, East of the Third Principal Meridian, in Cook County, Illinois.**
**Permanent Tax Index Number 17-35-104-024.**

**Parcel 2:**

**Lot 5 in Mary A. Hoagland's Subdivision of the South 100 feet of Lots 10 and 11 (except the East 80 feet of Lot 10) in Block 3 of Cleaverville in Section 35, Township 39 North, Range 14, East of the Third Principal Meridian, in Cook County, Illinois.**
**Permanent Tax Index Number 17-35-104-022.**

**Parcel 3:**

**A parcel of land being the East 80 feet of the South 100 feet of Lot 10 in Block 3 in Cleaverville (so called) a Subdivision of the North 71 and 20/100 acres of fractional Section 2, Township 38 North, Range 14, East of the Third Principal Meridian, and 20 acres of the South East part of fractional of Section 35, Township 39 North, Range 14, East of the Third Principal described as follows: Beginning at the South East corner of said Lot 10, thence Westerly along the North line of Oakwood Boulevard 80 feet; thence Northerly on a line parallel with the East line of said Lot 10 a distance of 100 feet; thence Easterly on a line parallel with the North line of Oakwood Boulevard 80 feet to the Illinois Central Railroad Company's right of way line; thence Southerly along said Westerly right of way line to the place of beginning in Cook County, Illinois.**

**Permanent Tax Index Number 17-35-104-023.**

**Address(es) of premises: The northeast corner of South Lake Park Avenue and East Oakwood Boulevard, Chicago, Illinois.**

Add. Fact, ¶ 11.

The first parcel sits on Lots 1, 2, 3, 4 and 5 of Mary A. Hoagland's Subdivision. The second parcel actually sits of Lot 6 of Mary A. Hoagland's Subdivision. However, the Claim for Lien mistakenly states that Parcel 2 sits on **Lot 5** instead of **Lot 6**. The Trustee argues, without citing any authority, that the typographical error in the legal description for Parcel 2 invalidates the entire Claim for Lien. The Trustee's position is not supported by the Act or case law.

The Act states that the Claim for Lien must contain a "**sufficiently** correct description of the lot, lots or tracts of land to identify the same." 770 ILCS 60/7. Other than mis-identifying the lot number for Parcel 2, the remainder of the legal description for the parcel is correct. Moreover, the legal description for parcels 1 and 3 are correct, the PINs for all three parcels are correct and the street address for the three contiguous parcels is correct.

12

Moreover, the case law states that a "description is sufficient if there is enough in it to enable a party familiar with the locality to identify the premises intended to be described with reasonable certainty." *Springer v. Kroeschell*, 43 N.E. 1084 (Ill. 1896). In the *Springer* case, the Illinois Supreme Court found that a claim that described the property as "lots ten (10) and eleven (11) in block fifty-one (51)" was sufficient even though the correct the description was "lots ten (10) and eleven (11), and the south seven and 2/12 (7 2/12) feet of lot seven, in block fifty-one (51)." *Id.* In *Dinkle & Webber Lumber Co. v. Rehrmann*, 33 N.E.2d 709 (Ill. App. 1941), the court acknowledged that a claim that mistakenly identified the property as being on lots 9 and 10, when in actuality the property was on lots 8 and 9, did not invalidate the entire claim for lien. *Id.*

The *Steinberg* case cited by the Trustee does not support the argument that a typographical error in the legal description renders the lien unenforceable. In *Steinberg*, a lien was ruled unenforceable against a third party purchaser because the lienholder identified the property by using the metes and bounds description instead of the legal description for the property. *Steinberg v. Chicago Title and Trust Co.*, 491 N.E.2d 1294, 1297 (Ill. App. 1986). The Court stated that the purpose of the description requirement is to protect third parties from purchasing real property without being aware that it is encumbered. *Id.* The Court reasoned that the legal description (as opposed to the metes and bounds description) provides enough information to readily identify the property affected by the lien through the use of local public records. *Id.*

Here, VWA's Claim for Lien contained the legal description for the three parcels at issue. In addition, the Claim for Lien included the Property's PINs and street address. With this information, the Property could be readily identified by anyone familiar with the property. In fact, the Debtor had no trouble identifying the property subject the lien. In each of his attempts to

13

invalidate VWA's lien as well in the Debtor's correspondence with VWA, the Debtor correctly identified the land that is subject to the lien. See Add. Fact, ¶¶ 12-14. Accordingly, the Claim for Lien sufficiently describes the Property as required by the Act and therefore, the Trustee's final argument fails.

Because VWA's Claim for Lien meets the requirements of the Act, it is a valid and enforceable lien. Accordingly, the Trustee's motion should be denied.

## CONCLUSION

For the reasons stated herein and in Williams and VWA's motion to Strike the Trustee's Statement of Facts, the Trustee's motion for Partial Summary Judgment should be denied.

Respectfully submitted,

**VERNON WILLIAMS and VERNON WILLIAMS ARCHITECTS, P.C.**

s/ Ronald Austin, Jr.

Ronald Austin, Jr.
BROTHERS & THOMPSON, P.C.
100 W. Monroe Street, Suite 1700
Chicago, Illinois 60603
(312) 372-2909
ra2law@cs.com

14

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on August 23, 2007, he caused VERNON WILLIAMS AND

VERNON WILLIAMS ARCHITECTS, P.C.'S MEMORANDUM IN OPPOSITION TO THE

TRUSTEE'S MOTION FOR PARTIAL SUMMARY JUDGMENT to be served on all counsel of

record via the Court's electronic filing system.

s/ Ronald Austin, Jr.

Ronald Austin, Jr.
BROTHERS & THOMPSON, P.C.
100 W. Monroe Street, Suite 1700
Chicago, Illinois 60603
(312) 372-2909
ra2law@cs.com

## INDEX OF ATTACHED CASES
## PURSUANT TO STANDING ORDER NO. 9

1.   *Elliott v. ITT Corp.*, 150 B.R. 36 (N.D. Ill. 1992)

2.   *In re Campbell*, 2007 WL 2283526 (Bankruptcy C.D. Ill. August 8, 2007)

3.   *In re National Industrial Chemical Co.*, 237 B.R. 437 (N.D. Ill. 1999)

4.   *D&K Properties Crystal Lake v. Mutual Life Ins. Co.*, 112 F.3d 257 (7th Cir. 1997)

5.   *Allen v. McCurry*, 449 US 90, 94, 101 S.Ct. 411 (1980)

6.   *Car Carriers, Inc. v. Ford Motor Co.*, 789 F.2d 589 (7th Cir. 1986)

7.   *Brzostowski v. Laidlaw Waste Systems, Inc.*, 49 F.3d 337 (7th Cir. 1995)

8.   *In re Estate of Royal*, 289 B.R. 913 (N.D. Ill. 2003)

9.   *Lester v. Brown*, 929 F. Supp. 291 (N.D. Ill. 1996)

10.  *Delaney Electric Co. v. Schiessle*, 601 N.E.2d 978 (Ill. App. Ct. 1992)

11.  *Northwest Millwork Co. v. Komperda*, 788 N.E.2d 399 (Ill. App. 2003)

12.  *Springer v. Kroeschell*, 43 N.E. 1084 (Ill. 1896)

13.  *Dinkle & Webber Lumber Co. v. Rehrmann*, 33 N.E.2d 709 (Ill. App. 1941)

14.  *Steinberg v. Chicago Title and Trust Co.*, 491 N.E.2d 1294 (Ill. App. 1986)

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| *IN RE*: | ) | |
| | ) | |
| ANTHONY FIELDS, | ) | |
| | ) | |
| Debtor, | ) | Chapter 7 |
| | ) | |
| _____ | ) | Bankruptcy No. 03 B 21620 |
| | ) | |
| CHARLES J. MYLER, not individually, | ) | |
| but solely as Chapter 7 Trustee, | ) | Judge Manuel Barbosa |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary No. 04 A 00189 |
| | ) | |
| ANTHONY FIELDS, RALPH BOOKER, | ) | Hearing Date: August 2, 2007 |
| VERNON WILLIAMS and VERNON | ) | |
| WILLIAMS ARCHITECTS, P.C., | ) | Hearing Time:     10:00 a.m. |
| LAKEVIEW REAL ESTATE | ) | |
| DEVELOPMENT CO., and | ) | |
| PARKWAY BANK AND TRUST | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

REPLY IN SUPPORT OF
TRUSTEE'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff, Charles J. Myler, not individually, but solely as Chapter 7 Trustee ("Trustee") in

the Bankruptcy of Debtor, Anthony Fields ("Debtor"), by his attorneys, Charles J. Myler,

Richard G. Larsen and Myler, Ruddy & McTavish, respectfully submits this Reply in support of

his Motion for Partial Summary Judgment.

BACKGROUND

I.    Procedural Background.

{00039481.DOC/v4/3020/018/9/6/2007 12:56 PM}

The procedural history of this dispute is well known by the Court and does not merit complete recitation. However, certain facts concerning the dismissal of an adversary petition in Debtor's Chapter 11 proceeding for want of prosecution require clarification, so that the Court may distinguish between the facts at issue in the prior Chapter 11 adversary petition and Trustee's Motion for Partial Summary Judgment.

Debtor filed his Chapter 11 Bankruptcy Petition on May 15, 2003, which was subsequently converted to a Chapter 7 proceeding on August 27, 2003. Debtor's Estate is comprised of, among other things, 900, 914-916 and 920-924 East Oakdale, Chicago, Cook County, Illinois. The PINs for these parcels are as follows: 900 is 17-35-104-024; 914-916 is 17-35-104-022; and 920-924 is 17-35-104-023 (hereinafter "Parcels 022, 023 and 024"). On June 10, 2002, Claimant, Vernon Williams Architects, P.C. ("Claimant"), recorded with the Cook County Recorder of Deeds an Architect's Mechanic's Lien Claim as Document No. 0020043287, purportedly against Parcels 022, 023 and 024 (the "Mechanic's Lien").

During the pendency of the Chapter 11 proceeding, Debtor filed a Petition to Declare Invalidity of Mechanic's Lien and Other Relief (the "Petition") against Claimant. Through his Petition, Debtor challenged whether Claimant could maintain its Mechanic's Lien on two distinct bases: (1) whether Claimant's Mechanic's Lien is defective because the work performed by Claimant was not authorized by Debtor or by the Debtor's recognized agent (Petition, ¶ 15); and (2) Claimant did not provide services which resulted in an improvement to Parcels 022, 023 and 24. Petition, ¶ 16. Debtor's Petition was set for trial on August 27, 2003 – a date coterminous with the conversion of Debtor's Chapter 11 proceeding to a Chapter 7. However, on August 27, counsel for Debtor was not prepared to proceed to trial, and, on her own motion, Judge Susan P. Sonderby summarily dismissed Debtor's adversary action for want of prosecution.

{00039481.DOC/v4/3020/018/9/6/2007 12:56 PM}                    2

Subsequent to the conversion of this matter to a Chapter 7 proceeding, a Letter of Appointment appointing Trustee to this case was filed on September 8, 2003. On February 5, 2004, Trustee filed an Adversary Complaint. Through the Adversary Complaint, Trustee seeks to determine whether Claimant has any interest in Parcels 022, 023 or 024. Adversary Complaint, ¶ 13.

On July 27, 2007, Trustee filed his Motion for Partial Summary Judgment (the "Motion"). Through this Motion, Trustee seeks entry of an order of partial summary judgment in his favor and against Claimant as to the validity of Claimant's Mechanic's Lien. Claimant's Mechanic's Lien is insufficient as a matter of law as it does not comport with Illinois' Mechanic's Lien Act. Specifically, Claimant's Mechanic's Lien is not perfected against Parcel 022 as it does not properly describe Parcel 022 in the legal description. Also, Claimant misfiled its Mechanic' Lien by identifying an owner other than Debtor, and Claimant did not provide Debtor with proper notice of the Mechanic's Lien.

Through the Response to Trustee's Motion (the "Response"), Claimant and Vernon Williams ("Williams")[1] admit that Parcel 022 is not accurately described in its Mechanic's Lien, but contend that this failure to conform with Illinois' Mechanic's Lien Act is of no import. Response pp. 12-13. Claimant also contends that its failure to properly identify the owner of Parcels 022, 023 and 024 in the Mechanic's Lien or to serve the owner with notice of lien is insignificant in determining the validity of the Mechanic's Lien. Response, pp. 7-11. Claimant also argues that Trustee's Motion should be denied under the doctrine of *res judicata*, because Judge Sonderby's dismissal of Debtor's Petition for want of prosecution supposedly bars Trustee's challenge to the validity of the Mechanic's Lien.

---

[1] Claimant and Williams are referred to hereinafter as "Claimant"; however, Vernon Williams Architects, P.C., not Williams, is the holder of the Mechanic's Lien claim against Debtor's Bankruptcy Estate

As is explained below, *res judicata* is not an applicable bar to Trustee's Motion. The validity of Claimant's Mechanic's Lien is an issue properly before this Court. And, as Claimant admits, its Mechanic's Lien does not attach to Parcel 022, does not identify the owner of Parcels 022, 023 and 024, and was not served directly upon Debtor. Individually, each of these defects is sufficient to nullify the Mechanic's Lien, as such liens are valid only if each of the statutory requirements of Illinois' Mechanic's Lien Act are scrupulously observed. Because these defects void the Mechanic's Lien as a matter of law, Trustee is entitled to entry of an order of partial summary judgment, pursuant to Bankruptcy Rule 7056/FRCP 56(a), finding the Mechanic's Lien unenforceable and invalidating Claimant's Lien.

## ARGUMENT & ANALYSIS

### I.  *Res Judicata Does Not Operate to Bar Trustee's Motion for Partial Summary Judgment.*

Through its Response, Claimant contends that Trustee's Motion must be denied as the doctrine of *res judicata* operates in this case to bar Trustee from challenging the validity of Claimant's Mechanic's Lien. Claimant argues that when Judge Sonderby summarily dismissed Debtor's Petition for Want of Prosecution, the validity of the Mechanic's Lien could no longer be challenged. Response, pp. 6-7. However, this Court is not precluded from determining whether the Mechanic's Lien is void as a matter of law for two reasons.    First, *res judicata* is inapplicable in this context, as there is no identity of claims between Debtor's Chapter 11 Adversary Petition, which challenged the circumstances surrounding the work upon which the Lien is based, and Trustee's contention that the Mechanic's Lien is void as a matter of law for Claimant's failure to comply with the rigid requirements prescribed by Illinois' Mechanic's Lien Act. Second, because determination of the status of Claimant's Mechanic's Lien is necessary to

avoid an inequitable administration of laws, Trustee may challenge whether the lien is void for
failure to comport with Illinois' Mechanic's Lien Act.

> A.    *Res Judicata* Is an Inapplicable Bar – An Element Essential to this
> Defense Cannot Be Met Because There Is No Identity of Causes between
> Debtor's Petition and Trustee's Adversary Action.

Claimant baldly states that "Debtor's adversary [action] and Trustee's [A]dversary
[C]omplaint both challenge the validity of VWA's Claim for Lien," therefore, the two causes of
action are identical for purposes of *res judicata*. Response, p. 6. However, in order to invoke the
doctrine of *res judicata*, Claimant must demonstrate that both Debtor's Adversary action and
Trustee's Adversary Complaint are based on the same or nearly the same factual allegations. In
re National Industrial Chemical Company, 237 B.R. 437, 441 (N.D. East. Div. 1999).

The Seventh Circuit determines identity of the causes of action using the "same transaction"
test. Id. Two claims are one for purposes of *res judicata* if they are based on the same, or nearly
the same, factual allegations. Id. *Res judicata* bars the subsequent suit if the claim upon which it
is based arises from the same incident, events, transaction, circumstances or other factual nebula
as a prior suit that had gone to final judgment. Id. However, Courts must not describe the facts
of the cases too broadly, but must examine them at a sufficient level of specificity in order to
determine whether to apply the doctrine of *res judicata*. Id. at 441-442.

In this case, Trustee seeks to invalidate the Mechanic's Lien based upon facts completely
separate and distinct from Debtor's Petition. Debtor challenged the Mechanic's Lien on two
specific grounds: (1) that Claimant's Mechanic's Lien is defective because the work performed
by Claimant was not authorized by either the owner of Parcels 022, 023 and 024 or by the
owner's recognized agent (Petition, ¶ 15); and (2) that Claimant did not provide services which
resulted in an improvement to Parcels 022, 023 and 24. Petition, ¶ 16. Trustee, however, seeks

to have the Mechanic's Lien deemed void as a matter of law because: (1) the Lien is not perfected against Parcel 022; and (2) misidentifies the Owner of Parcels 022, 023 or 024 and was never served upon the Owner. *Cf.* Motion. Thus, while the Petition and Trustee's Motion both attack the validity of the Mechanic's Lien, the facts and legal theories are not similar, let alone identical. As such, an element essential to establishing the doctrine of *res judicata* is not met, and *res judicata* does not operate to bar Trustee's Motion. In re National Industrial Chemical Company at 441-442.

        **B.**       Review of Claimant's Mechanic's Lien is Necessary to Avoid an Inequitable Administration of Law.

Pursuant to §27 of the Restatement 2d of Judgments, when an issue of fact or law is actually litigated and determined by a valid and final judgment and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim. Restat 2d of Judgments, §27. However, even when an issue is actually litigated and determined by a valid and final judgment and the determination is essential to the judgment, relitigation of the issue in a subsequent action between the parties is not precluded if the issue is one of law and a new determination is warranted in order to avoid inequitable administration of the laws. Restat 2d of Judgments, §28(2)(b).

Through its Response, Claimant contends that Trustee cannot maintain its action as to the validity of Claimant's Mechanic's Lien as Judge Sonderby's Order of Dismissal for Want of Prosecution has determined the legitimacy of the Lien. Response, pp. 6-7. However, Trustee is not precluded from challenging the validity of the Mechanic's Lien. Trustee is entitled to relitigate the issue supposedly decided by Judge Sonderby's Order of Dismissal in Debtor's Adversary Petition – the validity of the Mechanic's Lien – through Trustee's Adversary Action.

Judge Sonderby's Order made no findings as to Debtor's challenge of the circumstances concerning the work subject to Mechanic's Lien. Judge Sonderby did not hold a hearing on the Petition, no evidence was entered, no arguments presented. The Order of Dismissal was entered due solely to the incompetence of Debtor's counsel. Trustee seeks to invalidate the Mechanic's Lien on grounds separate and distinct from any challenge raised in Debtor's Petition. Specifically, Trustee contends that the Mechanic's Lien is void as a matter of law for failure to comport with Illinois' Mechanic's Lien Act as the Lien: (1) is not perfected against Parcel 022; and (2) misidentifies the Owner of Parcels 022, 023 or 024 and was never served upon the Owner. *Cf.* Motion.

It is essential for this Court to determine whether Claimant's Mechanic's Lien is perfected against any of Parcels 022, 023 or 024. Trustee contends – and Claimant does not dispute – that the Mechanic's Lien fails to comply with the strict guidelines prescribed by Illinois' Mechanic's Lien Act. *Cf.* Motion; Response, pp. 8-13. As such, the Mechanic's Lien is void as a matter of law, and Claimant is not entitled to the status of a secured creditor. Claimant makes references to this fact through its Response, wherein Claimant states that if the Mechanic's Lien is invalidated, "the bankruptcy estate would benefit because there would be more money available for the [secured] creditors of the estate." Response, p. 6. Currently, Parcels 022, 023 and 024 are subject to a condemnation action. The proceeds derived from this action would be distributed among Debtor's properly secured creditors. Should this Court determine that Claimant's Mechanic's Lien is invalid, Claimant would lose its standing as a secured creditor. It would be inequitable to allow Debtor's secured creditors to lose the benefit of the proceeds from the condemnation action by allowing Claimant's unenforceable Lien to go

unchallenged. It is therefore entirely unjust to allow the deficiencies of Claimant's Mechanic's Lien to be sustained by Judge Sonderby's Order of Dismissal for Want of Prosecution.

II.     Claimant's Mechanic's Lien is Invalid and Unenforceable as a Matter of Law.

Claimant contends that if the doctrine of *res judicata* will not operate to bar Trustee's Motion, that the Motion should be denied because its Lien adequately comports with Illinois' Mechanic's Lien Act. However, Claimant has failed to provide any valid support for this claim.

A lien claimant is required to file with the recorder's office a proper lien in order for the lien to be enforceable. *Cf.* Braun-Skiba, Ltd. v. LaSalle National Bank, 279 Ill. App. 3d 912, 665 N.E.2d 485 (1st Dist. 1996), *citing* Mutual 159 Ill. App. 3d 549, 510 N.E.2d 1219 (1st Dist. 1987). Since it is the obligation of the claimant to bring himself strictly within the terms of this section, a claimant is chargeable with notice of every fact which is or could be claimed necessary to enforce a lien. Steinberg v. Chicago Title & Trust Co., 142 Ill. App. 3d 601, 491 N.E.2d 1294 (1st Dist. 1986). In this case, Claimant did not file its Mechanic's Lien in accordance with Illinois' Mechanic's Lien Act.

A.     Claimant Admits that Its Mechanic's Lien Is Not Perfected Against Parcel 022 as Parcel 022 Is Not Properly Described in the Legal Description.

Claimant admits that it has not provided the proper legal description for Parcel 022 in the Mechanic's Lien. Response, pp. 12-13. However, Claimant argues that an 1896 holding and a 1941 holding, respectively, allow for liens to be sustained where they mistakenly identify the subject property. Response, 13. Claimant's reliance on these cases is misplaced, as neither is instructive as to the current application or interpretation of Illinois' Mechanic's Lien Act.

{00039481.DOC/v4/3020/018/9/6/2007 12:56 PM}     8

Pursuant to 770 ILCS 60/7, no contractor shall be allowed to enforce a mechanic's lien against or to the prejudice of any other creditor or incumbrancer or purchaser, unless within 4 months after completion… he or she shall either bring an action to enforce his or her lien therefore or shall file in the office of the recorder of the county in which the improvement to be charged with the lien is situated, a claim for lien, verified by the affidavit of himself or herself, or his or her agent or employee, which shall consist of a brief statement of the claimant's contract, the balance due after allowing all credits, **and a sufficiently correct description of the lot, lots or tracts of land to identify the same**. (emphasis added).  A lien is invalid if its three perimeter metes and bounds descriptions would not provide the average third-party purchaser or incumbrancer with enough information to readily identify the property affected by the lien through the use of local public records.  Steinberg v. Chicago Title & Trust Co., 142 Ill. App. 3d 601, 96 Ill. Dec. 834, 491 N.E.2d 1294 (1st Dist. 1986).

Vernon Williams Architects, P.C.'s Mechanic's Lien purports to identify and attach to Parcels 022, 023 and 024.  Claimant's Mechanic's Lien identifies Parcel 022 as:

> "Lot 5 in Mary A. Hoagland's Subdivision of South 100 feet of Lots 10 and 11 (except the East 80 feet of Lot 10) in Block 3 of Cleverville in Section 35, Township 39 North, Range 14, East of the Third Principal Meridian, in Cook County, Illinois."

See Mechanic's Lien.

Claimant's Mechanic's Lien is neither perfected nor enforceable as to Parcel 022.  Claimant failed to correctly identify Parcel 022's actual legal – i.e., metes and bounds – description in the Mechanic's Lien.  The proper legal description for Parcel 022 is:

> "LOT 6 IN MARY HOGALAND SUBDIVISION OF PART OF THE SOUTH 100 FEET OF LOTS 10 AND 11 IN BLOCK 3 IN CLEAVERVILLE IN SECTION

35, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL
MERIDIAN, IN COOK COUNTY, ILLINOIS."

In order for the Mechanic's Lien to be enforceable, Claimant had an absolute duty to

follow the guidelines set forth through Illinois' Mechanic's Lien Act in preparing and filing its

Lien. *Cf. Braun-Skiba, Ltd. v. LaSalle National Bank*, 279 Ill. App. 3d 912, 665 N.E.2d 485 (1st

Dist. 1996), *citing Mutual* 159 Ill. App. 3d 549, 510 N.E.2d 1219 (1st Dist. 1987).  Section 60/7

requires Claimant to provide a correct description of the subject property. 770 ILCS 60/7.

Claimant's admits that it erred in describing Parcel 022.  Response, p. 12.  The effect of

Claimant's failure to properly identify Parcel 022 in its Mechanic's Lien is that the Lien is

unenforceable as to Parcel 022.  Since the language of Claimant's Mechanic's Lien is clear and

incontrovertible, Trustee is entitled to entry of an order of partial summary judgment in his favor

and against Claimant, pursuant to Bankruptcy Rule 7056/FRCP 56(a), invalidating the lien.[2]

> B.   Claimant Did Not Record its Mechanic' Lien against Debtor, Nor Did
>      Claimant Provide Debtor with Proper Notice of the Mechanic's Lien.

Trustee also seeks partial summary judgment as to Claimant's Mechanic's Lien as

Claimant misidentified Lakeview Real Estate Development Co. ("Lakeview") as owner of

Parcels 022, 023 and 024 in the Mechanic's Lien and served Lakeview with notice of the Lien.

Rather than dispute this fact, Claimant contends that it did not have to identify owner of Parcels

022, 023 and 024 in its Lien, i.e., Debtor, nor was Claimant required to serve Debtor with notice

of the Lien.  Response, pp. 8-9.  Claimant argues that it wholly unnecessary under Illinois'

---

[2] This is a not a triable issue of fact, and as such, this issue of the enforceability of Claimant's Mechanic's Lien – an issue of law – is ripe for final disposition through summary judgment. FRCP 56(a); Bankruptcy Rule 7056; Gallace v U.S. Dep't of Agric., 273 F Supp 2d 53 (DC Dist Col. 2003), affd (App DC 2003) 2003 US App LEXIS 20074; *Cf.* Mintz v Mathers Fund, Inc., 463 F2d 495 (CA7 Ill. 1974); Tomalewski v State Farm Life Ins. Co., 494 F2d 882 (CA3 PA 1974); Freeman v. Continental Gin Co., 381 F2d 459 (CA5 Miss. 1967), reh den 384 F2d 365, (CA5 Miss. 1967).

Mechanic's Lien Act to identify the proper owner of Parcels 022, 023 and 024 in the Mechanic's Lien. Response, pp. 8-10. Claimant's contentions are nonsensical.

Illinois' Mechanic's Lien Act requires that a claim for lien shall be filed and prosecuted against the owner of the subject property. *Cf.* 770 ILCS 60/7. "Owner", as used in Illinois' Mechanic's Lien Act, means owner of any interest in property. M. Ecker & Co. v. LaSalle Nat. Bank., 268 Ill. App. 3d 874, 645 N.E.2d 335 (1st Dist. 1994). A lien must identify the owner of the subject property (*Cf.* Liens Act. Matot v. Barnheisel, 212 Ill. App. 489 (1 Dist. 1918)) and be delivered to the owner of the subject property or the owner's recognized agent the subject property. Debtor is not identified in the Mechanic's Lien, as required under Section 60/7. 770 ILCS 60/7. Moreover, Debtor has never been served with notice of the Mechanic's Lien – a condition precedent to prosecution of the Lien under 770 ILCS 60/1, *et seq*. Nonetheless, Claimant maintains that it is a proper secured creditor of Debtor's Bankruptcy Estate.

In response to these deficiencies, Claimant contends that it is simply unnecessary to identify the owner of the subject property in a claim for lien, and is wholly proper to serve the agent of an owner with notice of lien. Response, pp. 7-11. While the latter statement might be true, its validity is controverted by the fact that Claimant did not just fail to name Debtor as owner in its Mechanic's Lien, but Claimant identified Lakeview as the owner-of-record of Parcels 022, 023 and 024 and even served Lakeview with notice of the Lien. Claimant is attempting to misdirect the Court's attention from this error by proffering an unsupported claim that mechanic's liens need not identify the owner of record of the subject property. This argument is preposterous. *Cf.* 770 ILCS 60/7; see also M. Ecker & Co. v. LaSalle Nat. Bank., 268 Ill. App. 3d 874, 645 N.E.2d 335 (1st Dist. 1994) *Cf.* Liens Act. Matot v. Barnheisel, 212 Ill. App. 489 (1 Dist. 1918). Also, Claimant is trying to minimize the fact that it clearly viewed

11

Lakeview as owner of Parcels 022, 023 and 024 when it filed its Lien claim, but now considers Lakeview an "agent" of Debtor. *Cf.* Response, p.

Since at least 1999, Debtor has been the sole owner-of-record of Parcels 022, 023 and 024. Lakeview, an Illinois corporation organized in March 19, 1999 which was involuntarily dissolved on August 2, 2004, does not currently have nor has ever held or possessed any ownership interest in Parcels 022, 023 or 024. Regardless of any supposed, unsupported relationship between Debtor and Lakeview, Claimant had an absolute duty to follow the guidelines set forth through Illinois' Mechanic's Lien Act when it prepared and filed the Lien. *Cf.* Braun-Skiba, Ltd. v. LaSalle National Bank, 279 Ill. App. 3d 912, 665 N.E.2d 485 (1st Dist. 1996), *citing* Mutual 159 Ill. App. 3d 549, 510 N.E.2d 1219 (1st Dist. 1987). Had Claimant performed a simple index search with the Cook County Recorder of Deeds, it could have easily determined what Trustee discovered during his administration of this case: that Debtor, not Lakeview, is the owner of Parcels 022, 023 and 024; a fact which should have been properly set forth in Claimant's Mechanic's Lien claim. Steinberg v. Chicago Title & Trust Co., 142 Ill. App. 3d 601, 491 N.E.2d 1294 (1st Dist. 1986).

The effect of Vernon Williams Architects, P.C.'s failure to properly record and serve its Mechanic's Lien upon Debtor is that the Mechanic's Lien is unenforceable. The language of Claimant's Mechanic's Lien is clear and incontrovertible, as is the fact that Debtor was not identified in the Lien and was never provided with notice of the Lien. Accordingly, Trustee requests entry of an order of partial summary judgment in his favor and against Claimant, pursuant to Bankruptcy Rule 7056/FRCP 56(a), invalidating the lien.[3]

---

[3] This is a not a triable issue of fact, and as such, this issue of the enforceability of Claimant's Mechanic's Lien – an issue of law – is ripe for final disposition through summary judgment. FRCP 56(a); Bankruptcy Rule 7056; Gallace v U.S. Dep't of Agric., 273 F Supp 2d 53 (DC Dist Col. 2003), affd (App DC 2003) 2003 US App LEXIS 20074; *Cf.* Mintz v Mathers Fund, Inc., 463 F2d 495 (CA7 Ill. 2003); Tomalewski v State Farm Life Ins. Co., 494 F2d 882 (CA3 PA 2003); Freeman v. Continental Gin Co., 381 F2d 459 (CA5 Miss. 1967), reh den 384 F2d 365, (CA5

## CONCLUSION

Because it would be entirely inequitable to allow the deficiencies of Claimant's Mechanic's Lien to be sustained by Judge Sonderby's Order of Dismissal for Want of Prosecution to the detriment of Debtor's properly secured creditors, the doctrine of *res judicata* does not bar Trustee's Motion. Also, as there is no identity of claims between Debtor's Chapter 11 Adversary Petition and Trustee's Motion, an element essential to maintaining a defense of *res judicata* cannot be met, and the doctrine cannot be applied.

Claimant's Mechanic's Lien is unenforceable as it does not identify the owner of Parcels 022, 023 and 024, was never served upon the owner and does not describe one of the three lots to which it purports to attach. Claimant has offered no tenable support for the proposition that the requirements of Illinois' Mechanic's Lien Act need not be strictly adhered to. Individually, each of these defects is sufficient nullify the Lien, as such liens are valid only if each of the statutory requirements are scrupulously observed. As the Mechanic's Lien is void as a matter of law, Trustee is entitled to entry of an order of partial summary judgment, pursuant to Bankruptcy Rule 7056/FRCP 56(a), finding the Mechanic's Lien unenforceable and invalidating Lien, so that Trustee may proceed with his adversary action.

Respectfully submitted,

By: /s/ Charles J. Myler, not individually, but
solely as Chapter 7 Trustee for
the Estate of Anthony Fields
Attorneys for Charles J. Myler, Trustee

---

Miss. 1967).

Charles J. Myler, ARDC No. 2008602
Richard G. Larsen, ARDC No. 6193054
Myler, Ruddy & McTavish
105 E Galena Blvd, Ste #800
Aurora, Illinois 60505
(630) 897-8475
(630) 897-8076 (fax)

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 665855 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

CVan Hoey v. Baxter Intern., Inc.
N.D.Ill.,1997.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois.
Sarah VAN HOEY, Plaintiff,
v.
BAXTER INTERNATIONAL, INC., Baxter
International Inc. and Subsidiaries Pension Plan,
G. Marshall Abbey, Anthony J. Rucci, James R.
Tobin, J. Robert Hurley, Herbert E. Walker, Nicki
M. Norris, and Nancy V. Wescott, Defendants.
**No. 96 C 6231.**

Oct. 21, 1997.

ZAGEL, J.

## MEMORANDUM OPINION AND ORDER

*1 This case involves several claims asserted
under the Employee Retirement Income Security Act
("ERISA"), 29 U.S.C. §§ 1001 et. seq. In 1977,
Helen Van Hoey began working for American
Hospital Supply Corporation ("AHSC") which was
later acquired by defendant Baxter International, Inc.
("Baxter"). Helen participated in AHSC's benefits
plan and became a participant in the Baxter
retirement plan (generally referred to as the "Plan")
when the two companies merged in 1986. Van Hoey
ceased working for Baxter on October 9, 1987.

Baxter amends its Plan periodically. For
example, Baxter amended and restated its Plan
effective as of January 1, 1987 ("1987 Version").
Several years later, Baxter amended and restated its
Plan again, this one effective as of January 1, 1992

("1992 Version"). The 1992 Version included
Supplement A, which provided that specifically
enumerated terms adopted in the 1992 Version
would be effective on dates earlier than January 1,
1992.

Helen Van Hoey died on November 12, 1990.
Plaintiff Sarah Van Hoey is Helen's daughter and
sole beneficiary entitled to Helen's benefits from the
Plan. Some time between December of 1990 and
January of 1991, Baxter sent a benefit statement to
Sarah Van Hoey. After this, Van Hoey and her
accountant engaged in telephone conversations and
correspondence with agents of Towers Perrin, an
employee benefits consulting firm that assists Baxter
in administering its Plan, regarding the Plan and
when Sarah's benefits payments would commence.
On July 9, 1991, Van Hoey objected to a Towers
Perrin agent about proposed benefit reductions and
requested a copy of the Plan. By a letter dated the
same day, Towers Perrin formally denied Van
Hoey's claim for unreduced benefits, explained its
interpretation of the Plan, and attached a copy of it.
Then, by a letter dated July 15, 1991, Van Hoey
appealed this denial. On September 20, 1991, the
Administrative Committee charged with
administering Baxter's Plan considered the appeal
and denied it on the basis that: (1) Sarah Van Hoey's
benefits were governed by § 6.4(c) of the 1987
Version of the Plan which describes, essentially, the
pre-retirement death benefits payable to a
beneficiary; and (2) that her benefits pursuant to §
6.4(c) would be reduced pursuant to the Deferred
Vested Benefit Reduction Factors.

Around September 6, 1995, Baxter asked the
Administrative Committee to interpret the provisions
of the 1992 Version, and especially § 6.4(a)(i) which

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 665855 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

provides for unreduced benefits and which Van Hoey claimed should apply to her. After review, the Administrative Committee concluded that the adoption of the 1992 Version did not change its prior decision regarding Van Hoey.

Sarah Van Hoey filed suit in this court challenging the Administrative Committee's interpretation of the Plan and her right to benefits. Van Hoey filed a three-count complaint against defendants Baxter, Baxter's pension plan and the individual members of the Administrative Committee alleging violations of various sections of ERISA and asserting a claim for benefits (Count I), a claim for breach of fiduciary duties (Count II), and a demand for civil penalties under ERISA's reporting and disclosure provisions (Count III). Now, Baxter and Van Hoey assert cross motions for summary judgment.

## ANALYSIS

*2 Summary judgment shall be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

### A. Count I: § 502(a)(1) Benefits Claim

Section 502(a)(1) of ERISA provides in relevant part that "[a] civil action may be brought by a participant or beneficiary ... to recover benefits due to him under the terms of his plan, [or] to enforce his rights under the terms of the plan...."29 U.S.C. §

1132(a)(1). Defendant Baxter seeks summary judgment on Count I of the complaint on the grounds that the Plan Administrative Committee's denial of Van Hoey's benefit claim was not arbitrary and capricious where the committee engaged in a substantial investigative and review process in 1991 and a reconsideration in 1995 before denying her claim. Plaintiff Van Hoey seeks summary judgment in her favor on the grounds that she is entitled to unreduced benefits under the plain language of the Plan, and Baxter's denial of such was arbitrary and capricious. The heart of the matter is: does § 6.4(a)(i) in the 1992 Version of the Plan which provides unreduced death benefits to beneficiaries apply to Sarah Van Hoey?

When a benefits plan gives an administrator discretionary authority to determine eligibility for benefits or construe the plan, the administrator's actions should be judged under an arbitrary and capricious standard. *Chojnacki v. Georgia-Pacific Corp.,* 108 F.3d 810, 814 (7th Cir.1997) (citation omitted). Although plan administrators' actions are reviewed deferentially, the courts "shall not rubber stamp" their decisions. *Swaback v. American Info. Techs. Corp.,* 103 F.3d 535, 540 (7th Cir.1996). It is arbitrary and capricious for administrators to controvert the plain meaning of a plan. *Id.* Courts apply federal common law principles of contract interpretation to interpret the meaning of benefits plans and interpret them in an ordinary and popular sense as would a person of average intelligence and experience. *Id.* at 540-41.

Here, Baxter and Van Hoey agree that the arbitrary and capricious standard applies. The parties also agree that the Plan's terms are unambiguous, but each one interprets them differently, leading the court through a virtual maze of provisions within the 1987 and 1992 versions of the Plan requiring

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 665855 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

Page 3

considerable flipping back and forth between the two documents to understand each party's argument.

First, Baxter's interpretation. The short version of Baxter's argument is that the terms of the 1987 Version and the 1992 Version effectively created a 1990 Version of the Plan which applied § 6.4(a)(i) only to Participants who were terminated from employment on or after January 1, 1990. Step-by-step, Baxter argues as follows.

Step one: in the 1992 Version, § 2.17 provides that the effective date of that version is January 1, 1992 except as provided in Supplement A or other supplements.

*3 Step two: also in the 1992 Version, Paragraph A-5 in Supplement A provides that § 6.4(a)(i) has an effective date of January 1, 1990. Section 6.4(a)(i) provides in relevant part

In the case of a Participant who dies after December 31, 1989 and who had completed five Years of Benefit Service but had not yet completed 65 Points, the death benefit payable to the Participant's Beneficiary shall commence effective as of the month following the month in which the Participant would have attained an age which when combined with his Years of Vesting Service as of the date of his death would equal 65 Points. [ ] *The amount of the monthly Death Benefits* paid to such Beneficiary shall be determined as of the date such payment commence and *shall not be actuarially reduced for early commencement* (emphasis added).

Step three: as of January 1, 1990, the governing Plan was the 1987 Version with certain provisions of the 1992 Version, including § 6.4(a)(i), incorporated by reference.

Step four: the incorporation of the provisions in Supplement A effective as of January 1, 1990 effectively created a 1990 Version.

Step five: within the 1987 Version, § 1.3 provides in relevant part

Except to the extent expressly provided to the contrary ... the Accrued Benefits, eligibility, vesting and other rights of other Participants incurring a Termination of Employment prior to the Effective Date shall continue to be governed by the terms and conditions of the Plan as in effect at the time of such Termination of Employment.

In other words, a Participant's benefits are determined based on the Plan in effect when the Participant terminates employment.

Step six: the 1990 Version of the Plan had an Effective Date of January 1, 1990, and pursuant to § 1.3 of the 1990 Version, the participants who terminated employment prior to its Effective Date would be governed by the Plan in effect prior to January 1, 1990, i.e., the 1987 Version. The 1990 Version (which includes § 6.4(a)(i)) applies only to Participants who terminated employment on or after January 1, 1990.

Baxter applied this analysis to Helen Van Hoey, who terminated employment before January 1, 1990, and concluded that Helen was not governed by the 1990 Version or by § 6.4(a)(i).

In a single brief with two functions, Van Hoey responded to Baxter's motion and sought summary

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 665855 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

Page 4

judgment in her own favor on the grounds that the Administrative Committee erroneously applied § 1.3 of the 1987 Version to limit her rights. More specifically, Van Hoey makes the following multi-step argument.

Step one: within the 1992 Version, Supplement A reflects terms that took effect prior to January 1992 wherein it sets forth that "[t]he purpose of this Supplement A is to retroactively extend certain features of the Plan as in effect on January 1, 1992 to various periods beginning on or after January 1, 1987...."

Step two: Supplement A provides that § 6.4(a)(i) should apply as of January 1, 1990.

*4 Step three: within the 1987 Version, § 1.3 provides in relevant part that
[T]he Accrued Benefits ... and other rights of other Participants incurring a Termination of Employment prior to the Effective Date [defined in § 2.17 as January 1, 1987] shall continue to be governed by the terms and conditions of the Plan as in effect at the time of such Termination of Employment.

In other words, § 1.3 provides that Participants who terminate before January 1, 1987 are governed by the terms effective at termination. Thus, under principles of contract construction, especially the maxim of *expressio unius est exclusio alterius* (i .e., expression of one thing is exclusion of another), this provision should be construed to provide that those Participants who were not terminated as of January 1, 1987 should benefit from new terms and amendments effective after January 1, 1987.

Step four: where § 6.4(a)(i) expressly defines how to calculate a Participant's termination date "if he had not previously incurred a termination of employment", it must be inferred that this section also applies to those who had previously terminated their employment.

In response to Baxter's argument that § 1.3 and § 2.17 should be read to modify the new terms in the 1992 Version, Van Hoey asserts this contradicts the plain language of the 1992 Version because Supplement A explicitly designates terms that became effective prior to January 1, 1992, § 1.3 is not listed therein, and Supplement A expressly states that § 1.3 is not to limit the early effective terms.[FN1]

FN1. Paragraph A-1 of Supplement A provides in part that "[t]o the Extent that the provisions of this Supplement A commenced prior to January 1, 1992, such modification shall be taken into account for purposes of Section 1.3 of the Plan...."

After carefully reviewing these arguments, I find that the plain meaning of the 1987 and 1992 versions of the Plan mandates the application of § 6.4(a)(i) to Helen Van Hoey for the following reasons. First, according to the plain language of § 6.4(a)(i) it applies to "a Participant who dies after December 31, 1989." Helen died after this date in November 1990. Further, by providing special instructions for "[the Participant who] had not previously incurred a Termination of Employment", it is clear by implication that § 6.4(a)(i) is more generally addressed to those Participants who died after December 31, 1989 but had previously terminated employment.[FN2]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 665855 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

FN2. The specific phrase that I am referring to states

Such Death Benefit shall be based upon the assumption that the Participant had elected the ten-year certain payment option described in Section 7.2(c) and, *if he had not previously incurred a Termination of Employment,* that he had incurred a Termination of Employment immediately prior to his death (emphasis added).

Second, several parts of Supplement A further support this construction. Paragraph A-2 of Supplement A states that the supplement "shall be applicable to those Participants in the Plan who were Participants prior to January 1, 1992." Paragraph A-5 makes § 6.4(a)(i) "fully effective as of January 1, 1990", but it does not specify whether this means that § 6.4(a)(i) applies to those who were merely Participants as of January 1, 1990 or to those who were Participants as of January 1, 1990 *and* terminated employment on or after this date. However, a comparison between paragraphs A-4 and A-5 demonstrates that the Plan is most reasonably construed as applying the provisions effective as of January 1, 1990 to those who were merely Participants on that date. Specifically, paragraph A-4, unlike Paragraph A-5 (which, again, makes § 6.4(a)(i) effective as of January 1, 1990), designates a new effective date for certain enumerated provisions "subject to the limitations below ." These limitations are as follows:

**\*5** The provisions made effective as of January 1, 1989 by operation of subparagraphs A-4(a) and (d)-(i) above *shall not be effective with respect to Participants who incurred a Termination of Employment prior to such date* (emphasis added).

Thus, in Paragraph A-4, the drafters of the Plan expressly limited the applicability of several new provisions to Participants who terminated employment *after* the new effective date. Indeed, this shows that the drafters of the Plan, and Supplement A in particular, knew how to limit the effectiveness of the new provisions and did so, but only with respect to certain provisions enumerated within Paragraph A-4. The drafters of the Plan did not express any such limitations in the very next section, Paragraph A-5 wherein § 6.4(a)(i) was made effective as of January 1, 1990.

Baxter disputes this conclusion, arguing instead that the January 1, 1990 "Effective Date" described in Paragraph A-5 of Supplement A modified the January 1, 1987 "Effective Date" term contained in § 1.3 of the 1987 Version to create a new version of § 1.3 with a January 1, 1990 effective date. And this, in effect, made the enumerated provisions in Part A-5 inapplicable to "Participants incurring a Termination of Employment prior to the Effective Date [i.e. January 1, 1990] [who] shall continue to be governed by the terms ... as in effect at the time of such Termination ...." 1987 Vers., § 1.3. But I find that a reading of § 1.3 in conjunction with Paragraph A-1 of Supplement A undermines this argument. Specifically, Paragraph A-1 sets forth that

To the extent that the provisions of this Supplement A modify the provisions applicable to a Participant whose benefits commenced prior to January 1, 1992, such modification shall be taken into account for the purposes of Section 1.3 of the Plan in determining the provision of the Plan which govern the determination of such Participant's benefits.

This language, standing alone, seems ambiguous. However, I must interpret the contract as a whole, *see Echo, Inc. v. Whitson Co., Inc.,* 121 F.3d 1099, 1997 WL 432513 (7th Cir.1997), and I find that § 1.3 resolves this ambiguity.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 665855 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

Page 6

The terms in Supplement A are properly and meaningfully read into the part of § 1.3 that provides *"[e]xcept to the extent expressly provided to the contrary, in an applicable Appendix or elsewhere in the Plan,* the ... rights of other Participants ... shall continue to be governed by the terms ... of the Plan as in effect at the time of such Termination of Employment"* (emphasis added). In other words, Participants are governed by the terms effective at their termination *except* as provided to the contrary elsewhere in the Plan. Supplement A is clearly "elsewhere." As such, the rights of Participants continue to be governed by the Plan effective when they terminate *except* to the extent that Supplement A applies new terms to Participants as of the newly designated Effective Dates.

*6 In sum, I conclude that Baxter's Administrative Committee should have construed the Plan to apply § 6.4(a)(i) to Sarah Van Hoey and that its denial of Sarah Van Hoey's claim for unreduced benefits contradicts the plain language of the Plan. Consequently, I find that this decision was arbitrary and capricious. Baxter contends even if its committee's decision was wrong, it can only be overturned if it was also "downright unreasonable." Well, my response to this is that it was difficult to construe these Plan documents, but ultimately a careful analysis of them points to one clear interpretation. For this reason, the Administrative Committee's conclusion otherwise was downright unreasonable. This is distinguishable from *Gallo v. Amoco Corp.,* for example, a case Baxter cites. 102 F.3d 918 (7th Cir.1996), *cert. denied,* 521 U.S. 1129, 117 S.Ct. 2532, 138 L.Ed.2d 1031 (1997). The *Gallo* court found that the plan administrator's decision could not be deemed unreasonable or arbitrary and apricious even if it was wrong because the plan documents were silent on the pertinent issue, and the administrator's actions were consistent with the way the plan had been administered since its inception.

*Id.*

Finally, Baxter argues for a dismissal of all defendants other than the Plan from Count I because only the Plan can be liable for a wrongful denial of benefits. Van Hoey does not respond to this and therefore concedes the point. Consequently, Count I is dismissed as to all defendants except the Plan.

**B. Count II: Breach of Fiduciary Duties**

Baxter seeks summary judgment on Count II because it contends that Van Hoey cannot bootstrap a claim for benefits into a breach of fiduciary duty claim. In Count II of the complaint, Van Hoey alleges that the members of the Administrative Committee breached their fiduciary duties under ERISA § 404(a) by: (1) refusing to pay the uncontested amount of benefits that were due and (2) stalling in processing her appeal (of the denial of her benefits claim) and responding to document requests.

ERISA § 404(a) provides in part that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries...."29 U.S.C. § 1104(a). Section 502(a)(3) provides that

A civil action may be brought ... by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the term of the plan....

29 U.S.C. § 1132(a)(3).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 665855 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

Baxter contends that Van Hoey requests the same relief in her fiduciary duty breach claim as in her wrongful denial of benefits claim, and therefore the former claim should be denied. The United States Supreme Court recently observed that "we should expect that where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be appropriate." *Varity Corp. v. Howe*, 516 U.S. 489, ----, 116 S.Ct. 1065, 1079, 134 L.Ed.2d 130 (1996). Accordingly, § 502(a)(3) claims for breach of fiduciary duty where requested relief may be obtained from a § 502(a)(1) denial of benefits claim. *Mers v. Marriott Int'l Group Accidental Death & Dismemberment Plan*, 1996 WL 219701, at *3 (N.D.Ill. Apr.25, 1996).

*7 In Count II, Van Hoey asserts a breach of fiduciary duty claim and requests the full amount of benefits owed to her under the Plan. However, this relief is available pursuant to her § 502(a)(1) wrongful denial of benefits claim. Therefore, I find that further relief pursuant to § 502(a)(3) is not appropriate. To the extent plaintiff requests relief under § 409(a) it is denied because this section does not provide individual relief for improper processing of benefits claims, any recovery thereunder inures to the benefit of the plan. *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 148, 105 S.Ct. 3085, 3093, 87 L.Ed.2d 96 (1985).

C. *Count III: § 502(c)(1) Civil Penalties Claim*

Section 502(c)(2) of ERISA provides in relevant part that

Any administrator who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a ... beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested within 30 days after such request may in the court's discretion be personally liable to such ... beneficiary....

29 U.S.C. § 1132(c)(1).

Baxter moves for summary judgment on Van Hoey's demand for civil penalties under § 502(c)(1) on the grounds that this claim may only be brought against the "administrator", in this case the Administrative Committee, which Van Hoey failed to name as a defendant, or, alternatively, because Van Hoey failed to use the proper procedures to request information.

Van Hoey asserts her claim for civil penalties based on violations of the § 104(b) and § 105(a) disclosure provisions. 29 U.S.C. §§ 1024(b), 1025(a), respectively. Section 104(b) requires the "administrator" to furnish a summary plan description and annual report to participants and beneficiaries. Section 105(a) requires the "administrator" to furnish a statement of benefits to any participant or beneficiary who requests it in writing. The "administrator" is "the person specifically so designated by the terms of the instrument under which the plan is operated...."29 U.S.C. § 1002(16)(A). The Seventh Circuit has interpreted these provisions to mean that a cause of action for violations of ERISA's disclosure requirements is proper only against the plan administrator. *Klosterman v. Western Gen. Mgmt., Inc.*, 32 F.3d 1119, 1122 (7th Cir.1994).

Under § 2.4 of Baxter's ERISA plan, the

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 665855 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

Administrative Committee is "the committee which is responsible for administering the Plan...." 1987 Version; 1992 Version. Baxter contends that Van Hoey failed to name the Administrative Committee as an entity as a defendant in this lawsuit and that this precludes her claim for civil penalties for violations of disclosure requirements. Van Hoey fails to address this argument, and therefore **concedes** its validity. *Anderson v. Aurora Township, 1997 WL 534265, at \*4 (N.D.Ill. Aug.20, 1997)*. Van Hoey also **fails** to **respond** to Baxter's charge that she herself caused the delay she now complains of by failing to follow proper procedures. In fact, the evidence shows that Van Hoey misdirected her document requests to Baxter's legal department instead of addressing them specifically to the Administrative Committee as required under the terms of the Plan. When a plan designates a plan administrator, document requests must be addressed to that entity and requests addressed to the employer's legal department will not trigger civil penalties. *Jones v. UOP, 16 F.3d 141, 144 (7th Cir.1994)*. Here, the Plan designates the Administrative Committee as the plan administrator and Van Hoey failed to address her disclosure requests to it. Therefore Van Hoey, not Baxter, apparently caused the complained of delay and it would not be appropriate to fine defendants for it. In sum, Van Hoey does not dispute that she failed to name the proper defendant and that she misdirected document requests. I find that either fact provides sufficient reason to grant **summary judgment** in favor of Baxter on Count III, and so I do.

## CONCLUSION

\*8 For the foregoing reasons, I grant summary judgment in favor of Van Hoey and against Baxter International, Inc. on Count I. However, I grant summary judgment in favor of all the named defendants other than Baxter International, Inc. on Count I. As to Counts II and III, I grant summary judgment in favor of defendants.

N.D.Ill.,1997.
Van Hoey v. Baxter Intern., Inc.
Not Reported in F.Supp., 1997 WL 665855 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

In re GGSI Liquidation Inc.
Bkrtcy.N.D.Ill.,2006.

United States Bankruptcy Court,N.D. Illinois,Eastern
Division.
In re GGSI LIQUIDATION INC., et al., Debtors.
Gus A. Paloian, not individually but solely in his
capacity as the Chapter 7 trustee of the Above
captioned bankruptcy estates, Plaintiff,
v.
Grupo Serla S.A. de C.V. a/k/a Grupo Empresarial
Serla, S.A. de C.V.; Editorial Comercial, S.A. de C.V.;
Sergio Eduardo Guarneros Trujillo; Bank One
individually and as successor-in-interest to First
National Bank of Chicago, a national banking,
association, and Union Industrial Mexicana, S.A. de
C.V., Defendants.
**Bankruptcy No. 01 B 31751.**
**Adversary No. 03 A 03888.**
Sept. 7, 2006.

**Background:** Chapter 7 trustee brought adversary
proceeding to recover for bank's alleged violation of
automatic stay, as well as to recover sums still owing in
connection with printing press sold by debtor in
prepetition purchase transaction financed by bank.

**Holdings:** The Bankruptcy Court, Jack B.
Schmetterer, J., held that:

(1) while debtor did not acquire title to buyer's note
from bank by virtue of its actions, following buyer's
default, in paying 15% of principal balance owing on
note with accrued interest and in executing its own note
in favor of bank for remaining balance, debtor
nonetheless had contractual rights in note, that were
included in property of its Chapter 7 estate;

(2) bank from which debtor had agreed to repurchase

buyer's note, and to which debtor had already paid more
than $5 million, violated automatic stay when, fearful
that it would recover only pennies on the dollar in
connection with the $1,425,495.12 still owing under note
repurchase agreement, it agreed to sell buyer's note to
foreign company affiliated with buyer;

(3) stay violation was willful;

(4) trustee of corporate debtor's Chapter 7 estate had
standing to recover actual damages sustained by estate as
result of bank's willful stay violation;

(5) bank failed to take reasonable care to preserve
value of note;

(6) bank was liable on unauthorized postpetition
transfer theory;

(7) trustee was not estopped or barred by laches from
pursuing claims;

(8) trustee could not recover proceeds paid to bank
upon sale of buyer's note on unjust enrichment,
constructive trust or resulting trust theory;

(9) trustee was entitled to compensatory damages in
amount of roughly $1.2 million, plus attorney fees and
costs, fore bank's stay violation;

(10) bank's stay violation warranted punitive
damages award; and

(11) buyer could not raise allegedly defective nature
of press, in purportedly failing to deliver 45,000
impressions per minute, and its own alleged

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

nonacceptance thereof as defense to cause of action to recover purchase price.

So ordered.

### West Headnotes

**[1] Bankruptcy 51 ☞2535(1)**

51 Bankruptcy
    51V The Estate
        51V(C) Property of Estate in General
            51V(C)2 Particular Items and Interests
                51k2535 In General
                    51k2535(1) k. In General. Most Cited Cases
Under Illinois law, preliminary "whereas" clause in note repurchase agreement, indicating that, following buyer's default in making payments required by promissory note that it had executed in connection with its purchase of printing press, seller of press had repurchased 15% of this note from bank that had financed purchase transaction by paying 15% of principal balance of note and accrued interest, did not give seller any ownership interest in note, of kind included in property of the estate when it filed for bankruptcy relief, where this "whereas" clause was contradicted by operative provisions of note repurchase agreement, under which bank was obligated to transfer title to note only when it was paid in full; to extent that there was any conflict between operative provisions of agreement and preliminary recitals, operative provisions prevailed.

**[2] Contracts 95 ☞160**

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
            95k160 k. Recitals. Most Cited Cases
Under Illinois law, obligations and promises of parties in operative portion of contract prevail over preliminary recitals or preamble.

**[3] Evidence 157 ☞397(1)**

157 Evidence
    157XI Parol or Extrinsic Evidence Affecting Writings
        157XI(A) Contradicting, Varying, or Adding to Terms of Written Instrument
            157k397 Contracts in General
                157k397(1) k. In General. Most Cited Cases
Under Illinois law, evidence concerning the meaning and correctness of recital contained in integrated agreement is admissible and does not constitute improper parol evidence. Restatement (Second) of Contracts § 218(1).

**[4] Contracts 95 ☞160**

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
            95k160 k. Recitals. Most Cited Cases
Under Illinois law, "whereas" clauses in contract serve as recitals or mere explanations of circumstances surrounding execution of contract, and are not binding obligations unless referred to in operative portion of contract.

**[5] Evidence 157 ☞458**

157 Evidence
    157XI Parol or Extrinsic Evidence Affecting Writings
        157XI(D) Construction or Application of Language of Written Instrument
            157k458 k. Relation and Application of Language to Facts in General. Most Cited Cases

**Evidence 157 ☞461(1)**

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

157 Evidence
    157XI Parol or Extrinsic Evidence Affecting Writings
        157XI(D) Construction or Application of Language of Written Instrument
        157k461 Showing Intent of Parties as to Subject-Matter
            157k461(1) k. In General. Most Cited Cases

**Evidence 157 ☜462**

157 Evidence
    157XI Parol or Extrinsic Evidence Affecting Writings
        157XI(D) Construction or Application of Language of Written Instrument
    157k462 k. Showing Purpose of Writing. Most Cited Cases
Under Illinois law, parol or extrinsic evidence is admissible to explain parties' purpose in executing written instrument, what they intended, the consideration for its execution, and circumstances surrounding its execution.

**[6] Evidence 157 ☜448**

157 Evidence
    157XI Parol or Extrinsic Evidence Affecting Writings
        157XI(D) Construction or Application of Language of Written Instrument
        157k448 k. Grounds for Admission of Extrinsic Evidence. Most Cited Cases
Under Illinois law, nothing in parol evidence rule prevents court from considering facts surrounding the execution of agreement in question.

**[7] Contracts 95 ☜147(1)**

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
        95k147 Intention of Parties
            95k147(1) k. In General. Most Cited Cases
Under Illinois law, primary goal of court in construing contract is to give effect to intent of parties.

**[8] Bankruptcy 51 ☜2535(5)**

51 Bankruptcy
    51V The Estate
        51V(C) Property of Estate in General
        51V(C)2 Particular Items and Interests
        51k2535 In General
        51k2535(5) k. Property Subject of Sale or Transfer. Most Cited Cases
Under Illinois law, seller's actions, following buyer's default in making payments required by promissory note that it had executed in connection with its purchase of printing press, in honoring demands of bank that had financed purchase transaction by paying 15% of principal balance of note and accrued interest, did not result in partial assignment of 15% ownership interest in note from bank to seller, such as would be included in property of the estate when seller later filed for bankruptcy relief, given lack of evidence that parties had manifested intent to make immediate transfer of any right which bank had to enforce note, and given that, when seller subsequently received a partial $75,000 payment from buyer, it did not retain 15% of this amount but remitted buyer's entire $75,000 to bank.

**[9] Assignments 38 ☜30**

38 Assignments
    38I Property, Estates, and Rights Assignable
        38k30 k. Partial Assignments. Most Cited Cases
Under Illinois law, distinguishing feature of a partial assignment is manifestation of an intent: (1) to make immediate transfer of part, but not all, of assignor's right; and (2) to confer on assignee a direct right against obligor to performance of that part. Restatement

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

Page 4

(Second) of Contracts § 326 comment.

**[10] Assignments 38 ☞30**

38 Assignments
   38I Property, Estates, and Rights Assignable
      38k30 k. Partial Assignments. Most Cited Cases
Under Illinois law, question for court in deciding
whether a partial assignment took place is whether it was
contemplated that there would actually be an outright
assignment of some right, interest, and authority and
control of claim, or only a promise to pay out of any
proceeds of claim that might be collected in the future.
Restatement (Second) of Contracts §§ 326 comment, 330
comment.

**[11] Bankruptcy 51 ☞2535(1)**

51 Bankruptcy
   51V The Estate
      51V(C) Property of Estate in General
         51V(C)2 Particular Items and Interests
            51k2535 In General
               51k2535(1) k. In General. Most Cited
Cases

**Bills and Notes 56 ☞430**

56 Bills and Notes
   56X Payment and Discharge
      56k428 Mode and Sufficiency of Payment
         56k430 k. New Bills or Notes. Most Cited
Cases

**Contracts 95 ☞235**

95 Contracts
   95II Construction and Operation
      95II(F) Compensation

         95k235 k. Mode of Making Compensation.
Most Cited Cases
Under Illinois law, seller of printing press, in executing
and delivering to bank that had financed purchase
transaction a promissory note for balance owing on
buyer's note, after buyer defaulted and bank demanded
that seller repurchase buyer's note, could not thereby be
regarded as having made full payment of its obligations
under note repurchase agreement, such that it acquired
title to buyer's note and note was included in property of
the estate when it later filed for Chapter 11 relief, though
bank thereafter ceased its collection actions against
buyer and looked only to seller for payment, and though
bank, in order to avoid double-counting its assets by
recognizing two notes in connection with single loan
transaction, had thereafter listed buyer's note as "paid
off" on its internal accounts.

**[12] Bills and Notes 56 ☞430**

56 Bills and Notes
   56X Payment and Discharge
      56k428 Mode and Sufficiency of Payment
         56k430 k. New Bills or Notes. Most Cited
Cases
Under Illinois law, mere delivery of promissory note for
preexisting obligation will not be held to extinguish the
preexisting obligation, in absence of agreement to that
effect.

**[13] Payment 294 ☞1(1)**

294 Payment
   294I Requisites and Sufficiency
      294k1 Nature and Requisites in General
         294k1(1) k. In General. Most Cited Cases
Under Illinois law, mere promise to pay cannot of itself
be regarded as effective payment.

**[14] Bills and Notes 56 ☞429**

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

<u>56</u> Bills and Notes
    <u>56X</u> Payment and Discharge
       <u>56k428</u> Mode and Sufficiency of Payment
         <u>56k429</u> k. In General. <u>Most Cited Cases</u>
Under Illinois law, promissory note cannot be paid and
satisfied by new promise which goes unfulfilled.

**[15] Bankruptcy 51** ☞**2554**

<u>51</u> Bankruptcy
    <u>51V</u> The Estate
       <u>51V(C)</u> Property of Estate in General
         <u>51V(C)2</u> Particular Items and Interests
           <u>51k2552</u> Rights of Action; Contract Rights
Generally
            <u>51k2554</u> k. Rights Under Contracts.
<u>Most Cited Cases</u>
Although seller of printing press in purchase transaction
which was financed by third-party bank did not acquire
title to buyer's note from bank by virtue of its actions,
following buyer's default, in paying 15% of principal
balance owing on note with accrued interest and in
executing its own note in favor of bank for remaining
balance, seller nonetheless had contractual right to
transfer of buyer's note once it satisfied its obligations
under note repurchase agreement, as well as right to be
subrogated to bank's claims against buyer for any
payments that it made, which contractual and
subrogation rights were all included in "property of the
estate" when seller filed for bankruptcy. <u>11 U.S.C.A. §
541(a).</u>

**[16] Bankruptcy 51** ☞**2532**

<u>51</u> Bankruptcy
    <u>51V</u> The Estate
       <u>51V(C)</u> Property of Estate in General
         <u>51V(C)1</u> In General
           <u>51k2532</u> k. Interest of Debtor in General.
<u>Most Cited Cases</u>

**Bankruptcy 51** ☞**2539**

<u>51</u> Bankruptcy
    <u>51V</u> The Estate
       <u>51V(C)</u> Property of Estate in General
         <u>51V(C)2</u> Particular Items and Interests
           <u>51k2539</u> k. Future Interests. <u>Most Cited
Cases</u>
Every conceivable interest of debtor, future,
nonpossessory, contingent, speculative, and derivative,
is within reach of "property of the estate." <u>11 U.S.C.A.
§ 541(a).</u>

**[17] Bankruptcy 51** ☞**2492**

<u>51</u> Bankruptcy
    <u>51V</u> The Estate
       <u>51V(A)</u> In General
         <u>51k2492</u> k. Creation of Estate; Time. <u>Most
Cited Cases</u>

**Bankruptcy 51** ☞**2531**

<u>51</u> Bankruptcy
    <u>51V</u> The Estate
       <u>51V(C)</u> Property of Estate in General
         <u>51V(C)1</u> In General
           <u>51k2531</u> k. In General. <u>Most Cited Cases</u>
When bankruptcy petition is filed, virtually all property
of debtor at that time becomes "property of the estate."
<u>11 U.S.C.A. § 541(a).</u>

**[18] Bankruptcy 51** ☞**2531**

<u>51</u> Bankruptcy
    <u>51V</u> The Estate
       <u>51V(C)</u> Property of Estate in General
         <u>51V(C)1</u> In General
           <u>51k2531</u> k. In General. <u>Most Cited Cases</u>

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

**Bankruptcy 51 ☞2532**

51 Bankruptcy
    51V The Estate
        51V(C) Property of Estate in General
            51V(C)1 In General
                51k2532 k. Interest of Debtor in General.
Most Cited Cases
Terms "property" and "interest in property," as used in bankruptcy provision defining "property of the estate," are construed extremely broadly and encompass virtually every right that debtor has at time petition is filed. 11 U.S.C.A. § 541(a).

**[19] Bankruptcy 51 ☞2531**

51 Bankruptcy
    51V The Estate
        51V(C) Property of Estate in General
            51V(C)1 In General
                51k2531 k. In General. Most Cited Cases
By broadly defining "property of the estate" in the Bankruptcy Code, Congress intended to bring anything of value into estate. 11 U.S.C.A. § 541(a).

**[20] Bankruptcy 51 ☞2554**

51 Bankruptcy
    51V The Estate
        51V(C) Property of Estate in General
            51V(C)2 Particular Items and Interests
                51k2552 Rights of Action; Contract Rights
Generally
                51k2554 k. Rights Under Contracts.
Most Cited Cases
"Property of the estate" includes all rights of action that debtor may have arising from contract; to extent that contract is in existence when petition is filed, the underlying contract rights become estate property. 11 U.S.C.A. § 541(a).

**[21] Bankruptcy 51 ☞2554**

51 Bankruptcy
    51V The Estate
        51V(C) Property of Estate in General
            51V(C)2 Particular Items and Interests
                51k2552 Rights of Action; Contract Rights
Generally
                51k2554 k. Rights Under Contracts.
Most Cited Cases
Mere fact that, after agreeing to repurchase defaulting buyer's note from bank that financed purchase transaction, and after paying more than $5 million to bank under its note repurchase agreement, seller of printing press had defaulted in its remaining payments, in total amount of $1,425,495.12, did not result in automatic termination of seller's rights under note repurchase agreement or prevent such contractual rights from being included in property of its bankruptcy estate, where note repurchase agreement did not specify that time was of the essence, bank had given no notice prepetition that it was terminating seller's rights under agreement, and bank continued to treat note repurchase agreement as existing contract by filing proof of claim for sums that remained owing under agreement. 11 U.S.C.A. § 541(a).

**[22] Contracts 95 ☞211**

95 Contracts
    95II Construction and Operation
        95II(D) Place and Time
            95k211 k. Time as of the Essence of the
Contract. Most Cited Cases
Under Illinois law, when time is not of the essence, failure to perform in time specified does not terminate parties' rights under contract, and does not preclude recovery on contract.

**[23] Contracts 95 ☞211**

95 Contracts

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

95II Construction and Operation
    95II(D) Place and Time
        95k211 k. Time as of the Essence of the
Contract. Most Cited Cases
Under Illinois contract law, time is generally not of the
essence unless made so by express stipulation of parties
or by virtue of exigencies of transaction itself.

**[24] Subrogation 366 €─32**

366 Subrogation
    366k32 k. Benefit of Remedies of Creditor. Most
Cited Cases
Under Illinois law, subrogee generally acquires all
rights, securities, and remedies that creditor has against
debtor who is primarily liable; his right of subrogation,
while not superior to rights of original creditor, extends
to the latter's rights, both direct and incidental.

**[25] Bankruptcy 51 €─2394.1**

51 Bankruptcy
    51IV Effect of Bankruptcy Relief; Injunction and
Stay
        51IV(B) Automatic Stay
            51k2394 Proceedings, Acts, or Persons
Affected
            51k2394.1 k. In General. Most Cited Cases
Bank from which bankrupt seller had agreed to
repurchase a defaulting buyer's note, and to which
debtor-seller had already paid more than $5 million
under note repurchase agreement at time of debtor's
bankruptcy filing, violated automatic stay when, fearful
that it would recover only pennies on the dollar in
connection with the $1,425,495.12 still owing under note
repurchase agreement, it agreed to sell buyer's
promissory note for $1.1 million to foreign company
affiliated with buyer, without proper notice to
debtor-seller, even though it knew that it was thereby
impairing debtor-seller's rights against buyer and debtor's
ability to collect the $2.7 million that buyer had agreed
to pay for release of debtor's interest in the sold
equipment; by selling buyer's note without proper notice

to debtor that had paid more than $5 million therefor,
bank exercised control over estate assets to further its
own interests at other creditors' expense. 11 U.S.C.A. §
362(a)(3).

**[26] Bankruptcy 51 €─2391**

51 Bankruptcy
    51IV Effect of Bankruptcy Relief; Injunction and
Stay
        51IV(B) Automatic Stay
            51k2391 k. In General. Most Cited Cases

**Bankruptcy 51 €─2394.1**

51 Bankruptcy
    51IV Effect of Bankruptcy Relief; Injunction and
Stay
        51IV(B) Automatic Stay
            51k2394 Proceedings, Acts, or Persons
Affected
            51k2394.1 k. In General. Most Cited Cases
Automatic stay is extremely broad in scope and applies
to almost any type of formal or informal action taken
against debtor or property of the estate. 11 U.S.C.A. §
362(a).

**[27] Bankruptcy 51 €─2467**

51 Bankruptcy
    51IV Effect of Bankruptcy Relief; Injunction and
Stay
        51IV(D) Enforcement of Injunction or Stay
            51k2467 k. Damages and Attorney Fees. Most
Cited Cases
"Willful" violation of automatic stay does not require
that creditor have the specific intent to violate stay;
rather, creditor can be subject to liability for "willfully"
violating stay if creditor engages in conduct which
violates stay, with knowledge that a bankruptcy petition
has been filed. 11 U.S.C.A. § 362(h).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

Page 8

**[28] Bankruptcy 51 ⚬2467**

51 Bankruptcy
    51IV Effect of Bankruptcy Relief; Injunction and Stay
        51IV(D) Enforcement of Injunction or Stay
        51k2467 k. Damages and Attorney Fees. Most Cited Cases
Creditor may "willfully" violate automatic stay, and subject himself to damages award, even if creditor believes himself justified in taking the actions found to violate stay. 11 U.S.C.A. § 362(h).

**[29] Bankruptcy 51 ⚬2467**

51 Bankruptcy
    51IV Effect of Bankruptcy Relief; Injunction and Stay
        51IV(D) Enforcement of Injunction or Stay
        51k2467 k. Damages and Attorney Fees. Most Cited Cases
Ignorance of bankruptcy law does not excuse anyone involved in willful violation of automatic stay or prevent award of damages against him. 11 U.S.C.A. § 362(h).

**[30] Bankruptcy 51 ⚬2467**

51 Bankruptcy
    51IV Effect of Bankruptcy Relief; Injunction and Stay
        51IV(D) Enforcement of Injunction or Stay
        51k2467 k. Damages and Attorney Fees. Most Cited Cases
When willful violation of automatic stay is found, the Bankruptcy Code permits debtor to recover damages, including attorney fees and costs, that were necessarily and reasonably incurred by reason thereof. 11 U.S.C.A. § 362(h).

**[31] Bankruptcy 51 ⚬2394.1**

51 Bankruptcy
    51IV Effect of Bankruptcy Relief; Injunction and Stay
        51IV(B) Automatic Stay
        51k2394 Proceedings, Acts, or Persons Affected
        51k2394.1 k. In General. Most Cited Cases
Mere fact that bank, in selling defaulting buyer's note to foreign company affiliated with buyer, may have inserted language in note purchase agreement to effect that sale of note would not affect rights of bankrupt seller that had already paid more than $5 million to bank under earlier note repurchase agreement executed upon buyer's default did not alter fact that bank, by selling note without proper notice to debtor-seller to avoid recovering only pennies on the $1,425,495.12 that remained owing under their original note repurchase agreement, had exercised control over estate property to benefit itself at other creditors' expense in manner violative of automatic stay, where bank knew that, despite this limiting language, sale of note to entity affiliated with buyer would virtually eliminate debtor's ability to collect the $2.7 million which buyer had agreed to pay for release of debtor's interest in the sold equipment. 11 U.S.C.A. § 362(a)(3).

**[32] Bankruptcy 51 ⚬3568(2)**

51 Bankruptcy
    51XIV Reorganization
        51XIV(B) The Plan
        51k3566 Confirmation; Objections
        51k3568 Effect
        51k3568(2) k. Conclusiveness. Most Cited Cases
Bankrupt equipment seller's failure in its prior Chapter 11 case to schedule any interest in note which it agreed to repurchase from bank following buyer's default did not bar trustee in current Chapter 7 case, on res judicata grounds, from seeking to recover for bank's willful violation of stay in interfering with debtor-seller's contractual and subrogation rights by selling note,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

351 B.R. 529                                                    Page 9
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

without proper notice to debtor, to foreign entity affiliated with buyer; trustee had no control over debtor's schedules in earlier Chapter 11 case and was not in privity with debtor, completion of debtor's schedules in earlier case did not constitute a cause of action that possessed requisite identity with current stay litigation, and order confirming plan, while a final order, could not be presumed to have effected final judgment on merits regarding debtor's rights in note.

**[33] Judgment 228 ⬌540**

228 Judgment
    228XIII Merger and Bar of Causes of Action and Defenses
        228XIII(A) Judgments Operative as Bar
            228k540 k. Nature and Requisites of Former Recovery as Bar in General. Most Cited Cases
Three elements be satisfied for claim to be precluded under doctrine of res judicata: (1) identity of parties or their privies; (2) identity of causes of action; and (3) a final judgment on merits.

**[34] Judgment 228 ⬌675(1)**

228 Judgment
    228XIV Conclusiveness of Adjudication
        228XIV(B) Persons Concluded
            228k675 Persons Participating in or Promoting Action or Defense
                228k675(1) k. In General. Most Cited Cases
To justify preclusion under theory of privity, non-party must have "actual control" over earlier action, i.e., effective choice as to legal theories and proofs to be advanced on behalf of party to that action.

**[35] Judgment 228 ⬌585(2)**

228 Judgment
    228XIII Merger and Bar of Causes of Action and Defenses
        228XIII(B) Causes of Action and Defenses Merged, Barred, or Concluded
            228k585 Identity of Cause of Action in General
            228k585(2) k. What Constitutes Identical Causes. Most Cited Cases
Claim has "identity" with a previously litigated matter, for res judicata purposes, if it emerges from same core of operative facts as that earlier action.

**[36] Bankruptcy 51 ⬌3568(2)**

51 Bankruptcy
    51XIV Reorganization
        51XIV(B) The Plan
            51k3566 Confirmation; Objections
                51k3568 Effect
                    51k3568(2) k. Conclusiveness. Most Cited Cases
Bankrupt equipment seller's failure, in its prior Chapter 11 case, to schedule any interest in note which it had agreed to repurchase from bank following buyer's default did not bar trustee in current Chapter 7 case, under principles of judicial estoppel, from seeking to recover for bank's willful violation of automatic stay in interfering with debtor-seller's contractual and subrogation rights by selling note to foreign entity affiliated with buyer; court could not presume that debtor adopted inconsistent position in prior case, where neither the earlier Chapter 11 plan nor any order relating to plan was entered into evidence.

**[37] Bankruptcy 51 ⬌2391**

51 Bankruptcy
    51IV Effect of Bankruptcy Relief; Injunction and Stay
        51IV(B) Automatic Stay
            51k2391 k. In General. Most Cited Cases
Purposes of automatic stay are: (1) to protect debtor from its prepetition creditors by stopping all collection efforts, all harassment, and all foreclosure actions; and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

Page 10

(2) to protect all creditors by ensuring that estate will be preserved against attempts by other creditors to gain an unfair advantage with respect to payment of claims. 11 U.S.C.A. § 362(a).

**[38] Bankruptcy 51 €═2001**

51 Bankruptcy
    51I In General
        51I(A) In General
            51k2001 k. In General. Most Cited Cases
One of principal means by which bankruptcy law operates is to concentrate, in single forum, disputes affecting debtor's solvency and continuing operations.

**[39] Bankruptcy 51 €═2461**

51 Bankruptcy
    51IV Effect of Bankruptcy Relief; Injunction and Stay
        51IV(D) Enforcement of Injunction or Stay
            51k2461 k. In General. Most Cited Cases
Bank from which bankrupt seller had agreed to repurchase a defaulting buyer's note, and to which debtor-seller had already paid more than $5 million under note repurchase agreement at time of seller's Chapter 11 filing, "willfully" violated automatic stay when, fearful that it would recover only pennies on the dollar in connection with sums still owing under note repurchase agreement, it agreed to sell buyer's promissory note million to foreign company affiliated with buyer and thereby impaired debtor-seller's rights against buyer and debtor's ability to collect the $2.7 million that buyer had agreed to pay for release of debtor's interest in the sold equipment, even though bank's agents may have believed that they were simply exercising bank's ownership interest in note. 11 U.S.C.A. § 362(h).

**[40] Bankruptcy 51 €═2461**

51 Bankruptcy
    51IV Effect of Bankruptcy Relief; Injunction and Stay
        51IV(D) Enforcement of Injunction or Stay
            51k2461 k. In General. Most Cited Cases
In determining whether a stay violation was "willful," it is irrelevant whether the party violating stay by exercising control over property believed in good faith that it had right to property at issue. 11 U.S.C.A. § 362(h).

**[41] Bankruptcy 51 €═2461**

51 Bankruptcy
    51IV Effect of Bankruptcy Relief; Injunction and Stay
        51IV(D) Enforcement of Injunction or Stay
            51k2461 k. In General. Most Cited Cases
Not even a good faith mistake of law or legitimate dispute as to legal rights relieve a willful violator of automatic stay of consequences of his act. 11 U.S.C.A. § 362(h).

**[42] Bankruptcy 51 €═2461**

51 Bankruptcy
    51IV Effect of Bankruptcy Relief; Injunction and Stay
        51IV(D) Enforcement of Injunction or Stay
            51k2461 k. In General. Most Cited Cases
Stay violation may be "willful," even if the party violating stay misconstrues scope of stay and its listed exceptions, or otherwise believes he is justified in his actions. 11 U.S.C.A. § 362(h).

**[43] Bankruptcy 51 €═2392**

51 Bankruptcy
    51IV Effect of Bankruptcy Relief; Injunction and Stay
        51IV(B) Automatic Stay

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

51k2392 k. Property and Claims Subject to Stay. Most Cited Cases

Although creditors are permitted to transfer a claim or interest against debtor's estate to third party without violating stay, they are not permitted to sell property of the estate without seeking relief from stay. 11 U.S.C.A. § 362(a); Fed.Rules Bankr.Proc.Rule 3001, 11 U.S.C.A.

**[44] Bankruptcy 51 ☞2394.1**

51 Bankruptcy
    51IV Effect of Bankruptcy Relief; Injunction and Stay
        51IV(B) Automatic Stay
            51k2394 Proceedings, Acts, or Persons Affected
            51k2394.1 k. In General. Most Cited Cases

Bank, by giving notice of Chapter 7 debtor's default under note repurchase agreement, did not thereby violate automatic stay, where debtor did not make any payments in response to these notices, and notices were not shown to have any coercive or harassing effect. 11 U.S.C.A. § 362(a).

**[45] Bankruptcy 51 ☞2394.1**

51 Bankruptcy
    51IV Effect of Bankruptcy Relief; Injunction and Stay
        51IV(B) Automatic Stay
            51k2394 Proceedings, Acts, or Persons Affected
            51k2394.1 k. In General. Most Cited Cases

**Bankruptcy 51 ☞2395**

51 Bankruptcy
    51IV Effect of Bankruptcy Relief; Injunction and Stay
        51IV(B) Automatic Stay
            51k2394 Proceedings, Acts, or Persons Affected
            51k2395 k. Judicial Proceedings in General. Most Cited Cases

**Bankruptcy 51 ☞2397(2)**

51 Bankruptcy
    51IV Effect of Bankruptcy Relief; Injunction and Stay
        51IV(B) Automatic Stay
            51k2394 Proceedings, Acts, or Persons Affected
            51k2397 Mortgages or Liens
            51k2397(2) k. Foreclosure Proceedings. Most Cited Cases

Respite that automatic stay provides to debtors is not from communication with creditors, but from threat of immediate action by creditors, such as foreclosure or lawsuit. 11 U.S.C.A. § 362(a).

**[46] Bankruptcy 51 ☞2394.1**

51 Bankruptcy
    51IV Effect of Bankruptcy Relief; Injunction and Stay
        51IV(B) Automatic Stay
            51k2394 Proceedings, Acts, or Persons Affected
            51k2394.1 k. In General. Most Cited Cases

Mere presentment and other requests for payment unaccompanied by coercion or harassment are not barred by automatic stay. 11 U.S.C.A. § 362(a).

**[47] Bankruptcy 51 ☞2467**

51 Bankruptcy
    51IV Effect of Bankruptcy Relief; Injunction and Stay
        51IV(D) Enforcement of Injunction or Stay
            51k2467 k. Damages and Attorney Fees. Most Cited Cases

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

Trustee of corporate debtor's Chapter 7 estate had standing, under Code provision authorizing any "individual" damaged by willful violation of automatic stay to recover any resulting damages, to recover actual damages sustained by debtor's individual bankruptcy estate as result of bank's willful violation of automatic stay. 11 U.S.C.A. § 362(h).

**[48] Bankruptcy 51 ☜2394.1**

51 Bankruptcy
    51IV Effect of Bankruptcy Relief; Injunction and Stay
        51IV(B) Automatic Stay
            51k2394 Proceedings, Acts, or Persons Affected
            51k2394.1 k. In General. Most Cited Cases
Automatic stay applies to all debtors, including corporate debtors. 11 U.S.C.A. § 362(a).

**[49] Bankruptcy 51 ☜2461**

51 Bankruptcy
    51IV Effect of Bankruptcy Relief; Injunction and Stay
        51IV(D) Enforcement of Injunction or Stay
            51k2461 k. In General. Most Cited Cases
Automatic stay is linchpin of relief provided by the Bankruptcy Code, and it is incumbent on bankruptcy court to vindicate application of stay and to deter further violations. 11 U.S.C.A. § 362(a).

**[50] Bankruptcy 51 ☜2465.1**

51 Bankruptcy
    51IV Effect of Bankruptcy Relief; Injunction and Stay
        51IV(D) Enforcement of Injunction or Stay
            51k2465 Contempt
                51k2465.1 k. In General. Most Cited Cases
Regardless of whether the word "individual," as used in

Code provision authorizing any "individual" damaged by willful violation of automatic stay to recover any resulting damages, was broad enough to include Chapter 7 trustee suing to recover actual damages sustained by debtor's estate as result of bank's willful violation of automatic stay, trustee was entitled to damages, including reasonable and necessary attorney fees and costs, in exercise of bankruptcy court's civil contempt power. 11 U.S.C.A. §§ 105(a), 362(h).

**[51] Bankruptcy 51 ☜2465.1**

51 Bankruptcy
    51IV Effect of Bankruptcy Relief; Injunction and Stay
        51IV(D) Enforcement of Injunction or Stay
            51k2465 Contempt
                51k2465.1 k. In General. Most Cited Cases
Violation of automatic stay is punishable as contempt of court. 11 U.S.C.A. § 362(a).

**[52] Contempt 93 ☜30**

93 Contempt
    93II Power to Punish, and Proceedings Therefor
        93k30 k. Nature and Grounds of Power. Most Cited Cases
Power of contempt is inherent in all courts.

**[53] Bankruptcy 51 ☜2126**

51 Bankruptcy
    51II Courts; Proceedings in General
        51II(A) In General
            51k2124 Power and Authority
                51k2126 k. Carrying Out Provisions of Code. Most Cited Cases
Bankruptcy statute authorizing court to enter "necessary or appropriate" orders grants broad powers to bankruptcy courts to implement the provisions of title 11 and to prevent abuse of bankruptcy process. 11 U.S.C.A.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

§ 105(a).

**[54] Contempt 93 ⚮70**

93 Contempt
   93III Punishment
      93k70 k. Nature and Grounds in General. Most Cited Cases

**Contempt 93 ⚮74**

93 Contempt
   93III Punishment
      93k73 Indemnity to Party Injured
         93k74 k. In General. Most Cited Cases
Civil contempt sanctions are designed for dual purposes of compelling compliance with court order and compensating the complainant for losses caused by contemptuous actions.

**[55] Contempt 93 ⚮68**

93 Contempt
   93II Power to Punish, and Proceedings Therefor
      93k68 k. Costs and Fees. Most Cited Cases
Upon finding of civil contempt, court may, in its discretion, order reimbursement of fees and expenses incurred by complainant in bringing the violation to court's attention.

**[56] Secured Transactions 349A ⚮165**

349A Secured Transactions
   349AIV Rights and Liabilities of Parties
      349Ak164 Use and Disposition of Collateral or Proceeds
         349Ak165 k. Care of Collateral and Negligence of Secured Party. Most Cited Cases
Bank that held promissory note signed by buyer in connection with its purchase of printing press, and that continued to hold this note even after seller of press, upon being advised of buyer's default, entered into agreement with bank to repurchase note and paid more than $5 million to bank pursuant to this note repurchase agreement, had obligation under Illinois law to take reasonable care to preserve value of note, in which seller had rights pursuant to repurchase agreement, and was liable to trustee of seller's Chapter 7 estate for failing to exercise such reasonable care when, fearful that it would recover only pennies on the dollar in connection with the $1,425,495.12 still owing under repurchase agreement when seller filed for bankruptcy, it agreed to sell buyer's promissory note for $1.1 million to foreign company affiliated with buyer, without proper notice to debtor-seller, even though it knew that it was thereby impairing seller's rights against buyer under note. S.H.A. 810 ILCS 5/9-207.

**[57] Pledges 303 ⚮28**

303 Pledges
   303k28 k. Care of Property and Negligence of Pledgee. Most Cited Cases
Under Illinois law, holder of collateral security is bound to exercise ordinary diligence to preserve validity and pecuniary value thereof.

**[58] Pledges 303 ⚮30(2)**

303 Pledges
   303k30 Enforcement of Right of Action Pledged and Failure to Collect or Fix Liability
      303k30(2) k. Power and Duty of Pledgee to Enforce. Most Cited Cases
Under Illinois law, pledgee who has received instruments representing claims of the pledgor against third persons is under a duty to use reasonable diligence to preserve and collect those claims or to enable pledgor to do so.

**[59] Pledges 303 ⚮30(2)**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

351 B.R. 529                                                      Page 14
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

303 Pledges
   303k30 Enforcement of Right of Action Pledged and
Failure to Collect or Fix Liability
      303k30(2) k. Power and Duty of Pledgee to
Enforce. Most Cited Cases
Under Illinois law, one who holds commercial paper as
collateral security cannot, except perhaps in very
extreme cases, compromise with maker of that collateral
and surrender the same for less than amount due thereon,
and if he does so, then he is bound to account to the
pledgor.

**[60] Assignments 38 ☞18**

38 Assignments
   38I Property, Estates, and Rights Assignable
      38k17 Executory Contracts
         38k18 k. In General. Most Cited Cases
Under non-bankruptcy law, rights and duties under
contract are generally freely assignable; however, there
are exceptions to this rule.

**[61] Assignments 38 ☞18**

38 Assignments
   38I Property, Estates, and Rights Assignable
      38k17 Executory Contracts
         38k18 k. In General. Most Cited Cases
In general, unless parties have agreed otherwise, contract
rights are freely assignable, unless assignment would
materially change duties of obligor, increase obligor's
risk or impair obligor's chance of obtaining return
performance.

**[62] Trover and Conversion 389 ☞50**

389 Trover and Conversion
   389II Actions
      389II(D) Damages

         389k43 Value of Property
            389k50 k. Rights of Action and Evidences
of Indebtedness. Most Cited Cases

**Trover and Conversion 389 ☞53**

389 Trover and Conversion
   389II Actions
      389II(D) Damages
         389k53 k. Interest on Value of Property. Most
Cited Cases
Prima facie measure of damages in action for conversion
of promissory note is amount which the maker of note
agreed to pay and interest; however, where note was
pledged, amount of pledgor's debt to pledgee is deducted
in arriving at amounts recoverable.

**[63] Bankruptcy 51 ☞2588**

51 Bankruptcy
   51V The Estate
      51V(D) Liens and Transfers; Avoidability
         51k2588 k. Post-Petition Transactions. Most
Cited Cases
Cause of action to avoid transfer as unauthorized
postpetition transfer has four elements: (1) that property
was transferred; (2) that property was property of
bankruptcy estate; (3) that transfer occurred after
commencement of bankruptcy case; and (4) that neither
the bankruptcy court nor the Bankruptcy Code
authorized transfer. 11 U.S.C.A. § 549(a).

**[64] Bankruptcy 51 ☞2726.1(1)**

51 Bankruptcy
   51V The Estate
      51V(H) Avoidance Rights
         51V(H)2 Proceedings
            51k2725 Evidence
               51k2726.1 Burden of Proof
                  51k2726.1(1) k. In General. Most

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

Cited Cases

Burden of proof in cause of action to avoid transfer as unauthorized postpetition transfer falls, not on trustee seeking to avoid transfer, but on party claiming that transfer is valid. 11 U.S.C.A. § 549(a).

**[65] Bankruptcy 51 ☞2588**

51 Bankruptcy
    51V The Estate
        51V(D) Liens and Transfers; Avoidability
            51k2588 k. Post-Petition Transactions. Most Cited Cases
Bank from which bankrupt seller had agreed to repurchase a defaulting buyer's note, and to which debtor-seller had already paid more than $5 million under note repurchase agreement at time of debtor's bankruptcy filing, was liable to Chapter 7 trustee on unauthorized postpetition transfer theory when, without proper notice to debtor-seller or authorization from bankruptcy court, it sold buyer's note to entity affiliated with buyer for considerably less than face value of note and thereby interfered, postbankruptcy, with debtor's rights in note. 11 U.S.C.A. § 549(a).

**[66] Estoppel 156 ☞52(1)**

156 Estoppel
    156III Equitable Estoppel
        156III(A) Nature and Essentials in General
            156k52 Nature and Application of Estoppel in Pais
                156k52(1) k. In General. Most Cited Cases
Purpose of equitable estoppel under Illinois law is to prevent party from benefiting from that party's contrary misrepresentation.

**[67] Estoppel 156 ☞68(2)**

156 Estoppel
    156III Equitable Estoppel

        156III(B) Grounds of Estoppel
            156k68 Claim or Position in Judicial Proceedings
                156k68(2) k. Claim Inconsistent with Previous Claim or Position in General. Most Cited Cases
Under Illinois law, party is estopped merely by fact of having alleged or admitted in his pleadings in a former proceeding under oath the contrary of the assertion sought to be made.

**[68] Bankruptcy 51 ☞3568(2)**

51 Bankruptcy
    51XIV Reorganization
        51XIV(B) The Plan
            51k3566 Confirmation; Objections
                51k3568 Effect
                    51k3568(2) k. Conclusiveness. Most Cited Cases
Bankrupt equipment seller's failure, in its prior Chapter 11 case, to schedule any interest in note which it had agreed to repurchase from bank following buyer's default did not estop trustee in debtor's current Chapter 7 case from asserting that debtor had interest in note, for purpose of asserting claim against bank for interfering with that interest; prior declarations by debtor were not admissible against trustee.

**[69] Bankruptcy 51 ☞2422.5(4.1)**

51 Bankruptcy
    51IV Effect of Bankruptcy Relief; Injunction and Stay
        51IV(C) Relief from Stay
            51k2422 Cause; Grounds and Objections
                51k2422.5 In General
                    51k2422.5(4) Particular Cases
                        51k2422.5(4.1) k. In General. Most Cited Cases
Mere fact that bank may have advised Chapter 7 debtor with interest in promissory note of potential postpetition sale thereof did not mean that debtor, by failing to object to the sale, waived right to pursue claims against bank

351 B.R. 529                                                                                  Page 16
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

for violating automatic stay, where bank did not provide debtor with copy of sales agreement or make debtor aware of fact that, as result of bank's sale of note for considerably less than its face value to foreign entity affiliated with maker, debtor would lose all of its rights in note. 11 U.S.C.A. § 362.

**[70] Equity 150 ☞72(1)**

150 Equity
    150II Laches and Stale Demands
        150k68 Grounds and Essentials of Bar
            150k72 Prejudice from Delay in General
                150k72(1) k. In General. Most Cited Cases
Laches is established whenever claimant unreasonably delays in pursuing its rights and harm is thereby caused to other party.

**[71] Bankruptcy 51 ☞2461**

51 Bankruptcy
    51IV Effect of Bankruptcy Relief; Injunction and Stay
        51IV(D) Enforcement of Injunction or Stay
            51k2461 k. In General. Most Cited Cases
Chapter 7 debtor and trustee were not barred by laches from pursuing claim against bank for violating automatic stay in connection with sale of promissory note in which debtor had interest, though debtor failed to object to sale when allegedly notified thereof, where bank did not provide debtor with copy of sales agreement or make debtor aware of fact that, as result of bank's sale of note for considerably less than its face value to foreign entity affiliated with maker, debtor would lose all of its rights in note, and where, even assuming that debtor had proper notice, bank failed to provide notice to any other interested parties that it was engaging in postpetition sale of property in which estate had interest. 11 U.S.C.A. § 362(a).

**[72] Damages 115 ☞62(4)**

115 Damages
    115III Grounds and Subjects of Compensatory Damages
        115III(B) Aggravation, Mitigation, and Reduction of Loss
            115k62 Duty of Person Injured to Prevent or Reduce Damage
                115k62(4) k. Breach of Contract. Most Cited Cases
Doctrine of avoidable consequences requires the non-breaching party in contract case to take reasonable steps to mitigate damages after alleged breach and prohibits that party from recovering those damages which it should have acted to prevent.

**[73] Damages 115 ☞62(1)**

115 Damages
    115III Grounds and Subjects of Compensatory Damages
        115III(B) Aggravation, Mitigation, and Reduction of Loss
            115k62 Duty of Person Injured to Prevent or Reduce Damage
                115k62(1) k. In General. Most Cited Cases
Under Illinois mitigation of damages doctrine, injured party is not allowed to recover from wrongdoer those damages which the party should have foreseen and could have avoided without undue risk, burden or humiliation.

**[74] Bankruptcy 51 ☞2467**

51 Bankruptcy
    51IV Effect of Bankruptcy Relief; Injunction and Stay
        51IV(D) Enforcement of Injunction or Stay
            51k2467 k. Damages and Attorney Fees. Most Cited Cases
Chapter 7 debtor, by failing to object to bank's postpetition sale of promissory note in which it had interest after allegedly being notified by bank of potential sale, did not fail to mitigate its damages, so as to be barred from thereafter suing bank for interfering

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

with its rights in note in alleged violation of automatic stay, where bank did not provide debtor with copy of sales agreement or make debtor aware of fact that, as result of bank's sale of note for considerably less than its face value to foreign entity affiliated with maker, debtor would lose all of its rights in note. 11 U.S.C.A. § 362.

## [75] Declaratory Judgment 118A ☜100

118A Declaratory Judgment
    118AII Subjects of Declaratory Relief
        118AII(B) Status and Legal Relations
            118Ak100 k. Debtors and Creditors. Most Cited Cases
Chapter 7 trustee who had asserted substantive claims for relief, based on bank's alleged willful violation of automatic stay and unauthorized postpetition transfer, was not also entitled to declaratory relief, where rights and interests of parties could be determined through resolution of these substantive claims.

## [76] Implied and Constructive Contracts 205H ☜3

205H Implied and Constructive Contracts
    205HI Nature and Grounds of Obligation
        205HI(A) In General
            205Hk2 Constructive or Quasi Contracts
                205Hk3 k. Unjust Enrichment. Most Cited Cases
To state cause of action under Illinois law based on theory of unjust enrichment, plaintiff must allege that defendant has unjustly retained a benefit to plaintiff's detriment, and that defendant's retention of that benefit violates fundamental principles of justice, equity and good conscience.

## [77] Implied and Constructive Contracts 205H ☜3

205H Implied and Constructive Contracts
    205HI Nature and Grounds of Obligation
        205HI(A) In General
            205Hk2 Constructive or Quasi Contracts
                205Hk3 k. Unjust Enrichment. Most Cited Cases
Defendant's retention of benefit conferred on him by third party may be seen as "unjust," so as to support cause of action under Illinois law to recover upon theory of unjust enrichment, where: (1) benefit should have been given to plaintiff, but third party mistakenly gave it to defendant instead; (2) defendant procured benefit from third party through some type of wrongful conduct; or (3) plaintiff for some other reason had better claim to the benefit than defendant.

## [78] Implied and Constructive Contracts 205H ☜55

205H Implied and Constructive Contracts
    205HI Nature and Grounds of Obligation
        205HI(D) Effect of Express Contract
            205Hk55 k. In General. Most Cited Cases
Bank was not "unjustly enriched" by sale of buyer's promissory note, as required to allow trustee of bankrupt equipment seller's Chapter 7 estate to recover sales proceeds on unjust enrichment theory, though seller had previously agreed to repurchase note from bank and had paid more than $5 million of repurchase price, where note repurchase agreement expressly provided that bank would be obligated to transfer note to seller only when it was paid in full, and seller still owed more than $1.4 million under repurchase agreement at time of challenged sale; doctrine of unjust enrichment was not available to relieve debtor-seller of its bad bargain.

## [79] Implied and Constructive Contracts 205H ☜3

205H Implied and Constructive Contracts
    205HI Nature and Grounds of Obligation
        205HI(A) In General
            205Hk2 Constructive or Quasi Contracts
                205Hk3 k. Unjust Enrichment. Most Cited Cases
Under Illinois law, party is not "unjustly enriched" when it keeps proceeds from sale of its own interests.

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

**[80] Implied and Constructive Contracts 205H ☜55**

205H Implied and Constructive Contracts
    205HI Nature and Grounds of Obligation
        205HI(D) Effect of Express Contract
            205Hk55 k. In General. <u>Most Cited Cases</u>
Under Illinois law, plaintiff cannot pursue unjust enrichment claim when there is enforceable, express contract between parties.

**[81] Implied and Constructive Contracts 205H ☜55**

205H Implied and Constructive Contracts
    205HI Nature and Grounds of Obligation
        205HI(D) Effect of Express Contract
            205Hk55 k. In General. <u>Most Cited Cases</u>
Under Illinois law, doctrine of unjust enrichment does not operate to rescue party from consequence of a bad bargain, and enrichment of one party at expense of another is not "unjust" where it is permissible under terms of express contract.

**[82] Bankruptcy 51 ☜2543**

51 Bankruptcy
    51V The Estate
        51V(C) Property of Estate in General
            51V(C)2 Particular Items and Interests
                51k2543 k. Property Held by Debtor as Trustee, Agent, or Bailee. <u>Most Cited Cases</u>
Trustee of bankrupt equipment seller's Chapter 7 estate was not entitled to entry of order imposing constructive trust on sales proceeds obtained by bank based on its postpetition sale of promissory note that debtor-seller had previously agreed to repurchase following buyer's default, and on which debtor had already paid more than $5 million at time of its bankruptcy filing, where note repurchase agreement expressly provided that bank would be obligated to transfer note back to debtor-seller only when bank was paid in full, and particularly where none of facts on which trustee relied in arguing for constructive trust were present when petition was filed.

**[83] Trusts 390 ☜91**

390 Trusts
    390I Creation, Existence, and Validity
        390I(C) Constructive Trusts
            390k91 k. Nature of Constructive Trust. <u>Most Cited Cases</u>
Constructive trust is one raised by operation of law.

**[84] Trusts 390 ☜94.5**

390 Trusts
    390I Creation, Existence, and Validity
        390I(C) Constructive Trusts
            390k94.5 k. Fraud in General. <u>Most Cited Cases</u>

**Trusts 390 ☜102(1)**

390 Trusts
    390I Creation, Existence, and Validity
        390I(C) Constructive Trusts
            390k102 Breach of Duty by Person in Fiduciary Relation in General
                390k102(1) k. In General. <u>Most Cited Cases</u>
Absent coercion, duress or mistake, constructive trust is generally imposed in only two situations: (1) where actual or constructive fraud is considered as equitable grounds for raising the trust; or (2) where there is a fiduciary duty and subsequent breach of that duty.

**[85] Trusts 390 ☜91**

390 Trusts
    390I Creation, Existence, and Validity
        390I(C) Constructive Trusts
            390k91 k. Nature of Constructive Trust. <u>Most</u>

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

Page 19

Cited Cases
Constructive trust may arise when duress, coercion or mistake is present.

**[86] Trusts 390 ⬬91**

390 Trusts
   390I Creation, Existence, and Validity
      390I(C) Constructive Trusts
         390k91 k. Nature of Constructive Trust. Most Cited Cases
Under Illinois law, constructive trust will be used to compel party who unfairly holds a property interest or money to convey that property to the one to whom it justly belongs.

**[87] Trusts 390 ⬬91**

390 Trusts
   390I Creation, Existence, and Validity
      390I(C) Constructive Trusts
         390k91 k. Nature of Constructive Trust. Most Cited Cases
Under Illinois law, party "unfairly holds" property, so as to permit the imposition of constructive trust thereon, when he would be unjustly enriched if allowed to retain such property.

**[88] Trusts 390 ⬬110**

390 Trusts
   390I Creation, Existence, and Validity
      390I(C) Constructive Trusts
         390k106 Evidence to Establish Trust
            390k110 k. Weight and Sufficiency. Most Cited Cases
Under Illinois law, grounds for imposing constructive trust must be so clear, convincing, strong and unequivocal as to lead to but one conclusion.

**[89] Trusts 390 ⬬91**

390 Trusts
   390I Creation, Existence, and Validity
      390I(C) Constructive Trusts
         390k91 k. Nature of Constructive Trust. Most Cited Cases
Under Illinois law, some form of wrongdoing is prerequisite to imposition of constructive trust.

**[90] Bankruptcy 51 ⬬2547**

51 Bankruptcy
   51V The Estate
      51V(C) Property of Estate in General
         51V(C)2 Particular Items and Interests
            51k2547 k. Property Held in Trust or Custody for Debtor; Deposits. Most Cited Cases
Constructive trust cannot be imposed postbankruptcy, as any rights thereto must have been found under nonbankruptcy law prior to filing of bankruptcy petition.

**[91] Trusts 390 ⬬62**

390 Trusts
   390I Creation, Existence, and Validity
      390I(B) Resulting Trusts
         390k62 k. Nature of Resulting Trust. Most Cited Cases
Under Illinois law, "resulting trust" is an intent-enforcing trust, which arises from presumed intent of parties.

**[92] Trusts 390 ⬬62**

390 Trusts
   390I Creation, Existence, and Validity
      390I(B) Resulting Trusts
         390k62 k. Nature of Resulting Trust. Most Cited Cases

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

**Trusts 390 ☜91**

390 Trusts
    390I Creation, Existence, and Validity
      390I(C) Constructive Trusts
        390k91 k. Nature of Constructive Trust. Most Cited Cases
"Resulting trust," unlike a "constructive trust," seeks to carry out a donative intent rather than to thwart an unjust scheme.

**[93] Trusts 390 ☜72**

390 Trusts
    390I Creation, Existence, and Validity
      390I(B) Resulting Trusts
        390k71 Payment of Consideration for Conveyance to Another
          390k72 k. In General. Most Cited Cases
General rule is that when transfer of property is made to one person and purchase price is paid by another, resulting trust arises in favor of the person by whom purchase price is paid.

**[94] Trusts 390 ☜63.9**

390 Trusts
    390I Creation, Existence, and Validity
      390I(B) Resulting Trusts
        390k63.9 k. Creation and Existence in General. Most Cited Cases
Under Illinois law, resulting trust arises and vests, if at all, at time legal title is taken by the asserted trustee.

**[95] Trusts 390 ☜86**

390 Trusts
    390I Creation, Existence, and Validity

      390I(B) Resulting Trusts
        390k85 Evidence to Establish Trust
          390k86 k. Presumptions and Burden of Proof. Most Cited Cases

**Trusts 390 ☜89(5)**

390 Trusts
    390I Creation, Existence, and Validity
      390I(B) Resulting Trusts
        390k85 Evidence to Establish Trust
          390k89 Weight and Sufficiency
            390k89(5) k. Degree of Proof Required. Most Cited Cases
Under Illinois law, burden of proof to establish a resulting trust is on party claiming it, and evidence must be clear and convincing; if doubtful or susceptible to other interpretations, then evidence is insufficient to show resulting trust.

**[96] Bankruptcy 51 ☜2547**

51 Bankruptcy
    51V The Estate
      51V(C) Property of Estate in General
        51V(C)2 Particular Items and Interests
          51k2547 k. Property Held in Trust or Custody for Debtor; Deposits. Most Cited Cases
Trustee of bankrupt equipment seller's Chapter 7 estate was not entitled to entry of order imposing a resulting trust on sales proceeds obtained by bank based upon its postpetition sale of promissory note that debtor-seller had previously agreed to repurchase following buyer's default, and on which debtor had already paid more than $5 million at time of its bankruptcy filing, where, pursuant to terms of note repurchase agreement, bank was obligated to transfer note back to debtor-seller only when it was paid in full and retained title to note until it received full payment.

**[97] Contracts 95 ☜93(1)**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

Page 21

95 Contracts
   95I Requisites and Validity
     95I(E) Validity of Assent
      95k93 Mistake
       95k93(1) k. In General. Most Cited Cases

**Contracts 95 ☞94(1)**

95 Contracts
   95I Requisites and Validity
     95I(E) Validity of Assent
      95k94 Fraud and Misrepresentation
       95k94(1) k. In General. Most Cited Cases

**Contracts 95 ☞261(2)**

95 Contracts
   95IV Rescission and Abandonment
     95k257 Grounds for Rescission by Party
      95k261 Failure of Performance or Breach
       95k261(2) k. What Breach Will Authorize
Rescission in General. Most Cited Cases
Under Illinois law, rescission is available only where
contract is procured by fraud or misrepresentation,
where it is based on material mistake or in presence of
substantial non-performance or breach of contract by
party.

**[98] Bankruptcy 51 ☞3101**

51 Bankruptcy
   51IX Administration
     51IX(C) Debtor's Contracts and Leases
      51k3101 k. In General. Most Cited Cases
Chapter 7 trustee was not entitled to rescind debtor's
prepetition note repurchase agreement based on other
party's alleged substantial nonperformance in selling its
interest in note to third party, where note repurchase
agreement expressly provided that other party was
obligated to transfer note back to debtor only when it
was paid in full, and debtor had not only failed to satisfy

this "full payment" condition, thereby triggering other
party's obligation to reconvey, but was itself in default of
its obligations under note repurchase agreement when
bankruptcy petition was filed.

**[99] Bankruptcy 51 ☞2133**

51 Bankruptcy
   51II Courts; Proceedings in General
     51II(A) In General
      51k2127 Procedure
       51k2133 k. Orders. Most Cited Cases

**Bankruptcy 51 ☞2162**

51 Bankruptcy
   51II Courts; Proceedings in General
     51II(B) Actions and Proceedings in General
      51k2162 k. Pleading; Dismissal. Most Cited
Cases
Chapter 7 trustee waived his tortious interference claims
against bank by failing to plead them in his initial or
amended complaint and by failing to discuss claims in
proposed findings of fact and conclusions of law
submitted pretrial in accordance with bankruptcy court's
final pretrial order.

**[100] Bankruptcy 51 ☞2133**

51 Bankruptcy
   51II Courts; Proceedings in General
     51II(A) In General
      51k2127 Procedure
       51k2133 k. Orders. Most Cited Cases
Final pretrial orders are designed to prevent unfair
surprise and give parties an opportunity to fairly prepare
for and defend against new claims.

**[101] Damages 115 ☞184**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

115 Damages
    115IX Evidence
        115k183 Weight and Sufficiency
            115k184 k. In General. Most Cited Cases
In general, plaintiff has burden of proving damages to a reasonable degree of certainty.

**[102] Damages 115 ☞184**

115 Damages
    115IX Evidence
        115k183 Weight and Sufficiency
            115k184 k. In General. Most Cited Cases
Damages must be proven, and not just dreamed; however, some degree of speculation is permissible in computing damages, since reasonable doubts as to remedy ought to be resolved against wrongdoer.

**[103] Damages 115 ☞184**

115 Damages
    115IX Evidence
        115k183 Weight and Sufficiency
            115k184 k. In General. Most Cited Cases
Damages cannot be based on pure speculation or guesswork, but they also need not be proven with certainty of calculus.

**[104] Damages 115 ☞184**

115 Damages
    115IX Evidence
        115k183 Weight and Sufficiency
            115k184 k. In General. Most Cited Cases
Under Illinois law, once existence of damages is established, the evidence need only tend to show a basis for computation of damages with fair degree of probability.

**[105] Bankruptcy 51 ☞2467**

51 Bankruptcy
    51IV Effect of Bankruptcy Relief; Injunction and Stay
        51IV(D) Enforcement of Injunction or Stay
            51k2467 k. Damages and Attorney Fees. Most Cited Cases
Appropriate measure of damages for bank's willful violation of automatic stay when, having already collected more than $5 million from bankrupt seller on its agreement to repurchase defaulting buyer's note, it sold note to foreign entity affiliated with buyer for a sum approaching the amount still owed by debtor-seller under note repurchase agreement, in order to avoid receiving only pennies on the dollar in debtor-seller's bankruptcy case, and thereby prevented debtor from collecting the $2.7 million that buyer had agreed to pay for release of debtor's interest in the sold equipment, was difference between this $2.7 million and the roughly $1.5 million still owed under note repurchase agreement, plus attorney fees and costs; unlike other speculative damage measures proposed by trustee, there was reasonable certainty that debtor-seller, but for bank's interference, could have used funds provided by buyer in connection with negotiated $2.7 million settlement to acquire note from bank, satisfy its obligations under settlement, and net roughly $1.2 million. 11 U.S.C.A. § 362(h).

**[106] Bankruptcy 51 ☞2468**

51 Bankruptcy
    51IV Effect of Bankruptcy Relief; Injunction and Stay
        51IV(D) Enforcement of Injunction or Stay
            51k2468 k. Exemplary or Punitive Damages; Fines. Most Cited Cases
Four factors that bankruptcy courts may consider in deciding whether an award of punitive damages is appropriate for creditor's violation of automatic stay are: (1) nature of creditor's conduct; (2) creditor's ability to pay damages; (3) creditor's motive; and (4) any provocation by debtor. 11 U.S.C.A. § 362(h).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

Page 23

**[107] Bankruptcy 51 ☞2468**

51 Bankruptcy
   51IV Effect of Bankruptcy Relief; Injunction and Stay
      51IV(D) Enforcement of Injunction or Stay
        51k2468 k. Exemplary or Punitive Damages; Fines. Most Cited Cases
Punitive damages are awarded for both punitive and deterrent purposes in response to particularly egregious violations of automatic stay. 11 U.S.C.A. § 362(h).

**[108] Damages 115 ☞94.1**

115 Damages
   115V Exemplary Damages
      115k94 Measure and Amount of Exemplary Damages
        115k94.1 k. In General. Most Cited Cases
While award of punitive damages is appropriate in certain cases to punish wrongdoer for outrageous conduct and to deter others from engaging in similar conduct, award of punitive damages must be supported by the record and may not constitute a windfall to prevailing party.

**[109] Damages 115 ☞91.5(1)**

115 Damages
   115V Exemplary Damages
      115k91.5 Grounds for Exemplary Damages
        115k91.5(1) k. In General. Most Cited Cases
Punitive damages should be awarded only if actions of defendant are so reprehensible as to warrant further sanction, beyond that provided by compensatory damages award, in order to achieve punishment or deterrence.

**[110] Damages 115 ☞87(1)**

115 Damages
   115V Exemplary Damages
      115k87 Nature and Theory of Damages Additional to Compensation
        115k87(1) k. In General. Most Cited Cases

**Damages 115 ☞91.5(1)**

115 Damages
   115V Exemplary Damages
      115k91.5 Grounds for Exemplary Damages
        115k91.5(1) k. In General. Most Cited Cases
Punitive damages are disfavored under Illinois law, are recoverable only where defendant's alleged misconduct is outrageous, either because defendant's acts are done with malice or evil motive, or because they are performed with reckless indifference toward rights of others.

**[111] Bankruptcy 51 ☞2468**

51 Bankruptcy
   51IV Effect of Bankruptcy Relief; Injunction and Stay
      51IV(D) Enforcement of Injunction or Stay
        51k2468 k. Exemplary or Punitive Damages; Fines. Most Cited Cases
Bank's willful violation of automatic stay when, having already collected more than $5 million from bankrupt seller on its agreement to repurchase defaulting buyer's note, it sold note to foreign entity affiliated with buyer for a sum approaching the amount still owed by debtor-seller under note repurchase agreement, in order to avoid receiving only pennies on the dollar in debtor-seller's bankruptcy case, and thereby prevented debtor from collecting the $2.7 million that buyer had agreed to pay for release of debtor's interest in the sold equipment, was such as to warrant award of punitive damages in amount of $100,000; bank was sophisticated entity that acted deliberate and intentionally, with knowledge that it was impairing debtor-seller's rights against buyer, to further its own economic interests. 11 U.S.C.A. § 362(h).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

Page 24

**[112] Bankruptcy 51 ☜2158**

51 Bankruptcy
    51II Courts; Proceedings in General
        51II(B) Actions and Proceedings in General
            51k2158 k. Process; Service. Most Cited Cases

**Constitutional Law 92 ☜4478**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(G) Particular Issues and Applications
            92XXVII(G)25 Other Particular Issues and
Applications
            92k4478 k. Bankruptcy. Most Cited Cases
(Formerly 92k306(4))

**Treaties 385 ☜8**

385 Treaties
    385k8 k. Construction and Operation of Particular
Provisions. Most Cited Cases
Use of registered mail to serve Mexican nationals named
as defendants in cause of action brought by trustee of
bankrupt manufacturer's Chapter 7 estate satisfied
requirements of Federal Rule of Civil Procedure and of
the Hague Convention, as well as constitutional due
process concerns, where parties agreed that Mexican
government has never indicated any objection to service
on its citizens by mail from foreign country. U.S.C.A.
Const.Amend. 5; Fed.Rules Civ.Proc.Rule 4, 28
U.S.C.A.; Hague Convention on the Service Abroad of
Judicial and Extrajudicial Documents in Civil or
Commercial Matters, Art. 10(a), Fed.Rules
Civ.Proc.Rule 4 note, 28 U.S.C.A.

**[113] Contracts 95 ☜326**

95 Contracts
    95VI Actions for Breach
        95k326 k. Grounds of Action. Most Cited Cases
To properly prove a cause of action under Illinois law for
breach of contract, plaintiff must establish: (1) existence
of valid and enforceable contract; (2) performance by
plaintiff; (3) breach of contract by defendant; and (4)
resultant injury to plaintiff.

**[114] Contracts 95 ☜16**

95 Contracts
    95I Requisites and Validity
        95I(B) Parties, Proposals, and Acceptance
            95k16 k. Offer and Acceptance in General.
Most Cited Cases

**Contracts 95 ☜47**

95 Contracts
    95I Requisites and Validity
        95I(D) Consideration
            95k47 k. Necessity in General. Most Cited
Cases
In breach of contract action under Illinois law, plaintiff
should prove the factual circumstances surrounding
formation of agreement, specifically, the offer,
acceptance and existence of valuable consideration.

**[115] Sales 343 ☜178(4)**

343 Sales
    343IV Performance of Contract
        343IV(C) Delivery and Acceptance of Goods
            343k178 Acts Constituting Acceptance
                343k178(4) k. Use or Other Disposition by
Buyer. Most Cited Cases
Under Illinois law, buyer who has used the goods
provided by seller cannot thereafter claim that he has not
accepted them. S.H.A. 810 ILCS 5/2-606.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

**[116] Sales 343 ☞179(4)**

343 Sales
   343IV Performance of Contract
      343IV(C) Delivery and Acceptance of Goods
         343k179 Effect of Acceptance
            343k179(4) k. As Waiver of Defects as to
Quality, Fitness, or Condition. Most Cited Cases
Illinois law does not permit buyer to receive goods under
contract, appropriate them for his own use, and then
defeat action for purchase price on ground that goods
were not of exact quality or description called for by
contract. S.H.A. 810 ILCS 5/2-606.

**[117] Sales 343 ☞178(4)**

343 Sales
   343IV Performance of Contract
      343IV(C) Delivery and Acceptance of Goods
         343k178 Acts Constituting Acceptance
            343k178(4) k. Use or Other Disposition by
Buyer. Most Cited Cases

**Sales 343 ☞179(4)**

343 Sales
   343IV Performance of Contract
      343IV(C) Delivery and Acceptance of Goods
         343k179 Effect of Acceptance
            343k179(4) k. As Waiver of Defects as to
Quality, Fitness, or Condition. Most Cited Cases
Buyer of printing press from bankrupt manufacturer
could not raise allegedly defective nature of press, in
purportedly failing to deliver 45,000 impressions per
minute, and its own alleged nonacceptance thereof as
defense to cause of action brought by Chapter 7 trustee
to recover purchase price, where buyer had never
attempted to return press, but used it for four years in its
business, until eventually entering into agreement to sell
press to third-party purchaser as most valuable asset of
its business; under Illinois law, buyer had to be regarded
as having accepted printing press by failing to effectively

reject it despite having reasonable opportunity for
inspection and by acts inconsistent with debtor-seller's
continued ownership. S.H.A. 810 ILCS 5/2-606.

*543Mark A. McDermott, Skadden, Arps, Slate,
McAgher and Flo, Chicago, IL, for Debtors.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK B. SCHMETTERER, Bankruptcy Judge.
   Following trial, the following Findings of Fact and
Conclusions of Law are made and to be entered:

### FINDINGS OF FACT

#### The Parties

*The Plaintiff*

1. Goss Graphic Systems, Inc., n/k/a GGSI
Liquidation, Inc. ("Debtor" or "Goss") manufactured and
sold offset printing press systems, among other things,
for the newspaper, advertising, and commercial printing
markets. It filed under Chapter 11 of the Bankruptcy
Code, an action later converted to Chapter 7.

2. Plaintiff Gus A. Paloian (the "Trustee" or
"Plaintiff") is the Chapter 7 Trustee of the Bankruptcy
Estate of Goss and was appointed as such on or about
February 27, 2002.

3. Plaintiff sued as Chapter 7 Trustee by filing this
Adversary Complaint against Grupo Serla SA de C.V.
("Grupo Serla"), Editorial Comercial ("Editorial
Comercial"), Union Industrial Mexicana SA de CV
("Union Industrial"), Sergio Eduardo Guarneros Trujillo
("Guarneros"), and Bank One (the "Bank" or "Bank

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

Page 26

One").

Guarneros and His Companies.

### *Defendant Sergio Eduardo Guarneros Trujillo ("Guarneros")*

### *Defendant Bank One*

4. Guarneros was the General Administrator, or Chief Executive Officer, and President of Editorial Comercial and Grupo Serla at the time the events underlying *544 this suit took place.[FN1] Guarneros is a resident of Mexico.

8. Bank One was a national banking association organized under laws of the United States of America at the time this action was brought. It has since merged into J.P. Morgan Chase Bank, N.A. (Bank One's Answer at ¶ 17.)[FN2]

> FN1. Guarneros, when referred to collectively with Grupo Serla and Editorial Comercial, will hereinafter be referred to as "Guarneros and His Companies." Guarneros, Grupo Serla, Editorial Comercial, and Union Industrial, will alternatively be referred to as the "Foreign Defendants."

> FN2. That merger apparently brought into play Rule 25(c) Fed.R.Civ.P. [Rule 7025 Fed.R.Bankr.P.] which provides:

(c) Transfer of Interest. In case of any transfer of interest, the action may be continued by or against the original party, unless the court upon motion directs the person to whom the interest is transferred to be substituted in the action or joined with the original party.

No party moved that J.P. Morgan Chase Bank N.A. be substituted for Bank One as a party herein, and in the absence of such motion, no order was entered providing for substitution. Rule 25(c) does not require that anything be done after a "transfer of interest" under that Rule. The actions continued against Bank One and Circuit precedent holds that judgment ordered against the transferor of interest will be binding on its successors even though not named. *Otis Clapp & Son, Inc. v. Filmore Vitamin*, 754 F.2d 738, 743 (7th Cir.1985) citing 7A Wright and Miller, Federal Practice and Procedure § 1958 at 664-65.

The Plaintiff here was evidently satisfied that no substitution was required because facts concerning the merger and any applicable non-bankruptcy law supported the assumption that a judgment can be recovered from Chase if not from Bank One. *See* Vol 6 Moore's Federal Practice 3d ed 2006 § 25-31[2]. If that be so, the merger could be the sort of "transfer" referred to in Rule 25(c). See *Id.*, § 25-31[1].

### *Defendant Editorial Comercial, S.A. de C.V. ("Editorial Comercial")*

5. Editorial Comercial is a business entity organized under the laws of Mexico with its principal place of business in Mexico.

### *Defendant Grupo Serla, S.A. de C.V.A. a/k/a Grupo Empresarial Serla, S.A. de C.V. ("Grupo Serla")*

6. Grupo Serla is a business entity organized under the laws of Mexico with its principal place of business in Mexico.

### *Defendant Union Industrial Mexicana, S.A. de C.V. ("Union Industrial")*

7. Union Industrial is a business entity organized under the laws of Mexico. Union Industrial is related to

### *Introduction and Summary*

9. This Adversary proceeding relates to the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

bankruptcy case of Goss Graphic Systems, Inc., n/k/a GGSI Liquidation, Inc. ("Goss" or "Debtor").

10. In 1997, Goss sold a printing press to Editorial Comercial for the purchase price of $5,948,860.00. Grupo Serla and Editorial Comercial executed a promissory note (the "Grupo Serla Note" or the "Note") payable to the order of Goss in the principal sum of $5,370,000.00 for the printing press. Bank One financed the sale by purchasing the Grupo Serla Note from Goss. Bank One extended the financing with Goss' explicit agreement that it would remain secondarily liable on the Grupo Serla Note.

11. After the purchasers failed to pay amounts due under the Grupo Serla Note, Bank One demanded and Goss agreed to repurchase that Note. Subsequently, Goss paid Bank One $5,175,728.17 in connection with the repurchase obligation, a large portion of the total amount due. However, after Goss filed for bankruptcy protection, Bank One (being still in possession of the *545 original Grupo Serla Note) sold and delivered the Note to an entity connected to the makers of the Note and kept all of the sale proceeds. Bank One did this without giving notice to Goss' creditors or seeking modification or relief from the automatic stay. The bankruptcy case was later converted to one under Chapter 7 and the Plaintiff Trustee was appointed.

12. In the Trustee's First Amended Complaint consisting of eight counts, he seeks the following: (Count I) a judgment in favor of Trustee and against Grupo Serla and Editorial Comercial based on their failure to pay the amounts due and owing under the Grupo Serla Note for which payments they are jointly and severally liable; (Count II) a judgment in favor of Trustee and against Guarneros based on his failure to make any payments pursuant to his personal guarantee of the Grupo Serla Note; (Count III) a judgment in favor of Trustee and against Editorial Comercial based on its failure to cure its default under the Sale and Purchase Agreement; (Count IV) a declaratory judgment declaring that Goss is the rightful owner of the Grupo Serla Note; or alternatively, declaring that Goss is the equitable

owner of a majority interest in the Grupo Serla Note; (Count V) a constructive trust on any and all proceeds from the sale, assignment, disposition, or collection of the Grupo Serla Note in favor of the Trustee, an order requiring Union Industrial and/or Bank One to execute appropriate documents transferring all right, title, and interest in the Grupo Serla Note to the Trustee, and an order requiring Bank One and Union Industrial to account for any proceeds or other benefits generated by the Grupo Serla Note and to pay at least 80% of such funds to the bankruptcy estate; (Count VI) a rescission of the December 15, 2000 Agreement; (Count VII) a declaration that the transfer of the Grupo Serla Note to Union Industrial is void under 11 U.S.C. § 549; and (Count VIII) a judgment in favor of the Trustee and against Bank One and Union Industrial in the amount of actual damages incurred as a result of the violation of the automatic stay, including attorney fees, costs, and punitive damages.

13. In response, Bank One argued the following: (1) the Grupo Serla Note belonged to Bank One and was not property of the Goss bankruptcy estate; (2) Bank One protected and preserved Goss' interests when it sold the Grupo Serla Note; (3) Bank One cannot be held to have violated the automatic stay because it acted under a claim of ownership; (4) no interest of the estate was impaired or foreclosed; and (5) even if Bank One violated the automatic stay, the Trustee has failed to establish damages to the Estate.

14. Bank One also asserted the following affirmative defenses: (1) equitable estoppel bars the Trustee's claims; (2) Goss and the Trustee waived any right to pursue claims against Bank One; (3) the Trustee lacks standing to bring for violation of the automatic stay; (4) the Trustee's claims are barred by the doctrine of laches; (5) Goss failed to mitigate any alleged damages; (6) any award is subject to set-off; and (7) Goss ratified the conduct that the Trustee now claims was wrongful.

15. The Trustee seeks a judgment against the Foreign Defendants based on their breach of contract obligations pursuant to the sale and Promissory Note.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

The Trustee also requests judgment in his favor against Guarneros for all damages available pursuant to applicable law based on his personal guarantee of the Promissory Note.

16. In response, the Foreign Defendants argued: (1) they never accepted the printing press; (2) the printing press did **546** not meet specifications called for in the Sale and Purchase Agreement; (3) Goss cannot enforce the Promissory Note because Goss does not own or hold it; (4) Goss was already paid by Bank One; and (5) Guarneros and Editorial Comercial are no longer bound by the Promissory Note or any other agreement because of a handwritten settlement agreement between Goss and Grupo Serla.

17. Following trial and with agreement of the parties, final arguments were submitted in writing through filings of proposed Findings of Fact and Conclusions of Law. For reasons stated below and pursuant to separate judgment order to be entered, judgment will be entered in favor of Plaintiff against Bank One for damages based on Bank One's willful violation of the automatic stay. A separate judgment will enter in favor of Plaintiff against Bank One for damages based on Bank One's breach of its duty as a secured party pursuant to § 9-207 of the Uniform Commercial Code as adopted in Illinois, 810 ILCS 5/9-207, and for its transfer of the Goss property interest in the Note during bankruptcy, under 11 U.S.C. § 549. Judgment will also separately enter in favor of Plaintiff and against the Foreign Defendants jointly and severally for breach of contract based on their failure to pay Goss on the Promissory Note given when purchasing the printing press, and against Guarneros for breach of his personal guarantee. Other issues presented will be discussed below.

### Goss Sold A Printing Press

18. In December of 1996, Grupo Serla issued a letter of intent to purchase a Goss Universal 45 printing press from Goss. (Pl.Ex. 1; citations to Trustee's Trial Exhibits will hereinafter be referred to as "Pl.Ex. __".) In the letter of intent, Grupo Serla acknowledged that it "thoroughly reviewed" the printing press and found its "capability to meet our requirements." (Pl.Ex. 1.)

### The Sale and Purchase Agreement

19. On March 19, 1997, Editorial Comercial and Goss entered into a Sale and Purchase Agreement (the "Contract To Sell The Press") as amended in which Goss agreed to sell and Editorial Comercial agreed to purchase the "Goss Universal 45" printing press and related equipment (the "Printing Press") for $5,948,860.00. (Pl.Ex. 2, ST 1074.) Editorial Comercial made a $100,000.00 cash down payment. (BO Ex. 1; citations to Bank One's Trial Exhibits will hereinafter be referred to as "BO Ex. __.")

### The Purchaser Granted Goss a Security Interest in the Printing Press to Secure Payment

20. In order to secure payment of the purchase price, the Purchaser, Editorial Comercial, granted Goss a security interest in the Printing Press. (Pl.Ex. 2, ST 1057.) The security interest attached to "all attachments, accessories, improvements, replacements and proceeds, including insurance proceeds ... resulting from any sale, assignment or other conveyance, or damage or destruction thereof...." (Pl.Ex. 2, ST 1057, ¶ 15.)

21. The Purchaser also agreed not to "sell, assign or convey or in any manner, cause or permit a transfer of any present or future interest in the Secured Collateral [i.e. the Printing Press]." (Pl.Ex. 2, ST 1057, ¶ 15a.)

### The Purchaser Pledged To Hold The Printing Press In Safekeeping For Goss

22. As part of the Contract To Sell The Press, the Purchaser also executed a Pledge on the Printing Press.

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

(Pl.Ex. 2, ST 1070.) The object of the Pledge was to guarantee the performance of the obligations to pay Goss the purchase price of the Printing Press. (Pl.Ex. 2, ST 1070.) **547** In the Pledge, Guarneros, the 97% owner of the Purchaser, admitted receiving the Printing Press and agreed to hold it in safekeeping under the Pledge. (Pl.Ex. 2, ST 1070.)

23. The Purchaser and Guarneros further agreed in the Pledge that the "SELLER [Goss] may request the Judge to authorize the sale of the Machinery given in pledge if the PURCHASER does not perform the payment obligations pursuant to Addendum 'B' and Article 341 of the General Law of Credit Instruments and Operations." (Pl.Ex. 2, ST 1070.) The signed Pledge further stated, "For the interpretation, performance and execution of this pledge, the parties hereby expressly submit themselves to the laws and courts of Mexico, Federal District, Mexico." *Id.* However, no motion was filed to block Plaintiff's suit because this action was filed here instead of in Mexican courts, nor did the Foreign Defendants brief or argue the choice of law clause. The Foreign Defendants did not rely on that provision at all, and pursuant to the Final Pre-Trial Order they thereby waived it.

### Bank One Financed The Sale Of The Printing Press

24. The Contract To Sell The Press was subject to securing suitable financing. (Pl.Ex. 2, ST 1068.) Bank One agreed to finance the transaction. (Pl.Ex. 3.)

25. In connection with financing of the sale, Grupo Serla and Editorial Comercial executed a promissory note (the "Grupo Serla Note") on September 4, 1997 in the amount of $5,370,000.00 for the financed portion of the purchase price. (Pl.Ex. 4.) Guarneros signed the Grupo Serla Note "por aval," that is personally guaranteeing the same. (Pl.Ex. 4.) Guarneros thereby became responsible for payments on the Grupo Serla Note. (S.Guarneros, 10/5/05, Test. 51-52.)

26. Bank One then financed the sale by purchasing the Grupo Serla Note from Goss pursuant to a Note Purchase Agreement. (Pl.Ex. 3.) Bank One paid the full face amount for the Grupo Serla Note, $5,370,000.00, to or on behalf of Goss as follows: (1) payment to Goss via wire transfer by Bank One to Goss' account at Banker's Trust Co. in the amount of $5,022,594.00; (2) payment to Exporters Insurance Company Ltd. ("Exporters") via wire transfer made by Bank One on behalf of Goss in the amount of $320,556.00 to pay Goss' obligation to pay the insurance premium; and (3) an arrangement fee paid to Bank One in the amount of $26,850.00 in satisfaction of Goss' obligations under Article II(D) of the Note Purchase Agreement.

### The Credit Insurance Policy

27. The Note Purchase Agreement provided that Goss would arrange for Exporters to provide an insurance policy for the benefit of Bank One which would provide export insurance to cover 85% of Editorial Comercial's obligations to pay for the Printing Press. (BO Ex. 5, ST 1079, 3rd Whereas Clause.) Under the Note Purchase Agreement, Goss also warranted and agreed that it would do all things necessary to keep the Exporters insurance policy in full force and effect. (BO Ex. 5, ST 1083, Art. IV(B)(2).)

28. It was Goss' decision to choose Exporters, the company that issued the insurance policy. (L.Spano, 10/20/05, Test. 19.) Under the export credit insurance policy, Exporters agreed to indemnify Goss as the insured and Bank One as loss payee for 85% of the insured's loss "covered solely and directly by nonpayment of an 'Eligible Credit.' " (BO Ex. 8, BO 844.) "Eligible Credit" was defined as "a payment obligation insured herein ...," namely the amount due from Grupo Serla and Editorial Comercial to Goss under the Grupo Serla Note. Among other exclusions, the **548** policy provided that Exporters would not be liable for loss resulting from "commercial disputes between the Insured [Goss] and the Buyer [Editorial Comercial]." (BO Ex. 8, Test. 2, 5, 12, Endorsement No. 1, BO 00854; L. Spano, 10/20/05, Test. 16.) The policy also required

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

Goss to "establish and maintain a first priority security interest in the goods sold to the Buyer [Editorial Comercial] under the Contract [Sale and Purchase Agreement]." (BO Ex. 8, p. 5, IV(J), BO 847.)

29. The purpose of the credit insurance policy was to provide "credit support"; that is, security that Bank One would be paid if Grupo Serla and Editorial did not make the payments. (BO Ex. 8, 2, BO 844.) Bank One would not have financed the transaction on terms that were agreed to without the credit insurance, as well as the letter of credit. (L.Spano, 10/20/05, Test. 15-16.) Goss arranged for such a letter of credit to be issued by Banker's Trust for the benefit of Bank One. This letter of credit provided part of the credit support that induced Bank One to purchase the Grupo Serla Note. (L.Spano, 10/20/05, Test. 16.)

30. On August 26, 1999, after Guarneros and His Companies failed to pay for the Printing Press, Goss made a claim under the Exporters credit insurance policy to fund the balance due to Bank One, amounting to 85% of the total amount due under the Grupo Serla Note. (BO Ex. 48.) At Goss' request, on September 2, 1999, Bank One sent Goss an "executed copy" of the Grupo Serla Note for use in making its insurance claim (BO Ex. 49), apparently referring to a copy of the executed Note, not a duplicate signed original.

31. After an insurance adjusting firm performed an investigation, Exporters denied Goss' insurance claim. (J. Gaynor, 10/18/05, Test. 43.)

### Guarneros and His Companies Failed To Pay For The Printing Press Despite Extreme Use Of It

32. After taking possession of the Printing Press and signing the Grupo Serla Note, Guarneros and His Companies failed to pay as agreed. (Pl.Exhs. 6, 118.) Guarneros and His Companies made only one payment of $75,000.00 on the Grupo Serla Note. (S.Guarneros, 10/5/05, Test. 45.)

33. On or about October 15, 1998, Grupo Serla made the $75,000.00 partial payment representing a portion of accrued interest due under the Grupo Serla Note. (Trustee's Amend. Compl., ¶ 30.) Grupo Serla sent this payment to Goss. This was the only payment that Grupo Serla, Editorial Comercial, and Guarneros made with respect to the Grupo Serla Note. (BO Ex. 28; L. Spano, 10/20/05, Test. 45-46.)

34. Goss in turn paid the entire $75,000.00 to Bank One on December 21, 1998. (BO Ex. 28.)

35. Grupo Serla contended at trial that the reason it did not make payments due from it for the Printing Press was that the Press did not meet specifications in the Purchase and Sale Agreement and did not perform as Goss represented that it would. (S. Guarneros, 10/5/05, Test. 44-46, 166-67; L. Spano, 10/20/05, Test. 31-32.) The Foreign Defendants alleged that the Printing Press did not deliver 45,000 impressions per hour as promised in the Purchase and Sale Agreement and based on Goss' pre-sale representations. However, the evidence and facts presented at trial demonstrate that they used the Printing Press to produce commercially acceptable products with nine or ten workers using it for several shifts a day, and accepted rather than rejected the Press.

### *549Bank One Sent Numerous Notices To Guarneros And His Companies Demanding Payment

36. As a result of the failure of the Foreign Defendants to pay amounts due under the Grupo Serla Note, Bank One formally notified Guarneros and His Companies of default on July 30, 1998. (Pl.Ex. 6.) In addition, Bank One sent at least 17 demand notices for past due installments to Guarneros and His Companies from the year 1997 through 2000. (Pl.Exhs. 5, 6, 7, 118.) However, Guarneros and His Companies still failed to make any principal or further interest payments due under the Grupo Serla Note. (S.Guarneros, 10/5/05, Test. 45.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

*Bank One And Goss Jointly Filed Suit Against Guarneros And His Companies To Collect On The Grupo Serla Note*

37. Due to the continued failure of Guarneros and His Companies to pay the amounts due under the Grupo Serla Note, Bank One and Goss jointly sued Guarneros and His Companies in the Circuit Court For The Eighteenth Judicial Circuit in DuPage County, Illinois (the "DuPage Litigation"). (Pl.Exhs. 9, 15.)

38. The joint complaint by Bank One and Goss was initially filed in May 1999 in DuPage County by a suburban law firm selected by Goss' General Counsel, Mary Ann Spiegel ("Spiegel"), with Bank One's consent. (BO Ex. 33.) When Spiegel became dissatisfied with the progress of the litigation in February 2000, she decided to replace the original litigation counsel with Joseph Krasovec ("Krasovec") of Schiff, Hardin & Waite, with whom she had worked before on various Goss matters. Bank One consented to Spiegel's selection of Krasovec to take over the litigation. Krasovec took his direction in the litigation primarily from Goss, and Goss paid his attorney's fees. (BO Ex. 53, SH & W 337; J. Krasovec, 10/24/05, Test. 4-7, 9-12.) Once Krasovec took over, he filed a Second Amended Complaint on behalf of Goss and Bank One. (Pl.Ex. 15.)

39. In the DuPage Litigation, Bank One and Goss pleaded alternatively that Bank One or Goss or both were entitled to recover the amounts due and owing on the Grupo Serla Note. (Pl.Ex. 15.)

40. As joint plaintiffs, Goss and Bank One encountered difficulties in obtaining service of process over the Mexican Defendants, all of whom were located in Mexico. This caused the DuPage litigation to proceed slowly. (J. Krasovec, 10/24/05, Test. 32-33.) No recovery was achieved as a result of this litigation. In fact, service was obtained only over Editorial Comercial. (J. Krasovec, 10/24/05, Test. 32-33.) As a result, the pending DuPage litigation never proceeded to a judicial resolution of the joint complaint. (J. Krasovec 10/24/05, Test. 32-33.)

*Goss' Payments Under The Grupo Serla Note*

41. On September 1, 1998, Bank One wrote a letter to Goss giving Goss notice that it had not received payment due from Grupo Serla with respect to the payments due under promissory notes. (BO Ex. 21.) The letter stated that pursuant to the Note Purchase Agreement, Bank One was entitled to demand repurchase by Goss of 15% of its then-outstanding obligations. (BO Ex. 21.) Therefore, Bank One made a demand for Goss to pay 15% of its obligations equal to $724,950.00 plus $29,608.61 of accrued interest toward repurchase of the Note. (BO Ex. 21.)

42. In response, on or about September 15, 1998, Goss paid Bank One $754,558.61. (Pl.Ex. 8.)

43. After Guarneros and His Companies continued in their failure to make subsequent payments due, Bank One demanded that Goss pay the remaining 85% *550 due in order to repurchase the Grupo Serla Note. (BO Ex. 66; Pl.Ex. 21; R. Kaplan, 9/26/05, Test. 48-49.) Ronnie Kaplan ("Kaplan"), a First Vice President of Bank One, testified that he believed he called Joseph Gaynor ("Gaynor"), the Chief Financial Officer of Goss, and demanded that Goss pay the balance needed to repurchase the Grupo Serla Note. (R. Kaplan, 9/26/05, Test. 48.) Gaynor memorialized this demand in writing. (BO Ex. 66.) The letter proposed that Goss repurchase the Grupo Serla Note according to a specified payment schedule. (BO Ex. 66.)

44. After a series of negotiations regarding the remainder of obligations to repurchase the Grupo Serla Note (R. Kaplan, 9/26/05, Test. 49), on December 15, 2000 Goss and Bank One executed an agreement (the "Note Repurchase Agreement") wherein Goss agreed to repurchase the remaining 85% due for repurchase of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

Page 32

Grupo Serla Note from Bank One through delivery of a promissory note payable to Bank One ("Repurchase Note") in the amount of $5,675,495.12 (collectively the "Note Repurchase Transaction"). (Pl.Ex. 21.)

45. The Repurchase Note was payable in installments as follows:

| Date | Amount |
|------|--------|
| 12/15/00 | $ 750,000 |
| 12/31/00 | $1,500,000 |
| 01/31/01 | $ 500,000 |
| 02/28/01 | $ 750,000 |
| 03/31/01 | $ 750,000 |
| 04/30/01 | $ 750,000 |
| 05/31/01 | Remaining principal balance |

46. The Note Repurchase Agreement recognized that Goss "has repurchased 15% of the Grupo Serla Note from the Bank by paying the Bank the principal amount of US$805,000 plus accrued interest." (Pl.Ex. 21.) The Note Repurchase Agreement further stated, "[T]he Bank has demanded that the Company [Goss] repurchase the remaining 85% of the Grupo Serla Note by paying the Bank the principal amount of US$4,564,500 plus interest through December 15, 2000 in the amount of US $1,110,995.12."(Pl.Ex. 21.)

47. The Note Repurchase Agreement "became effective upon the later to occur of (i) the execution of counterparts hereof by the Parties and (ii) the receipt by the Bank of the Repurchase Note duly executed by the Company [Goss]." (Pl.Ex. 21.)

48. The Note Repurchase Agreement was executed as required and was delivered to Bank One and thereby became effective within one week of December 15, 2000. (M.Page, 9/30/05, Test. 44.) The Note Repurchase Agreement allowed Bank One to retain physical possession of the original Grupo Serla Note pending payment in full of all amounts due under or in connection with the Repurchase Note or as a court of competent jurisdiction might otherwise direct. (Pl.Ex. 21.)

49. Kaplan, a First Vice President of Bank One, signed the Note Repurchase Agreement on behalf of Bank One after a series of negotiations with Gaynor of Goss. (R. Kaplan, 9/26/05, Test. 53-54.) It was Kaplan's custom and practice to review documents before he

signed them and not sign them if they were false. (R. Kaplan, 9/26/05, Test. 53-54.) Kaplan acknowledged through testimony his understanding that the Note Repurchase Agreement was an agreement for Goss to repurchase the Grupo Serla Note. (R. Kaplan, 9/26/05, Test. 56-57.)

### The Obligations Under The Repurchase Note And The Note Purchase Agreement

50. The terms in the Repurchase Note given by Goss to Bank One differed from terms specified in the original Note Purchase Agreement. (Pl.Exhs. 3, 21.) The interest rate contained in the Repurchase Note differed from the interest rate contained in the original Grupo Serla Note (which evidenced the "obligations" under *551 the Note Purchase Agreement). (Pl. Exhs. 4, 21; R. Kaplan, 9/26/05, Test. 69-72.) The interest rate contained in the Repurchase Note equaled the Eurodollar Rate plus 1.5% per annum. (Pl.Ex. 21.) The interest rate contained in the Grupo Serla Note equaled the "LIBOR" rate plus 1% per annum. (Pl.Ex. 4.) Salas of Bank One testified that LIBOR and the Eurodollar rate are the same. (A.Salas, 10/18/05, Test. 42.)

51. The Grupo Serla Note and the Repurchase Note also contained different default interest rates. The default interest rate contained in the Repurchase Note initially equaled the Eurodollar rate plus 4% and then converted to the prime rate plus 2% per annum. (Pl.Ex. 21.) The default interest rate contained in the Grupo Serla Note equaled LIBOR plus 4% and did not convert. (Pl.Ex. 4.)

52. Further, by its terms, the Note Purchase Agreement was freely assignable while the Repurchase Note was not generally assignable except to another financial institution. (Pl.Ex. 21.) The Note Purchase Agreement stated:
After the purchase hereunder, following prior written notice to the Supplier, the Lender may sell, transfer, pledge, negotiate, grant participations in or otherwise dispose of all or any part of the Notes

purchased by the Lender under this Agreement to any party without increasing the Supplier's obligations hereunder, and any such party shall enjoy all the rights privileges, and obligations of the Lender under this Agreement with respect to such transferred notes.

(Pl.Ex. 3.)

The Repurchase Note provided:
The Bank may at any time assign this Note and its rights hereunder to any affiliate, and the Bank or any subsequent holder of this Note may at any time assign this Note and its rights hereunder to a financial institution or, with the consent of the Company which consent shall not be unreasonably withheld or delayed, to any other person or entity, provided, however, that such consent shall not be required if any of the events in the first sentence of the immediately preceding paragraph has occurred and is continuing.

The first sentence of the immediately preceding paragraph in the Repurchase Note provided:In addition to, and without limitation of, any rights of the Bank under applicable law, if any amount payable hereunder is not paid within 5 days after the same becomes due, there is any material adverse change in the Company's financial condition, there is a material default under any agreement governing indebtedness of the Company under the Federal Bankruptcy Code or similar state law or if the Company becomes insolvent, howsoever evidenced, the Bank may declare all unpaid principal and interest payable hereunder immediately due and payable.

(Pl.Ex. 21.)

### The Bank Stopped Seeking Payment From Guarneros And His Companies

53. After December 15, 2000, the Bank stopped demanding payment for the amounts due under the Grupo Serla Note from Guarneros and His Companies.

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

(A.Salas, 10/18/05, Test. 34-36.) Salas, Bank One's record-keeper for this transaction, testified that Bank One stopped sending demand notices to Guarneros and His Companies after that date because the relevant relationship was then between Bank One and Goss. (A.Salas, 10/18/05, Test. 34-36.) Thereafter, Bank One billed Goss on the Repurchase Note. (A.Salas, 10/18/05, Test. 34-36.)

**\*552** 54. Beginning on December 26, 2000, after Goss had made payments to Bank One pursuant to the Repurchase Note, Bank One billed Goss for amounts that were due under that Repurchase Note. (Pl.Ex. 121.)

55. The specific dollar amounts claimed by Bank One in its invoices to Goss corresponded to the Repurchase Note and not to the Grupo Serla Note. (Pl.Ex. 121.) The default notices sent by Bank One to Guarneros and His Companies sought default interest of LIBOR plus 4% because that was the default interest rate contained in the Grupo Serla Note owned by the Bank at that time. (Tr Ex. 118; R. Kaplan, 9/26/05, Test. 68-70; A. Salas, 10/18/05, Test. 41-43.) However, the default notices sent to Goss were based on the interest rate contained in the Repurchase Note. (A. Salas, 10/18/05, Test. 41-43; Pl. Exhs. 33, 34, 51, 64 (BO 03626), 74, 121.)

### Bank One's Internal Computer System

56. Bank One maintains a computer system called an LS2 System which keeps track of accounting events. (Pl.Ex. 119; A. Salas, 10/18/05, Test. 53.) The LS2 System reports reflected that on December 15, 2000 (the date of the Note Repurchase Transaction) the Grupo Serla Note was paid off and a new commitment representing the Repurchase Note was set up. (A.Salas, 10/18/05, Test. 54.) Salas of Bank One testified that this was done for accounting purposes, as Bank One did not want to show two assets on its books. (A.Salas, 10/18/05, Test. 54.)

### Goss' Payments Under The Repurchase Note

57. Prior to filing for bankruptcy protection, Goss made all payments due pursuant to the Repurchase Note except the April and May 2001 payments. (M.Page, 9/30/05, Test. 44.)

58. The April and May 2001 repurchase payments that were due for those months totaled $1,425,495.12. Goss therefore owed Bank One less than $1.5 million in principal and accrued interest with respect to its obligation to repurchase the Grupo Serla Note at the time that Goss filed its Chapter 11 bankruptcy petition on September 10, 2001. (J. Gaynor, 10/18/05, Test. 72.)

59. In addition to paying Bank One $925,728.17 ($805,500.00 plus interest) as earlier noted to repurchase what Bank One characterized in the Note Repurchase Agreement as 15% of the Grupo Serla Note, Goss paid Bank One payments totalling an additional $4,250,000.00 pursuant to its repurchase obligations. (Pl. Exhs. 21; M. Page, 9/30/05, Test. 44.) Thus, prior to filing for bankruptcy protection, Goss paid Bank One a total of $5,175,858.50, (Pl.Ex. 21; M. Page, 9/30/05, Test. 44), then leaving only $1,425,495.12 in principal due on Goss' repurchase obligation.

### Guarneros And His Companies Agreed To Sell The Printing Press Despite The Fact They Had Not Paid For It

60. Guarneros and His Companies took steps to sell the Printing Press to a third party despite the fact they had not yet paid for it. (Pl.Exhs. 29, 129.) This sale process began on or about May 23, 2001 when Guarneros and His Companies entered into a letter of intent with Quebecor World Inc. ("Quebecor"). (Pl.Ex. 23.) In the letter of intent, Quebecor expressed its interest in acquiring certain "Selected Assets" for $13,000,000.00 through a wholly owned Newco subsidiary, Quebecor World Directory Mexico, S.A. de C.V. (Pl.Ex. 23.) The "Selected Assets" included the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

Printing Press which had been purchased from Goss. (Pl.Ex. 23, ST 0257.)

61. A condition precedent to the Quebecor purchase was that the Printing Press and other Selected Assets would be *553 free and clear of all liens, claims, and liabilities at closing. (Pl.Ex. 23, ST 234.) If the assets were not free and clear, Quebecor had the right to withhold money as necessary until any liens were removed. (S.Guarneros, 10/5/05, Test. 83-84.)

62. Quebecor placed a total value of $13,000,000.00 on all the assets it was interested in purchasing (Pl.Ex. 23), of which it put a specific value of $4,000,000.00 on the Printing Press. (Pl.Ex. 23, ST 257.) The Printing Press was the highest valued single asset Quebecor agreed to purchase. (Pl.Ex. 23, ST 257.)

### The Agreement To Pay Goss $2,700,000.00

63. Guarneros and His Companies understood that the Printing Press had to be free and clear of all liens, claims, and liabilities prior to closing the sale with Quebecor. (S.Guarneros, 10/5/05, Test. 58.) Specifically, Guarneros realized that he needed the Goss lien released to close the deal with Quebecor. (S.Guarneros, 10/5/05, Test. 87.)

64. Therefore, on or about June 25, 2001, after four years of failing to pay any principal on the Grupo Serla Note but only four weeks after receiving the Quebecor letter of intent to purchase the Printing Press for $4,000,000.00 as part of the $13,000,000.00 asset sale, Guarneros came to Chicago and executed a handwritten summary of terms for agreement with Goss ("Agreement in Principal [sic]") on behalf of his company, Grupo Serla. (Pl.Ex. 25.) Goss never sent to Bank One, and Bank One never received from Goss a copy of the handwritten document. (M.Page, 10/25/05, Test. 20.) However, the lawyer representing both Bank One and Goss in the state court litigation received a formal typewritten draft agreement detailing the specific terms

of the handwritten agreement.

65. On June 26, 2004, Joseph Krasovec ("Krasovec"), who represented Goss and Bank One in the DuPage litigation, became aware of Goss' intent to settle separately because Spiegel, Goss' General Counsel, sent him a formal typewritten draft agreement to review. Krasovec sent a fax back to Spiegel with a mark-up of the draft and wrote: "HERE ARE MY SUGGESTED CHANGES. DID YOU LEAVE BANK ONE OFF FOR A PARTICULAR REASON? I'M SURE GRUPO WILL INSIST THEY BE ON IT."(Pl.Ex. 26.)

66. In the Agreement in Principal [sic], Guarneros agreed to pay Goss $2,700,000.00 in exchange for the Printing Press, "as is, where is," and Goss' release of any security interest, retention of title, or pledge in the Printing Press. (Pl.Ex. 25.) At that time, Grupo Serla had the ability to pay $2,700,000.00 to Goss from proceeds of the asset sale to Quebecor. (S.Guarneros, 10/5/05, Test. 74.) At the meeting where the Agreement in Principal [sic] was executed, a representative of Goss told Guarneros that Goss owned the Grupo Serla Note. (S.Guarneros, 10/5/05, Test. 72.)

67. The Agreement in Principal [sic] was subject to approval by Goss management. (Pl.Ex. 25.) Goss' management approved the agreement on or about the date the Agreement in Principal [sic] was drafted, June 25, 2001. (J. Gaynor, 10/5/05, Test. 190.)

68. Guarneros considered this agreement to be the final agreement between the parties on the subject. (S.Guarneros, 10/5/05, Test. 170.) However, Spiegel recognized that the June 25, 2001 Agreement in Principal [sic] was not a final agreement between Goss and Grupo Serla and told Mark Page ("Page"), an attorney for Bank One:

Needless to say, I am frustrated by the hurry up request from Serla for a meeting*554 to discuss settlement, followed by silence. It reminds me of past attempts to reach settlement in this matter and it doesn't seem to be promising.

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

(Pl.Ex. 36, BO 00318.)

### Bank One Was Notified Of The Agreement In Principal [sic] Between Goss And Grupo Serla

69. On July 2, 2001, Krasovec of Schiff Hardin & Waite, who had been representing both Goss and the Bank in the DuPage Litigation, told Bank One that Goss and Grupo Serla met and reached an agreement in principle to settle Goss' claims against Grupo Serla. (Pl.Ex. 27.) At trial, Page further admitted that Bank One knew about the Agreement in Principal [sic] between Goss and Grupo Serla. (M.Page, 9/30/05, Test. 47, 58-59.)

### The Contract to Sell The Printing Press To Quebecor

70. On July 5, 2001, shortly after executing the Agreement in Principal [sic] with Goss, Guarneros executed the final agreement selling the Printing Press to Quebecor. (Pl.Ex. 29.) The Agreement was officially titled, "Acquisition of Assets of Grupo Serla S.A. DE C.V. By Quebecor World Directory Mexico, S.A. DE C.V." ("Contract To Sell The Press To Quebecor"). (Pl.Ex. 29.) In this Contract To Sell The Press To Quebecor, Guarneros represented to Quebecor that Grupo Serla agreed to pay Goss $2,700,000.00 for the Printing Press and to accept the Printing Press in its present condition pursuant to the June 25, 2001 Agreement in Principal [sic]. (Pl.Ex. 29(a).)

### Bank One Was Notified Of The Sale To Quebecor

71. On August 9, 2001 Goss notified Bank One that Quebecor bought the assets of Grupo Serla. (Pl.Ex. 36.) Goss continued to notify Bank One periodically about the status of the sale. For example, on September 20, 2001, Goss told Page that the sale of assets to Quebecor was supposed to close in November. (Pl.Ex. 43.) Goss

told Bank One on this same date that Grupo Serla told Goss that it would fund the payments due under the Agreement in Principal [sic] from proceeds of the sale. (Pl.Ex. 43.)

### The Pledge Proceedings In Mexico

72. When Guarneros and His Companies agreed to sell the Printing Press to Quebecor, Goss engaged Jorge Leon Orantes, a Mexican commercial litigation lawyer associated with Goodrich, Riquelme & Associates for over 43 years, to enforce the Pledge Agreement. (J. Orantes, 9/19/05, Test. 3.) Orantes testified at trial that he filed an application to enforce the Pledge Agreement in Mexico on two occasions (the "Pledge Proceedings"). (J. Orantes, 9/19/05, Test. 50.) Orantes testified that the judge rejected the pledge sale claim because it was necessary for Goss to present the original executed Grupo Serla Note, and not a copy. That was impossible for Goss to do, as Bank One still held the original executed note.

73. On August 9, 2001, Goss notified Bank One via e-mail about the Pledge Proceedings. (Pl.Ex. 36.) Specifically, Goss told Bank One that it instructed its counsel to get an injunctive case on file in Mexico based on the pledge included in the Sale and Purchase Agreement. (Pl.Ex. 36.) Goss told Bank One that it asked Krasovec to draft a letter to Quebecor's attorney regarding the Pledge. (Pl.Ex. 36.) Goss also told Bank One that both steps were aimed at protecting the asset which secured payment of the purchase price under the contract. (Pl.Ex. 36.)

### Goss' Filings For Bankruptcy Protection

74. In September 1999, Goss filed a Chapter 11 proceeding in Delaware. (J. Gaynor, 10/18/05, Test. 75-76.) That filing *555 was made after Goss had paid Bank One 15% of the buyer's obligations pursuant to the Note Repurchase Agreement plus $4,250,000 under the Repurchase Note leaving only a balance of

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

$1,425,495.12 due under the Note Repurchase Agreement. (*See* Findings Nos. 46 and 60.)

75. Goss, as bankruptcy debtor, did not list the Grupo Serla Note on Schedule B, Personal Property, (BO Ex. 46, KE 001221), but did schedule the Note Purchase Agreement on Schedule G, Executory Contracts. (BO Ex. 47, p. KE 001569)

76. Goss' original 1999 bankruptcy case under Chapter 11 resulted in a confirmed plan in which Goss assumed the Note Purchase Agreement as an executory contract. (J. Gaynor, 10/18/05, Test. 78-79.) The confirmed Chapter 11 plan in that case was not offered in evidence.

77. On September 10, 2001, Goss filed a second Chapter 11 proceeding in this Court. The context of this filing was Goss' inability to enforce the Pledge Agreement in a Mexican court, and inability to pay the last two payments due under the Repurchase Note in April and May of that year.

78. On October 25, 2001, Goss filed its bankruptcy schedules in the new Chapter 11 case. (BO Exhs. 97, 98, 165.) Goss listed the Note Purchase Agreement with First National Bank of Chicago (the predecessor of Bank One in 1997) as an executory contract on Schedule G-Executory Contracts and Unexpired Leases. (BO Ex. 98.) Bank One is not listed as a secured creditor on Schedule D. (BO Ex. 165.)

79. When this bankruptcy case was filed under Chapter 11, Bank One was aware of the following: (1) Goss had paid Bank One $5,175,858.50 pursuant to the Note Repurchase Agreement; (2) Guarneros and His Companies were in the process of selling the Printing Press; (3) Grupo Serla had signed a handwritten Agreement in Principal [sic] to pay Goss $2,700,000.00; and (4) Goss had filed an action in Mexico to enforce its lien, but could not succeed because Bank One held the original signed Grupo Serla Note.

### Bank One Asked Goss For Information Regarding How Much It Would Receive From The Settlement

80. On September 20, 2001, Bank One asked Goss for an update on Goss' discussions with Guarneros and His Companies as well as Goss' intentions with respect to the proceeds of the Agreement in Principal [sic] with Grupo Serla. (Pl.Ex. 43.) Goss informed Bank One that the asset sale to Quebecor, including the Printing Press, was supposed to close in November and that Grupo Serla told Goss that it would fund the payments due under the Agreement in Principal [sic] from the proceeds of the asset sale to Quebecor. (Pl.Ex. 43.)

81. On or about October 3, 2001, Goss also informed Bank One that the Agreement in Principal [sic] with Grupo Serla would be subject to approval by the bankruptcy court and that it believed none of the proceeds of the Agreement in Principal [sic] would be allocated to Bank One. (Pl.Ex. 46.) Spiegel of Goss told Bank One that she believed that payments due to Bank One pursuant to the Repurchase Note were a pre-petition liability and would be dealt with by the plan of reorganization in the pending Chapter 11 case. (Pl.Ex. 46.)

82. Bank One believed that it would recover little or nothing under the Chapter 11 plan of reorganization. The following is an excerpt of the testimony of Page of Bank One:

Q. And, in fact, you looked at the plan of reorganization, right?

A. Yes.

Q. And under the plan of reorganization, the unsecured creditors might \*556 receive stock or a small amount of cash, but it was not much, correct?

A. Right.

(M.Page, 9/30/05, Test. 57-58.)

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

83. Bank One's credit managers subsequently committed its analysis to writing. In a Credit Approval Summary for Bank One, the following was reported: (1) Goss was then in Chapter 11 for the second time in two and a half years; (2) the secured debt was presently trading at 10% to 20% of face value; and (3) if the Bank did not sell the Grupo Serla Note it would only receive its pro-rata share of the equity of a reorganized Goss and whatever could be recovered through a lawsuit against Grupo Serla in Mexico. (Pl.Ex. 91.) The Bank believed little if anything would be recovered under the above scenarios. (Pl.Ex. 91.)

### Bank One Notified Guarneros And His Companies That It Wanted Part Of The Settlement

84. Page, the lawyer for Bank One, sent a letter to William O'Connor ("O'Connor"), counsel for Guarneros and His Companies, seeking to be part of the settlement discussion with Goss so that a "global resolution" could be reached. (Pl.Ex. 49.) In order to support this request, Bank One represented that it had purchased the Grupo Serla Note and that Guarneros and His Companies remained fully obligated to Bank One on the Grupo Serla Note. (Pl.Ex. 49.) Bank One also represented that it had the right to enforce the security for the Grupo Serla Note. (Pl.Ex. 49.) Prior to this time, Bank One had not taken steps to settle with the Foreign Defendants on its own. (M.Page, 9/30/05, Test. 57.)

85. In addition to the letter, Page also called O'Connor and told him that Bank One owned the Grupo Serla Note. (M.Page, 9/30/05, Test. 57.)

86. On October 11, 2001 counsel for Goss in Mexico (the "Mexican Counsel") asked DuPage Litigation Counsel for Bank One and Goss (the "DuPage Litigation Counsel") to send documents to allow the proceedings for enforcement of the pledge to succeed. (Pl.Ex. 54.)

87. On October 12, 2001, the DuPage Litigation Counsel responded by notifying Mexican counsel and

Bank One that because of a potential conflict of interest between Goss and Bank One, Mexican counsel should request anything needed directly from Goss. (Pl.Ex. 54.)

88. On October 12, 2001, the DuPage Litigation Counsel advised Bank One of a potential conflict of interest between Goss and Bank One. (Pl.Ex. 54.)

89. On October 15, 2001, the DuPage Litigation Counsel confirmed that he had additional discussions with Bank One regarding a conflict of interest between Goss and Bank One. (BO Ex. 107.)

### Quebecor Issued Checks Endorsed To Goss

90. Pursuant to the Modified Agreement between Quebecor and Grupo Serla, Quebecor issued a check on October 16, 2001 payable to Grupo Serla and then endorsed by Grupo Serla in favor of Goss in the amount of $1,600,000.00. (Pl.Ex. 57.) Also on or about October 16, 2001, Quebecor issued another check payable to Grupo Serla and also endorsed by Grupo Serla in favor of Goss in the amount of $200,000.00. (Pl.Ex. 58.)

91. Guarneros directed that these two checks were to be directed and transmitted to Goss. (S.Guarneros, 10/05/05, Test. 89.) Guarneros testified that it was his intent to pay Goss 100% of those funds. (S.Guarneros, 10/05/05, Test. 89.) He said that the two checks were actually to be given to Goss as soon as Guarneros and His Companies received assurance as to *557 who owned the Grupo Serla Note. (S.Guarneros, 10/05/05, Test. 96-97.)

### Guarneros And His Companies Met With Bank One Through Their Representatives In Chicago

92. In Chicago, John Adams ("Adams"), an agent of Guarneros and His Companies met with Chicago counsel for Guarneros and His Companies, William O'Connor

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

("O'Connor") and Sam Tenenbaum ("Tenenbaum"). (Pl.Ex. 129, Adams Dep., 61-70). Adams and counsel for Guarneros and His Companies then met with representatives of Bank One. (Pl.Ex. 129, Adams Dep., 70) Bank One representatives knew O'Connor represented Guarneros and His Companies at that time. (M.Page, 9/30/05, Test. 62.) Goss was not represented at the meeting. (M.Page, 9/30/05, Test. 62.) Page did not tell the Bankruptcy Creditors' Committee, the Bankruptcy Court or Debtor's Bankruptcy Counsel about the meeting. (M.Page, 9/30/05, Test. 65.)

93. Shortly before the meeting, Adams (a representative of Guarneros and His Companies) sent a detailed e-mail to Guarneros. (Pl.Ex. 59.) In the e-mail, Adams confirmed to Guarneros the following:

a. He spoke with Goss;

b. Goss told him that it had instructed its lawyers in Mexico to do whatever was necessary to file a lien on the equipment in Mexico;

c. the closing of the asset sale had not taken place yet;

d. Bank One had contacted Bill O'Connor in writing (Guarneros was sent a copy) and claimed Bank One still owned the note;

e. he understood Goss had been making payments on the Note;

f. he was going to Chicago;

g. the first thing he was going to do when he got to Chicago was to go to Bank One and find out if Bank One owned the note (" 'we' have to know who owns the Note and what was in the agreement between Bank One and Goss");

h. Goss cannot make any agreement now without Court approval and/or creditor approval: i.e. "whatever they say must first be agreed upon by the judge or the creditors committee. They are the ones with the power to accept or reject any offer or to make any agreement";

i. we could have a meeting with both Bank One and Goss at the same time. They would have to agree on how the money would be split between the both of them. If this has to happen the odds are they will never agree; and

j. Cuco told me today that you were sending me the checks by air to Oklahoma. As soon as I receive those checks, I am leaving for Chicago;

(Pl.Ex. 59.)

94. At the meeting, Adams or Tenenbaum raised the issue of having Bank One sell the Grupo Serla Note directly to the makers of the Note. (M.Page, 9/30/05, Test. 63.) The first document drafted by Page relating to the sale of the Note was based on this assumption. (M. Page, 9/30/05, Test. 62; Pl.Ex. 70.) Page also confirmed at trial that Bank One knew Adams had brought the checks endorsed to Goss. (M.Page, 9/30/05, Test. 64.) Page testified that Adams told him at the meeting that there was also a budget to resolve the claims of Grupo Serla's various creditors and that he had the money available in the United States. (M.Page, 9/30/05, Test. 64.)

**\*558** 95. Either at that meeting or the day after the meeting, Bank One (through its counsel Page) again told Adams that Bank One owned the Grupo Serla Note. (Pl.Ex. 129, Adams Dep., 68-69.) Based on this representation, Guarneros and His Companies refused to meet further with Goss, and they instructed Quebecor to cancel the two checks that had been endorsed to Goss. (Pl.Ex. 69(b), 69(c).)

96. Guarneros and His Companies had intended to meet with Goss through their lawyers and Adams while he was in Chicago. (Pl.Ex. 129, Adams Dep., 68-69.) However, based on Bank One's representation that it owned the Grupo Serla Note, Adams called Goss and said that there was no reason to meet. (Pl.Ex. 129, Adams Dep., 68-69.) Adams testified to what he observed: "We got two people on different sides both say that they own the note and they-and with the note is all rights to that press." (Pl.Ex. 129, Adams Dep., 61.) Adams testified that a Bank One representative told him, "Look, we're the owners of this press. Goss isn't. You're negotiating with the wrong people." (Pl.Ex. 129, Adams Dep., 56.)

*Quebecor Confirmed It Was Withholding Money For Goss*

97. On October 29, 2001, pursuant to Goss' inquiry, Quebecor confirmed that certain funds were in escrow and remained to be paid on November 15, 2001. (Pl.Ex. 61.) Quebecor also confirmed that it had been directed to issue certain specific payments to various creditors including Goss at the closing. (Pl.Ex. 61.)

98. On November 15, 2001, Quebecor wrote Guarneros and told him the following:

(1) Goss' Attorney notified Quebecor about the beginning of the Pledge Proceeding seeking the sale of the Printing Press; (2) Goss indicated that the amount of the debt was $5,940,000.00; (3) Quebecor contemplated making a payment in the amount of $5,000,000.00 in fulfillment of the modified asset sale agreement; (4) as a result of the notification by Goss, Quebecor was going to retain $5,000,000.00; and (5) once Quebecor receives evidence that there is no contingency on the free use, possession, and enjoyment of the Printing Press acquired by Quebecor, Quebecor will proceed to make the payment. (Pl.Exhs. 69, 69(a).)

99. On November 15, 2001, Grupo Serla responded in writing to Quebecor stating: (1) As to the checks in amounts of $1,600,000.00 and $200,000.00 endorsed over to Goss, Grupo Serla had been made aware that Goss no longer held the right for collection; (2) Bank One now had the collection rights on this debt; (3) therefore, Grupo Serla has given back the checks so that they were canceled; (4) it had been talking to Bank One with the objective of coming to an understanding on the payment; (5) it believed it would be able to solve this circumstance quickly so that new checks could be generated in place of those which were cancelled; and (6) with that understanding, it would appreciate it if the payment to Goss would be stopped. (Pl.Exhs. 69(b), 69(c).)

***Bank One Sold The Grupo Serla Note To The Foreign Defendants Without Seeking An Order Modifying The Automatic Stay***

100. Having succeeded in blocking the payments to Goss, Bank One sold the Grupo Serla Note and related items to Union Industrial Mexicana, S.A. de C.V. ("Union Industrial") for $1,100,000.00. (Pl.Exhs. 88, 106.)

101. As a result of the Note sale to Union Industrial and delivery of the Note to Union Industrial: (1) Goss did not receive any part of the $5,000,000.00 withheld by Quebecor; (2) Goss did not receive *559 any part of the $2,700,000.00 Grupo Serla agreed to pay to Goss; and (3) Goss did not receive the two checks totaling $1,800,000.00 which had been endorsed over to Goss (Pl.Ex. 130, Guarneros Dep., 90); and (4) without the Note Goss lost forever any ability to enforce collection on that Note or enforce the Pledge Agreement in a Mexican court. Instead, Bank One received $1,100,000.00. (M.Page, 9/30/05, Test. 100.)

***The Connection Between Union Industrial And Guarneros And His Companies***

102. Union Industrial is related to Guarneros and His Companies. (S.Guarneros, 10/5/05, Test. 30-35.) Guarneros testified to the following: (1) he owns 97% of Grupo Serla and Editorial Comercial; (2) he previously owned 97% of Union Industrial; (3) all three of these companies are located at 711 Suite C, Batriostismo Mexico City; (4) the lawyer for all three companies is Oscar Sosa Gueterez; and (5) none of the three companies has ever had any employees. (S.Guarneros, 10/5/05, Test. 30-35.)

103. Bank One representatives were aware before the closing of the transaction with Union Industrial that Union Industrial was connected to Guarneros and His Companies. (M.Page, 9/30/05, Test. 85.)

104. Guarneros claimed that he sold Union Industrial to his father approximately four years prior to his testimony (about the same time that Union Industrial purchased the Grupo Serla Note). (S. Guarneros,

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

10/5/05, Test. 31.) Guarneros testified at his deposition that there were no written documents regarding the sale of Union Industrial. (Pl.Ex. 130, Guarneros Dep., 16.) At trial, Guarneros revised his testimony to say that he does not remember any written documents regarding the sale, but that there must be some. (S.Guarneros, 10/5/05, Test. 32.) Guarneros acknowledged in his testimony at trial that he did not produce at trial any documents regarding the alleged sale. (S.Guarneros, 10/5/05, Test. 31-34.)

### The Negotiation Of The Union Industrial Note Purchase Agreement

105. Sale of the Grupo Serla Note by Bank One to Union Industrial was accomplished through two documents: a "Note Purchase Agreement" and an "Amended And Restated Note Purchase Agreement" (collectively the "Union Industrial Note Purchase Agreement"). (Pl.Exhs. 88, 106.) The first draft of the Union Industrial Note Purchase Agreement was prepared by O'Connor, Chicago counsel for Guarneros and His Companies as well as Union Industrial. (Pl.Ex. 75.) On November 21, 2001, O'Connor delivered the first draft to Bank One. (Pl.Ex. 75.) In his cover letter attached to the draft, O'Connor stated, "[A]lthough we are anxious to close, we do not wish to notify Goss until we have reached a signed agreement." (Pl. Ex. 75.)

106. Page did not send the Union Industrial Note Purchase Agreement to Goss or anyone who might be looking out for Goss' (or its creditors') interests. (M.Page, 9/30/05, Test. 71-73.) At trial, Page claimed that he and O'Connor (counsel for Guarneros and His Companies) were in fact looking out for Goss' interests, but his further testimony showed the disingenuous nature of such a claim:

Q. Did you send it to anyone other than you who might be looking out for Goss' interests?
A. Other than me?
Q. Yeah.
A. I sent it to-Oh. I sent it to-
Q. Who might be looking-
A. -O'Connor
Q. -for Goss' interest.

A. I sent it to O'Connor.
\*560 Q. Well, O'Connor wasn't looking out for Goss' interests, was he?
A. Well, I guess he wanted to settle with them, but ...
Q. You think O'Connor was looking out for Goss's interests?
A. No. I mean, he wanted to-no. He was looking out for his clients' interests.
Q. His clients were adverse to Goss, weren't they?
A. Yes, they had a dispute with Goss.

(M.Page, 9/30/05, Test. 80-81.)

107. On or about December 10, 2001, Bank One and Union Industrial executed the first of the Union Industrial Note Purchase Agreements. (Pl.Ex. 88.) Prior to this date, Goss was not notified of the negotiation or the agreement. (M.Page, 9/30/05, Test. 71-73, 80-84.) When a final agreement was reached, Bank One did not notify bankruptcy counsel for the Debtor or the Bankruptcy Court or Creditors' Committee. (M.Page, 9/30/05, Test. 97-98.)

108. The Union Industrial Note Purchase Agreement contained a provision that the Bank has argued here purported to preserve Goss' recourse against the makers and guarantor of the Grupo Serla Note. Specifically, it provided in section 7.1 that:

[n]either this agreement nor any action taken hereunder shall impair or affect in any way any rights, claims or remedies, if any, Goss may have against Editorial Comercial, Grupo Serla, and/or Sergio Guarneros Trujillo immediately before the execution of this Agreement. Any such rights of Goss shall continue the same as if this Agreement had not been made or consummated.

(BO Ex. 119, § 7.1, BO 02748-49.)

In the light of the knowledge of Bank One representatives that the Foreign Defendants denied that

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

Goss had any rights on claims or remedies against the Foreign Defendants (Pl.Ex. 106; BO 02820) and in the light of Bank One's delivery of the Note, to an entity related to the makers, the claims that this bit of wording protected Goss (without showing it to Goss to ask for the views of its lawyers) was pure sophistry or perhaps the only "fig leaf" of protection to Bank One that its lawyers could provide.

109. After Bank One entered into the 2001 Note Purchase Agreement with Union Industrial on December 10, 2001, in purported compliance with paragraph 4.1 of the Note Purchase Agreement, Bank One notified Goss by sending written notice of its intention to do so to Spiegel and Gaynor, Goss' Chief Financial Officer, and Krasovec, counsel in the DuPage litigation, in advance of the closing of the transaction with Union Industrial. (BO Exhs. 116, 117.) However, Bank One never sent a copy of the proposed draft agreement or executed agreement to Goss. (M.Page, 10/25/05, Test. 79.)

### The Purchase Price

110. In the Union Industrial Note Purchase Agreement, Bank One sold various items to Union Industrial in addition to the Grupo Serla Note (namely, the Repurchase Note, the Pledge, and its proof of claim) for $1,100,000.00. (Pl.Exhs. 88, 106.)

### Bank One Closed The Union Industrial Note Purchase Agreement

111. On December 12, 2001, representatives of Bank One internally approved the sale of the Grupo Serla Note to Union Industrial. (Pl.Ex. 91.) The sale resulted in interest income of $671,000 for the Bank. (Pl.Ex. 91.) Goss did not receive any portion of the sale proceeds. (M.Page, 9/30/05, Test. 77.)

*561 112. At the closing, Bank One gave the original Grupo Serla Note and the Pledge to O'Connor who was

the lawyer for: (1) the makers of the note; (2) the defendants named in the Pledge Proceedings; (3) the parties who sold the Printing Press to Quebecor; and (4) the parties who agreed to pay Goss $2,700,000.00 in the Agreement in Principal [sic]. (M.Page, 9/30/05, Test. 99.)

113. Page made sure that Bank One received the $1,100,000.00 wire transfer before he gave the original documents to O'Connor. (M.Page, 9/30/05, Test. 76, 100.)

### Bank One Admitted It Knew the Union Industrial Note Purchase Agreement Would Affect The Agreement In Principal [sic] Between Goss And Grupo Serla

114. Bank One's representative Page admitted that Bank One knew that the Union Industrial Note Purchase Agreement that Bank One entered into with the Foreign Defendants would cause the Foreign Defendants to "gain leverage" in their settlement discussions with Goss. (M.Page, 9/30/05, Test. 102.) Bank One was also aware that as a result of the deal negotiated between Bank One and the Foreign Defendants, the Foreign Defendants would deny that Goss had any rights, claims or remedies against Guarneros and His Companies. (Pl.Ex. 106; BO 02820.) Bank One, however, failed to provide Goss with a copy of the sale agreement and specific details of the transaction. (M.Page, 9/30/05, Test. 136.) It also failed to inform Goss that the Foreign Defendants intended to deny that Goss had any rights in the Grupo Serla Note.

115. When Union Industrial came before the Bankruptcy Court and first claimed in pleadings that it owned the Grupo Serla Note, Bank One (who was served with those pleadings) (M.Page, 9/30/05, Test. 102) did not file anything disputing that Union Industrial owned the Grupo Serla Note at that time. (M.Page, 9/30/05, Test. 102.)

### Bank One Executed Documents Post-Petition Intended To Prevent Goss From Receiving Money

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

116. Bank One maintained possession of the Grupo Serla Note continuously from the date of its purchase until it assigned its right, title and interest in the Note to Union Industrial. (L. Spano, 10/20/05, Test. 45; M. Page, 9/30/05, Test. 96.) The Union Industrial Note Purchase Agreement closed on December 19, 2001.

117. On December 19, 2001 Union Industrial wrote to Quebecor and advised Quebecor that Union Industrial, not Goss, was then owner of the Grupo Serla Note asserting that it had purchased the Grupo Serla Note from Bank One. (Pl.Exhs. 102, 102(a).) Union Industrial also told Quebecor that it was not reserving any right against Quebecor and that the Printing Press then belonged to Quebecor free and clear of any encumbrances. (Pl.Exhs. 102, 102(a).)

118. On or about December 20, 2001, Kaplan of Bank One signed a letter addressed to "Union Industrial-Mexico" stating the following:
Re: Goss Promissory Note
To Whom It May Concern:
  Yesterday, Bank One sold its promissory note from Goss Graphics to Union Industrial. William O'Connor has the signed documents. The money from this transaction has been received by Bank One. The only remaining issue is the receipt of an execution copy of the note purchase agreement signed by Union Industrial with all the pages initialed.

(Pl.Ex. 107.)

119. It is inferred and found from the circumstances in this case that Bank One *562 representatives were fully aware that Kaplan composing the above letter and giving it to Union Industrial, Bank One was actually providing and intending to provide Guarneros and His Companies with ability to consummate the sale to Quebecor without any payment to Goss on the balance due it or on its lien rights on the Printing Press.

120. On January 18, 2002, Adams, as agent for Editorial Comercial, Grupo Serla, Union Industrial, and Sergio Guarneros, came to Chicago and took the original Grupo Serla Note, the Repurchase Note, the Note Repurchase Agreement, and the Pledge from O'Connor's firm, Sachnoff & Weaver (the Chicago lawyers for Guarneros and His Companies as well as Union Industrial). (Pl.Ex. 110.)

121. Adams took the originals and went to St. Louis to deliver them to Guarneros. (Pl.Ex. 129, Adams Dep., 107.) Guarneros then took the originals to Mexico. *Id.*

122. Adams confirmed that he delivered the original Grupo Serla Note and Pledge to Guarneros, not to Union Industrial:
Q. Now, it says that you as agent for Editorial Comercial, Grupo Empresarial Serla and Union Industrial Mexicana and Sergio Guarneros acknowledge receipt on this 18th day of January, 2002 of the following original documents, copies of which are attached hereto.
Do you see that?
A. Yes, sir.
Q. And did you get those originals on that date?
A. Yes, sir.
Q. And these are true and accurate copies of those?
A. Yes, sir.

(Pl.Ex. 129, Adams Dep., 106.)

Adams continued:
My memory is, which is strong on this one, is that Bill O'Connor and Sam Tenenbaum had been in contact with the Mexican attorneys. This information had been, they had the originals in some suit that was here in Illinois. And so they wanted me to sign for the originals because in Mexico you can't take duplicates. You have to have originals. So I picked up the originals, they put it in [sic] an envelope, I went to St. Louis, gave it to Sergio. And then Sergio took it to Mexico with him.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

(Pl.Ex. 129, Adams Dep., 106-107.)


123. Bank One representatives were fully aware that Goss filed for bankruptcy protection at the time that Bank One sold the Grupo Serla Note to Union Industrial. (R. Kaplan, 9/26/05, Test. 94.)

### Bank One Admitted Goss Possessed Contractual Rights

124. A Bank One witness admitted at trial that Goss possessed contractual rights under the Note Repurchase Agreement. (M.Page, 9/30/05, Test. 49.) Specifically, this Court asked Page:

Q: Did you view-did the bank view or you as its lawyer view Goss as having contractual rights under this agreement?
A: Goss?
Q: Yes.
A: Oh, yes ...

(M.Page, 9/30/05, Test. 49.)


### Bank One Continued Its Collection Efforts On The Repurchase Note After The Bankruptcy Filing

125. After Goss filed for bankruptcy protection, Bank One continued to send past due notices to Goss requesting that Goss wire transfer funds regarding the **\*563** payments due on the Repurchase Note. (A. Salas, 10/18/05, Test. 44.)

126. Salas, a Bank One employee, sent these notices on behalf of Bank One in an effort to obtain payments from Goss, including "penalty interest." (A.Salas, 10/18/05, Test. 45-46.) Salas testified that Bank One treated debtors who filed for bankruptcy protection the same as those who had not. (A.Salas, 10/18/05, Test. 46.) Upon this Court's inquiry, Salas testified:

Q: Madam, were you ever given instruction as part of your work at the bank as to how to treat debtors who

were in bankruptcy?
A: No, sir.
Q: So basically are you saying in your experience once someone filed bankruptcy, they received from Bank One the same sort of notices they would receive if they were outside of bankruptcy?
A: Yes, sir.
Q: And there was no practice of seeking permission of the court to send such notices?
A: Not that I'm aware of, no.

(A.Salas, 10/18/05, Test. 46.)


### Bank One's Proof Of Claim Contained Penalty Interest

127. As of November 19, 2001 there was $62,798.41 of penalty interest due on the Repurchase Note. (A.Salas, 10/18/05, Test. 51.)

128. On November 21, 2001, Bank One filed its proof of claim in the amount of $1,499,055.03. (Pl.Ex. 74.) The proof of claim lists $1,425,495.12 in principal and $73,559.91 in interest. (Pl.Ex. 74.)

129. On November 8, 2001, Salas, the Bank One employee who sent past due invoices to Goss, notified Kaplan that two installments of $757,293.98 and $678,962.64 were still past due. (Pl.Ex. 65.) Kaplan replied, "Company filed for bankruptcy, but we are working with Grupo Serla to get paid." (Pl.Ex. 65.) When Salas specifically asked Kaplan whether she should send past due notices to both Goss and Grupo Serla, Kaplan responded, "Sure." (Pl.Ex. 65.)

130. Goss did not make any payment to Bank One as a result of these notices. (A.Salas, 10/18/05, Test. 73.)

131. As soon as a Bank One attorney informed Salas that she should not send any further notices, she did not send any further notices. (A.Salas, 10/18/05, Test. 76,

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

78-79.)

132. The word "demand" did not appear in the notices. (A. Salas, 10/18/05, Test. 62, 75, 79; Pl. Exhs. 52, 63.)

133. On November 8, 2001, Bank One sent a Fourth Past Due Invoice to Goss requesting that $678,962.64 be wire transferred to Bank One. (Pl.Ex. 63, BO 3633.) Also on November 8, 2001, Bank One sent a Seventh Past Due Invoice to Goss requesting that $757,293.98 be wired transferred to Bank One. (Pl.Ex. 63, BO 3632.)

134. On November 8, 2001 Bank One calculated the Penalty Interest Due for the "Past Due Loans" and sent the same to Dan Dillman, a Goss executive. (Pl.Ex. 64.) The penalty interest totaled $59,447.14 as of November 8, 2001. (Pl.Ex. 64, BO 3625.)

135. Statements of fact contained in the Conclusions of Law shall constitute additional Findings of Fact.

## CONCLUSIONS OF LAW

### JURISDICTION

Jurisdiction over this proceeding lies pursuant to 28 U.S.C. 157 and 1334(b) in that the matters raised herein arise under Title 11 U.S.C. and are related to a case under Title 11. Reference of the matters and issues herein were made to the bankruptcy court under District Court Internal Operating Procedure 15(a).

*564 Portions of this action are core proceedings pursuant to 28 U.S.C. 157(b)(2), while related jurisdiction lies over other portions. To the extent any issue is not a core proceeding, all of the Defendants by their counsel consented under 28 U.S.C. section 157(c) that the Bankruptcy Court may not only hear but also decide and enter final judgment on related jurisdiction counts following trial. (Bank One's Revised Post-Trial Proposed Findings of Fact and Conclusions of Law, 33, ¶ 4; citations to Bank One's Revised Post-Trial Proposed Findings of Fact and Conclusions of Law will hereinafter be referred to as "BO PT Findings, __"; Trustee's Amended Final Argument, 41, ¶ 4.) Counsel for the Foreign Defendants consented orally on the record.

Venue for this Adversary Proceeding lies in this District under 28 U.S.C. § 1409(a).

Bank One and Goss agreed that the Repurchase Note is governed by Illinois law. (Pl.Ex. 21.) The also agreed to waive trial by jury in any judicial proceeding involving, directly or indirectly, any issue in any way arising out of, related to, or connected with the Repurchase Note or with the relationship established thereunder. Id. The Mexican Defendants did not demand trial by jury or assert, argue or brief any rights under Mexican law, but argued their case under cited Illinois precedents and statutes. The Pretrial Order provided that issues not argued would be deemed waived, and therefore any issues under Mexican law have been waived.

### I. Goss Did Not Own The Note When Bank One Sold It

#### A. The Note Repurchase Agreement Did Not Transfer Ownership Of The Grupo Serla Note To Goss Or Define An Ownership Therein

[1] After a series of negotiations regarding the balance due under the Grupo Serla Note (R. Kaplan, 9/26/05, Test. 49), on December 15, 2000, Goss and Bank One entered into the Note Repurchase Agreement. Goss agreed therein to pay the remaining 85% of the buyer's obligations under the Grupo Serla Note through delivery of a promissory note payable to Bank One (the "Repurchase Note") in the amount of $5,675,495.12. (Pl.Ex. 21.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

The Trustee relies on language in the Note Repurchase Agreement for support that Goss owned all or part of the Grupo Serla Note, specifically the following: (1) two recital clauses in the Note Repurchase Agreement to that effect; (2) a characterization of the "effective" provision in the agreement; and (3) an inference that Goss' delivery of the Repurchase Note should be treated as actual and immediate full payment for the Grupo Serla Note.

The Note Repurchase Agreement consists of one page. The relevant portions of it provided:

Whereas, the Company has repurchased 15% of the Grupo Serla Note from the Bank by paying the Bank the principal amount of US$805,000 plus accrued interest;

Whereas, the Bank has demanded that the Company repurchase the remaining 85% of the Grupo Serla Note by paying the Bank the principal amount of US$4,564,500 plus interest through December 15, 2000 in the amount of US$1,110,995.12;

NOW, THEREFORE, in consideration of the mutual promises and covenants as expressed herein, and good and valuable consideration, the Parties hereto agree as follows:

(1) The Company shall repurchase the remaining 85% of the Grupo Serla Note from the Bank in accordance with the **565** terms of the note attached hereto as Exhibit A (the "Repurchase Note").

(2) Upon the Bank's receipt of payment in full in immediately available funds of all amounts due and payable by the Company under or in connection with the Repurchase Note, the Bank shall endorse and return the Grupo Serla Note to the Company or as a court of competent shall otherwise direct.

(3) This Agreement shall become effective upon the later to occur of (I) the execution of counterparts hereof by the Parties and (ii) the receipt by the Bank of the Repurchase Note duly executed by the Company ...

(Pl.Ex. 21.)

The first recital relied upon by the Trustee, that Goss

"has repurchased 15% of the Grupo Serla Note from the Bank by paying the Bank the principal amount of U.S. $805,000 plus accrued interest ...," does not mean that Goss owned 15% of the Note.

[2] First, the operative provisions of an agreement supercede an inconsistent recital. Obligations and promises of parties in the operative portion of the contract prevail over a preliminary recital or preamble. *Brookens v. Peabody Coal Co.,* 11 Ill.2d 322, 143 N.E.2d 25, 27 (1957); *Ill. Housing Dev. Auth. v. M-Z Constr. Corp.,* 110 Ill.App.3d 129, 65 Ill.Dec. 665, 441 N.E.2d 1179 (1982) (holding that the preliminary recitals of an agreement impose no binding obligations on the parties unless so referred to in the operative portion of the instrument as to show a design they should form a part of it).

[3] Evidence concerning the meaning and correctness of a recital contained in an integrated agreement is admissible and does not constitute improper parol evidence, as contrary facts may be proved. Restatement (Second) of Contracts § 218(1) (1981). *See also* Restatement (Second) of Contracts § 218(1) cmt. b (1981).

[4] Illinois courts have held that "whereas" clauses serve as recitals and are merely explanations of the circumstances surrounding the execution of the contract. *Regnery v. Meyers,* 287 Ill.App.3d 354, 360, 223 Ill.Dec. 130, 679 N.E.2d 74 (1997). "These recitals are not binding obligations unless referred to in the operative portion of the contract." *McMahon v. Hines,* 298 Ill.App.3d 231, 237, 697 N.E.2d 1199, 1204, 232 Ill.Dec. 269, 274 (1998) (comparing *Regnery,* 287 Ill.App.3d at 360, 223 Ill.Dec. 130, 679 N.E.2d 74) ("whereas" clause merely a recital paragraph, the terms of which are not part of contract), with *Brady v. Prairie Material Sales, Inc.,* 190 Ill.App.3d 571, 577, 137 Ill.Dec. 857, 546 N.E.2d 802 (1989) (holding that recital paragraphs were part of agreement because operative clause stated that the preceding terms of the agreement were not a mere recital).

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

Page 47

In the circumstances surrounding execution of the Note Repurchase Agreement, the recital was material only insofar as it recounted how much Goss paid to date with respect to its recourse obligations under the Grupo Serla Note. Page of Bank One testified that the wording of the recital was only a convenient shorthand the parties had developed for referring to the more complicated repayment transaction undertaken pursuant to Goss' endorsement of the Grupo Serla Note and Article V(A)(2) of the Note Purchase Agreement, i.e., the operative contract provisions. (M.Page, 9/30/05, Test. 40.)

The Trustee's contention based on the second whereas clause cited was that "the Bank has demanded that the Company [Goss] repurchase the remaining 85% of the Grupo Serla Note...." However, that *566 clause did not address the date that the repurchase was to be completed. It merely described the demand that Goss honor its recourse obligation under the Note Purchase Agreement. As described above, Paragraph 2 of the Note Repurchase Agreement specifically provides that the repurchase was not to be complete and Goss was not entitled to return of the Grupo Serla Note until "the Bank's receipt in full in immediately available funds of all amounts due and payable by [Goss]...." (Pl.Ex. 21.)

The operative provisions of the Note Repurchase Agreement between Goss and Bank One evidenced no intent to transfer ownership of the Grupo Serla Note to Goss as of its execution. Rather, they provided for Goss to make payments over time, in accordance with a schedule of payments, and they did not provide for endorsement and delivery of the Grupo Serla Note to Goss until after "Bank One's receipt of payment in full in immediately available funds of all amounts due and payable by the Company under or in connection with the Repurchase Note."(Pl.Ex. 21.)

Evidence of the negotiations was introduced, and fully supports this interpretation. Kaplan and Page of Bank One and Gaynor of Goss testified that Bank One and Goss intended only to extend the time for Goss to satisfy its remaining recourse obligations and did not

intend to change any other aspect of the Note Purchase Agreement. (J. Gaynor 10/18/05, Test. 49; R. Kaplan 9/26/05, Test. 95.) Drafts of the Note Repurchase Agreement and Repurchase Note exchanged between the parties corroborate this testimony. (See BO Exhs. 59, 66.)

[5] Parol or extrinsic evidence is admissible to explain the purpose of the execution of a written instrument, what the parties intended, the consideration for its execution, and the circumstances surrounding its execution. _Lincoln Nat'l Life Ins. Co. v. Horwich_, 115 F.2d 892, 895-96 (7th Cir.1940); _Dancy v. William J. Howard, Inc._, 297 F.2d 686, 688 (7th Cir.1961); _Cinquegrani v. IRS (In re Cinquegrani)_, Nos. 89 B 7850, 89 A 0747, 1993 WL 134752, at *7 (Bankr.N.D.Ill. Feb.1, 1993).

[6] The Illinois Supreme Court long ago also observed that nothing in the parol evidence rule prevents a court from considering facts surrounding the execution of the agreement in question. See _Linn v. Clark_, 295 Ill. 22, 128 N.E. 824, 828 (1920) (the parol evidence rule does "not exclude evidence of the circumstances of the execution of the contract and of the facts in connection with it which may tend to explain its meaning by showing the situation of the parties and all their relations to one another and the subject matter of the contract.").

[7] Pursuant to Illinois law, the primary goal in construing a contract is to give effect to intent of the parties. _Cress v. Recreation Services, Inc._, 341 Ill.App.3d 149, 277 Ill.Dec. 149, 795 N.E.2d 817, 838 (2003). See also _First Bank and Trust Co. of Illinois v. Village of Orland Hills_, 338 Ill.App.3d 35, 39, 272 Ill.Dec. 485, 787 N.E.2d 300, 304 (2003); _Pennsylvania Life Insurance Co. v. Pavlick_, 265 Ill.App.3d 526, 529, 202 Ill.Dec. 424, 637 N.E.2d 1160, 1162 (1994).

As the trial testimony of the parties' representatives did not contradict or add any term to the operative provisions of the Note Repurchase Agreement, it was not necessary to demonstrate an ambiguity in order to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

introduce evidence of the negotiations and circumstances surrounding its execution.

The Note Repurchase Agreement and Repurchase Note did not give Goss an ownership interest in the Grupo Serla Note because they merely extended the *567 time for Goss to make payments of its pre-existing recourse obligation under its indorsement and the Note Purchase Agreement. As noted, Paragraph 2 of the Note Repurchase Agreement specifically provided that Goss was not to be entitled to possession of the Grupo Serla Note until Goss made all of its outstanding payments due to Bank One:

Upon the **Bank's receipt of payment in full in immediately available funds of all amounts due and payable by the Company** under or in connection with the Repurchase Note, the Bank shall endorse and return the Grupo Serla Note to the Company or as a court of competent jurisdiction shall otherwise direct.

(Tr. Exh. 21.) (emphasis supplied).

The Trustee argues that the Note Repurchase Agreement became effective the week of December 15, 2000 because that is when Bank One received the agreement executed by Goss. Therefore, the Trustee argues as a matter of law that the Grupo Serla Note was property of the estate when Bank One endorsed, delivered, and sold it to Union Industrial. (Trustee's Amended Final Argument, 43, ¶ 10.)

Contrary to Trustee's assertion, paragraph three of the Note Repurchase Agreement, which discusses when the agreement was to become effective, does not prove that Goss owned all or any part of the Grupo Serla Note when it delivered the Repurchase Note to Bank One. Paragraph 3 provides: "[t]his Agreement shall become effective upon the later to occur of (i) the execution of counterparts hereof by the parties and (ii) the receipt by the Bank of the Repurchase Note duly executed by the company." (Pl.Ex. 21.) This clause demonstrates that the parties intended to ensure that Bank One received what Goss promised to give to the Bank, an executed

promissory note for $5,675,495.12, before extension of the time for Goss to pay off its recourse obligations with respect to the Grupo Serla Note became effective.

At the time of entry into the Note Repurchase Agreement, the credit insurance claim had been denied and Goss failed to make immediate and full payment of its recourse obligations to Bank One both under its endorsement and the Note Purchase Agreement. The Note Repurchase Agreement upon becoming effective would relieve Goss of its default, but Bank One wanted to be clear (and Goss consented) that this relief would not take place until Bank One received the required executed documents. The fact that the Note Repurchase Agreement became "effective" did not mean that Goss had completed its repurchase of the Grupo Serla Note. Rather, it meant that the agreed-upon extension of time for Goss to pay was effective, and that Goss' immediate obligation to pay the remaining balance on the Grupo Serla Note to Bank One under the Note Purchase Agreement was suspended. The Note Repurchase Agreement, consistent with the original Note Purchase Agreement, by its explicit terms makes clear that Goss was not entitled to return of the Grupo Serla Note until it repaid the amount of the Grupo Serla Note in full. (Pl.Ex. 21.)

**B. Other Evidence Did Not Show Under Illinois Law That Goss Was Partial Owner Of The Grupo Serla Note**

[8] Goss did not own 15% of the Grupo Serla Note because of its payment to Bank One of 15% of the amount of the notemakers' default. Goss did not acquire a partial ownership interest under the Note Purchase Agreement or applicable law. U.C.C. § 3-203(d) as adopted in Illinois provides: "If a transferor purports to transfer less than the entire instrument, *568 negotiation of the instrument does not occur. The transferee obtains no rights under this Article and has only the rights of a partial assignee." 810 ILCS 5/3-203(d) (2005).

[9][10] In this case, a partial assignment did not take

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

place. The distinguishing feature of a partial assignment is a manifestation of intent to: (1) make an immediate transfer of part of but not all of the assignor's right; and (2) confer on the assignee a direct right against the obligor to the performance of that part. Restatement (Second) of Contracts § 326 cmt. b (1981). The factual question presented to determine whether a partial assignment took place is whether it was contemplated that there would actually be an outright assignment of some right, interest, and authority and control of a claim, or only a promise to pay out of any proceeds of a claim that might be collected in the future. Restatement (First) of Contracts § 156 cmts. a-c (1932); Cf.Restatement (Second) of Contracts § 326 cmt. b and § 330 cmt. b (1981).

No partial assignment took place as a result of Goss' repayment of a portion of the buyer's obligations because the evidence did not show that the parties manifested an intent to make an immediate transfer and assignment of part, but not all, of Bank One's rights to enforce the Grupo Serla Note. SeeRestatement (Second) of Contracts § 326 cmt. b (1981).

The Trustee has also not satisfied the second requirement for a partial assignment under Illinois law. He did not establish that Goss had the right to enforce any interest in the Grupo Serla Note directly against Grupo Serla and Editorial Commercial, the makers of the Grupo Serla Note. The Note Repurchase Agreement did not give Goss any rights vis-à-vis those two companies.

It is clear, moreover, that no partial assignment took place because Bank One retained possession of the Note and control of the claim and authority to collect on the claim and Note. Goss recognized this fact when it received the only payment made by Grupo Serla, $75,000 in October 1998. Notwithstanding that it had previously repaid 15% of the Buyer's obligations in default in September 1998, Goss forwarded the entire payment to Bank One without claiming that it was a 15% owner of the Grupo Serla Note and therefore entitled to 15% of the payment. Miller v. Wells Fargo Bank Int'l Corp., 540 F.2d 548, 558-59 (2d Cir.1976); Winterstein

v. CrossCheck, Inc., 149 F.Supp.2d 466, 470-71 (N.D.Ill.2001).

Based on the facts in this case, no partial assignment took place and Goss did not obtain the rights as a partial assignee through the payments it made to Bank One.

**C. Goss' Delivery Of The Repurchase Note Does Not Demonstrate That The Repurchase Was Completed**

[11][12][13] The Trustee's additional argument that Goss' delivery of the Repurchase Note to the Bank constituted immediate and actual full payment to the Bank for the Grupo Serla Note is contrary to the legal presumption that a promise is not to be regarded as payment. It is well settled in Illinois law that mere delivery of a promissory note by a debtor for a preexisting obligation will not be held to extinguish the preexisting obligation in the absence of an agreement to that effect. Keller v. North American Life Ins. Co., 301 Ill. 198, 204-05, 133 N.E. 726, 729 (1921). This "doctrine proceeds on the obvious ground that nothing can be justly considered as payment in fact but that which is in truth such, unless something else is expressly agreed to be received in its place. That a *569 mere promise to pay cannot of itself be regarded as an effective payment is manifest." Keller, 133 N.E. at 729.

[14] More recently on this point, it has been observed that "[a] note cannot be paid and satisfied by a new promise which goes unfulfilled."American Nat'l Bank & Trust v. Dozoryst, 256 Ill.App.3d 674, 679, 195 Ill.Dec. 608, 628 N.E.2d 1072, 1076 (1993). Consequently, Goss' mere delivery of the Repurchase Note did not discharge the obligation of Goss to make immediate full payment to the Bank before it was entitled to gain possession and ownership of the Grupo Serla Note. Full actual payment of its recourse obligations to Bank One was always the condition that Goss had to satisfy to become the owner of the Grupo Serla Note.

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

No evidence introduced by the Trustee rebuts the legal presumption that the delivery of the Repurchase Note did not extinguish Goss' obligations under the Note Purchase Agreement and should not be treated as actual and immediate full payment. The Note Repurchase Agreement did not rebut the presumption because paragraph 2 of that agreement makes it clear that Bank One would endorse and deliver the Grupo Serla Note only upon Bank One's receipt of payment in full in immediately available funds of all amounts due and payable by Goss under the Repurchase Note. (Pl.Ex. 21.)

In summary, the delivery of the Repurchase Note did not discharge Goss' obligation to make immediate full payment to the Bank before it was entitled to gain ownership of the Grupo Serla Note. Full actual payment of its recourse obligations to Bank One was always the condition that Goss had to satisfy to become the owner of the Grupo Serla Note, and none of the evidence proffered by the Trustee alters this.

**D. *Bank One's Collection Efforts Do Not Prove that It Recognized That Goss Owned The Grupo Serla Note***

Prior to the Note Repurchase Agreement, Bank One attempted to collect payment due on the Grupo Serla Note from Guarneros and His Companies. After the Note Repurchase Agreement has given, Bank One stopped demanding payment from Guarneros and His Companies and started sending bills to Goss with the same frequency.

The Trustee argues that this occurred because Bank One understood that Goss owned the Grupo Serla Note after the Note Repurchase Agreement. Despite the Trustee's argument, Bank One's collection efforts in this regard do not prove that it acknowledged Goss owned the Grupo Serla Note. Rather, Bank One was attempting to collect on the Grupo Serla Note from parties obligated under the Note. Despite Bank One's attempts from 1997 until 2000 to collect on the Note, it was unsuccessful. Bank One then focused its collection efforts on Goss as Goss was required to make payments to Bank One

pursuant to its secondary liability. Therefore, Bank One's collection efforts do not prove it acknowledged Goss owned the Grupo Serla Note.

**E. *Bank One's Internal Computer System Does Not Prove That Bank One Understood Goss Owned The Grupo Serla Note***

The Trustee argues that Bank One's internal records confirm that Bank One acknowledged Goss had repurchased the Grupo Serla Note. Bank One maintains a computer system, referred to as the LS2 System, which keeps track of historical events. (A.Salas, 10/18/05, Test. 53.) The LS2 System reflected that on December 15, 2000 the Grupo Serla Note was paid off *570 and a new commitment representing the Repurchase Note was set up. Therefore, the Trustee argues that Bank One's internal records confirm that Bank One understood that Goss repurchased the Grupo Serla Note.

Salas, the Bank's record-keeper for this transaction, testified that the Bank's computer system mandated this approach because only one note per deal could be entered on the system. Maintaining the notes in this manner ensured that Bank One avoided double-counting of its assets. (A. Salas 10/18/05, Test. 66-67.) This action was not specific to this transaction but part of Bank One's normal process. Such administrative minutiae does not support the Trustee's position. A creditor's internal procedures do not define a bankruptcy debtor's property interests.

**II. *Goss Property Interest In Note And Impairment Thereof By Stay Violation***

**A. *Although It Did Not Own All Or Part Of The Grupo Serla Note, Goss Owned Interests Therein Constituting Property Of The Estate***

[15] Bank One always recognized that Goss had an interest in the Note even though the Bank held title to

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

and possession of that Note. The two parties even joined together with same counsel to sue the foreign Defendants in pleadings that recognized the interests of each. (Findings of Fact, ¶ 37.)

Section 541(a) of the Bankruptcy Code provides that the "estate is comprised of all the following property, wherever located and by whomever held ... all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. 541(a)(1). The Supreme Court views this not as a limitation of what is included in the estate but as a broad, inclusive definition. _United States v. Whiting Pools, Inc.,_ 462 U.S. 198, 103 S.Ct. 2309, 2312, 76 L.Ed.2d 515 (1983).

[16][17] "When a bankruptcy petition is filed, virtually all property of the debtor at that time becomes property of the bankruptcy estate." _In re Yonikus,_ 996 F.2d 866, 869 (7th Cir.1993). "[T]he term 'property' has been construed most generously and an interest is not outside its reach because it is novel or contingent or because enjoyment must be postponed." _In re Yonikus,_ 996 F.2d at 869 (citing _Segal v. Rochelle,_ 382 U.S. 375, 379, 86 S.Ct. 511, 515, 15 L.Ed.2d 428 (1966)). "[E]very conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of § 541." _In re Yonikus,_ 996 F.2d at 869 (citing _In re Anderson,_ 128 B.R. 850, 853 (D.R.I.1991)).

[18] The Bankruptcy Code does not provide a definition for either the term "property" or the term "interest in property." However, those terms should be construed extremely broadly, encompassing virtually every right that a debtor has at the time of filing. _See, e.g., Segal v. Rochelle,_ 382 U.S. 375, 379, 86 S.Ct. 511, 515, 15 L.Ed.2d 428 (1966).

[19] Congress intended to bring "anything of value" into the estate. "[T]he Supreme Court has determined that property of the estate includes property in which the debtor had no possessory rights at the time the bankruptcy petition was filed." _In re Nash,_ 228 B.R. 669, 672 (Bankr.N.D.Ill.1999).

[20] Property accruing to the estate under 11 U.S.C. 541 includes all rights of action the debtor may have arising from contract. Collier on Bankruptcy, 541.08[4] (15th ed. rev.2005). Claims arising from contracts entered into by the debtor before *571 filing for bankruptcy have been held to be within the reach of 541. _Hoseman v. Weinschneider,_ 277 B.R. 894, 899 (N.D.Ill.2002) (noting that for a contract claim to be part of the estate, there must have been a contract, something that could have been enforced and assigned or otherwise alienated or levied against; mere negotiations will not suffice). To the extent that a contract is in existence at the filing of a bankruptcy petition, the underlying contract rights become property of the estate. _In re Sherlock Homes of W.N.Y., Inc.,_ 246 B.R. 19, 23 (Bankr.W.D.N.Y.2000).

Based on the foregoing precedent and the broad application of 11 U.S.C. § 541, it is clear that Goss possessed several interests in the Grupo Serla Note that constituted property of the estate. Pursuant to the Note Repurchase Agreement, prior to the sale by Bank One to Union Industrial Goss had a right to obtain and own the entire Grupo Serla Note upon completion of its payment obligations due to Bank One. Goss possessed this contractual right pursuant to the Note Repurchase Agreement which provided:

Upon the Bank's receipt of payment in full in immediately available funds of all amounts due and payable by the Company under or in connection with the Repurchase Note, the Bank shall endorse and return the Grupo Serla Note to the Company or as a court of competent jurisdiction shall otherwise direct.

(Pl.Ex. 21.)

Prior to filing for bankruptcy, Goss made payments to Bank One in the amount of $5,175,728.17 pursuant to its obligations under the Note Repurchase Agreement. Goss made all of the payments due from it except the April and May 2001 payments. (M.Page, 9/30/05, Test. 44.) The April and May 2001 payments totaled

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

$1,425,495.12. Therefore, Goss had the contract right to own and possess the Grupo Serla Note by paying Bank One the relatively small balance due. Goss' contractual right to complete its repurchase of the Grupo Serla Note therefore constituted property of the bankruptcy estate.

Bank One recognized that Goss possessed contractual rights. Its representative admitted at trial that Goss possessed contractual rights in the items sold to Union Industrial. Specifically, Page, Bank One's lawyer who testified in these proceedings admitted:

THE COURT: Did you view-did the bank view or you as his lawyer view Goss as having contractual rights under this agreement?

THE WITNESS: Goss?

THE COURT: Yes.

THE WITNESS: Oh, yes ...

(M.Page, 9/30/05, Test. 49.)

[21] Goss possessed this contractual right both before and after its bankruptcy filing as its rights under the Note Repurchase Agreement were never terminated by any notice or assertion from Bank One. Moreover, it does not appear from the documents that its rights were automatically terminated by nonpayment as time of payments due was not specified to be "of the essence."

[22][23] "When time is not of the essence, a failure to perform in the time specified does not terminate the parties' rights under the contract, and does not preclude recovery on the contract." 17A Am.Jur.2d *Contracts* 607 (2006). "Ordinarily, time is not of the essence unless made so by express stipulation of the parties or by virtue of the exigencies of the transaction itself." *See King v. Stevenson*, 445 F.2d 565, 569 (7th Cir.1971). In this case, the Note Repurchase Agreement did not expressly provide that time was of the essence. Nor should it be found that time *572 of payments was of the essence based on the proven intent of the parties or exigencies of the transaction. *See Id.*Because time was not of the essence and the Note Repurchase Agreement was not formally terminated by notice, Goss' still maintained the

previously described contractual rights in the Grupo Serla Note post-bankruptcy.

In addition, the several requests for payment sent to Goss post-petition, as late as November 8, 2001, demonstrated that Bank One treated the Note Repurchase Agreement as an active contract. (Pl.Ex. 63.) Those reminders of monies due corroborated that the contract was still alive and showed that bank officials knew that contract was alive.

In addition to Goss' previously described contract rights in the Grupo Serla Note, under IL ST CH 26 ¶ 3-412, Goss had the right to payment on the Grupo Serla Note from the maker to the extent of its payments to Bank One. *See Primus Auto. Fin. Servs., Inc. v. Otto-Wal, Inc.*, No. 3:98CV7424, 2000 WL 621176, at *14 (N.D.Ohio Apr.3, 2000). For each payment Goss made to Bank One as endorser under Article 3 and as a party secondarily liable under the Note Purchase Agreement, Goss acquired the immediate right to sue the makers of the Grupo Serla Note for reimbursement. U.C.C. § 3-412 ("The obligation [of the issuer to pay an instrument according to its terms] is owed to a person entitled to enforce the instrument [defined in § 3-301] *or to an endorser who paid the instrument under Section 3-415* ") (emphasis added); IL ST CH 26 ¶ 3-412. Goss, by virtue of its payments to Bank One, became entitled to repayment from Editorial and Grupo Serla, the issuers of the note. *See Primus Auto. Fin. Servs., Inc. v. Otto-Wal, Inc.*, No. 3:98CV7424, 2000 WL 621176, at *14 (N.D.Ohio Apr.3, 2000). IL ST CH 26 ¶ 3-412 provides:

The issuer of a note or cashier's check or other draft drawn on the drawer is obliged to pay the instrument (i) according to its terms at the time it was issued or, if not issued, at the time it first came into possession of a holder, or (ii) if the issuer signed an incomplete instrument, according to its terms when completed, to the extent stated in Sections 3-115 and 3-407. The obligation is owed to a person entitled to enforce the instrument or to an endorser who paid the instrument under Section 3-415.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

[24] Furthermore, Goss and later the Trustee could have become entitled to full rights of subrogation including the right to all collateral had they tendered or attempted to tender the remaining payments due the holder of the Grupo Serla Note. "Generally speaking, the party subrogated acquires all the rights, securities, and remedies the creditor has against the debtor who is primarily liable. His right of subrogation, although not superior to the rights of the original creditor, extends to the latter's rights, both direct and incidental." 73 Am.Jur.2d *Subrogation* § 61 (2006).

Based on the foregoing, Goss' various rights constituted property of the estate as defined in the Bankruptcy Code, 11 U.S.C. § 541.

**B.** *Violation Of The Automatic Stay By Bank One*

[25] Finding that Goss' interests in the Grupo Serla Note constitute property of the estate, it is necessary to determine whether its interests in the Grupo Serla Note were altered in a manner in violation of the relevant provisions of 11 U.S.C. 362(a) through the Bank's sale of the Note to Union Industrial.

**\*573** Upon the filing of a bankruptcy petition, the automatic stay arises as a matter of law. 11 U.S.C. § 362(a). Section 362(a) lies at the heart of the Bankruptcy Code. It provides one of the most fundamental protections afforded to debtors by preventing the piecemeal destruction of the debtor's property. Without the stay provided by 11 U.S.C. 362(a), there would be a race to the courthouse to claim assets of the debtor, and a successful reorganization would be impossible.

[26]Section 362(a)(3) states that a filing of a petition for relief under the Bankruptcy Code serves as an automatic stay of "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. 362(a)(3). "The stay of section 362 is extremely broad in scope and ... applies to almost any type of formal or informal action taken against the debtor or the property of the estate." Collier on Bankruptcy, 362.03 at 362-12.12 (15th ed. rev.2005).

[27]Section 362(h) provides damages for "willful" violations of the stay.[FN3] 11 U.S.C. § 362(h). A willful violation of the stay does not require that the creditor had the specific intent to violate the stay. *In re Bloom,* 875 F.2d 224, 227 (9th Cir.1989). A creditor can be subject to liability under § 362(h) if the creditor engages in conduct which violates the automatic stay, with knowledge that a bankruptcy petition had been filed. *In re Roete,* 936 F.2d 963, 965 (7th Cir.1991).

> FN3. In 2005, the Bankruptcy Code was substantially revised, and § 362(h) was modified and relabeled § 362(k)(1). This opinion will refer to the section as § 362(h) as the prior version of the statute controls this case.

[28][29][30] Willfulness can be found even if the creditor believed himself justified in taking the actions found to violate the stay. *In re Sumpter,* 171 B.R. 835, 843 (Bankr.N.D.Ill.1994). Moreover, ignorance of bankruptcy law does not excuse anyone involved in a willful violation of the stay. When a willful violation of the stay is found, the Bankruptcy Code allows the debtor to recover damages including attorney's fees and costs necessarily and reasonably incurred by reason thereof. *In re Alfred Fridge,* 239 B.R. 182, 190 (Bankr.N.D.Ill.1999).

By applying the foregoing to the present case, it is evident that Bank One knowingly violated the automatic Bankruptcy stay by taking steps that wiped out Goss' interest in the Grupo Serla Note. At the time Goss filed for bankruptcy protection, Goss' estate possessed a protectable interest in the Grupo Serla Note, which Bank One disregarded and severely impaired or entirely destroyed.

Bank One argues that sale of its right, title, and interest in the Grupo Serla Note and related documents

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

to Union Industrial did not violate the automatic stay because: (1) Bank One did not sell property of the estate; and (2) irrespective of who owned the Grupo Serla Note, Bank One did not impair or foreclose any right or interest of the estate, since the estate retained the same rights after the sale as before. (BO PT Findings, 33, ¶ 6.)

Bank One's arguments fail. Goss' interest in the Grupo Serla Note was altered in a manner contrary to relevant provisions of 11 U.S.C. 362(a) through the sale to Union Industrial. As was extensively discussed, Goss' interest in the Grupo Serla Note constituted property of the estate. Goss obtained an interest in the Grupo Serla Note based on its payments to Bank One.

Further, Bank One did impair an interest of the estate, Goss' interest in the **574 Grupo Serla Note, because Goss did not retain the same rights after the sale as before. Prior to Bank One's sale of the Grupo Serla Note to Union Industrial, Goss had the potential to collect from the makers of the Grupo Serla Note. Evidence presented at trial demonstrates that the possibility of Goss recovering from the makers of the Note was tangible. However, once Bank One sold the Grupo Serla Note, Goss lost the opportunity to collect from the makers or guarantor in Mexican courts where its litigation to collect had already lost because it did not possess the Note. Pursuant to Section 7.1 of the Amended and Restated Note Purchase Agreement, the Buyer (Union Industrial) denied that Goss had any rights in the Grupo Serla Note. (Pl.Ex. 106, BO 02819-20.) Further, after the sale to Union Industrial, the location of the Grupo Serla Note was unknown. Therefore, the estate clearly did not retain the same rights in the Grupo Serla Note after Bank One sold it to Union Industrial as it possessed no rights after the sale.

Bank One argues that it preserved Goss' property interest in the Note in connection with sale of its bankruptcy claim to Union Industrial. However, instead of passively retaining possession of the Grupo Serla Note, Bank One exercised control by affirmatively taking the Note and endorsing, transferring physical possession, and selling the same to an entity Bank One knew was related to the makers of the Note.

Bank One's sale of the Grupo Serla Note and related items did not merely maintain or continue the perfection of an interest in property. Bank One sold the Grupo Serla Note after Goss paid Bank One $5,175,728.17 pursuant to the Note Repurchase Agreement. Bank One negotiated a sale with the makers of the Grupo Serla Note without providing notice to Goss. Bank One then handed the Grupo Serla Note along with the security documents to the lawyers for the makers of the Note while Goss was even then attempting to enforce its rights in the Mexican Pledge Proceedings. It thereby interdicted the plan of some Foreign Defendants to pay $2.7 million to Goss to pay off its lien, a sum more than sufficient to enable Goss to pay the balance due from it to Bank One and thereby release the Note that entitled it to payment from the Foreign Defendants.

Bank One effectively sold and delivered the original Grupo Serla Note and the original Pledge Agreement to the lawyer who represented not only Union Industrial, but Grupo Serla, Editorial Comercial, and Guarneros as well. Clearly these actions were done in willful violation of the automatic stay.

### C. Bank One Did Not Preserve Goss' Rights In The Sale To Union Industrial

[31] Bank One argues that the sale of the Grupo Serla Note to Union Industrial did not foreclose Goss' rights in the Grupo Serla Note, as Union Industrial agreed to honor all of Goss' rights against Bank One. (BO PT Findings, 76-77, ¶ 115.) Bank One also argues that it did not transfer property of the estate because it transferred only its own right, title and interest in the Grupo Serla Note and related documents to Union Industrial. (BO PT Findings, 52, ¶ 52.) According to Bank One, it "ensured that the estate's rights were preserved in the sale of the Bank's interest in the Grupo Serla Note to Union Industrial." (BO PT Findings, 52, ¶ 53.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

Bank One cites to Sections 2.1 and 2.2 of the Amended and Restated Note Purchase Agreement between Bank One and Union Industrial to support its argument. Section 2.1 provided:

**\*575** 2.1 Assets to be Conveyed. Subject to the terms and conditions of this Agreement at Closing (as hereinafter defined), Lender shall endorse and assign to Buyer, or as Buyer directs, and Buyer shall purchase and accept from Lender, all of Lender's right, title and interest in and under the Serla Note, the Guaranty, the Repurchase Note, the Note Purchase Agreement, the 2000 Agreement, and the Claim, and any and all other related rights and loan documents (such assets being conveyed are hereinafter collectively referred to as the "Purchased Assets").

(Pl.Ex. 106, 2.1, BO 02810.)

Pursuant to Section 2.2 of the Amended and Restated Note Purchase Agreement, Bank One asserts that Union Industrial explicitly assumed all of Bank One's obligations under the Grupo Serla Note and other items sold. Section 2.2. provided:

2.2 Obligations to be Assumed. Subject to the terms and conditions of this Agreement, with effect on and after the date of the Closing (as hereinafter defined), Buyer assumes and agrees to perform and comply with the obligations that Lender may have under the Serla Note, the Guaranty, the Repurchase Note, the Note Purchase Agreement, the 2000 Agreement, and the Claim, as well as under any and all loan and security documents.

(Pl.Ex. 106, § 2.2, BO 02810.)

However, the same Agreement demonstrates that Bank One knew that Union Industrial maintained that Goss possessed no rights before it sold the Grupo Serla Note:

7.1 Preservation of Goss' Recourse. Neither this agreement nor any action taken hereunder shall impair or affect in any way any rights, claims, or remedies, if any, Goss may have against Editorial, Serla, and/or Sergio

Eduardo Guarneros Trujillo. Any such rights of Goss shall continue the same as if this Agreement had not been made or consummated. **Notwithstanding (but without limitation of) the foregoing, Buyer, on behalf of itself, all affiliates, successors and assigns, denies that Goss has any such rights and reserves all of their respective rights to deny or otherwise contest that Goss has any such rights.**

(Pl.Ex. 106, BO 02819-20.) (emphasis supplied).

Bank One argues that paragraph 7.1 only relates to Goss' rights against Editorial Comercial, Grupo Serla, and Guarneros, and by its terms it does not relate to or limit Union Industrial's unconditional undertaking to assume and perform and comply with Bank One's obligations regarding the Grupo Serla Note in Section 2.2.

This explanation, however, is contrary to evidence presented at trial. It is undeniable that Union Industrial is an entity related to Guarneros and His Companies and with the Note in their hands and out of the country, Goss could not assert any rights against the Foreign Defendants after the Note sale to Union Industrial. Further, Goss would no longer be able to obtain possession and ownership of the Grupo Serla Note upon completion of its repayment obligations so as to be able to enforce its rights in the Note. Therefore, Goss would never have the legal ability to seek payment on the Note from the Foreign Defendants. It was disingenuous in the first place for Bank One to pretend to protect Goss without bringing is lawyers into the negotiation. Moreover, Bank One knew that by selling the Grupo Serla Note to an entity related to the makers of the Note Goss' rights would be destroyed, not preserved.

**\*576** It is clear from the plain language in the Amended and Restated Note Purchase Agreement that Bank One knew that Union Industrial denied that Goss had any rights before the Bank signed the Union Industrial Note Purchase Agreement and endorsed and delivered the Grupo Serla Note and the Pledge to the

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

Page 56

lawyer for Guarneros and His Companies.

Even if there were some substance to the fiction that Bank One sought to protect Goss' rights, purporting to preserve an interest when selling property of a bankruptcy estate is not sufficient to avoid finding a violation of the automatic stay. *See, e.g., In re Bialac, 712 F.2d 426, 432 (9th Cir.1983)* (noting that while the sale of the debtor's one-sixth interest in the note attempted to preserve his interest, "it would be more consistent with the best interests of the debtor and all creditors if the division of property in which the debtor had a fractional interest is under the auspices of the trustee in bankruptcy."). Bank One was fully aware that the Amended and Restated Note Purchase Agreement would affect the debtor's rights in the Grupo Serla Note while the automatic stay was in effect and never sought court approval or even informed Goss of sale contract terms before it acted.

Facts in this case are similar to those in *In re Bialac, 712 F.2d 426 (9th Cir.1983).* In *In re Bialac,* it was held that the preforeclosure right of debtor who had an interest in a note to redeem that entire note was a property right entitled to automatic stay protection. *712 F.2d 426 (9th Cir.1983).* Therefore, a violation of the automatic stay was found when debtor's right of redemption was diminished by a post-bankruptcy foreclosure by the secured creditor. *Id.* More specifically, the post-petition act in *In re Bialac* that violated the stay was a foreclosure sale by the secured creditor on the five non-debtors' interests in the pledged note and not the debtor's interest. However, foreclosure of the interests of non-debtors violated the stay because it altered and diminished the debtor's right of redemption; whereas prior to foreclosure the debtor could have paid $450,000 to redeem the entire note, afterwards he would have to pay $300,000 to protect only his interest.

Bank One argues that *In re Bialac* is distinguishable from the instant case on two grounds. First, that it did not foreclose on the pledged Grupo Serla Note but merely assigned its interest in the Note subject to Goss'

rights and second, that the transaction with Union Industrial did not diminish Goss' right of redemption but preserved it. (BO PT Findings, 65, ¶ 85.) It argues that Goss could redeem and recover possession of the Grupo Serla Note for the same amount, i.e., the unpaid balance of the note Repurchase Agreement (approximately $1.5 million at the time of the Bank's assignment to Union Industrial) after the sale to Union Industrial. *Id.*

Despite Bank One's arguments (similar to those of the debtor in *In re Bialac*), Goss' right to obtain possession and ownership of the Grupo Serla Note was not preserved. Prior to the sale to Union Industrial, Goss would have to pay Bank One $1,425,495.12 plus accruing interest to redeem, obtain possession and ownership of the Grupo Serla Note. After the sale to Union Industrial, the purchaser denied that Goss possessed any rights in the Grupo Serla Note despite its payments to Bank One totaling $5,175,728.17. Moreover, the Grupo Serla Note was taken to Mexico where its location is currently unknown. Goss could not redeem and obtain possession of a note whose whereabouts were and are unknown by the parties involved. It is certainly clear that Goss was deprived of its rights to redeem and obtain **\*577** the Grupo Serla Note from Bank One and use it to sue the parties liable.

**D. *Goss' Treatment Of The Grupo Serla Note And The Note Purchase Agreement In Its Earlier Confirmed Chapter 11 Case Does Not Preclude The Trustee's Contention Of Goss' Interest***

[32] On July 30, 1999, Goss filed a Chapter 11 proceeding in Delaware, Case No. 99-2756. In that proceeding, Goss filed its sworn and attested bankruptcy schedules. In those schedules, Goss listed the Note Purchase Agreement as an executory contract. In its answer to No. 14 of Schedule B entitled "Personal Property," Goss did not list any interest in the Grupo Serla Note. (BO Ex. 46, KE 001223.) Goss' Schedule D entitled "Creditors Holding Secured Claims" reflects Bank One as a secured creditor only with respect to a secured bank lending syndicate and not in any individual capacity holding the Grupo Serla Note as collateral. (BO

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

Page 57

Ex. 162, KE 000192.)

These bankruptcy schedules were filed on September 23, 1999, approximately one year after Goss paid the last of two payments under the Note Purchase Agreement that the Trustee now contends resulted in Goss' acquisition and ownership of 15% of the Grupo Serla Note. Goss' Chapter 11 plan in the Delaware reorganization proceeding was confirmed on November 4, 1999, but was not submitted into evidence.

Bank One argues that the Trustee is precluded by doctrine of *res judicata* from claiming an ownership interest in the Grupo Serla Note. As discussed above, Goss did not own the Grupo Serla Note, but rather possessed interests in it. Moreover, Goss is not barred by *res judicata* from asserting an ownership interest in the Grupo Serla Note as a result of its former Chapter 11 plan.

[33] Courts do indeed promote the goal of finality in reorganization proceedings through appropriate application of the doctrine of res judicata. *Eubanks, M.D. v. FDIC,* 977 F.2d 166, 169 (5th Cir.1992). However, Seventh Circuit precedent requires that the following three elements be satisfied for a claim to be precluded pursuant to the doctrine of *res judicata:* (1) an identity of parties or their privies; (2) an identity of the causes of action; and (3) a final judgment on the merits. *See D & K Properties Crystal Lake v. Mut. Life Ins. Co. of N.Y.,* 112 F.3d 257, 259 (7th Cir.1997). Not one of these elements is satisfied based on the facts of this case.

[34] The first element, identical parties or their privies, is not present. To justify preclusion under a theory of privity, a non-party must have actual control. To have control of litigation requires that a person have effective choice as to legal theories and proofs to be advanced on behalf of the party to the action. *Benson and Ford, Inc. v. Wanda Petroleum Co.,* 833 F.2d 1172, 1174 (5th Cir.1987) (quoting *Hardy v. Johns-Manville Sales Corp.,* 681 F.2d 334, 339 (5th Cir.1982)). In this case, the Trustee did not have control of the 1999 Debtor

or its schedules. He did not control or participate in the prior bankruptcy proceedings. Moreover, as a representative of the estate in this case, the Trustee does not represent the same interests as the 1999 Chapter 11 Delaware Debtor.

The second element, an identity of the causes of action, is also not satisfied in this case. Bank One argues that this element is satisfied because the operative facts on which the Trustee bases his ownership contention are the same as those that existed prior to commencement of the Delaware reorganization proceeding; that is two payments made by Goss in 1998 pursuant*578 to the Note Purchase Agreement which occurred before the commencement of the Delaware Chapter 11 proceeding on July 30, 1999.

[35] That argument is flawed. No prior cause of action existed. Goss' treatment of the Grupo Serla Note in its 1999 bankruptcy schedules did not constitute a cause of action. "A claim has 'identity' with a previously litigated matter if it emerges from the same 'core of operative facts' as that earlier action." *Lester v. Brown,* 929 F.Supp. 291, 294 (N.D.Ill.1996); *see also People Who Care v. Rockford Bd. of Educ.,* 68 F.3d 172, 177 (7th Cir.1995) ("[I]dentity exists where there is a 'single core of operative facts giving rise to a remedy.' "). The issue in this case was not previously litigated as no prior cause of action existed. Therefore, the second element is not satisfied.

The third element, a final judgment on the merits, is also not satisfied. While Bank One cites authority for the proposition that an order confirming a plan of reorganization is given the same effect as a district court's judgment on the merits for claim preclusion purposes, in this case there is no evidence to suggest that a settlement or final judgment was reached regarding Goss' interests in the Grupo Serla Note in Goss' first bankruptcy case. Goss' confirmed Chapter 11 plan was not entered into evidence. This Court is thus left to speculate as to the plan provisions and the position that Goss took with respect to its interests in the Grupo Serla Note. Therefore, the Trustee is not now barred by the

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

doctrine of *res judicata* from taking a position contrary to the one Goss took in its 1999 confirmed Chapter 11 reorganization proceeding.

[36] The facts in this case also fail to support application of the doctrine of judicial estoppel. That doctrine applies to preclude a party from assuming a position in a legal proceeding inconsistent with one previously asserted. One cannot determine from the evidence presented that Goss previously assumed a position in a legal proceeding (the prior bankruptcy case) inconsistent with the one asserted in this case, as neither Goss' earlier Chapter 11 plan nor any order relating to the plan was entered into evidence.

### E. *Bank One Gained An Advantage Over Other Creditors Post-Petition*

[37] The purposes of the automatic stay are: (1) to protect the debtor from its pre-petition creditors by stopping "all collection efforts, all harassment, and all foreclosure actions" and (2) "to protect all creditors by ensuring that the estate will be preserved against attempts by other creditors to gain an unfair advantage with respect to payment of claims." *Knopfler v. Glidden Co. (In re Germansen Decorating, Inc.),* 149 B.R. 517, 521 (Bankr.N.D.Ill.1992).

[38] "[T]he stay also protects creditors by preventing the dismemberment of the estate by other creditors seeking to gain an unfair advantage over their peers." *Id.* "One of the principal means by which bankruptcy law operates is to concentrate, in a single forum, disputes affecting a debtor's solvency and continuing operations." *Nat'l Tax Credit Partners, L.P. v. Havlik,* 20 F.3d 705, 708 (7th Cir.1994) (citing *Covey v. Commercial National Bank of Peoria,* 960 F.2d 657, 661-62 (7th Cir.1992); *Levit v. Ingersoll Rand Fin. Corp.,* 874 F.2d 1186 (7th Cir.1989); *In re Iowa R.R.,* 840 F.2d 535 (7th Cir.1988); *Boston & Maine Corp. v. Chicago Pacific Corp.,* 785 F.2d 562 (7th Cir.1986)).

"Aggregation prevents efforts by creditors to pick off or affect the disposition of assets in ways that may be privately beneficial**\*579** but collectively harmful. The bankruptcy judge then serves as dispatcher, resolving the claims that are conveniently treated together while releasing others for decision in their original forums." *Nat'l Tax Credit Partners, L.P. v. Havlik,* 20 F.3d 705, 708 (7th Cir.1994) (citing 11 U.S.C. § 362(d); 28 U.S.C. § 157(b)(5), (c); *Pettibone Corp. v. Easley,* 935 F.2d 120 (7th Cir.1991)).

Bank One argues that it did not gain an advantage over other creditors post-petition because it did not obtain any of the Debtor's funds or foreclose any interest of the estate. Rather, Bank One argues that it merely sold its own interest to a third party which paid the funds to it, under an agreement that explicitly preserved the Debtor's rights.

To the contrary, Bank One moved deliberately and specifically to block Goss from recovering a large payment for its interest so that the Bank could receive a major payment. The meeting at Bank One where Bank One told counsel for Guarneros and His Companies that it owned the Grupo Serla Note, along with the subsequent negotiations with Guarneros and His Companies, were clearly attempts by Bank One to block any deal by Goss and gain an advantage over other bankruptcy creditors. At trial, a Bank One witness admitted that it reviewed the plan of reorganization and the information Goss provided regarding Bank One's claims. (M.Page, 9/30/05, Test. 57-58.) Bank One determined that it would receive "little or nothing" through the bankruptcy proceedings unless it sold the Grupo Serla Note, and determined to better its position through such a sale. (*See* Findings of Fact, ¶ 83.)

Within days of receiving requested information from Goss, Bank One initiated actions to sell the Grupo Serla Note. By selling the Grupo Serla Note to Union Industrial and blocking Goss' rights therein, Bank One was able to recover $1,100,000.00. Goss, however, despite paying Bank One $5,175,728.17 for its interest in the Grupo Serla Note, received nothing. Through its

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

tactic, Bank One clearly received more than it would have received for its claim through Goss' bankruptcy. This is precisely the type of conduct that the automatic stay was meant to prevent.

Bank One prevented the type of aggregation of assets in bankruptcy required by law by selling the Grupo Serla Note in which Goss possessed an interest in to Union Industrial. Bank One's deliberate and intentional actions constitute a willful violation of the automatic stay.

**F. *Bank One Acted In Violation Of The Automatic Stay Despite Its Assertion That It Acted Under A Claim Of Ownership To The Grupo Serla Note***

Bank One argues that it did not violate the automatic stay when it assigned all of its right, title, and interest in the Grupo Serla Note to Union Industrial because Bank One believed it owned the note and thus acted under a claim of ownership. Bank One extensively cites *United States v. Inslaw* to support this argument. 932 F.2d 1467 (D.C.Cir.1991).

In *Inslaw,* the parties contracted prepetition for the debtor Inslaw, Inc. to provide and install software in some of the offices of defendant Department of Justice (the "Department"). As a result of a temporary contract modification, the Department received computer tapes containing the source and object codes for enhanced software and agreed to restrict use of that software to the offices covered by the original contract. Inslaw then filed for bankruptcy. One month later, the contract modification expired. After that, the Department installed the software in 23 more of its offices. Inslaw filed an Adversary Proceeding claiming that the Department *580 was in violation of the stay by continuing and expanding the use of its estate property (i.e., the enhanced software), without Inslaw's consent. *Inslaw,* 932 F.2d at 1468-70.

The bankruptcy court, affirmed by the district court,

held in favor of Inslaw. The D.C. Circuit reversed and dismissed the complaint for lack of jurisdiction. The D.C. Circuit found that the debtor was trying to remedy pre-petition acts of fraud, bias or harassment allegedly on the part of the Department by asserting a stay violation. *Id.* at 1474. It was further found that Section 362(a) applies only after the bankruptcy filing, and the bankruptcy judge lacked jurisdiction to resolve the pre-bankruptcy contract dispute between Inslaw and the Department. *Id.* at 1474.

As to Inslaw's interests in computer tapes and the enhanced software installed as prior to the bankruptcy filing, it was held that they did not become property of the estate because as of the petition date the estate held no possessory interest over them and the Department held the property under a claim of ownership. It was reasoned:

As to these, Inslaw held no possessory interest when it filed for bankruptcy on February 7, 1985. Nor can it claim a possessory interest over them through the Code's turnover provisions, as could the debtor-in-possession in *Whiting Pools,* because, as Inslaw freely admits, the Department held possession of the copies under a claim of ownership (its view of the contract and Modification 12) and claimed the right to use enhanced PROMIS without further payment. It is settled law that the debtor cannot use the turnover provisions to liquidate contract disputes or otherwise demand assets whose title is in dispute.

*Id.* at 1472 (citations omitted).

The facts in *Inslaw* are quite dissimilar to those in this case. The Bank's claim of ownership was subject to Goss' interests. Goss possessed those rights and interests in the Grupo Serla Note earlier discussed as a result of paying Bank One $5,175,728.17, and the contractual provisions, and Bank One recognized that Goss possessed contractual rights in the Grupo Serla Note. (*See* Findings of Fact, ¶ 125.) Goss was only required to pay Bank One $1,425,495.12 more before it would have been entitled to full ownership and possession rights of the Grupo Serla Note, only a sixth of what Goss had

Page 60

already paid Bank One.

To act under the Bank's claim of ownership in this case had the effect of denying and foreclosing all of Goss' rights in the Grupo Serla Note. After Bank One sold the Grupo Serla Note to Union Industrial, Goss could no longer redeem the Note or pursue the Mexican Pledge Proceedings and could no longer attempt to collect from the makers of the Note.

Bank One's actions demonstrate that it knew it was impairing Goss' rights even before it sold to Union Industrial. While Bank One argues that it was legitimately acting under a claim of ownership, it did not apprise all interested parties of circumstances surrounding the sale prior thereto. Instead, Bank One sold the Note to Union Industrial without notifying Goss' creditors, requesting court permission, seeking relief from the automatic stay, or even providing Goss with a copy of the sale agreement.

Bank One also cites for support _In re Carousel Int'l Corp., 89 F.3d 359 (7th Cir.1996)_. In that case, the trustee held $250,000 in escrow as to which the estate asserted a claim of ownership. The bankruptcy trustee ultimately settled the dispute agreeing that only $10,000 of the $250,000 should be retained as property of **\*581** the bankruptcy estate. The bankruptcy court issued an order approving the settlement and authorizing distribution of the escrowed funds to the shareholders subject to satisfaction of all liens. _Id._ at 360-61. The Trustee asserted that all of the funds were property of the estate pending resolution of how those funds would be distributed. _Id._ at 361. A Seventh Circuit panel opinion held that $240,000 was not property of the estate, as it was already determined that only $10,000 was property of the estate. _Id._ at 362. Therefore, the trustee did not have rights to the entire $250,000.

The facts in _In re Carousel Int'l Corp._ are distinguished from those here. In _Carousel,_ the bankruptcy court issued an order approving a settlement in which it was agreed that only $10,000 of the total

funds held in escrow was property of the estate. Therefore, it was found that the trustee could not assert a right of ownership to the entire amount of funds in escrow as it was determined that only $10,000 of the $250,000 was property of the estate.

For _Carousel_ to be applicable here, a bankruptcy judge would have had to determine and define Goss' interests in the Grupo Serla Note, and Goss would then have to claim that some greater interest was property of the estate and thus protected by the automatic stay. Such did not occur in this case.

Unlike the facts in _Carousel,_ there was no judicial determination of Goss' and Bank One's prospective interests in the Grupo Serla Note before Bank One sold it to Union Industrial. Instead, ignoring all of Goss' rights and interests, Bank One sold the Grupo Serla Note to Union Industrial. Bank One decided to protect itself at the expense of any rights that Goss may have had, and it did not seek a determination from the bankruptcy court that it owned and possessed all rights to the Grupo Serla Note before it proceeded on its path of self-help.

[39][40][41] While Bank One argues that it acted in good faith under claim of ownership to all rights in the Grupo Serla Note, that claim is irrelevant to whether it willfully violated the automatic stay. In determining whether a stay violation was willful, it is irrelevant whether the party believed in good faith that it had a right to the property at issue. _In re Ramirez, 183 B.R. 583, 589 (9th Cir. BAP 1995)_ (multiple citations omitted). "Not even a good faith mistake of law or a legitimate dispute as to legal rights relieve a willful violator of the consequences of his act." _Id. See also Fleet Mortgage Group, Inc. v. Kaneb (In re Kaneb), 196 F.3d 265, 268-69 (1st Cir.1999); In re Flack, 239 B.R. 155, 162 (Bankr.S.D.Ohio 1999); In re Steenstra, 280 B.R. 560, 567-68 (Bankr.D.Mass.2002)._

[42] "A stay violation might still be a willful one if the actor misconstrues the scope of the automatic stay and its listed exceptions or otherwise believes he is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

justified, because a specific intent to violate the stay is not necessary." *In re Will*, 303 B.R. 357, 364 (Bankr.N.D.Ill.2003) (multiple citations omitted). Specific intent is not required for a finding of a willful violation of the automatic stay. It is sufficient that a party acted in violation of the automatic stay with knowledge of the pending bankruptcy case. *Price v. United States (In re Price)*, 42 F.3d 1068, 1071 (7th Cir.1994). In this case, Bank One willfully violated the stay even if its agents believed it acted under a claim of ownership.

### G. *Bank One Did More Than Sell Its Claim To Union Industrial*

Bank One argues in the alternative that it merely sold its claim to Union Industrial and that Bankruptcy Rule 3001 allows the *582 assignment of claims. However, it did much more than sell its claim. Indeed, it is disingenuous for Bank One to argue it only sold its claim. The main purpose of the Amended and Restated Note Purchase Agreement was to sell the Grupo Serla Note, not a claim in bankruptcy.

The sale document between Bank One and Union Industrial is entitled the "Amended And Restated **Note Purchase Agreement.**" (Pl.Ex. 106.) (emphasis supplied). The sale documents were not titled, "Amended And Restated Claim Sale Agreement."

Kaplan, the Bank One representative who negotiated the sale to Union Industrial, understood that Bank One sold the Grupo Serla Note and was unable to place any value on Bank One's claim versus the value that was placed on the Grupo Serla Note and/or other items sold. (R. Kaplan, 9/26/05, Test. 112-13.)

It was noted in the Bank One memorandum as to reasons warranting sale of the Note that claims were trading at 10% to 20% of face value. (Pl.Ex. 91.) Bank One's claim against the estate was for $1,425,495.12 plus accruing interest. Therefore, Union Industrial paid it far

more than the value of Bank One's claim. Union Industrial did not bring a claim but rather bought out the Bank's interest in the Note so as to get it away from Goss.

[43] While creditors are permitted to transfer a claim or interest against a debtors' estate to a third party without violating the stay, they are not permitted to sell property of the estate without seeking relief from the automatic stay. Bank One argues that it merely acted to protect its existing property interests and contract rights. Here, however, it is obvious that Bank One did far more by effectively blocking exercise of all of Goss' interests in the Grupo Serla Note so as to use its possession of the Note to obtain more than the bankruptcy case would have provided to it.

The reason Bank One did this is easy to discern. Kaplan testified that he was aware that Bank One would receive little if anything if it did not sell the items to Union Industrial that were sold under the Amended and Restated Note Purchase Agreement. (R. Kaplan, 9/26/05, Test. 120-21.) By selling them, it recovered more than it could have as a legitimate creditor in the bankruptcy case.

### H. *Bank One's Transmission Of Default Notices to Goss Did Not Violate The Automatic Stay*

[44][45] Mere requests for payment unaccompanied by coercion or harassment are generally not viewed as violations of the automatic stay. *See, e.g., Morgan Guaranty Trust Co. of New York v. American Savings & Loan Assoc.*, 804 F.2d 1487, 1491 (9th Cir.1986), and cited with approval in *In re Duke*, 79 F.3d 43, 45 (7th Cir.1996). As the Seventh Circuit opinion stated in *Duke*, "[t]he Third Circuit [has] explained that the respite provided by § 362 'is not from communication with creditors, but from the threat of immediate action by creditors, such as foreclosure or a lawsuit.' " 79 F.3d at 45 (quoting *Brown v. Pa. State Employees Credit Union*, 851 F.2d 81, 86 (3d Cir.1988)). For there to be a stay violation, a request must have a coercive or harassing

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

Page 62

effect. *See id.*

[46] "[M]ere presentment and other requests for payment unaccompanied by coercion or harassment are not barred by § 362(a)." *Cox v. Zale Delaware, Inc.,* 242 B.R. 444, 449 (N.D.Ill.1999) (citing *Murray v. Great Valley Savings Ass'n.,* 89 B.R. 533, 534-37 (Bankr.E.D.Pa.1988)).

The Trustee has failed to offer any evidence that the many default notices sent by Bank One had a coercive or harassing **\*583** effect on Goss. Goss' bankruptcy estate did not make any payments in response to the notices. While Salas of Bank One acknowledged that she sent the notices for purposes of collection, neither Salas nor anyone else from Bank One contacted Goss to obtain payment, threatened Goss with foreclosure or a lawsuit, or did anything else to obtain payment. The notices thus did not have any coercive or harassing effect on Goss.

In the context of Bank One's other egregious violations of the automatic stay, to view such conduct as a potential violation of the automatic stay would trivialize the serious violations. (But as noted earlier, those notices recognized that the contract with Goss was alive and viable.)

**I. *The Trustee Does Not Lack Standing To Bring Claims For Stay Violation***

[47] Bank One asserts that the Trustee cannot recover damages on behalf of the estate as a matter of law because the estate is a corporate debtor and 11 U.S.C. § 362(h) provided that only an "individual" injured by a willful violation is entitled to damages and other relief under that section. *See e.g., Consolidated Rail Corp. v. Gallatin State Bank,* 173 B.R. 146 (N.D.Ill.1992); *In re Midway Indus. Contractors, Inc.,* 178 B.R. 734 (N.D.Ill.1995); *In re Bequette,* 184 B.R. 327 (Bankr.S.D.Ill.1995); *In re Shape, Inc.,* 135 B.R. 707 (Bankr.D.Me.1992).

However, § 362(h) permits a Chapter 7 Trustee to recover actual damages sustained by the individual bankruptcy estate as a result of a willful violation of the automatic stay. *Martino v. First National Bank of Harvey (In re Garofalo's Finer Foods, Inc.),* 186 B.R. 414, 439 (N.D.Ill.1995). In *Martino,* the opinion reasoned that applying a more limited definition of "individual" would produce a result clearly at odds with Congress' presumed intent:

[T]here are many situations in which a creditor willfully violates the automatic stay by acting to take possession of estate property. Under section 704(a), the trustee is obligated to recover the property for the benefit of the estate. *See*11 U.S.C. § 704(a) (the trustee is required to "collect and reduce to money the property of the estate ..."). If the trustee incurs legal expenses in recovering such property and cannot recover his fees from the party that violated the stay, either the estate will be depleted by the amount of the trustee's costs of recovery or the trustee will not be reimbursed for those costs. Either of these results is clearly undesirable. By adopting a broader definition of "individual" (i.e., one based upon the second portion of the Black's Law Dictionary definition), the court avoids these undesirable results while at the same time ensuring that the goal Congress certainly sought to create (i.e., enforcement of the automatic stay) and the incentive it created to achieve that goal (i.e., the possible recovery of attorney's fees) are properly preserved. Thus, in the absence of clear language to the contrary, this court declines to apply the narrow definition of "individual" adopted by the bankruptcy court and the Ninth Circuit and instead finds that a chapter 7 trustee is an "individual" for the purposes of section 362(h).

[48][49] Section 362 provides that the automatic stay goes into effect upon the filing of a bankruptcy petition under any chapter of the Bankruptcy Code. The automatic stay applies to all debtors, including corporate debtors. "The automatic stay is the linchpin of the relief provided by the Bankruptcy Code and, thus, it is incumbent upon the bankruptcy court to vindicate**\*584** the application of the stay and to deter further violations." *In re Kirk,* 199 B.R. 70, 71 (Bankr.N.D.Ga.1996). If the Trustee were not allowed to bring actions against entities found to have violated the

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

automatic stay and thereby harmed the bankruptcy estate, the automatic stay would be rendered meaningless as a protection as to corporate debtor property.

## J. The Trustee Can Recover Damages Against Bank One For Stay Violation

[50]Section 362(h) of the Bankruptcy Code provides, "An individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(h). The Bankruptcy Code does not explicitly define the word "individual." _Consolidated Rail Corp. v. Gallatin State Bank,_ 173 B.R. 146, 147 (N.D.Ill.1992). Many courts have held that the word "individual" should be interpreted narrowly thus precluding a debtor corporation from recovering under this provision. _Consolidated Rail Corp. v. Gallatin State Bank,_ 173 B.R. 146 (N.D.Ill.1992); _In re Midway Indus. Contractors, Inc.,_ 178 B.R. 734 (N.D.Ill.1995); _In re Bequette,_ 184 B.R. 327 (Bankr.S.D.Ill.1995); _In re Shape, Inc.,_ 135 B.R. 707 (Bankr.D.Me.1992).

Contrary authority has held that the word "individual" should not be limited to the literal sense, and that corporations and other entities injured by a willful violation of the stay may recover damages under § 362(h). _In re Atlantic Business and Community Corp.,_ 901 F.2d 325 (3d Cir.1990); _Budget Service Co. v. Better Homes of Virginia, Inc.,_ 804 F.2d 289 (4th Cir.1986); _In re Academy Answering Service, Inc.,_ 100 B.R. 327 (N.D.Ohio 1989). "According to this view, it is unlikely that Congress meant to give a remedy to only individual debtors against those who willfully violate the automatic stay and not to debtors which are corporations or other entities, since such a narrow construction of the term 'individual' would defeat much of the purpose of the provision." 9B Am.Jur.2d _Bankruptcy_ § 1763 (2006). It has also been found that applying the word "individual" in the literal sense would be contrary to the intent and purpose of the automatic stay as a whole, which is to protect property of the estate for benefit of all creditors. _Id._ (citing _In re Randy Homes Corp.,_ 84 B.R. 799

(Bankr.M.D.Fla.1988)).

Other courts have found that § 362(h) permits a chapter 7 trustee to recover actual damages sustained by the individual bankruptcy estate as a result of a wilful violation of the automatic stay. It has specifically been found that attorney fees incurred by the trustee in prosecuting such an action are a type of actual damages sustained by the estate. _Martino v. First National Bank of Harvey (In re Garofalo's Finer Foods, Inc.),_ 186 B.R. 414, 439 (N.D.Ill.1995); _See_ 11 U.S.C. § 362(h); _In re Burke,_ 147 B.R. 955, 959 (Bankr.W.D.Mo.1992) (finding that the trustee was damaged by defendant's willful violation of § 362(a)(3) in the amount equal to "the attorney fees expended to prosecute the instant action" and thereby permitted the trustee to recover those fees); _In re Omni Graphics, Inc.,_ 119 B.R. 641, 645 (Bankr.E.D.Wis.1990) ("attorneys' fees and costs are, in and of themselves, a form of damages under section 362(h) which can be awarded in the absence of other actual damages.").

In _Martino,_ it was found that the Trustee may be considered an individual for all purposes under § 362(h) entitled to recover damages. 186 B.R. 414 (N.D.Ill.1995). It was also found that the word "individual"*585 should be given a more expansive definition, thus "a chapter 7 trustee may properly be considered an 'individual' since the trustee always files an adversary action on behalf of an artificial entity (i.e., the bankruptcy estate) rather than in his individual capacity." _Id._ at 438. Because § 362(a) was intended to give all debtors broad protections for benefit of the bankruptcy estate and those entitled to it, it was opined that the definition of the word "individual" should be interpreted to allow a Chapter 7 trustee to recover damages under § 362(h). _Id._ at 437-39.

While courts are divided over whether a trustee may recover damages under § 362(h), a trustee can certainly recover damages in the exercise of this Court's civil contempt and equitable powers. "A bankruptcy trustee not entitled to recover damages under 11 U.S.C. § 362(h) may nonetheless recover damages in the form of costs

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

and attorneys' fees under 11 U.S.C. § 105(a) as a sanction for ordinary civil contempt." 9B Am.Jur.2d *Bankruptcy* § 1763 (2006) (citing *In re Pace,* 67 F.3d 187 (9th Cir.1995)).

[51] A violation of the automatic stay is punishable as contempt of court. Collier on Bankruptcy, 362.11 (15th ed. rev.2005). Many opinions have found that while a corporate debtor cannot recover damages for creditor's violation of automatic stay under § 362, damages can nevertheless be awarded to a corporate debtor in exercise of the court's civil contempt and equitable powers. *In re Pace,* 67 F.3d 187, 194 (9th Cir.1995); *Johnston Environmental Corp. v. Knight (In re Goodman),* 991 F.2d 613, 620 (9th Cir.1993); *Jove Eng'g, Inc. v. IRS (In re Jove Eng'g, Inc.),* 92 F.3d 1539, 1554 (11th Cir.1996); *In re San Angelo Pro Hockey Club, Inc.,* 292 B.R. 118, 124 (Bankr.N.D.Tex.2003).

"An award of damages in favor of a corporate debtor may provide an incentive for debtors to prosecute violations of the stay and for creditors to observe the limits imposed by the automatic stay. Similarly, civil contempt as a sanction may serve to insure compliance with the automatic stay or to compensate a debtor for losses or damages sustained because of a stay violation." *In re San Angelo Pro Hockey Club, Inc.,* 292 B.R. 118, 124 (Bankr.N.D.Tex.2003).

[52][53] The power of contempt is inherent in all courts, as the ability to enforce orders (in this case the statutory injunction called the automatic stay) is essential to the orderly administration of justice. *See Shillitani v. U.S.,* 384 U.S. 364, 370, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966). Section 105 of the Bankruptcy Code codifies the contempt power of bankruptcy courts and provides as follows:

The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action o making any determination necessary or appropriate to enforce or implement court orders or

rules, or to prevent an abuse of process.

11 U.S.C. § 105(a). "Section 105 grants broad powers to bankruptcy courts to implement the provisions of Title 11 and to prevent an abuse of the bankruptcy process." *In re Volpert,* 110 F.3d 494, 500 (7th Cir.1997).

[54] Civil contempt sanctions are designed for the dual purposes of compelling compliance with a court order and compensating the complainant for losses caused by contemptuous actions. *Tranzact Technologies, Inc. v. 1Source Worldsite,* 406 F.3d 851, 856 (7th Cir.2005). "The purpose of a civil contempt proceeding ... is *586 remedial, with its purpose being either enforcement of a prior court order or compensation for losses or damages sustained as a result of noncompliance with the provisions of the order at issue." *Commodity Futures Trading Comm'n v. Premex, Inc.,* 655 F.2d 779, 785 (7th Cir.1981).

[55] Upon a finding of civil contempt, a court may, at its discretion, order reimbursement of the complainant, as part of the civil relief, of the party's fees and expenses incurred in bringing the violation to the court's attention. *Commodity Futures Trading Comm'n v. Premex, Inc.,* 655 F.2d 779, 785 (7th Cir.1981) (citations omitted)."It is within the trial court's discretion to award fees upon a finding of civil contempt." *Tranzact Technologies, Inc. v. 1Source Worldsite,* 406 F.3d 851, 856 (7th Cir.2005). The Trustee is thus entitled to damages including together with reasonable and necessary attorneys fees and costs based on Bank One's willful violation of the automatic stay in the exercise of this Court's civil contempt power.

## III. *Trustee's Recovery Under U.C.C. § 9-207 And 11 U.S.C. § 549*

### A. *Bank One's Sale Of The Grupo Serla Note To Union Industrial Also Breached Its Duty Imposed On A Secured Party Under U.C.C. § 9-207And Illinois*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

***Precedent***

[56] Apart from violating the stay that protected Debtor's interests in the Note, Bank One also breached its duties under the Uniform Commercial Code.

When the makers of the Grupo Serla Note failed to pay the amounts due, Bank One demanded that Goss pay a portion of the buyer's obligations under the Grupo Serla Note. Goss, therefore, made payments to Bank One. Bank One held possession of the original Grupo Serla Note in order to secure Goss' further debt to Bank One. As holder of that security, Bank One owed a duty to Goss to preserve the value of the same. Bank One's sale to Union Industrial for $1,100,000.00 breached this duty.

Bank One argues that it used reasonable care in the custody and preservation of the Grupo Serla Note because it insisted that the transferee-Union Industrial-agree to honor all of Bank One's obligations to Goss under the Grupo Serla Note. Bank One, however, knew that Union Industrial denied that Goss possessed any rights in the Grupo Serla Note, and knew that release of the Note and preventing Goss from recovering the Note made the assertedly protective contract language wholly meaningless. Bank One cannot make the good faith argument that it took reasonable care in preserving Goss' interests by requiring an ineffective clause in the sale agreement that was made meaningless by release of the Note.

[57][58] The holder of collateral security is bound to exercise ordinary diligence to preserve the validity and pecuniary value thereof. It is clear that a pledgee who received instruments representing claims of the pledgeor against third persons was under a duty to use reasonable diligence to preserve and collect the claims or to enable the pledgeor to do so. Gary Spivey, *Duty of pledgee of commercial paper as to its enforcement of collection*, 45 A.L.R.3d 248, 1972 WL 31994, § 3 (The Lawyers Co-operative Publishing Company 2006).

The Uniform Commercial Code appears to preserve the common-law rule. *Id.* U.C.C. § 9-207 provides:

(a) Duty of care when secured party in possession. Except as otherwise provided in subsection (d), a secured party shall use reasonable care in the custody and preservation of collateral in the secured party's possession. In the case of chattel paper or an instrument, reasonable*587 care includes taking necessary steps to preserve rights against prior parties unless otherwise agreed.

*See* 810 ILCS 5/9-207.

In construing this duty of care, courts from various jurisdictions have recognized that "at common law, and implicitly under the Uniform Commercial Code, a creditor may assign its rights and transfer possession of collateral without the knowledge or consent of the debtor, so long as the debtor's right to redeem upon payment of the debt is not impaired." *Harris v. Key Bank*, 193 F.Supp.2d 707, 717 (W.D.N.Y.2002) (citing *Chittenden Trust Co. v. Marshall*, 146 Vt. 543, 547, 507 A.2d 965 (1986)). *See also* *McRae v. Vogler*, 272 Or. 230, 536 P.2d 509 (1975).

[59] Bank One recognizes that under U.C.C. § 9-207(1) a secured creditor is required to use reasonable care in preserving the collateral, but fails to recognize that it did not take reasonable care in preserving Goss' rights in the Grupo Serla Note. It compromised with makers of the Grupo Serla Note by selling the Grupo Serla Note to Union Industrial, a company allied with the Foreign Defendants. Bank One did this despite the well-settled general rule that "one holding commercial paper as collateral security cannot, except perhaps in very extreme cases, compromise with the maker of the collateral, and surrender the same for less than the amount due thereon, and that if he does so, he will be bound to account to the pledgeor." *Rights of pledgeor of collateral note as affected by its transfer by pledgee to the maker*, 99 A.L.R. 26, II(a) (Thomson/West 2006).

Bank One concedes that case law construing a

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

Page 66

secured creditor's duty to preserve collateral both under the U.C.C. and prior to its enactment permits a secured party to sell its principal claim and assign its interest in a note pledged as security to the maker itself or a party related to the maker of the pledged note, only provided the debtor's right to redeem is preserved. (BO PT Findings, 104, ¶ 187.)

Bank One asserts that Goss' right to redeem the putative collateral, i.e., the Grupo Serla Note was preserved. Bank One, however, did not really preserve Goss' rights in the sale to Union Industrial. Prior to the sale, Goss had the right to obtain the Grupo Serla Note upon completion of its payment obligations. However, after the sale of the Grupo Serla Note to Union Industrial, the location of the Grupo Serla Note became unknown except that it had been taken into Mexico, and Goss lost all ability to use that Note in litigation.

Bank One is correct in asserting that Illinois law follows a general rule of assignability. *Bradley v. Parks,* 83 Ill. 169 (1876); *see Deane v. Fort Dearborn Trust & Sav. Bank,* 241 Ill.App. 517, 1926 WL 3901, at \*4 (1926) ("There is no doubt about the rule that a pledgee has such a special interest in the pledged property that he can sell and assign his interest therein along with the original indebtedness"); *see also* 30 Ill. Law and Prac. Pledges § 33 ("In the absence of a contract providing otherwise, a pledgee may transfer or assign his interest under the contract of pledge. He has a special interest in the property pledged that he can sell and assign his interest therein along with the original indebtedness.").

This general common-law rule is consistent with the Uniform Commercial Code as adopted in Illinois. One of the purposes of that Code is to "encourage and facilitate commercial transactions by allowing parties to freely contract under uniform laws." *Wegner v. Grunewaldt,* 821 F.2d 1317, 1321 (8th Cir.1987) (rejecting proposed construction of U.C.C. that "would impair the transferability of secured property.").

\*588[60][61] Under non-bankruptcy law, rights and

duties under a contract are generally freely assignable. However, there are exceptions to this rule. One exception is where the chance of obtaining return performance is materially impaired by the assignment. "In general, unless the parties have agreed otherwise, contract rights are freely assignable unless assignment would materially change the duties of the obligor, increase the obligor's risk, or impair the obligor's chance of obtaining return performance." *U.S. v. Doe,* 940 F.2d 199, 204-05 (7th Cir.1991). Bank One argues the rule with no recognition of that exception. In this case, it is clear that Bank One's alleged assignment was inconsistent with the general rule encouraging assignability because Goss' rights were impaired with result that it had no chance of "obtaining return performance."

## B. *Damages Recoverable For Bank One's Breach Of Its Duty Imposed Under U.C.C. § 9-207*

[62] The "prima facie measure of damages in an action for the conversion of a promissory note is the amount which the maker of the note agreed to pay, and interest." *Rights of pledgeor of collateral note as affected by its transfer by pledgee to the maker,* 99 A.L.R. 26, II(d) (Thomson/West 2006). However, the amount of the pledgeor's debt to the pledgee is deducted in arriving at the amounts recoverable. Thus, it has been held that the pledgee is liable to the pledgeor for the full amount due on the collateral note, less what was due from the pledgeor to the pledgee. *Id.*

Pursuant to U.C.C. § 9-625 and 810 ILCS 5/9-625, Goss is entitled to damages based on Bank One's breach of its duty. Under 810 ILCS 5/9-625, Remedies for secured party's failure to comply with this Article, "Damages for noncompliance ... a person is liable for damages in the amount of any loss caused by a failure to comply with this Article."

In sum, even without reaching the automatic stay issues, the evidence presented requires judgment against Bank One for damages based on Bank One's breach of its

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

duty imposed under U.C.C. § 9-207 as adopted in Illinois.

### C. *Trustee's Recovery Pursuant To 11 U.S.C. § 549*

In Plaintiff's First Amended Complaint, Plaintiff sought recovery under 11 U.S.C. § 549. Section 549(a) permits a trustee to void an unauthorized, post-petition transfer of property of the estate. 11 U.S.C. § 549(a). The trustee can then recover the property transferred (or, with court permission, its value) from the transferee. 11 U.S.C. § 550(a).

[63][64] Avoidance under section 549(a) has four elements: (1) property was transferred; (2) the property was property of the bankruptcy estate; (3) the transfer occurred after commencement of the case; and (4) neither the bankruptcy court nor the Bankruptcy Code authorized the transfer. *Krol v. Wilcek (In re H. King & Assocs.),* 295 B.R. 246, 291 (Bankr.N.D.Ill.2003). "The burden of proof falls, not on the trustee seeking to avoid the transfer, but on the party claiming the transfer is valid." *In re Blair,* 330 B.R. 206, 213 (Bankr.N.D.Ill.2005); Fed. R. Bankr.P. 6001.

In this case, Bank One owned the Grupo Serla Note. Goss, however, possessed contractual rights in it and upon full payment, was entitled to full ownership and possession rights of the Grupo Serla Note. If the Trustee were successful in avoiding the transfer of the Grupo Serla Note to Union Industrial under § 549, Goss' recovery would be the rights of the estate that were transferred. This recovery would be impractical,**\*589** as the location of the Grupo Serla Note is unknown. In addition, it would be extremely difficult to recover the interests that Goss had in the Grupo Serla Note from Union Industrial.

[65] The Trustee, however, is nonetheless entitled to recovery in the form of damages based on Bank One's violation of the automatic stay and damages caused from Bank One's violation of the U.C.C. Pursuant to 810 ILCS

5/9-625, remedies for secured party's failure to comply with Article, "a person is liable for damages in the amount of any loss caused by a failure to comply with this Article ..." Bank One is therefore liable for damages in the amount of loss caused by its unauthorized transfer of Goss' rights in the Note post bankruptcy.

### IV. *Bank One's Affirmative Defenses Fail*

### A. *Equitable Estoppel Does Not Bar The Trustee's Claim*

[66][67] The purpose of equitable estoppel is to prevent a party from benefitting from that party's contrary misrepresentation. *In re Griffin Trading Co.,* 270 B.R. 883, 901 (Bankr.N.D.Ill.2001); *Dupwe v. Wallace,* 355 Ark. 521, 140 S.W.3d 464 (2004). "[A] party is estopped merely by the fact of having alleged or admitted in his pleadings in a former proceeding under oath the contrary of the assertion sought to be made." *Id.* at 469.*See also In re McGunn,* 284 B.R. 855, 864 (Bankr.N.D.Ill.2002) (a party cannot assert one position in a legal proceeding that is contrary to a position taken earlier in either the same or a related proceeding).

[68] Bank One argues that the Trustee is estopped from claiming an ownership interest in the Grupo Serla Note because Goss as debtor-in-possession, and the Trustee as Plaintiff, have taken inconsistent positions. Namely, Bank One argues that Goss as a debtor-in-possession in two Chapter 11 proceedings did not list the Grupo Serla Note as an asset and thus should be estopped from asserting it in this case. Bank One also argues that the Trustee claimed for the first time in this lawsuit that Goss owned the Grupo Serla Note.

Equitable estoppel does not bar the Trustee's Claim. Debtor made numerous representations that it, in fact, owned the Grupo Serla Note. (Pl.Ex. 129, Adams Dep., 61; M. Page, 9/30/05, Test. 58; S. Guarneros, 10/5/05, Test. 89.) The Debtor was not silent on this point. Moreover, prior declarations by the Debtor are not

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

admissible against the Trustee based on privity in this case. *Matter of L & S Industries Inc.,* 989 F.2d 929 (7th Cir.1993).

**B. *Goss And The Trustee Did Not Waive Any Right To Pursue Claims Against Bank One***

[69] Bank One argues that it disclosed the sale of its right, title, and interest in the Grupo Serla Note to Goss on multiple occasions and while Goss had every chance to redeem its interests, it chose not to. Further, at no time did Goss object to Bank One's sale to Union Industrial. Therefore, Bank One argues that Goss' failure to object or redeem its interests constitutes a waiver of the Trustee's claim that Bank One's conveyance of its right, title, and interest in the Grupo Serla Note constituted unlawful acts.

While Bank One may have informed Goss of a sale involving the Grupo Serla Note, it did not provide Goss with a copy of the sale agreement. Providing Goss with a copy of the agreement could have allowed Goss to view the conditions of the sale. Bank One failed to inform the bankruptcy court or any of Goss' creditors of *590 the sale. Bank One also failed to seek modification of the automatic stay. Goss may have been given written notice of the sale to Union Industrial (eight days by fax; seven days by overnight mail) but at no point was Goss made aware that it would lose all of its rights through the Bank's sale. Thus, Goss did not knowingly waive any right to pursue claims against Bank One.

**C. *The Trustee's Claims Are Not Barred By The Doctrine Of Laches***

[70] Laches is established whenever a claimant unreasonably delays in pursuing its rights and harm is thereby caused to the other party. *Nancy's Home of the Stuffed Pizza, Inc. v. Cirrincione,* 144 Ill.App.3d 934, 98 Ill.Dec. 673, 494 N.E.2d 795, 800 (1986).

[71] Bank One argues that a laches defense was created in its favor because, despite having notice, Goss sat on its hands during the period in which Bank One transferred its right, title, and interest in the Grupo Serla Note. However, it fails to acknowledge that Goss was never informed of critical circumstances and terms surrounding the sale to Union Industrial. Goss was not informed that its rights would be lost in the transaction because Bank One failed to provide Goss a copy of the sale agreement. In addition, the sale was executed without giving notice to creditors, the bankruptcy court, or seeking relief from the automatic stay. Goss did not delay in protecting its rights, as there was no reason to suggest that Goss' rights would be lost in the sale. The Trustee's claims are thus not barred by the doctrine of laches.

Even if Goss was fully aware that it would loss all rights in the Grupo Serla Note and took no action to protect its rights upon the sale to Union Industrial, Bank One would still be found in violation of the automatic stay. In addition to protecting the debtor, the automatic stay protects creditors by preventing the dismemberment of a debtor's assets by individual creditors levying on the property, thus promoting the bankruptcy goal of equality of distribution. Collier on Bankruptcy ¶ 362.03 (15th ed. rev.2005). Because the estate possessed rights in the Grupo Serla Note, Bank One should have served and filed a motion for relief from stay seeking permission from this Court to sell the Grupo Serla Note to Union Industrial. In doing so, Bank One should have complied with Rule 4001(a) which would have required Bank One to serve notice on all creditors' committees (or all creditors listed by the Debtor if there is no committee). Fed. R. Bankr.4001(a). Providing notice is the minimum protection that can be afforded interested creditors and other parties. *See Solow v. First America Bank (In re Papa's Market Cafe, Inc.),* 162 B.R. 519, 523 (Bankr.N.D.Ill.1993). Bank One, however, failed to inform the Debtor that it would lose all rights once the sale was consummated and failed to provide notice to any other interested parties that it was selling estate property without seeking permission from this court.

**D. *Goss Did Not Fail To Mitigate Any Alleged***

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

Page 69

*Damages*

[72][73] The doctrine of avoidable consequences requires the non-breaching party in a contract case to take reasonable steps to mitigate damages after the alleged breach and prohibits that party from recovering those damages which it should have acted to prevent. *Shearson Hayden Stone, Inc. v. Leach*, 583 F.2d 367, 370 (7th Cir.1978). Under the Illinois mitigation of damages doctrine, "an injured party is not allowed to recover from a wrongdoer those damages which the party should have foreseen*591 and 'could have avoided without undue risk, burden or humiliation.' " *Grill v. Adams*, 123 Ill.App.3d 913, 79 Ill.Dec. 342, 463 N.E.2d 896, 902 (1984) (quoting Restatement (Second) of Contracts § 350(1) (1981)).

[74] Bank One argues that the Debtor and the Estate had a duty to mitigate any damages they incurred. Because the Debtor did not object to the impending sale of the Grupo Serla Note to Union Industrial, Bank One argues that Goss' inaction precludes the Trustee from prevailing for the full amount of his claim. Because Goss was not fully informed of all of the circumstances or terms surrounding the sale to Union Industrial, and had but a few days to react to the notice of sale, it cannot be held that it had a duty to mitigate damages. Therefore, Goss did not have an opportunity to mitigate damages and lacked the funds to do so because the Bank effectively interdicted the large checks prepared for Goss so that the Bank could benefit from those funds as it did.

**V. *Certain Claims By Trustee Fail***

**A. *The Trustee Is Not Entitled To Declaratory Relief***

[75] The Trustee's claim for declaratory relief is denied. Granting such relief would not serve any of the purposes of the Declaratory Judgment Act, 28 U.S.C. § 2201. *F.T.C. v. Bay Area Bus. Council, Inc.*, No. 02 C 5762, 2003 WL 21003711, at *4-5 (N.D.Ill. May 1, 2003); *Amari v. Radio Spirits, Inc.*, 219 F.Supp.2d 942,

944 (N.D.Ill.2002).

The purposes of declaratory judgments are to clarify and settle the legal relations at issue and to terminate and afford relief from uncertainty, insecurity, and controversy giving rise to the proceeding. Where the substantive suit would resolve the issues raised by the declaratory judgment action, the declaratory judgment action serves no useful purpose because the controversy has ripened and the uncertainty and anticipation of litigation are alleviated.

*Tempco Elec. Heater Corp. v. Omega Eng'g Inc.*, 819 F.2d 746, 749 (7th Cir.1987).

Because the Trustee has sued on substantive claims and because the rights and interests of the parties will be determined through resolution of those claims, declaratory relief would serve no useful purpose. *Amari v. Radio Spirits, Inc.*, 219 F.Supp.2d 942, 944 (N.D.Ill.2002).

Further, Plaintiff is not entitled to a declaratory judgment providing that Goss was the "owner" of the Grupo Serla Note when it was not. While Goss certainly possessed interests in the Grupo Serla Note by virtue of the Note Repurchase Agreement, Goss was not entitled to possession or ownership of the Grupo Serla Note until it made its further payment due of approximately $1.5 million to cure its default or provided adequate assurance that the default would be cured. Because Goss did not do so, Plaintiff is not entitled to a declaration that Goss (and now Trustee) is owner of the Grupo Serla Note.

**B. *The Trustee Has Failed To Prove His Claim For Unjust Enrichment***

[76][77] The Trustee has failed to prove a claim for unjust enrichment. The doctrine of unjust enrichment underlies a number of equitable remedies, including constructive trust. *HPI Health Care Services, Inc. v. Mt. Vernon Hosp., Inc.* 131 Ill.2d 145, 160, 137 Ill.Dec. 19,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

545 N.E.2d 672, 678 (1989). "To state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's*592 retention of that benefit violates the fundamental principles of justice, equity and good conscience." *Id.* When a plaintiff seeks to recover a benefit that was transferred to the defendant by a third party, retention of the benefit is unjust where: (1) the benefit should have been given to the plaintiff, but the third party mistakenly gave it to the defendant instead; (2) the defendant procured the benefit from the third party through some type of wrongful conduct; or (3) the plaintiff for some other reason had a better claim to the benefit than the defendant. *See Id.* and cases cited.

[78] The Trustee argues that he is entitled to a claim for unjust enrichment against the Bank based on a wrongdoing, but fails to make a clear showing of wrongdoing. The Trustee argues that Union Industrial paid $1,100,000.00 to Bank One "on the mistaken belief that Bank One owned the Grupo Serla Note."Goss did indeed have significant rights in the Grupo Serla Note, but Goss did not own the Grupo Serla Note.

The Trustee also argues that Goss had a better claim than Bank One to proceeds from sale of the Grupo Serla Note because Goss either owned the Grupo Serla Note outright (as a result of the Note Purchase Agreement) or was at least an equitable owner of a large percentage of the Grupo Serla Note when Bank One delivered and endorsed the Grupo Serla Note to Union Industrial. Thus, the Trustee argues that Bank One would be unjustly enriched by retaining the proceeds of the sale.

[79] However, Goss did not own the Grupo Serla Note at the time of the sale to Union Industrial. Goss possessed significant rights in the Grupo Serla Note as a result of its payments to Bank One and contract rights. But while Goss paid Bank One a significant amount of its repayment obligations, it did not complete its payments and therefore was not entitled to ownership and possession of the Grupo Serla Note. Thus, it has not been proved that Bank One was unjustly enriched by

retaining the proceeds of the sale. A party is not unjustly enriched when it keeps the proceeds from the sale of its own interests. *See also Interlease Aviation Investors II (Aloha) L.L.C. v. Vanguard Airlines, Inc.,* No. 02 C 4801, 2004 WL 1149397, at *11-12 (N.D.Ill. May 20, 2004) (no unjust enrichment from recovery on own claim).

[80][81] Moreover, the claim of unjust enrichment is precluded because a plaintiff cannot pursue an unjust enrichment claim when there is an enforceable, express contract between the parties. *Cromeens, Holloman, Sibert, Inc. v. AB Volvo,* 349 F.3d 376, 397 (7th Cir.2003). *See also* 42 C.J.S. Implied Contracts § 5 (May 2006). "The doctrine does not operate to rescue a party from the consequence of a bad bargain, and the enrichment of one party at the expense of the other is not unjust where it is permissible under the terms of an express contract." *Id.*

Goss and Bank One were parties to an express contract. The Note Repurchase Agreement expressly provided that Goss would not be able to obtain possession or ownership of the Grupo Serla Note until payment in full on the Note Repurchase Agreement. Goss failed to complete its repurchase obligations. Therefore, an unjust enrichment claim is precluded.

This is in no way inconsistent with the rulings herein that the Bank harmed Goss' interests and thereby violated the stay, and also that it violated its duties under U.C.C. § 9-207. Those concepts prevail, but this one does not.

## C. The Trustee Has Failed To Prove His Claim For A Constructive Trust

[82][83][84] The Trustee's request for imposition of a constructive trust on the proceeds*593 Bank One received from the sale and assignment of its interests to Union Industrial is denied. A constructive trust is one raised by operation of law. Absent coercion, duress, or

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

mistake a constructive trust is generally imposed in only two situations: (1) where actual or constructive fraud is considered as equitable grounds for raising the trust; and (2) where there is a fiduciary duty and a subsequent breach of that duty. *See, e.g., Amendola v. Bayer,* 907 F.2d 760, 762-63 (7th Cir.1990) (a constructive trust will not be imposed unless the claimant makes a showing of wrongdoing, such as fraud, breach of fiduciary duty, duress, coercion or mistake); *Davis v. Combes,* 294 F.3d 931, 936 (7th cir.2002) (same); *Bressner v. Ambroziak,* 379 F.3d 478, 483-84 (7th Cir.2004) (same).

[85][86][87] A constructive trust may also arise when duress, coercion or mistake is present. *Id.* "A constructive trust will be used to compel a party who unfairly holds a property interest or money to convey that property to the one to whom it justly belongs ..." *A.T. Kearney, Inc. v. INCA Intern., Inc.,* 132 Ill.App.3d 655, 660, 87 Ill.Dec. 798, 477 N.E.2d 1326, 1332 (1985). A party "unfairly hold[s] property" when they would be "unjustly enriched if [he] were permitted to retain such property." *Id.* (citing *Zack Co. v. Sims,* 108 Ill.App.3d 16, 63 Ill.Dec. 732, 438 N.E.2d 663 (1982)).

[88][89] The grounds for imposing a constructive trust must be so clear, convincing, strong and unequivocal as to lead to but one conclusion. *Suttles v. Vogel,* 126 Ill.2d 186, 127 Ill.Dec. 819, 533 N.E.2d 901, 904-05 (1988) (citations omitted); *see also Davis v. Combes,* 294 F.3d 931, 936-37 (7th Cir.2002). As explained by the decision in *Davis,* some form of wrongdoing is a prerequisite to the imposition of a constructive trust. The Trustee's allegations of fraud are insufficient, as the Trustee has not presented evidence that the Bank engaged in fraudulent conduct. Moreover, Bank One was clearly not a fiduciary of Goss. Further, the unjust enrichment argument and contention that Goss owned the Note when it was sold have been rejected in earlier discussions.

[90] Finally, a constructive trust cannot be imposed post bankruptcy, as any rights thereto must have been found under nonbankruptcy law prior to filing of the bankruptcy petition. *In re Davenport,* 268 B.R. 159, 163

(Bankr.N.D.Ill.2001) (citing *In re CL Furniture Galleries, Inc.,* 95 C 50103, 1995 WL 756853, at *8 (N.D.Ill.Dec.20, 1995)* (in order to prevail on theory of constructive trust, Debtor must have acquired a judicially imposed constructive trust prior to the filing of Debtor's bankruptcy petition)). The Trustee did not have a judicially imposed constructive trust as of the date of the bankruptcy filing; therefore, the imposition of a constructive trust on the proceeds from the sale is inappropriate. The Trustee's claim for the imposition of a constructive trust thus fails.

**D. *The Trustee Is Not Entitled To Proceeds Through A Resulting Trust***

[91][92][93] A resulting trust "is based upon the 'natural equity' that one who pays for property should enjoy it." *In re Estate of Koch,* 297 Ill.App.3d 786, 788, 232 Ill.Dec. 189, 697 N.E.2d 931, 933 (1998). A resulting trust is an "intent enforcing trust" which arises from the presumed intent of the parties. *In re Estate of Wilson,* 81 Ill.2d 349, 355, 43 Ill.Dec. 23, 410 N.E.2d 23, 26 (1980). "A resulting trust, unlike a constructive trust, seeks to carry out a donative intent rather than to thwart an unjust scheme. The general rule is that where a transfer of property is made to one person and the purchase price is *594 paid by another, a resulting trust arises in favor of the person by whom the purchase price is paid." *In re Crossroad Health Ministry, Inc.,* 319 B.R. 778, 780 (Bankr.D.D.C.2005) (citing Collier on Bankruptcy ¶ 541.11[3] at 541-67 (15th ed. rev.2003)); *United States v. Marx,* 844 F.2d 1303, 1309 (7th Cir.1988) (internal quotations and citations omitted).

[94][95] Under well established Illinois precedent, a resulting trust arises and vests, if at all, at the time legal title is taken by the asserted trustee. *Hanley v. Hanley,* 14 Ill.2d 566, 152 N.E.2d 879, 882 (1958). *See also In re Estate of McCormick,* 262 Ill.App.3d 163, 199 Ill.Dec. 502, 634 N.E.2d 341, 345 (1994); *Gary-Wheaton v. Meyer,* 130 Ill.App.3d 87, 85 Ill.Dec. 180, 473 N.E.2d 548, 555 (1984); *In re Sacramento Real Estate,* 201 B.R. 225, 233 (Bankr.N.D.Ill.1996). The burden of proof to establish such a trust is on the party claiming it, and the

evidence must be clear and convincing; if doubtful or susceptible to other interpretations, the evidence is insufficient to show a resulting trust. *In re Davenport*, 268 B.R. 159, 163 (Bankr.N.D.Ill.2001).

[96] The Trustee argues that because Goss owned the Grupo Serla Note when Bank One sold it, Goss was and the Trustee is now entitled to sale proceeds through imposition of a resulting trust. This claim fails.

Bank One initially paid Goss the full face amount of the Grupo Serla Note and obtained ownership of it at that time subject to Goss' interest. When Goss made its repurchase obligation payments, it was paying amounts that it owed to Bank One pursuant to the Note Purchase Agreement. As earlier discussed, it did not then own the Note.

The Trustee alternatively argues that the Note Repurchase Agreement and Repurchase Note were equivalent to a real estate installment contract, such that it would be unfair to the estate if Goss did not receive an equitable interest in return for its payments. The real estate installment analogy is not applicable to the facts in this case.

Bank One originally provided $5,370,000.00 to or on behalf of Goss for the Grupo Serla Note. Bank One extended the financing with Goss' explicit agreement that it would remain secondarily liable on the Grupo Serla Note and would pay Bank One the outstanding balance on the Grupo Serla Note in the event the makers defaulted and the credit insurer denied coverage. Accordingly, from inception of the transaction, it was agreed that the risks of nonpayment by the makers and the credit insurer would fall on Goss, not on Bank One. This risk allocation is what induced Bank One to pay Goss $5,370,000.00 for the Grupo Serla Note.

The instant case is not analogous to some hypothetical real estate installment contract in which a court might find that a buyer, who had made substantial payments was equitable owner under the doctrine of equitable conversion. *See e.g., In re Streets and Beard Farm Partnership*, 882 F.2d 233, 235 (7th Cir.1989). In the installment contract case, the seller gives the buyer nothing before the parties enter into the transaction for the buyer to purchase the real estate. The seller in that situation promises that he will convey his consideration, title to the real estate, when buyer completes making all of the payments or a designated portion thereof. If that seller were allowed to keep both the real estate and all funds paid after the buyer makes substantial but not all payments, an injustice would result, so courts may fashion the remedy that Trustee urges here.

*595 In this case, however, Bank One paid Goss $5,370,000.00 for the Grupo Serla Note, and Goss assumed the recourse obligation to repay the funds if the notemakers defaulted and the credit insurer denied coverage. Therefore, the equitable principles sometimes presented in real estate installment contract transactions are not applicable in this case.

### E. The Trustee Has Failed To Prove A Basis For Rescinding The Note Repurchase Agreement

[97][98] "[R]ecission is available only when a contract is procured by fraud or misrepresentation, when it is based on a material mistake, or in the presence of substantial non-performance or breach of contract by a party." *Home Sav. Ass'n v. State Bank of Woodstock*, 763 F.Supp. 292, 296 (N.D.Ill.1991); *Taylor v. Bob O'Connor Ford, Inc.*, No. 97 C 0720, 1998 WL 177689, at *12 (N.D.Ill. Apr.13, 1998). The Trustee argues that Bank One, through its officers and lawyers, made representations to Goss that Goss had repurchased 15% of the Grupo Serla Note, and was required to repurchase the remaining 85% of the Grupo Serla Note. In selling the Grupo Serla Note to Union Industrial, Goss argues that Bank One sold a promissory note that Goss already purchased. Thus, Goss argues Bank One did not substantially perform its contractual rights under the Note Repurchase Agreement and that agreement should be rescinded and payments thereunder returned.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

However, Bank One did substantially perform its obligations. Under the Note Repurchase Agreement and Repurchase Note, the only remaining performance required of Bank One-to endorse and return the Grupo Serla Note to Goss-was expressly conditioned on Bank One's "receipt of payment in full in immediately available funds of all amounts due and payable by the Company under or in connection with the Repurchase Note ..." (Pl.Ex. 21, Agmt. § 2.) It is undisputed that at no time before filing bankruptcy or thereafter did Goss make the final payments due under the Repurchase Note. The Trustee's assertion that Goss' delivery of the Repurchase Note to the Bank constituted immediate actual full payment to the Bank for the Grupo Serla Note is contrary to the legal presumption that a promise to pay is not to be regarded as payment, and was rejected in earlier discussions herein. As a result, Bank One never became obligated to perform under the Note Repurchase Agreement and was not required to deliver the Grupo Serla Note to Goss. _Coronet Ins. Co. v. Saez_, 151 Ill.App.3d 287, 104 Ill.Dec. 632, 502 N.E.2d 1292, 1295 (1986).

Further, because Goss itself was in default under the Note Repurchase Agreement, neither it nor its Trustee could seek to rescind the agreement. _W.H. Purcell Co. v. Sage_, 200 Ill. 342, 65 N.E. 723 (Ill.1902); 12A Ill. Law & Prac. Contracts § 375, at 216 (1983) ("A party to a contract may not take advantage of his own default to rescind the contract, nor may he rescind for breach of the contract by the other party if he himself is substantially in default.")

For these reasons, the Trustee's rescission argument fails.

**F. _The Trustee's Assertion Of Claims For Tortious Interference With Contract And Tortious Interference With Prospective Economic Advantage Following Trial Was Waived_**

[99] In the Trustee's final proposed Findings of Fact and Conclusions of Law submitted posttrial, the Trustee

argued for the first time that Bank One tortiously interfered with the Agreement in Principal *596 [sic], dated June 25, 2001, between Goss and the Foreign Defendants. (Pl.Ex. 25.) The Trustee also asserted for the first time the claim that Bank One tortiously interfered with Goss' prospective economic advantage, arguing that Goss was to collect certain monies from Quebecor stemming from sale of Grupo Serla's assets to Quebecor (the claims will be referred to hereinafter as the "Alleged Interference Claims"). Notice of these claims was not given or pleaded in the Initial Complaint or the Amended Complaint filed May 19, 2005 (only four months before trial), nor were those claims discussed in the initial Trustee's Proposed Findings of Fact and Conclusions of Law submitted pretrial in accordance with this Court's Final Pretrial Order. At no time before or after trial did the Trustee ask leave of court to plead the Alleged Interference Claim.

The Trustee now argues that Bank One's post-petition actions in violating the automatic stay interfered with the potential recovery of $2,700,000.00 for Goss. He further argues that Bank One's actions in violating the automatic stay prevented Goss from receiving $5,000,000.00 from Quebecor, and wishes to argue that this stay violation was a tortious interference with the economic expectations of Goss.

[100] Final pretrial orders are designed to prevent unfair surprise and give parties an opportunity to fairly prepare for and defend against new claims. _Gorlikowski v. Tolbert_, 52 F.3d 1439, 1443-44 (7th Cir.1995) (noting that "[b]ecause the parties rely on the pretrial conference to inform them precisely what is in controversy, the pretrial order is treated as superseding the pleadings and establishes the issues to be considered at trial."). See also _In re Craig_, No. 03 A 4341, 2004 WL 1490427, at *1-3 (Bankr.N.D.Ill. June 29, 2004) (sanctioning debtor for failing to comply with final pretrial order); _SNA Nut Co. v. Haagen-Dazs Co._, 302 F.3d 725, 732 (7th Cir.2002) (holding that "a defense not raised in a pretrial order is deemed waived").

Since the whole purpose of pretrial conferences and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

orders "is to clarify the real nature of the dispute at issue, a claim or theory not raised in the pretrial order should not be considered by the fact-finder." *Gorlikowski v. Tolbert,* 52 F.3d 1439, 1444 (7th Cir.1995). As was further noted in *SNA Nut Co. v. Haagen-Dazs Co.,* "[w]hile this result may seem harsh, pretrial orders help to prevent protracted litigation due to changing theories and arguments such as those that we are encountering in this case." 302 F.3d 725, 732 (7th Cir.2002).

This Court's Final Pretrial Order, dated November 9, 2004, stated, "Any party not filing proposed Conclusions of Law or a brief may be found to have waived legal issues not thereby presented." Pursuant to that Order, the Trustee was required to at least give notice in advance of trial all grounds for relief sought.

Therefore, the Trustee's attempt to raise these new tort claims post-trial is denied. Any other result would unfairly prejudice Bank One because it did not receive notice of such claim or have any opportunity to: (1) build legal defenses to these claims in pre-trial discovery; (2) attack these claims in its pre-trial briefs; and (3) call witnesses to rebut these claims and cross-examine Trustee's witnesses on these claims during trial.

The Trustee has not even asked for leave to amend the Complaint to add the Alleged Interference Claims. While leave to amend shall be freely given when justice so requires under Fed.R.Civ.P. 15(a), leave is inappropriate where there is undue delay, bad faith, dilatory motive on the part of the movant, repeated failure to cure **597** deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, or futility of the amendment. *Villa v. City of Chicago,* 924 F.2d 629, 632 (7th Cir.1991); *Chavez v. Illinois State Police,* 251 F.3d 612, 633 (7th Cir.2001). At any event, such leave was not even requested.

As is the case here, "[u]ndue prejudice occurs when the amendment 'brings entirely new and separate

claims'...."*In re Ameritech Corp. v. Computer Systems Solutions, Inc.,* 188 F.R.D. 280, 283 (N.D.Ill.1999). The Trustee's attempt to add the Alleged Interference Claims by final argument must not be allowed. Indeed, there is some doubt whether attempt to amend the Complaint at this time should be allowed if it were sought because the Trustee had sufficient time prior to the filing of his Final Proposed Findings of Fact and Conclusions of Law to assert these claims. *See Jones v. GES Exposition Servs., Inc.,* No. 02-6243, 2004 WL 2011396, at *6 (N.D.Ill. Sept. 7, 2004) (denying motion to amend because plaintiff's filings showed that he knew of the grounds for claims against the new proposed defendants for years, but needlessly waited). Moreover, the Trustee's tardy attempt to argue the Alleged Interference Claims after trial prejudices Bank One's ability to defend against or argue this issue. *Fort Howard Paper Co. v. Standard Havens, Inc.,* 901 F.2d 1373, 1379-80 (7th Cir.1990) (denying post-trial attempt to add defenses to Answer).

Trustee's argument is not saved by our Circuit authority on the meaning of federal notice pleading. The Federal Rules of Civil Procedure are based on the concept of notice pleading. *Duda v. Bd. of Educ. of Franklin Park Pub. Sch. Dist. No. 84,* 133 F.3d 1054, 1057 (7th Cir.1998). Under this concept, "[i]t is sufficient if the complaint adequately notifies the defendants of the nature of the cause of action." *Id.* In this case, the Trustee did not give notice that a cause of action in tort was presented or intended in his First Amended Complaint or his pre-trial proposed Findings of Fact and Conclusions of Law. There was no notice at all that the Trustee intended to assert a cause of action in tort until his post-trial Findings of Fact and Conclusions of Law. Notice of that sort following trial for the first time does not satisfy federal notice pleading standards.

## VI. *Damage Analysis*

### A. *The Appropriate Amount Of Damages Awarded In Favor Of Trustee And Against Bank One*

Trustee's recovery of damages for stay violation, for

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

Page 75

violation under U.C.C. § 9-207 and under 11 U.S.C. 549 all implicate and caused the same damages.

In this case, the Trustee proposes several possible theories for which damages may be recovered. He argues that acts by Bank One damaged Goss by the following: (1) preventing Goss from receiving $2,700,000.00 from the settlement between Goss and Grupo Serla, including preventing Goss from collecting $1,800,000.00 in two checks endorsed by Grupo Serla to Goss pursuant to that settlement; (2) preventing Goss from enforcing its security interest through the Mexican Pledge Proceedings; and (3) preventing Goss from receiving $5,000,000.00 withheld in connection with the re-sale of the Printing Press to Quebecor. The Trustee therefore seeks a money judgment against Bank One for all these computations of damages plus punitive damages and fees.

[101][102] In general, "[a] 'plaintiff has the burden of proving damages to a reasonable degree of certainty.' "*Haslund v. Simon Property Group, Inc.,* 378 F.3d 653, 658 (7th Cir.2004) (quoting *598Williams v. Board of Education,* 52 Ill.App.3d 328, 10 Ill.Dec. 161, 367 N.E.2d 549, 553 (1977)). "Damages must be proved, and not just dreamed, though 'some degree of speculation is permissible in computing damages, because reasonable doubts as to remedy ought to be resolved against the wrongdoer.' " *MindGames, Inc. v. Western Pub. Co., Inc.,* 218 F.3d 652, 658 (7th Cir.2000) (citations omitted).

[103][104] Damages cannot be based on pure speculation or guesswork, but they also need not be proven with the certainty of calculus. *BE & K Const. Co. v. Will & Grundy Counties Bldg. Trades Council,* 156 F.3d 756, 770 (7th Cir.1998). Under Illinois law, where the existence of damages is established, "the evidence need only tend to show a basis for the computation of damages with a fair degree of probability." *Medcom Holding Co. v. Baxter Travenol Laboratories, Inc.,* 106 F.3d 1388, 1398 (7th Cir.1997) (citing *In re Busse,* 124 Ill.App.3d 433, 438-39, 79 Ill.Dec. 747, 464 N.E.2d 651 (1984)).

[105] The possible theories for which damages may be recovered will be discussed below:

**1. Damages resulting from preventing Goss from receiving $2,700,000.00 from the settlement between Goss and Grupo Serla, including preventing Goss from collecting $1,800,000.00 in checks endorsed by Grupo Serla to Goss pursuant to that settlement.**

On or about June 25, 2001 Guarneros came to Chicago and executed a handwritten summary of terms for agreement with Goss ("Agreement in Principal [sic]") on behalf of his company, Grupo Serla. (Pl.Ex. 25.) The Agreement in Principal [sic] provided that "Goss will release any security interest, or retention of title or pledge upon full payment ..."*Id.*Pursuant to the Agreement in Principal [sic] Guarneros agreed to pay Goss $2,700,000.00. Guarneros testified that it was his intent to pay Goss 100% of those funds. (S.Guarneros, 10/05/05, Test. 89.) Evidence further suggests that Guarneros intended to cooperate and agree to the terms in the Agreement in Principal [sic], as Guarneros authorized Quebecor to issue two checks totaling $1,800,000.00 payable to Grupo Serla and endorsed by Grupo Serla in favor of Goss. (Pl.Ex. 57; S. Guarneros, 10/05/05, Test. 89.)

Goss, however, could not satisfy its obligations under the Agreement in Principal [sic] until it acquired the Grupo Serla Note. Goss could only obtain possession and ownership of the Grupo Serla Note upon paying Bank One $1,425,495.12, plus accrued interest. Once Goss paid Bank One the requisite amount due, it would have the ability to implement the Agreement in Principal [sic]. (Pl.Ex. 57.)

Bank One argues that the Foreign Defendants did not intend to be bound by the handwritten settlement agreement. However, even though that agreement could be said to require a more detailed documentation, Guarneros testified that he intended to pay Goss $2,700,000.00 and was able to do so. Further, checks totaling $1,800,000.00 endorsed to Goss were en route

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

to Goss. By paying Bank One the outstanding balance, Goss would have been able to fulfill its obligations under the Agreement in Principal [sic]. That is, out of the $1,800,000 it could have paid off the Bank the approximately $1,500,000 due it and then still retained $300,000 and the right to the rest of the promised $2,700,000 (amounting to another $900,000) for a net recovery of $1,200,000.

Bank One's actions prevented Goss from recovering any settlement proceeds. Instead, Goss lost the opportunity to participate in a tripartite transaction consisting *599 of itself, Bank One, and Grupo Serla which would have allowed it to realize net proceeds of $1,200,000 after paying off the Bank debt from the settlement. Bank One's actions blocked and presented that likely outcome.

The $1,200,000 thereby lost by Goss comprises damages that can be measured with reasonable certainty, plus attorneys fees and costs. A separate evidentiary hearing will be set to rule on the amount of attorney fees sought by the Trustee. This computation of $1,200,000 in damages applies to fix damages both for willful stay violation and also to measure damages for the U.C.C. § 9-207 violation by Bank One earlier discussed and for the unauthorized transfer of property interests under 11 U.S.C. § 549.[FN4]

> FN4. It could be reasoned since the Bank's claim is apparently unsecured that it would not receive the balance needed to redeem the Note but rather would be relegated to the small result of its unsecured claim in bankruptcy. That is apparently what its internal analysis apprehended. However, since Bank One owned the Note subject to Debtor's interests therein, it would be no simple matter for Debtor to obtain it so as to receive the $2.7 million being offered; litigation to force the Bank to turn it over without payment would be problematic. So the Bank held a likely blocking position unless it was first paid and Debtor's recovery of the full $2.7 million was speculative. Only a three way

deal would have produced a certain recovery of the $1.2 million for Debtor; recovery of the full $2.7 million was most unlikely and does not offer a solid basis for damages in that amount.

## 2. Damages Asserted to Result from Preventing Goss from Enforcing its Security Interest Through the Mexican Pledge Proceedings.

The Trustee argues that Bank One's actions prevented Goss from enforcing its security interest in the Mexican Pledge Proceedings. The Mexican court Judge in the Pledge Proceedings dismissed the case because Goss was unable to produce the original Grupo Serla Note. Goss, however, had no right to possess the Grupo Serla Note. Bank One owned the Grupo Serla Note and was not required to turn the Grupo Serla Note over to Goss until it was paid in full. Bank One possessed the Grupo Serla Note as a form of security, and it would make no commercial sense to have given the Grupo Serla Note to Goss in the absence of full payment of its obligations. Only if Goss had paid Bank One the full amount due and owing under the Grupo Serla Note, it would have had the opportunity to enforce it in the Mexican proceedings.

Apart from the lack of evidence or authority to suggest that Bank One had to provide Goss with the original Grupo Serla Note, evidence suggests that Bank One did cooperate with Goss in the state court litigation as Bank One and Goss filed a joint complaint against the Foreign Defendants. (Pl.Ex. 15.)

At any event, this path toward ascertaining damages is far too speculative.

## 3. Damages Asserted to result from preventing Goss from receiving $5,000,000.00 held back in connection with the resale of the Printing Press to Quebecor.

The Trustee argues that Bank One's willful violation of the automatic stay prevented Goss from receiving

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

$5,000,000.00 withheld by Quebecor in connection with the asset sale to Grupo Serla.

Bank One argues that the Trustee failed to offer proof as to the reason Quebecor ultimately decided to release the funds to Grupo Serla. However, the letter written by Kaplan of Bank One demonstrates why Quebecor ultimately decided not to release the funds to Goss-that is, Bank One had sold the Grupo Serla Note to Union Industrial.

On or about December 20, 2001 Kaplan wrote a "To Whom It May Concern" letter **600** addressed to Union Industrial stating that Bank One had sold its promissory note from Goss to Union Industrial and that the only remaining issue was the receipt of an execution copy of the note purchase agreement. (Pl.Ex. 107.) Bank One knew that in order to complete the sale with Quebecor, Grupo Serla would need the Printing Press to be free and clear of all liens. Bank One therefore negotiated the sale with Union Industrial whereby it received $1,100,000. Bank One then wrote the above "To Whom It May Concern" letter in which it acknowledged that it had sold the Grupo Serla Note to Union Industrial. Union Industrial could then forward this letter to Quebecor as evidence that the Printing Press was now free and clear of all liens and the sale could thus be consummated. The only party that did not benefit from this scheme and procedure was Goss.

However, Goss did not have possession of the Grupo Serla Note and as such, could not have released it to Quebecor. Quebecor did not enter into any agreement with Goss to pay Goss for the Printing Press. Goss could not expect any funds from Quebecor because it was not in possession of the Grupo Serla Note and did not have the cash needed to redeem the Note. Therefore, this path to computation of damages is speculative. Thus, the Trustee is not entitled to damages based on this theory.

**B. *Punitive Damages Are Appropriate***

[106][107] In determining whether an award of punitive damages is appropriate for a creditor's violation of the automatic stay, the following relevant factors may be considered: (1) the nature of the creditor's conduct; (2) the creditor's ability to pay damages; (3) the motive of the creditor; and (4) any provocation by the debtor. *In re Sumpter,* 171 B.R. 835, 845 (Bankr.N.D.Ill.1994). "Punitive damages are awarded in response to particularly egregious conduct for both punitive and deterrent purposes." *Id.*

[108] It is beyond dispute that awarding punitive damages is appropriate in certain cases to punish a wrongdoer for outrageous conduct and to deter others from engaging in similar conduct. *Hennessy v. Penril Datacomm Networks, Inc.,* 69 F.3d 1344, 1352 (7th Cir.1995). "An award of punitive damages, however, must be supported by the record and may not constitute a windfall to the prevailing party." *Id.* (citations omitted).

[109] It should be presumed that because a plaintiff has been made whole by compensatory damages, punitive damages should only be awarded if the actions of the defendant are so reprehensible to warrant further sanctions to achieve punishment or deterrence. *State Farm v. Campbell,* 538 U.S. 408, 416, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) (noting that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.").

[110] Under Illinois law, punitive damages are disfavored. *Zelinski v. Columbia,* 335 F.3d 633, 641 (7th Cir.2003) (citing *Smith v. Prime Cable of Chicago,* 276 Ill.App.3d 843, 213 Ill.Dec. 304, 658 N.E.2d 1325, 1336 (1995)). They are therefore only recoverable "where the alleged misconduct is outrageous either because the acts are done with malice or an evil motive or because they are performed with a reckless indifference toward the rights of others." *Id.*

[111] Based on the above factors and precedent,

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

punitive damages are appropriate in this case. Bank One's conduct was particularly egregious in light of the circumstances, Bank One is a sophisticated creditor with the ability to pay damages, *601 Bank One was motivated by the opportunity to gain $1,100,000 as opposed to having its claim dealt with in Goss' bankruptcy, and Bank One acted with indifference to the harm it was causing to Goss in bankruptcy.

Bank One's actions in executing the sale to Union Industrial were deliberate and intentional. It was fully aware that it was selling and delivering the Grupo Serla Note and Pledge to an entity connected to the makers. The law firm representing Union Industrial in connection with the sale was the same law firm representing Guarneros and His Companies in the DuPage Litigation and otherwise. Bank One admitted at trial that the initial offer to purchase the Grupo Serla Note and Pledge was made on behalf of the makers of the Grupo Serla Note themselves. (M.Page, 9/30/05, Test. 63-64.) Thus, Bank One knew the harm it was doing to Goss and it harmed Goss' property interest that was part of the bankruptcy estate in complete disregard of the bankruptcy stay. Sophisticated commercial entities cannot be allowed to disregard the stay and grab a slice of benefit that would otherwise go to bankruptcy creditors. This type of conduct must be deterred by a serious award in addition to damages.

Therefore, the judgments entered in favor of Trustee and against Bank One will include punitive damages in the amount of $100,000.00, an amount large enough to demonstrate the serious nature of stay violation and deter similar conduct by others.

**VII. *Editorial Comercial Breached The Contract To Sell The Printing Press By Failing To Pay For The Printing Press***

**A. *Summons Served On Foreign Defendants***

[112] On December 31, 2003 the Foreign

Defendants moved to Quash Summonses and to Dismiss Pursuant to Bankruptcy Rule 7012(b) ("Motion to Quash"). They argued that the Trustee's attempt to serve them by registered mail was insufficient under Fed.R.Civ.P. 4 and Article 10(a) of the Hague Convention. *See* Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Feb. 10, 1969, 20 U.S.T. 361, 658 U.N.T.S. 163. They also argued that the exercise of jurisdiction over certain of the Foreign Defendants was inconsistent with constitutional guarantees of due process.

On May 18, 2004, an Order was entered denying the Motion to Quash for reasons then stated from the bench. That decision was based on a Seventh Circuit opinion, *Research Systems Corp. v. IPSOS Publicite,* 276 F.3d 914 (7th Cir.2002). In *Research Systems Corp.* it was opined that the manner of service by simple certified mail is a method permitted by Article 10(a) of the Hague Convention, so long as the foreign country does not object. *Id.* at 926. In this case, the parties agreed that the Mexican government has never indicated any objection to service on its citizens by mail from a foreign country. Under that decision, *stare decisis* in this Circuit holds that service by registered mail is sufficient. Further, service by mail has long been held to meet due process requirements. *See*Fed.R.Civ.P. 5(b)(2)(B); *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 319, 70 S.Ct. 652, 94 L.Ed. 865 (1950) (noting that "the mails today are recognized as an efficient and inexpensive means of communication.").

**B. *Merits Of Contract Breach Actions***

Grupo Serla, Editorial Comercial, and Guarneros all executed or guaranteed the *602 Grupo Serla Note to obtain the Printing Press. They failed to pay for the Printing Press as required and now must pay damages to Goss.

[113] To properly prove a cause of action in breach of contract, a plaintiff must establish the following

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

Page 79

essential elements: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of the contract by the defendant; and (4) resultant injury to the plaintiff. *Gallagher Corp. v. Russ,* 309 Ill.App.3d 192, 199, 721 N.E.2d 605, 611, 242 Ill.Dec. 326, 332 (1999) (citing *Allstate Insurance Co. v. Winnebago County Fair Association Inc.,* 131 Ill.App.3d 225, 233, 86 Ill.Dec. 233, 475 N.E.2d 230 (1985)).

[114] A defendant's failure to comply with a duty imposed by the contract gives rise to the breach. *Hickox v. Bell,* 195 Ill.App.3d 976, 992, 142 Ill.Dec. 392, 552 N.E.2d 1133 (1990). In a breach of contract action, a plaintiff should prove the factual circumstances surrounding formation of the agreement, specifically, the offer, acceptance and existence of valuable consideration. *Gallagher Corp.,* 309 Ill.App.3d at 199, 242 Ill.Dec. 326, 721 N.E.2d 605.

In this case, Editorial Comercial agreed to purchase the Printing Press pursuant to the Contract To Purchase The Press. Goss delivered the Printing Press pursuant to the Contract To Purchase The Press. Grupo Serla and Editorial Comercial executed a Promissory Note for the financed portion of the purchase price. Guarneros personally guaranteed the Promissory Note. Editorial Comercial, Grupo Serla, and Guarneros failed to pay as required. Guarneros and His Companies then sold the Printing Press to a third party and kept the proceeds. Goss suffered significant damages as a result of the Foreign Defendants breach of contract through nonpayment.

The Foreign Defendants argued that the Printing Press did not deliver 45,000 impressions per hour as promised in the Purchase and Sale Agreement and Goss' pre-sale representations. However, they failed to offer expert testimony or detailed evidence to corroborate this assertion by preponderance of evidence.

Editorial Comercial also attempted to argue that the Printing Press was never accepted. However, testimony of Guarneros demonstrates that the Printing Press was used for several years. Guarneros testified as follows:

Q: At some time the Goss Universal produced commercially acceptable product, did it not?

A: Acceptable in reference to what? Directories? Magazines? Books?

Q: At least one of those, correct?

A: Yes. Very poor quality, but, yes.

(S.Guarneros, 10/5/05, Test. 44-45.)

Editorial Comercial's defense that it never accepted the Printing Press fails. The Contract To Sell The Press defines acceptance. Paragraph four of the Contract To Sell The Press states:

4. *Conformity-Acceptance Of Machinery*

a) Conformity shall mean substantial conformity of the Machinery in all material respects to the applicable descriptions, specifications and warranties of sale. Conformity shall be conclusively determined upon the occurrence of any one of the following events:

(i) Purchaser's production of saleable, commercially acceptable product in the ordinary course, subject to the printing limitations imposed on the type of printed product, supplies or *603 auxiliary equipment, or Purchaser's operating personnel ...

(Pl.Ex. 2; ST 1055.)

Guarneros testified that he took no steps to return the Printing Press. Guarneros admitted at trial that he did not request that Goss take back the Printing Press. While Guarneros attempted to argue that the Printing Press was never accepted because it was defective and did not perform as specified, it was ultimately sold as the largest single asset of the $13,000,000.00 asset sale to Quebecor, demonstrating its continued market value.

The Uniform Commercial Code also defines acceptance. U.C.C. § 2-606 provides that acceptance occurs when the buyer:

(a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

conforming or that he will take or retain them in spite of their non-conformity; or

(b) fails to make an effective rejection (subsection (1) of Section 2-602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or

(c) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

*See*810 Ill.Comp. Stat. 5/2-606 (2004).

In this case, Guarneros and His Companies used the Printing Press for four years. This allowed them ample time to inspect and reject the Printing Press prior to actually selling the same to Quebecor as the largest part of a $13,000,000 asset sale. The Printing Press was the highest valued single asset Quebecor purchased in the sale. (Pl.Ex. 23, ST 257.) These facts demonstrate that Editorial Comercial accepted the Printing Press. The Foreign Defendants claimed that the Printing Press did not deliver 45,000 impressions per hour as promised in the Purchase and Sale Agreement and based on Goss' pre-sale representations. However, the evidence and facts presented at trial demonstrate that the Printing Press was used to produce commercially acceptable products with nine or ten workers using the Printing Press for several shifts a day over a period of several years.

[115][116] When a buyer has used the goods provided by the seller, he cannot thereafter claim that he has not accepted them. *Sherwin-Williams Co. v. Mark Charcoal Co., Inc.,* No. 80 C 4541, 1985 WL 3932, at *3 (N.D.Ill. Nov.15, 1985). "The law does not permit a person to receive goods under a contract, appropriate them for his own use, and then defeat an action for the purchase price on the ground that the goods were not of the exact quality or description called for by the contract." *Foley & Co. v. Excelsior Stove & Manufacturing Co.,* 265 Ill.App. 78, 94 (1932).

[117] Under Illinois law, Guarneros and His

Companies cannot assert that they never accepted the Printing Press when they clearly exercised ownership over it and used it extensively for many years following purchase. *See, Foley & Co. v. Excelsior Stove & Manuf. Co.,* 265 Ill.App. 78, 94 (1932) (use of 8,000 catalogs of 25,000 printed constitutes acceptance of all of them); *Sherwin-Williams Co. v. Mark Charcoal Co., Inc.,* 1985 U.S. Dist. Lexis 13846, 1985 WL 3932 (N.D.Ill.1985) (holding that a buyer cannot revoke acceptance if it exercises dominion over the goods or permits them to be altered or changed while in its control). Pursuant to its contractual obligations to Goss, Editorial Comercial must now pay Goss for the Printing Press.

In connection with the Sale and Purchase Agreement, Editorial Comercial and *604 Grupo Serla executed a Promissory Note in the amount of $5,370,000.00. Guarneros personally guaranteed the debt and signed the Promissory Note as Guarantor. Guarneros and His Companies failed to pay Goss as agreed. There remains $9,724,858.50 due and owing pursuant to the Promissory Note including interest on the Note through commencement of time, plus interest accruing to date of judgment. As a result, a separate judgment will enter in favor of Plaintiff against Guarneros and His Companies jointly and severally for principal and interest due plus attorneys fees allowed by the contract papers when enforcement is required, plus costs.

The Sale and Purchase Agreement provided:

Upon an Event of Default, Seller shall provide Purchaser with written notice thereof and an opportunity to cure within a reasonable time determined by Seller and specified in such notice. Upon the failure of Purchaser to cure in accordance with Seller's demand and upon written demand by Seller, the Purchaser shall peaceably deliver possession of the Machinery to Seller, and, to the extent permitted by law, the entire contract indebtedness remaining unpaid shall become immediately due and payable. Purchaser shall reimburse Seller for its reasonable expenses incurred in the retaking, holding, preparing the Machinery for resale and the expenses relating to reselling and the like, and for the reasonable attorneys' fees and legal expenses incurred by the Seller. In addition, Seller shall have all the rights and

351 B.R. 529
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

Page 81

remedies of a seller and a secured party as established or permitted upon agreement by the Uniform Commercial Code which rights and remedies, to the extent permitted by law, shall be cumulative.

(Pl.Ex. 2, ST 1057.)

Editorial Comercial, Grupo Serla, and Guarneros failed to pay Goss amounts due under the Grupo Serla Note and the Sale and Purchase Agreement. Editorial Comercial was obligated to make payments to Goss under the Grupo Serla Note and the Sale and Purchase Agreement. Grupo Serla and Guarneros were obligated to make payments to Goss pursuant to the Grupo Serla Note. Written demand was made for payment, but not complied with.

A separate judgment will therefore enter in favor of Trustee and against Editorial Comercial, Grupo Serla, and Guarneros jointly and severally for the balance due and owing on the Grupo Serla Note plus interest accruing thereon until this trial began for a total then of $9,724,858.50 plus further contract interest to date of judgment, plus attorney fees and costs as provided for in the Sale and Purchase Agreement quoted above. A separate evidentiary hearing will be held on the amount of Trustee's attorney fees to be awarded against these Defendants apart from attorneys fees sought against the other Defendant Bank One.

## CONCLUSIONS

For reasons stated herein, Judgments will separately be entered as follows on the Trustee's First Amended Complaint:

Counts I, II, and III address Editorial Comercial, Grupo Serla, and Guarneros' failure to make payments to Goss pursuant to the Sale and Purchase Agreement, the Grupo Serla Note, and Guarneros' personal guaranty of the Grupo Serla Note. Trustee will recover judgment

against those parties as provided above on those counts, for damages plus fees and costs.

Count IV seeks a declaratory judgment which will be denied for reasons stated.

Count V seeks imposition of a constructive trust and other relief against all Defendants*605 which will be denied pursuant to reasons stated.

Count VI seeks rescission of the December 15, 2000 Agreement which will be denied pursuant to reasons stated.

Judgment will therefore be entered on Counts IV, V and VI in favor of Defendants.

Count VII seeks recovery declaring that transfer of the Note by Bank One was void, pursuant to 11 U.S.C. § 549, but while the Note transfer was not void the transfer of Goss interests in the Note is void and damages of $1,200,000 will be awarded. The same damages are awarded because Bank One violates its duty to Goss under U.S.C. § 9-207 as adopted in Illinois.

Count VIII seeks recovery against Bank One in the form of damages based on Bank One's willful violation of the automatic stay. Pursuant to Bank One's willful violation of the automatic stay and for reasons stated, judgment will separately enter in favor of Trustee and against Bank One for $1,200,000 in actual damages, plus $100,000.00 in punitive damages, plus attorney fees and costs. The amount of fees to be awarded (allocated separate from fees awarded against the Foreign Defendants) will be determined by this Court at a later evidentiary hearing.

Pursuant to these Findings of Fact and Conclusions of Law, and separate order this date, this case is set for status to consider Trustee's requests for attorneys fees

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

351 B.R. 529                                                                    Page 82
351 B.R. 529, 60 UCC Rep.Serv.2d 1133
(Cite as: 351 B.R. 529)

and proposed draft judgment orders against Foreign
Defendants under Counts I, II, and III, for judgment in
favor of Defendants under Counts IV, V, and VI, and for
judgment order against Bank One under Counts VII and
VIII and to consider requests for fees against it.

All costs will be sought by Bills of Costs separately
allocated between the Mexican Defendants and Bank
One and noticed before the Court for approval and
allowance.

Bkrtcy.N.D.Ill.,2006.
In re GGSI Liquidation Inc.
351 B.R. 529, 60 UCC Rep.Serv.2d 1133

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.


**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | Chapter 7 |
| | ) | Bankruptcy No. 03 B 21620 |
| ANTHONY FIELDS, | ) | Judge Manuel Barbosa |
| | ) | |
| Debtor, | ) | |
| _____ | ) | |
| CHARLES J. MYLER, not individually but | ) | Adversary No. 04 A 00189 |
| solely as trustee, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | |
| ANTHONY FIELDS, RALPH BOOKER, | ) | |
| VERNON WILLIAMS, VERNON | ) | |
| WILLIAMS ARCHITECTS, P.C., | ) | |
| LAKEVIEW REAL ESTATE DEVELOP- | ) | |
| MENT CO., and PARKWAY BANK, | ) | |
| | ) | |
| Defendants. | ) | |

**VERNON WILLIAMS AND VERNON WILLIAMS ARCHITECTS, P.C.'S
RESPONSE TO THE TRUSTEE'S STATEMENT OF
UNCONTESTED MATERIAL FACTS**

Vernon Williams ("Williams") and Vernon Williams Architects, P.C. ("VWA") by and

through their attorneys respond to the Trustee's Statement of Uncontested Material Facts ("Trustee's

Facts") as follows:

**GENERAL OBJECTION**

Williams and VWA object to the Trustee's Facts because they fail to comply with Local Rule

7056-1 of the United States Bankruptcy Court for the Northern District of Illinois. Specifically, the

Trustee's Facts are not supported by "specific references to the affidavits, parts of the record, and

other supporting materials relied upon to support the facts set forth." Local Rule 7056-1B.

Accordingly, Williams and VWA move to have each of the Trustee's Facts stricken. This General Objection applies to each of the responses below.

## RESPONSES AND SPECIFIC OBJECTIONS

1.      On or before January 1, 2000, and at all times thereafter, Debtor, Anthony Fields was and remains the sole owner of certain real property commonly known as 900, 914-916 and 920-924 East Oakdale, Chicago, Cook County, Illinois.

**RESPONSE**: Without waiving the General Objection, Williams and VWA have no basis to dispute the Trustee's Fact # 1.

2.      Debtor, Anthony Fields, filed his Chapter 11 Bankruptcy Petition on June 15, 2003, which was converted to a Chapter 7 proceeding on August 27, 2003.

**RESPONSE**: Without waiving the General Objection, Williams and VWA admit that the Debtor's bankruptcy petition was converted to a Chapter 7 proceeding on August 27, 2003. Williams and VWA deny the remainder of the Trustee's Fact #2. See Affidavit of Vernon Williams, ¶ 13.

3.      A Letter of Appointment appointing Trustee to this case was filed on September 8, 2003.

**RESPONSE**: Without waiving the General Objection, Williams and VWA have no basis to dispute the Trustee's Fact #3.

4.      Debtor's Estate is comprised of, among other things, 900, 914-916 and 920-924 East Oakdale, Chicago, Cook County, Illinois.

**RESPONSE**: Without waiving the General Objection, Williams and VWA admit the Trustee's Fact # 4.

2

5.     On June 10, 2002, Claimant recorded with the Cook County Recorder of Deeds an Architect's Mechanic's Lien Claim as Document No. 0020043287 (the "Mechanic's Lien") against 900, 914-9 16 and 920-924 East Oakdale, Chicago, Cook County, Illinois.

**RESPONSE**: Without waiving the General Objection, Williams and VWA deny that VWA's Architect's Notice and Claim for Lien was filed on June 10, 2002. The correct date is January 10, 2002. See the Affidavit of Vernon Williams, ¶ 10. Williams and VWA admit the remainder of the Trustee's Fact #5.

6.     Vernon Williams Architects, P.C. filed a proof of claim against Debtor for the sums sought through the Mechanic's Lien on January 13, 2004.

**RESPONSE**: Without waiving the General Objection, Williams and VWA admit the Trustee's Fact #6.

7.     Vernon Williams Architects, P.C.'s Mechanic's Lien does not identify the owner of the Property, Fields.

**RESPONSE**: Without waiving the General Objection, Williams and VWA admit that the Debtor Anthony Fields is not identified by name in the Architect's Notice and Claim for Lien. Williams and VWA deny the remainder of the Trustee's Fact #7. See copy of Lien, attached to the Affidavit of Vernon Williams as Exhibit 2.

8.     Vernon Williams Architects, P.C.'s Mechanic's Lien does not identify the owner of 900, 914-916 and 920-924 East Oakdale, Chicago, Cook County, Illinois.

**RESPONSE**: Without waiving the General Objection, Williams and VWA deny the Trustee's Fact #8. See copy of Lien, attached to the Affidavit of Vernon Williams as Exhibit 2.

3

9.     Vernon Williams Architects, P.C. has never served the owner of 900, 914-916 and 920-924 East Oakdale, Chicago, Cook County, Illinois with a copy of its Mechanic's Lien.

**RESPONSE:** In addition to the General Objection, Williams and VWA object on the basis of foundation as the Trustee has no basis for this statement. Without waiving any objections, Williams and VWA deny the Trustee's Fact # 9. See copy of the Lien attached to the Affidavit of Vernon Williams as Exhibit 2, and note that it was served at the home address of the Debtor, Anthony Fields.

10.     Vernon Williams Architects, P,C,'s Mechanic's Lien does not identify describe 914-916 East Oakdale, Chicago, Cook County, Illinois.

**RESPONSE:** Without waiving the General Objection, Williams and VWA deny the Trustee's Fact #10. See Affidavit of Vernon Williams, ¶ 8 and Exhibit 2.

Respectfully submitted,

**VERNON WILLIAMS and VERNON WILLIAMS ARCHITECTS, P.C.**

s/Ronald Austin, Jr.

Ronald Austin, Jr.
**BROTHERS & THOMPSON, P.C.**
100 West Monroe Street, Suite 1700
Chicago, Illinois 60603
(312) 372-2909
ra2law@cs.com

4

## CERTIFICATE OF SERVICE

The undersigned certifies that on February 21, 2008, he caused VERNON WILLIAMS AND

VERNON WILLIAMS ARCHITECTS, P.C.'S RESPONSE TO THE TRUSTEE'S STATEMENT

OF UNCONTESTED MATERIAL FACTS to be served on all counsel of record via the Court's

electronic filing system.

s/ Ronald Austin, Jr.
Ronald Austin, Jr.
BROTHERS & THOMPSON, P.C.
100 W. Monroe Street, Suite 1700
Chicago, Illinois 60603
(312) 372-2909
ra2law@cs.com

Order Form (01/2005)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Manuel Barbosa | DATE: | June 19, 2008 |
|---|---|---|---|
| **CASE NUMBER** | 03B21620 | **ADVERSARY NUMBER** | 04A00189 |
| **CASE TITLE** | Charles J. Myler, Trustee v. Anthony Fields, et al. | | |

**DOCKET ENTRY TEXT:**

Defendant's Motion for Summary Judgment is granted.

■[ For further details see text below.]

## STATEMENT

This matter comes before the Court on the motion of defendant, Vernon Williams and Vernon Williams Architects, P.C. for summary judgment. The motion is brought pursuant to Federal Rule of Bankruptcy Procedure 7056 and Federal Rule of Civil Procedure 56 on the complaint filed by the trustee on February 5, 2004 wherein the trustee challenges the validity of the defendant architect's notice and claim for lien. The parties have complied with applicable local rules as well as the briefing schedule entered pursuant to order of this court. Oral argument was heard on April 10, 2008.

The relevant facts are not in dispute. The defendant is a licensed architect and the owner of Vernon Williams Architects, P.C. On December 1, 1999, the defendant entered into a contract with the debtor to perform architectural services for an entity owned by the debtor known as Lakeview Real Estate Development Co. The defendant provided debtor with architectural services from December 10, 1999 through June 21, 2001. It is defendant's further contention that he submitted invoices to the debtor for his work performed up through June of 2003 and to date has only received a $5,000 retainer. On May 15, 2003, the debtor filed bankruptcy under Chapter 11 and on June 10, 2003, the debtor filed an adversary complaint against Williams and Vernon Williams Architects seeking to invalidate the mechanics lien filed by the latter.

On or about June 30, 2003, the debtor filed a motion for summary judgment relative to his adversary complaint and said motion was denied after hearing. A trial date on the debtor's adversary complaint was set for August 27, 2003. On that trial date, the debtor informed the Court he was not prepared to proceed to trial and the case was dismissed for want of prosecution. On the same date, the Court converted debtor's Chapter 11 case to a Chapter 7 case. On February 5, 2004, Charles J. Myler, the Chapter 7 trustee assigned to this case, filed an adversary complaint against defendant challenging the validity of defendant's claim for lien. The defendants have filed

## STATEMENT

an answer and affirmative defense to the complaint alleging as a first affirmative defense that the trustee's adversary claim is barred by the doctrine of res judicata.

A motion for summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure and its made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7056. Rule 56(c) reads in relevant part:

"The judgment sought should be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law". Summary judgment is designed to avoid unnecessary trials when there are no genuine issues of material fact in dispute between the parties. Farries v. Stanadyne, 832 F.3d 374, 378 (7th Cir. 1987). The burden is on the movant to show that there is no genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 US 242 (1986).

## DISCUSSION

Both parties agree in their argument and in their submission of authorities with the well-established elements necessary for res judicata. The doctrine is intended to avoid the relitigation of matters which have been decided by a court of competent jurisdiction and ensures the finality of decisions by barring relitigation of claims in matters that have been raised or could have been raised in an earlier proceeding. D&K Properties Crystal Lake v. Mutual Life Insurance Co., 112 F.3d 257, 259 (7th Cir. 1997). The three elements of res judicata are: (1) an identity of causes of action; (2) an identity of parties or their privies; and (3) a final judgment on the merits. The parties agree that the bankruptcy court's dismissal for want of prosecution constitutes a final judgment for purposes of this motion.

### A. IDENTITY OF CAUSES OF ACTION

Both parties agree that the Seventh Circuit determines identity of causes of action using the "same transaction test". Under this test, a claim has identity with a previous claim where both claims arise from a single core of operative facts. Both parties cite In re National Industrial Chemical Co. 237 B.R. 437, 441 (Bankr. N.D. Ill. 1999) among other cases for the proposition that two claims are one for purposes of res judicata if they are based on the same, or nearly the same factual allegations.

The trustee argues that the mechanics lien challenge made by the debtor is distinct and based upon different facts than that made by the trustee. The trustee argues that his challenge is different from the debtors in that the debtor used two specific grounds: (1) that the defendant's mechanics lien is defective because the work performed by the defendants was not authorized by the owners of the parcels or by the owners' recognized agent; and (2) that the defendant did not provide services which resulted in improvements to those parcels. The trustee points out that his action seeks to have the mechanics lien deemed void as a matter of law because (1) the lien was not perfected against one of the parcels and (2) it misidentifies the owner of three of the parcels and was never served upon the owner. Thus, it is trustee's argument that while the petition and the trustee's motion both attack the validity of the mechanics lien, the facts and legal theories are not similar and thus not identical.

### B. Identity of Parties

The trustee further argues that there is no identity of parties in the debtor's complaint and the trustee's adversary action. The trustee points out that in this case, the Chapter 7 trustee was not appointed until the same day in which the case was converted to a Chapter 7 and that retention of counsel was not approved until a month and a half after the debtor's complaint against the

## STATEMENT

defendant was dismissed. The Trustee cites authority for the proposition that privity in a res judicata case involves a person so identified in interest with another that he represents the same legal right regardless of whether that person is a formal party of record. In re Wilcher, 56 B.R. 428, 429 (Bankr. N.D. Ill. 1985). The aforesaid case, cited in an opinion written by Judge Schmetterer goes on to state, "such identification of interest can be shown by two sets of circumstances which are relevant here: the interests of a person are placed before the Court by one authorized to sue or defend on his behalf, or, a person with an interest in the outcome controls or shares control of a suit by another." Williams v. Steffan, 122 B.R. 987 (Bankr. N.D. Ill. 1991). Clearly, the element of control was not present here on the part of the trustee since his special counsel or counsel was not appointed until a month and a half after the initial litigation was concluded. However, the movant correctly points out that the control language upon which the trustee relies taken from Judge Schmetterer's opinion in the case of In re GGSI Liquidation, Inc. (Paloian v. Grupo Serla) at 351 B.R. 529 ( Bankr. N.D. Ill. 2006) was taken from the Fifth Circuit case of Benson and Ford, Inc. v. Wanda Petroleum Co., 833 F.2d 1172 (5th Cir. 1987). In that case, it is clear that the element of control is identified simply as one of three alternate means by which privity can be found to have been created in a case between parties. Thus, the absence of control is hardly fatal to the finding of res judicata. It is clear by virtue of the code that the trustee steps into the shoes of the debtor and acquires no greater rights than the debtor has as of the time of filing.

The Benson case further reiterates that a non-party who has succeeded to a party's interest in property is bound by any prior judgments against that party. Privity is also found when there is an identity of interests in the litigation and those interests are adequately represented. The trustee and the debtor both have the same interest and motivation in avoiding the claim of the defendant in this case. Adequate representation does not mean successful or even good representation, but merely that the parties were motivated by the same pecuniary interest and took appropriate action to protect that interest. This court concludes that the identity of the parties element has been satisfied.

With respect to the identity of causes of action, this court concludes that both the debtor's adversary as well as trustee's adversary complaint arise from a single core of operative facts. Both complaints seek to invalidate the claim for lien that is based on architectural services performed by the defendant. The fact that the trustee and the debtor have chosen different legal arguments to advance in their complaints does not alter the fact that they arise out of the same transaction as contemplated in the same transaction test articulated by the Seventh Circuit in the In re National Industrial Chemical Co. Case. Further that case makes it clear that a mere change in legal theory does not create a new cause of action for purposes of res judicata and additionally, the doctrine bars relitigation of claims that were or could have been raised in the earlier proceeding. It is clear that the legal theory advanced by the trustee could have been raised in the earlier proceeding brought by the debtor.

Accordingly, this Court finds that the requisite elements of res judicata are present and that the movant is entitled to summary judgment. Defendant's Motion for Summary Judgment is granted.

**JUN 1 9 2008**

_____

MANUEL BARBOSA,

## UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| IN RE: | ) | Chapter 7 |
|  | ) | Bankruptcy No. 03 B 21620 |
| ANTHONY FIELDS, | ) | Judge Manuel Barbosa |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |
| CHARLES J. MYLER, not individually, | ) |  |
| but solely as trustee, | ) |  |
|  | ) |  |
| Plaintiff, | ) | Adversary No. 04 A 00189 |
|  | ) |  |
| vs. | ) |  |
|  | ) |  |
| ANTHONY FIELDS, RALPH BOOKER, | ) |  |
| VERNON WILLIAMS, VERNON | ) |  |
| WILLIAMS ARCHITECTS, P.C. | ) |  |
| LAKEVIEW REAL ESTATE DEVELOP- | ) |  |
| MENT CO., and PARKWAY BANK, | ) |  |
|  | ) |  |
| Defendants. | ) |  |

### NOTICE OF APPEAL

CHARLES J. MYLER, Trustee/Plaintiff, by and through his attorneys, Charles J. Myler, Richard G. Larsen and Myler, Ruddy & McTavish, appeals under 28 U.S.C. § 158(a) from the Final Order of the U.S. Bankruptcy Court, Northern District of Illinois, Eastern Division, granting defendant, Vernon Williams, Motion for Summary Judgment, entered in this adversary proceeding on the 30th day of June, 2008.

The party to the Final Order appealed from and the names of his attorneys are as follows:

Charles J. Myler, Trustee, 105 E. Galena Blvd., 8th Floor, Aurora, IL 60505

Richard G. Larsen, Myler, Ruddy & McTavish, 105 E. Galena Blvd., 8th Floor, Aurora, IL 60505

**DATED:**      July 9, 2008

/s/ Charles J. Myler
Charles J. Myler, Trustee in Bankruptcy

Charles J. Myler, #2008602
Richard G. Larsen #6193054
Attorneys for Trustee
**Myler, Ruddy & McTavish**
105 E. Galena Blvd., 8th Floor
Aurora, Illinois  60505
(630) 897-8475, (630) 897-8076 Fax